**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
LEAD CASE NO. 04-21448-CIV-GOLD/TURNOFF
CONSOLIDATED WITH CASE NO: 04-22072-CIV-GOLD/TURNOFF AND
CASE NO: 05-20663-CIV-GOLD/TURNOFF**

|  |  |  |
|---|---|---|
| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, a federally-recognized Indian Tribe, | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 04-CV-21448-GOLD/TURNOFF** |
| **v. UNITED STATES OF AMERICA, THE ENVIRONMENTAL PROTECTION AGENCY; STEPHEN L. JOHNSON, Acting Administrator of the EPA;[1] JIMMY PALMER, Regional Administrator of the EPA, Region IV** | ) ) ) ) ) ) ) | **Miccosukee Tribe's Third Amended Complaint** |
| **Defendants,** | ) ) | |

The Plaintiff, the Miccosukee Tribe of Indians of Florida, files this Third Amended Complaint seeking relief in the nature of declaratory and injunctive relief under the Administrative Procedures Act for violations of the Federal Water Pollution Control Act ("Clean Water Act") and the Administrative Procedure Act.[2]

## FEDERAL ISSUES IN DISPUTE

1. This is a civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et. seq.*, which governs judicial review of agency action.

2. In Count I, Plaintiff disputes Defendants' agency action deciding that the State of Florida's 2003 amendments to the "Everglades Forever Act" ("EFA") embodied in section 373.4592,

---

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Stephen L. Johnson is automatically substituted as a co-defendant, in place of Michael O. Leavitt.

[2] This Third Amended Complaint is filed with permission of the Court, as reflected in the Court Order of May 23, 2006 (DE 139).

Florida Statutes, do not constitute a change to Florida's water quality standards for the Everglades

Protection Area. The agency action as reflected in Defendant EPA's November 5, 2003, decision

document, is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with

law.  APA, 5 U.S.C. § 706.

3.  In Count II, the Tribe challenges the Defendants' agency action in converting the

moderating provisions contained in Section 6 of the Phosphorus Rule (which among other things

changed the December 31, 2006 compliance deadline previously approved by EPA) into a de facto

variance policy, and the agency's approval of such a variance policy without following the procedure

required by law, contrary to the Clean Water Act and its implementing regulations.

4.  In Count III, Plaintiff challenges Defendants' agency actions in the form of a segmented

review of the State of Florida's Phosphorus Rule, F.A.C. 62-302.540, ("Phosphorus Rule"), and their

conclusions that selected sections of the Rule did not constitute a change to Florida's water quality

standards, and that those sections that constituted a change are in compliance with the Clean Water

Act and its implementing regulations.  The Defendant EPA's January 24, 2005, July 27, 2005, May

8, 2006, and May 31, 2006 EPA decision documents are arbitrary and capricious, an abuse of

discretion and otherwise not in accordance with law.  APA, 5 U.S.C. § 706.

**PLAINTIFF**

5.  The Miccosukee Tribe of Indians of Florida (the "Tribe") is a federally recognized Indian

Tribe whose members reside, work, and recreate within the Florida Everglades and are directly and

adversely affected by the Amended EFA, the Phosphorus Rule, and their implementation by the State

of Florida, as a result of Defendants' arbitrary and capricious conduct and  failure to enforce the

provisions of the Clean Water Act in their review of the Amended EFA, the Phosphorus Rule.

6. The Tribe and its members have resided in the Florida Everglades for generations and have a substantial interest in this litigation. Plaintiff has a special interest in the protection of the entire Everglades by ensuring that water quality standards established comply with the Clean Water Act, including but not limited to water quality standards established for waters being discharged into the Tribe's traditional Everglades homeland, and the meeting of compliance deadlines, because discharges of polluted phosphorus laden water are harmful to the natural state of the Everglades and where members of the Tribe continue to reside, work, and recreate.

7. The Tribe's landed interests in the Everglades include a Federal Indian Reservation; a perpetual lease for use and access to substantial portions of Water Conservation Area 3A; the Miccosukee Reserved Area on the border of Everglades National Park; and aboriginal and customary use and occupancy rights in Everglades National Park and the Big Cypress National Preserve. The Tribe and its members depend upon the environmental preservation of these areas for their entire culture and way of life, and have a fundamental, substantial interest in preserving these areas as viable natural ecological systems.

8. The alteration of the natural state of the Everglades as a result of water discharges containing excessive nutrients and pollutants, and the permanent destruction of the Everglades as a unique natural ecosystem, including imbalances in natural flora and fauna, seriously threatens the entire culture and way of life of the Tribe and its members, their traditional base of subsistence, their commercial activities, recreational activities, their religious practices, and the natural resources of the Everglades (including the land, flora and fauna living on the land, and the natural water flow)

3

on which these activities depend.

9. Among the subsistence and recreational activities of the Tribe and its members are hunting, fishing, frogging, commercial air-boating, subsistence agriculture, as well as gathering of native plant material in the Everglades. The members of the Miccosukee Tribe are the only residents of the Everglades.

10. Nutrients and pollutants that cause degradation of water quality are received and absorbed by the lands and waters of the Everglades. The absorption of the nutrients in the Everglades lands and waters, which is causing the degradation in water quality, is occurring not only in plant materials, but also in the soils, causing permanent and irreparable damage to the Everglades.

11. Degradation of Everglades water quality directly threatens the very existence of the Tribe and its members, their economy, their religion, their recreation, and their entire culture and way of life.

12. Plaintiff's Tribal members, as the sole residents and users of the Everglades who have a unique cultural and historical tie to it, are directly affected and have sustained, and will continue to sustain, damage from excessive levels of nutrients permitted to flow into the Everglades.

## DEFENDANTS

13. The United States of America ("United States") is the government of the United States, which may be named as a defendant and against which equitable relief may be entered under 33 U.S.C. § 1365(a)(1), and against which declaratory judgment and injunctive relief may be entered pursuant to 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57 and 65(a).

14. The Environmental Protection Agency ("EPA") is an agency of the United States that

4

may be named as a defendant and against whom equitable relief may be entered under 33 U.S.C. § 1365 (a)(1) and against which declaratory judgment and injunctive relief may be entered pursuant to 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57, and 65(a).

15. Stephen L. Johnson is the acting Administrator of the Environmental Protection Agency and may be named as a defendant under 33 U.S.C. § 1365(a)(1) and (2) and is a person against whom declaratory judgment and injunctive relief may be entered pursuant to 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57, and 65(a).

16. Jimmy Palmer is the EPA Regional Administrator for Region IV and may be named as a defendant under 33 U.S.C. § 1365(a)(1) and (2) and is a person against whom declaratory judgment and injunctive relief may be entered pursuant to 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57, and 65(a).

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1362 (civil actions brought by federally recognized Indian Tribes wherein matter in controversy arises under the Constitution, laws, or treaties of the United States); 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff); and under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et. seq.

18. The declaratory relief requested is authorized pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706. Injunctive relief is authorized by 33 U.S.C. § 1365 (a) and 5 U.S.C. § 706. Further necessary and proper relief is authorized by 28 U.S.C. § 2202.

19. Venue is proper in this district under 28 U.S.C. § 1391(b) because this claim arose in the Southern District of Florida; and under 28 U.S.C. § 1391(e) because it is a civil action against the United States, its agencies and/or officers or employees of those agencies acting in their official capacities.

## GENERAL ALLEGATIONS

20. The Federal Water Pollution Control Act, commonly known as the Clean Water Act, as amended, 33 U.S.C. §§ 1251 to 1387, is a comprehensive water quality statute enacted by Congress to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The Clean Water Act seeks to attain water quality that provides for the protection and propagation of fish, shellfish, and wildlife.

21. The Clean Water Act requires the adoption of water quality criteria as part of water quality standards that will fully protect the designated use of the entire water body.

22. The Clean Water Act allows revisions of water quality standards only if such revisions are subject to, and consistent with, the anti-degradation policy of the Act.

23. The Clean Water Act requires that when a state revises or adopts a new water quality standard, such revised or new standard shall be submitted to the Administrator of EPA for review and approval.

24. The Clean Water Act requires water quality standards to protect the public health or welfare, enhance the quality of water, and serve the purposes of the Clean Water Act.

25. Water quality standards must be established based on water quality based treatment controls and strategies, not technology based levels of treatment.

6

26. The Clean Water Act requires the state to notice and hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards.

27. The State of Florida, its agency, the Department of Environmental Protection ("DEP") and its statutory component, the Environmental Regulation Commission ("ERC"), have set narrative water quality criteria for all classes of waters in Florida, providing that man-induced nutrient enrichment shall be considered degradation and prohibiting nutrient-induced imbalances in natural populations of aquatic flora and fauna.

28. Among the State of Florida's existing narrative water quality criteria are FAC 62-302.530(48)(b) which requires that in no case shall nutrient concentrations of a body of water be altered so as to cause an imbalance in the natural populations of aquatic flora or fauna; and FAC 62-302.530(48)(a) which defines man-induced nutrient enrichment as degradation and requires that the discharge of nutrients continue to be limited to prevent violations of other standards contained in the chapter. Other provisions require that substances in concentrations that result in the dominance of nuisance species shall not be allowed and that to ensure biological integrity, the Shannon Weaver diversity index of benthic macroinvertebrates shall not be reduced to less than 75% of established background levels.

29. The Everglades Protection Area is defined under Florida law as Water Conservation Area 1 or the Arthur R. Marshall Loxahatchee National Wildlife Refuge, Water Conservation Area 2A, Water Conservation Area 2B, Water Conservation Area 3A, Water Conservation Area 3B, and Everglades National Park.  Fla. Stat. § 373.4592(2)(I).   The State of Florida does not have

jurisdiction over the Tribe's federal Indian Reservation and/or the Miccosukee Reserved Area, which are not located within the Everglades Protection Area .

30.  Everglades National Park and the Arthur R. Marshall Loxahatchee National Wildlife Refuge ("Loxahatchee") are designated as Outstanding Florida Waters under section 62-302.700 of the Florida Administrative Code, which gives these areas additional special protection.

31.  The Everglades Protection Area is categorized as a Class III water body. The designated use of Class III waters includes recreation, propagation and maintenance of a healthy, well-balanced population of fish and wildlife. The relevant supporting water quality criteria for Class III designated uses are contained in Florida Administrative Code section 62-302.500 (Surface Waters: Minimum Criteria, General Criteria) and section 62-302.530 (Table: Surface Water Quality Criteria). The criterion of particular concern in the Everglades is the Class III nutrient criteria for nutrients with the primary nutrient of concern being phosphorus.

**The Everglades Forever Act**

32.  The Everglades Forever Act, §  373.4592, Florida Statutes, was signed into law and became effective in 1994 ("1994 EFA").  The Everglades Forever Act applies to the Everglades Protection Area, which is designated as a Class III water body.

33.  On June 21, 1994, shortly after the 1994 EFA became law, the Tribe sent the EPA a 60 day letter notifying the EPA that the 1994 EFA changed Florida's water quality standards because it allowed discharges of phosphorus above the level that caused an imbalance of flora and fauna to continue until December 31, 2006; that it violated the Clean Water Act's anti-degradation standards; and that Florida had failed to submit the EFA to the EPA for review as required by the Clean Water

Act.

34. On September 15, 1994, the EPA sent DEP a copy of the Tribe's allegations and by letter dated October 31, 1994, DEP responded to the EPA informing them that the State did not consider the EFA to constitute a change in water quality standards under the Clean Water Act.

35. Without having conducted a proper section 303(c) review required under the Clean Water Act and requested by the Tribe, the EPA agreed with the State that the EFA did not constitute a change in standards in a letter dated April 12, 1995.

36. Four weeks prior to the EPA's April 12, 1995 letter, the Miccosukee Tribe of Indians filed a federal lawsuit substantially similar to the present action against the same federal Defendants claiming that the 1994 EFA had changed Florida's water quality standards and that the Defendants had failed to comply with its non-discretionary duty under the Clean Water Act to review these new State water quality standards. Case No. 95-9533-CIV-Davis (S.D. Fla.) The federal lawsuit was brought under the citizen suit provision of the Clean Water Act seeking to compel the EPA to perform its nondiscretionary duty pursuant to section 303(c) of the Clean Water Act to review and disapprove of the 1994 EFA as a change in State water quality standards; to require EPA to force Florida to initiate notice and public hearings on the change; and to find the 1994 EFA in violation of the anti-degradation requirements of the Act.

37. On July 26, 1995, the Federal District Court granted the Defendants' motion to dismiss the case and found that the EFA had not changed water quality standards and that EPA had no mandatory duty to review the Act.

38. The Eleventh Circuit Court of Appeals reversed the District Court's dismissal on

February 10, 1997 and held that the lower Court should not have relied on the State's representations that the Act did not change the standards. *Miccosukee Tribe of Indians of Florida v. United States*, 105 F.3d 599 (11th Cir. 1997). The Court of Appeals remanded with instructions that the District Court conduct its own factual findings to determine whether the EFA changed water quality standards.

39.  On September 30, 1997, following the remand, the EPA announced its intention to review the 1994 EFA pursuant to section 303(c) of the Clean Water Act. The EPA held a public meeting on November 19, 1997, and the public comment period was held open until November 28, 1997. The Tribe presented public comments on the issue, stating that the 1994 EFA was a change in water quality standards.

40. On January 30, 1998, the EPA issued its determination on its review conducted pursuant to section 303(c) of the Clean Water Act, finding that the 1994 EFA did not change the State's water quality standards.

41.  On September 11, 1998, the District Court issued an Order on the Tribe's Complaint, finding the Defendant EPA's determination that the 1994 EFA was not a change in water quality standards under the Clean Water Act to be arbitrary and capricious, and remanded it back to the EPA with the directive to review the 1994 EFA as a change to Florida's water quality standards and to approve or disapprove the change, as required by the Clean Water Act.

42.  Upon remand from the Eleventh Circuit, the EPA conducted another review of the EFA as a change in water quality standards pursuant to section 303(c) of the Clean Water Act and issued a determination, dated September 15, 1999, approving the changes. The EPA found that the

unprecedented twelve year schedule in the 1994 EFA was a compliance schedule and stated that the acceptability and reasonableness of the twelve year schedule was based on the condition that the December 31, 2006 deadline for the phosphorus criterion would be met. The EPA concluded that Florida's narrative criterion for nutrients, as amended by the 1994 EFA compliance schedule, met the requirements of the Clean Water Act.

43. In a subsequent related case, Friends of the Everglades sued the EPA claiming that the 1999 EPA determination was arbitrary and capricious. Case No. 00-935-CIV-Seitz/Garber. Based upon the EPA's repeated emphasis that Florida must meet the December 31, 2006 compliance deadline, the District Court upheld the EPA's administrative determination that the 1994 EFA was in compliance with the legislative requirements of the Clean Water Act and was, accordingly, a lawful administrative implementation of that Act.

**The Amended Everglades Forever Act**

44. In 2003, the Florida legislature amended the Everglades Forever Act with Senate Bill 626, enacted on May 20, 2003, and Senate Bill 54A, enacted on July 1, 2003 (collectively, the "Amended EFA"). The Amended EFA, among other things, eliminated the 2006 compliance deadline and established a substantial change in the State's water quality standards for the Everglades Protection Area.

45. The Amended EFA was passed, notwithstanding the EPA's administrative imposition of the 2006 compliance deadline in the 1994 EFA, and despite the District Court's Order sustaining the 1994 EFA based upon that deadline.

46. The EPA has a non-discretionary duty to review the Amended EFA and approve or

disapprove the changes to the water quality standards.

47. This non-discretionary duty included a review under the Clean Water Act of the changes established by the Amended EFA as a new administrative implementation; to determine under the doctrine of administrative res judicata whether the changes were lawfully based upon either (1) a material change in factual circumstances in the physical environment warranting a change, or (2) a material strengthening of the existing standards to improve water quality, and, if so, to approve or disapprove those changes to the State's water quality standards.

48. Pursuant to section 303(c)(2)(A) of the Clean Water Act, states electing to establish their own water quality standards, must submit all new or revised standards to EPA for approval or disapproval. Under section (303)(c)(3), EPA must either approve or disapprove these standards within 60 or 90 days, respectively, of their submittal.

49. In enacting the amendments to the 1994 EFA, the State of Florida once again changed its water quality standards by authorizing moderating provisions that allow harmful discharges of nutrients into the Everglades Protection Area to continue for an extended period of time, and violate the narrative and numeric criteria for phosphorus until at least 2016, and will continue to cause an imbalance in the natural populations of flora and fauna.

50. The Amended EFA, among other things, replaced the deadline in the 1994 EFA, which required that all waters being discharged to the Everglades Protection Area must meet the numeric phosphorus criterion, by December 31, 2006, with a requirement only to implement the pre-2006 projects and strategies of the Long Term Plan, defined in the Amended EFA, by December 31, 2006. The Amended EFA has thus substituted the requirement that the phosphorus criterion must be met

in waters being discharged to the Everglades Protection Area by 2006 with a mere requirement that a plan for meeting the criterion at some future time be in place by 2006.

51. The Amended EFA states that the Long Term Plan will be implemented for an initial thirteen year phase (2003-2016), and contemplates another ten year second phase (until 2026), and does not require the achievement of the numeric or narrative phosphorus criterion.

52. The Amended EFA authorizes permits that violate the Clean Water Act.

53. The Amended EFA allows landowners and permittees, who are not in compliance by December 31, 2006, to discharge in excess of both the numeric criterion and narrative criterion for phosphorus for at least an additional ten years in violation of the Clean Water Act and in direct contradiction to both the Defendant EPA's prior administrative determination and the District Court's prior order that the 2006 compliance deadline would be met under the 1994 EFA.

54. The Long Term Plan authorized by the Amended EFA reduces enforcement of water quality based standards to technologically based limitations that will allow continued degradation in violation of established water quality standards.

55. By authorizing moderating provisions that replace or supplant the narrative criterion by allowing discharges of water that will violate the narrative and numeric criteria for phosphorus until at least 2016, the Amended EFA represents a *de facto* suspension of water quality standards and a moratorium on water quality enforcement through 2016; changes Florida's water quality standards; and violates the Clean Water Act, including its anti-degradation requirements.

56. By creating impacted and unimpacted areas of Class III waters in the Everglades Protection Area, the Amended EFA improperly established two subcategories of designated use for

the Everglades in violation of the Clean Water Act.

57.  By authorizing moderating provisions that allow discharges into unimpacted areas that will cause an imbalance of flora and fauna, the Amended EFA violates the Clean Water Act and its anti-degradation requirements and fails to provide water of sufficient quality to fully protect the existing designated uses of the entire water body.

58.  As a result of this change in water quality standards, excessive nutrients and pollutants will continue to be discharged into the waters of the Everglades for extended periods of time, thereby violating the existing narrative nutrient water quality criterion.

59.  The Clean Water Act states that a water quality standard may be revised only if such revision is subject to, and consistent with, the anti-degradation policy established by the Act. By not making a determination that the Amended EFA is inconsistent with the Clean Water Act, the EPA has authorized continued degradation of water quality in violation of the Clean Water Act.

60.  The Amended EFA requires the wholesale approval of technology based limitations which replace and/or nullify water quality based effluent standards and allow continued pollution in violation of the narrative phosphorus  water quality criterion and the requirements of the Clean Water Act.

61.  Under 40 CFR § 131.20(c), the State of Florida is required to notify the EPA of any revision to water quality standards within 30 days of the final state action to adopt and certify the revised standard.  That requirement applies to the passage of the Amended EFA.

62.  The State failed to notify the administrator of the EPA, as required by 33 U.S.C. § 1313(c), that by amending the 1994 EFA, the State has in effect changed water quality standards.

14

63. Defendants are required to review these changes in Florida's water quality standards and can only allow the change to the water quality standards if such changes are consistent with the anti-degradation policy established under the Clean Water Act.

64. Defendants have failed to require the State of Florida to comply with the requirements of the Clean Water Act and applicable federal regulations.

65. Defendants have failed to find that the Amended EFA is a change in Florida's water quality standards, and to disapprove such changes, as required by the Clean Water Act.

66. Plaintiff notified EPA by letter dated June 3, 2003, of the revision in water quality standards caused by the amendment of the 1994 EFA and of the State of Florida's failure to comply with the procedures for review and revision of water quality standards. Plaintiff also notified the State of Florida and its officials.  The letter notified the Administrator of the EPA that the amendment of the 1994 EFA effectively changed Florida's water quality standards, and that these changes violated the anti-degradation requirements of the Clean Water Act.  The letter was notice to Defendants that they had 60 days to compel the State of Florida to comply with the procedures for revision and review of water quality standards prescribed in section 303(c) of the Clean Water Act, the regulations in 40 C.F.R. § 131.20, and with the anti-degradation requirements of the Clean Water Act.  In the alternative, the notice was intended to allow the State of Florida to cure its violations within 60 days as required by 33 U.S.C. § 1365(b).

67. On July 1, 2003, the EPA, through James D. Giattana, Director of the Water Management Division, Region 4, responded to the Plaintiff's notification.

68.  In further response to the Tribe's 60 day letter, on November 5, 2003, the EPA

15

considered the amendments to the 1994 EFA enacted May 20, 2003, and July 1, 2003, through a perfunctory analysis and decided that the Amended EFA does not constitute at this time, new or revised water quality standards and, therefore, is not subject to approval or disapproval under section 303(c) of the Clean Water Act.

69. Any negative change in water quality brought about by the Amended EFA and Defendants' arbitrary and capricious decision that the Amended EFA does not constitute a change in water quality standards  under the Clean Water Act, or a change to the December 31, 2006 compliance deadline, results in injury to the Tribe which has an interest in the Everglades for spiritual, aesthetic, conservation, recreational, economic, religious and cultural reasons.

**The Phosphorus Rule**

70. The 1994 version of the Everglades Forever Act mandated that the State Department of Environmental Protection ("DEP") establish a numeric phosphorus criterion that numerically interpreted the existing narrative criterion by rule.  The EFA stated: "By December 31, 2001, the department [of Environmental Protection] shall file a notice of rulemaking in the Florida Administrative Weekly to establish a phosphorus criterion in the Everglades."  Fla. Stat. § 373.4592(4)(e)(2) (1994).

71. The 2003 Amended Everglades Forever Act mandated that DEP adopt a numeric phosphorus criterion by rule and required that, "[i]n no case shall such phosphorus criterion allow water in the Everglades Protection Area to be altered so as to cause an imbalance in the natural populations of aquatic flora and fauna." Fla. Stat. § 373.4592(4)(e)(2).

72. On December 28, 2001, DEP noticed its first proposed phosphorus rule, which contained

only a proposed numeric phosphorus criterion and did not contain other provisions, such as moderating provisions and permitting, which were later adopted as part of the rule.

73. DEP, through the Environmental Regulation Commission ("ERC"), held hearings and adopted Rules 62-302.540 and 62-302.530 on July 8, 2003.

74. The DEP published its Notice of Change to Rules 62-302.530 and 62-302.540 on July 18, 2003 and a second Notice of Change to Rule 62- 302.540 on July 25, 2003.

75. On June 25, 2004, the State's Joint Administrative Procedures Committee certified Rule No. 62-302.540. The effective date of this revision to Rule 62-302.540 was July 15, 2004.

76. Because the EPA disapproved Subsection 4(c)(1) of the State's Rule 62-302.540 adopted on July 15, 2004, the State of Florida published a Notice of Proposed Rulemaking on March 11, 2005, amending Subsections 4(c), 4(d) and 5(c). The Environmental Regulation Commission adopted the proposed amendments on April 7, 2005.

77. The amendments to Subsections 4(c), 4(d) and 5(c) of Rule 62-302.540 were filed with Florida's Secretary of State on May 5, 2005, with an effective date of May 25, 2005 . The term "Phosphorus Rule" or "Rule" in this Second Amended Complaint refers to Rule 62-302.540 as amended with the revisions to Subsections 4(c), 4(d), and 5(c), unless otherwise specified or chronologically inapplicable.

78. The Phosphorus Rule adopted by the state of Florida on June 25, 2004, and amended on May 5, 2005, entitled, "Water Quality Standards for Phosphorus Within the Everglades Protection Area," constitutes a change in Florida water quality standards.

79. Defendants are required to review the Phosphorus Rule as a whole a change in Florida's

water quality standards and can only allow such change if it is consistent with the Clean Water Act and its implementing regulations.

80.  The Tribe sent a letter to the EPA on September 16, 2003, and a second letter on November 19, 2004, telling the Administrator that it must review and disapprove the Phosphorus Rule as a change to water quality standards.  The letter notified the Administrator of the EPA that the Phosphorus Rule effectively changed Florida's water quality standards, and that these changes violated the anti-degradation requirements of the Clean Water Act.  The letter was notice to Defendants that if they failed to act within the time period set forth by statute to review the Phosphorus Rule, that the Tribe would file a lawsuit compelling them to do so.

81. The Phosphorus Rule adopted by the state of Florida is contrary to the Clean Water Act.

82.  The "net improvement moderating provision" in the Phosphorus Rule is available for certain discharges to the Everglades Protection Area and allows discharges of water that do not meet the phosphorus criterion through at least December 31, 2016.

83.  The "hydropattern restoration moderating provision" in the Phosphorus Rule is available for certain discharges to the Everglades Protection Area and allows discharges of water to unimpacted areas that do not meet the phosphorus criterion through at least December 31, 2016.

84.  The Long Term Compliance Permit requirements for phosphorus discharges contained in the Phosphorus Rule allows discharges based on Technology Based Effluent Limitations ("TBELs"), as established through Best Available Phosphorus Reduction Technology ("BAPRT"), and the Phosphorus Rule deems discharges to be in compliance with water quality standards if they comply with the moderating provisions contained in the Rule, regardless of the discharge level of

phosphorus.

85. The Rule states that permits shall not require water quality based effluent limitations through 2016, but instead shall include only technology based effluent limitations.

86. As a result of the change in water quality standards contained in the Phosphorus Rule, excessive nutrients and pollutants will continue to be discharged into the waters of the Everglades Protection Area for extended periods of time, thereby violating and/or amending both the existing narrative and numeric phosphorus criterion.

87. The EPA had a non-discretionary duty to conduct a section 303(c) review, within a set time frame, of the entire Phosphorus Rule, and all of the new water quality standards for the Everglades Protection Area contained therein, to determine whether they comply with the purposes of the Clean Water Act, and to require the State to follow the procedural requirements under the Clean Water Act and its implementing regulations, including holding a public hearing for the purpose of reviewing, modifying, or adopting all of the changes in the State of Florida's water quality standards contained in the Phosphorus Rule. The EPA did not review the Phosphorus Rule in a timely manner as required.

88. Under 40 C.F.R. § 131.20(c), the State of Florida was required to notify the EPA of any revision to water quality standards within 30 days of the final state action to adopt and certify the revised standard as set forth in the Phosphorus Rule, but did not do so.

89. On January 12, 2005, long after the 30 day requirement had passed, the State finally notified the EPA administrator that it had adopted the Phosphorus Rule, but contended that only certain sections of the Rule should be reviewed by EPA as a change in water quality standards.

90. The Clean Water Act requires that revised and/or new water quality standards must protect the public health or welfare, enhance the quality of water, and serve the purposes of the Clean Water Act.

91. The EPA reviewed only those portions of the Phosphorus Rule that the State of Florida contended were subject to review, rather than reviewing the entire Rule at that time.

92. On January 24, 2005, less than two weeks after the State submitted its letter requesting review of only selected portions of the Phosphorus Rule, and after the time limit required under the Clean Water Act for review by the EPA, the EPA issued a Determination.

93. The January 24, 2005 EPA Determination ("January 2005 EPA Determination") approved the selected portions of the Phosphorus Rule that were submitted, except for Subsection 4(c)(1), which EPA did not approve because it was unable to conclude that this Section was protective of the designated use of the entire Loxahatchee National Wildlife Refuge.

94. On May 5, 2005, the State of Florida officially adopted amendments to Subsections 4(c), 4(d), and 5(c) of the Phosphorus Rule, making the four-part test for determining achievement of the numeric phosphorus criterion for WCA 2 and WCA 3 applicable to the Loxahatchee National Wildlife Refuge (WCA 1). The State of Florida submitted the revisions to Subsections 4(c) and 4(d) to the EPA for review on June 3, 2005.

95. On July 27, 2005, the EPA issued a Determination ("July 2005 EPA Determination") approving the State of Florida's revisions to Subsections 4(c) and 4(d) of the Phosphorus Rule, which adopted the four-part test for determining achievement of the numeric phosphorus criterion, for Loxahatchee as being consistent with the Clean Water Act. Technically, the EPA stated that it

was "withdrawing the Agency's January 24, 2005, action not to approve subparagraph (4)(c)(1) Rule

62-302.540 F.A.C."

96. The July 2005 EPA Determination did not review the revisions to Subsection 5(c) of the

Phosphorus Rule adopted by the State of Florida, which deleted language that stated that discharges

from Loxahatchee National Wildlife Refuge must not result in a violation of the concentration limits

established for the Refuge in Appendix B of the Settlement Agreement.

97. On May 6, 2006, after the Court issued a February 16, 2006, Order stating its intention

to hold an evidentiary hearing on whether the EPA had reviewed Sections (1) (2) and (5) of the

Phosphorus Rule, which the Tribe had contended in its Complaint the agency had not, the State

finally presented Sections (1), (2) and (5) to the EPA for review.

98. On May 8, 2006, the EPA issued a "Determination," which segmented the review of

Section 5 of the Phosphorus Rule into subsections, and found that Subsection (5)(d) was a new or

revised water quality standard, but that the previously unreviewed Sections (1), (2), and Subsections

(5)(a), 5(b), and 5(c) did not constitute new or revised water quality standards.

99. On May 31, 2006, the EPA issued its "Determination Regarding Phosphorus Rule

Subsection 5(d)," concluding that Subsection (5)(d) is consistent with the requirements of the Clean

Water Act and approving it.

100. The Phosphorus Rule does not contain the word "variance," was never publicly noticed

as containing a variance or variance policy, and neither the State of Florida, nor the EPA, ever

conducted hearings on a variance or any change in and/or temporary removal of a designated or

21

existing use.

101. Neither the State of Florida nor the EPA conducted the required use attainability analysis as part of the Phosphorus Rule process or the variance policy approval process.

102. The EPA Determinations approved the moderating provisions in the Phosphorus Rule as a variance policy, even though the State did not properly notice the Rule as containing either a variance or variance policy, the State did not request approval of either a variance or variance policy, and the Phosphorus Rule itself does not contain a section concerning a variance or a variance policy.

103. The EPA Determinations recognize that any specific implementation procedure for a particular numeric criterion must be consistent with 40 C.F.R. § 131.11, which requires states to adopt a water quality criteria protective of the designated use of the entire water body, but then conversely admits that some of the areas currently considered unimpacted may become impacted through the use of moderating provisions.

104. At the time that the EPA issued its January 24, 2005 Determination, the State of Florida had not established a monitoring network that would ensure attainment of the phosphorus criterion for the entire water body for WCA 2, WCA 3 or Everglades National Park. The State's proposal in the June 25, 2004 version of the Phosphorus Rule that the monitoring network for Loxahatchee Wildlife Refuge would be the 14 stations identified in the Settlement Agreement was rejected by the EPA as not protective of the entire marsh for Loxahatchee.

105. At the time of the adoption of the May 5, 2005 version of the Phosphorus Rule and the June 2005 EPA Determination, the State of Florida had not established a monitoring network that would ensure attainment of the phosphorus criterion for the entire water body.

106.   The Phosphorus Rule fails to provide water of sufficient quality to protect the designated and/or existing uses, creates subcategories of use, and takes, removes and/or degrades the existing use.

107.   The Phosphorus Rule improperly changes and/or extends the December 31, 2006, compliance deadline previously established by the EPA that requires waters delivered to the Everglades Protection Area to comply with the phosphorus criterion and other state water quality standards until at least 2016.

108.   The Phosphorus Rule does not properly interpret and will violate the narrative nutrient criterion for phosphorus, which mandates that nutrient concentrations not cause an imbalance of natural populations of aquatic flora and fauna.

109.   The Phosphorus Rule contains moderating provisions that amend the existing phosphorus criterion for nutrients and that *de facto* modify the anti-degradation policy by allowing the continued discharge of harmful nutrients into the Everglades Protection Area for an extended period of time with water that will continue to cause an imbalance in the natural populations of flora and fauna.

110.   The moderating provisions and long term compliance permit provisions in the Phosphorus Rule establish a *de facto* moratorium on enforcing the phosphorus criterion, and neutralize and/or amend the phosphorus criterion, by agreeing, under certain conditions, to suspend enforcement for discharges into the Everglades Protection Area until at least 2016, and by authorizing permits that are not consistent with the Clean Water Act and its implementing regulations.

111. The Phosphorus Rule authorizes the use of technology based effluent limitations, rather than water quality based standards, for discharges to the Everglades Protection Area that will allow continued degradation in violation of established water quality standards and anti-degradation requirements.

112. The Miccosukee Tribe is a downstream water user, as that term is used in the Clean Water Act and its regulations.

113. The EPA must ensure that the water quality standards established by the State of Florida do not adversely impact the Tribe, a downstream user's, water quality standards.

114. In 1999, the EPA approved the Tribe's water quality standards for its Federal Reservations lands under the Clean Water Act, including a numeric criterion for phosphorus, which EPA concluded was protective, but not overly protective, of the Everglades and scientifically defensible.

115. Under the Clean Water Act and its implementing regulations, the changes to the State's water quality standards contained in the Phosphorus Rule must result in the attainment and maintenance of the downstream water user's standards.

116. The January 2005 EPA Determination acknowledges that the State's method for determining the achievement of compliance with the phosphorus criterion is different than the Tribe's.

117. The EPA did not conduct, nor require the State to conduct, the analysis necessary to meet the obligation under the Clean Water Act to ensure that the State's new water quality standards contained in the Phosphorus Rule would result in the attainment and maintenance of the Tribe's

water quality standards.

118.  At the time of the January 2005 EPA Determination, the State of Florida had no monitoring network in place to monitor its water north of Tribal lands to ensure the attainment and maintenance of the Tribe's downstream water quality standards.

## COUNT I

### Violations of the APA Concerning the Everglades Forever Act

119.  Plaintiff realleges and incorporates by reference paragraphs 1 through 118 above.

120. Defendants' decision reflected in its November 5, 2003 document that the Amended EFA does not constitute a change in water quality standards is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706.

121.  The Amended Everglades Forever Act effectively changed the State's water quality standards for the Everglades Protection Area, including the December 31, 2006 compliance deadline previously approved by the EPA.

122.  The Amended EFA imposes a *de facto* moratorium on enforcement of the narrative water quality standards until the year 2016, and thereby legislatively authorizes continuing violations of the State's narrative and numeric criteria for phosphorus and other nutrients and fails to protect the designated uses of the entire water body.

123. The Amended EFA is a new or revised water quality standard that allows excessive levels of nutrients and pollutants to be discharged into the Everglades and fails to take into consideration the public water supplies, propagation of fish and wildlife, or the damage to the

recreational, agricultural and other uses of the Everglades as required by the Clean Water Act.

124. By authorizing technology based levels of treatment for extended periods of time, which do not have to comply with the water quality based standard, the Amended EFA allows continued degradation of the water body in violation of the Clean Water Act.

125. The EPA had a duty to conduct a section 303(c) review of the newly enacted standards in the Amended EFA to determine whether they comply with the purposes of the Clean Water Act and to require the State to follow the procedure requirements under the Clean Water Act and its regulations, including holding a public hearings for the purpose of reviewing, modifying or adopting these changes in water quality standards for the Everglades, but failed to do so.

126. The Clean Water Act requires that revised or new water quality standards protect the public health or welfare, enhance the quality of water, and serve the purposes of the Clean Water Act. The Defendants' conclusion that the Amended EFA does not constitute a change in water quality standards is arbitrary and capricious and contrary to this requirement.

127. By participating in the implementation of the Clean Water Act, the State of Florida has submitted its enacted water quality standards to be part of federal administrative implementation of the Clean Water Act and subject to federal administrative law.

128. Under the Clean Water Act and federal administrative law, the function of EPA in reviewing Florida's Amended EFA is not a rule-making function but, rather, an adjudicatory one of reviewing another governmental authority's decision to determine whether that decision conforms

26

to law.

129. Under established principles of administrative law, the EPA's determination that the 2006 compliance deadline of the 1994 EFA was reasonable and necessary for Florida's water quality standards to comply with the Clean Water Act constituted an administrative adjudication by that agency, which was based upon proper review procedures and a fully litigated evidentiary record; accordingly that EPA ruling is a final agency action governed by the doctrine of administrative res judicata.

130. Pursuant to the doctrine of administrative res judicata, EPA's review of the Amended EFA was arbitrary and capricious and contrary to law because it failed to determine, as it had with the 1994 EFA, that the Amended EFA was a change in water quality standards and to determine that such change was warranted either (A) by a change in environmental circumstances in the Everglades Protection Area; or, (B) by the implementation of more stringent water quality standards than were contained in the original EFA.

131. There are no changes in the physical environment of the Everglades Protection Area that would warrant EPA's decision to not find that the Amended EFA was a change in Florida's water quality standards, as implemented by the EPA's prior administrative approval of the changes to the water quality standards rendered by the 1994 EFA and as sanctioned by the District Court Order confirming that administrative action. EPA's failure to do so is arbitrary and capricious and contrary to law.

132. The Amended EFA results in a lowering of the water quality standards; changes the December 31 2006, compliance deadline administratively and judicially established under the changes to the water quality standards rendered by the 1994 EFA; and allows continued degradation of the Everglades in violation of the Clean Water Act. Accordingly, the doctrine of administrative res judicata precludes EPA from finding that the Amended EFA does not change water quality standards as a matter of law.

133. Due to Defendants' knowing and conscious failure to comply with, and enforce, the requirements of the Clean Water Act and the APA, Plaintiff has suffered legal wrongs because of agency action and is adversely affected and aggrieved by agency action within the meaning of the Administrative Procedure Act, 5.U.S.C. 702.

**WHEREFORE**, Plaintiff requests that the Court declare and order that:

a) The Amended EFA is a change in the State of Florida's water quality standards;

b) Defendants' agency action defined in the document that determined that the Amended EFA is not a change in the State of Florida's water quality standards is arbitrary and capricious, an abuse of discretion, not in accordance with law and the Clean Water Act, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA;

c) The issue be remanded back to the agency with directions to review the Amended EFA as a change to the State's water quality standards, as the Clean Water Act and its implementing regulations require, consistent with the above findings and declarations;

d) Defendants' failure to conduct the review required under section 303(c) of the Clean Water

Act of the Amended EFA as a change in water quality standards, including requiring the State to hold public hearings and follow the procedures of the Clean Water Act and its regulations, is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. 706;

e) Defendants be required to enforce the Clean Water Act and compel the State to comply with the requirements of the Clean Water Act, including submittal of the required documents to the EPA, public notice, public hearings and a public comment period to review the modification and/or change to the State's water quality standards by the Amended EFA;

f) The EPA's declaration that the Amended EFA does not constitute a change to the State of Florida's water quality standards in light of its prior administrative determination concerning the 1994 EFA, including its approval of a December 31, 2006, compliance deadline that was sanctioned by the District Court Order confirming that administrative action, is arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law within the meaning of the APA;

g) The Court retains jurisdiction with respect to EPA's review of the Amended EFA;

h) Award Plaintiff litigation costs, including reasonable attorney and expert witness fees;

I) Order such other and further relief as the Court deems just and proper.

## COUNT II

**Violations of the APA Concerning EPA's Approval of a Variance or Variance Policy**

134. The Plaintiff realleges and incorporates by reference paragraphs 1 though 133 above.

135. Section 6 of the Phosphorus Rule contains "moderating provisions," which are not a proper variance or variance policy, but instead constitute a change in water quality standards that (a) constitutes a *de facto* change to the compliance schedule for meeting the phosphorus criterion that was previously approved by the EPA; (b) amounts to a *de facto* moratorium on enforcement by agreeing, under certain conditions, not to enforce the existing phosphorus criterion; and (c) constitutes a *de facto* modification of Florida's anti-degradation policy by allowing the continued discharge of pollution into the Everglades Protection Area until at least 2016.

136. The EPA improperly characterized Section 6 of the Phosphorus Rule as setting forth "general variance procedures" and approved it as consistent with the requirements of 40 C.F.R. §131.10, and thereby effectively approved the Long Term Plan and BAPRT without a proper analysis or public notice.

137. The Phosphorus Rule, including Section 6, does not contain the terms variance, variance policy or general variance procedure, was not publicly noticed as a variance, variance policy or general variance procedure, nor did the State of Florida request approval of a variance, variance policy or general variance procedure.

138. Section 5 of the Phosphorus Rule, contains Long Term Compliance Permits that deems discharges to be in compliance with water quality standards through at least 2016, as long as the permittee implements the moderating provisions contained in Section 6 of the Rule.

139. Section 6 of the Phosphorus Rule prohibits water quality based effluent limitations through 2016 and beyond, regardless of the discharge and its effect on the receiving water body.

140. By approving the moderating provisions as a variance policy, and approving the use of

such a variance policy for permits, the EPA arbitrarily and capriciously approved the removal of an existing and/or designated use, which constitutes a taking of a use contrary to the Clean Water Act and its implementing regulations.

141. The EPA acted contrary to the APA, in an arbitrary and capricious manner, abused its discretion, and acted otherwise not in accordance with law, in excess of statutory authority and without observance of procedure required by law, by converting the moderating provisions contained in Section 6 of the Phosphorus Rule into a variance policy, which was never publicly noticed as part of the Rule or submitted for review by the State, and by approving the variance policy without requiring the State to meet the requirements of the Clean Water Act and its implementing regulations.

142. The EPA acted contrary to the APA, in an arbitrary and capricious manner by converting the moderating provision in Section 6 of the State's Phosphorus Rule into a variance and/or variance policy and approving it without following the procedure required by law.

143. The EPA did not conduct, or require the State to follow the procedures or conduct the proper analysis necessary to determine whether Section 6 of the Phosphorus Rule could be construed as a variance or variance policy under 40 C.F.R. § 131.13 and 40 C.F.R. § 131.10.

144. The EPA did not require the State to publicly notice the moderating provisions as a variance or variance policy, and neither the State nor EPA held a public hearing as required under the Clean Water Act and its implementing regulations.

145. The EPA had a non-discretionary duty to require the State of Florida to adhere to the Clean Water Act and its implementing regulations, including those that require public notice and

31

comment, and the production of a use attainability analysis, when seeking a variance or removal of an existing and/or designated use.

146. The EPA did not require the State of Florida to publicly notice and hold hearings on a variance and/or variance policy, including such use in permits, or prepare the analysis required for a variance and/or variance policy.

147. The EPA failed to require the State to comply with the requirements and procedures of the Clean Water Act and its regulations.

**WHEREFORE**, Plaintiff requests the Court to:

a) Declare that the EPA acted in an arbitrary and capricious manner, abused its discretion and acted otherwise not in accordance of law, as set forth in the APA, by converting the moderating provisions in the Phosphorus Rule into a variance policy and approving the moderating provisions as a variance policy contrary to the requirements of the Clean Water Act and its implementing regulations; and that the Court remand this issue to the EPA for a determination consistent with these findings;

b) Declare that the EPA acted in an arbitrary and capricious manner, abused its discretion and acted otherwise not in accordance of law, by failing to force the State to follow the proper procedure for analyzing and noticing a variance, including the holding of a public hearing, as required under the Clean Water Act and its implementing regulations;

c) Declare that the EPA acted in an arbitrary and capricious manner and contrary to law by declaring that the moderating provisions in Section 6 of the Phosphorus Rule could be approved as a variance policy and that such approval does not change the December 31, 2006, compliance

deadline previously approved by EPA;

d) Declare that the EPA acted in an arbitrary and capricious manner, and contrary to law, by approving moderating provisions in Section 6 of the Phosphorus Rule as a variance policy, as well as the use of such variance policy in the permits in Section 5, that do not comply with the Clean Water Act;

e) Award Plaintiff litigation costs, including reasonable attorney and expert witness fees; and

f) Order such other and further relief, as the Court deems just.

## COUNT III

### Violations of the APA Concerning the Phosphorus Rule

148. Plaintiff realleges and incorporates by reference paragraphs 1 through 147 above.

149. Florida's Phosphorus Rule entitled "Water Quality Standards for Phosphorus Within the Everglades Protection Area," on its face changed the State's water quality standards for the Everglades Protection Area and is in violation of the requirements of the Clean Water Act and its implementing regulations.

150. The EPA's failure to review the Phosphorus Rule as a whole, and its segmented determinations that certain sections and/or subsections of the Rule are consistent with the Clean Water Act, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA.

151. The EPA' segmentation of the Rule for review and its determinations that find that Sections 1, 2, and Subsections 5(a), 5(b) and 5 (c) of the Phosphorus Rule are not a change in water quality standards are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law, in violation of the APA.

152. Some examples of how the Phosphorus Rule is contrary to the Clean Water Act and its implementing regulations are set forth in paragraphs 153 through 163 below, any one of which demonstrates that the Defendants acted in an arbitrary and capricious manner, abused their discretion, or acted otherwise not in accordance with law as defined by the APA.

153. The Phosphorus Rule does not ensure that the State's change in water quality standards will result in the attainment and maintenance of the Water Quality Standards of the Miccosukee Tribe, the downstream water user, as required by the Clean Water Act and its implementing regulations

154. Section 4 of the Rule, which contains the numeric phosphorus criterion and its achievement methodology, will allow violations of the narrative phosphorus criterion, which mandates no imbalance in the natural populations of aquatic flora and fauna in the Everglades Protection Area, and will not protect the entire water body.

155. The compliance methodology in the Rule is not consistent with the Clean Water Act, is not scientifically defensible, and will allow violations of the narrative criterion.

156. The data screening methodology in Section 4 of the Rule is not scientifically defensible and will allow violations of the phosphorus criterion.

157. The moderating provisions in Section 6 of the Rule will replace or supplant the phosphorus criterion and will allow the continued discharge of water that does not meet the phosphorus criterion in the Everglades Protection until at least 2016, thereby violating the anti-degradation requirements of the Clean Water Act.

158. The moderating provisions in the Rule change the December 31, 2006 compliance schedule deadline previously approved by EPA for meeting the phosphorus criterion to at least 2016, and amounts to a *de facto* moratorium on its enforcement by agreeing, under certain conditions, not to enforce the existing phosphorus criterion; and is a *de facto* modification of Florida's anti-degradation policy by allowing the continued discharge of harmful nutrient pollution into the Everglades Protection Area for extended periods of time.

159. The Phosphorus Rule improperly establishes two subcategories of use for Class III waters in the Everglades Protection Area, dividing the waters into "impacted" and "unimpacted" areas, which is contrary to the Clean Water Act and its implementing regulations.

160. The Phosphorus Rule authorizes a hydropattern restoration moderating provision that allows discharges that do not meet the phosphorus criterion into unimpacted areas that will not provide water of sufficient quality to fully protected the existing use of the water body, which EPA acknowledges will result in an increase of impacted areas, and thereby allows the taking of an existing use.

161. The Phosphorus Rule authorizes technology based effluent limitations, which replace and/or nullify water quality standards, including the phosphorus criterion, and will allow continued degradation of the Everglades Protection Area with water that does not meet the phosphorus criterion until at least December 31, 2016.

162. The Phosphorus Rule contains Long Term Permit requirements in Section 5 that contain no enforceable water quality based discharge limits through 2016; that constitute a *de facto* new compliance schedule for the phosphorus criterion and/or amend the criterion by agreeing, under

certain conditions, to suspend enforcement on discharges into the Everglades Protection Area; and that *de facto* modify Florida's anti-degradation policy by allowing the continued discharge of nutrient pollution for an extended period of time.

163. The new water quality standards established by the Phosphorus Rule allows excessive levels of nutrients and pollutants to be discharged into the Everglades for an extended period of time, and fails to take into consideration the public water supplies, propagation of fish and wildlife, or the damage to the recreational, agricultural and other uses of the Everglades as required by the Clean Water Act.

164. The Clean Water Act requires that revised or new water quality standards protect the public health or welfare, enhance the quality of water, and serve the purposes of the Clean Water Act. The EPA Determinations on the Phosphorus Rule are contrary to this requirement. Set forth in paragraphs 165 to 177 are some examples of how the EPA Determinations are contrary to the Clean Water Act, any one of which is sufficient to demonstrate that Defendants acted in an arbitrary and capricious manner, abused their discretion, or acted otherwise not in accordance with law, as defined by the APA.

165. The EPA's May 8, 2006 Determination which segments review of the Phosphorus Rule into sections and subsections and concludes that Sections (1), (2) and Subsections (5)(a), (b) and (c) are not new or revised water quality standards is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, as defined by the APA.

166. The EPA's May 31, 2006 Determination that segments review of the Phosphorus Rule, as well as Section 5, and concludes that Subsection (5)(d) is consistent with the requirements of the

36

Clean Water Act by failing to conduct a proper review of whether the Phosphorus Rule, including Subsection 5(d), changes the December 31, 2006 compliance deadline to at least 2016, is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, as defined by the APA.

167. Defendants' determination that the designated use of the entire water body will be protected, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706.

168. Defendants' January 2005 EPA Determination and July 2005 EPA Determination that the entire water body will be protected, which was made without prior review and approval of an established compliance network is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706.

169. Defendants' approval of the moderating provisions, which change the December 31, 2006 compliance deadline previously established by EPA for meeting the phosphorus criterion in the Everglades Protection Area, as consistent with the Clean Water Act and its implementing regulations is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706.

170. Defendants' approval of the hydropattern restoration and net improvement sections of the Phosphorus Rule as consistent with the Clean Water Act and provisions of 40 C.F.R. Part 131, and their adoption of these moderating provisions as a general variance procedure and their determination that this does not constitute a removal of an existing use, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA, 5 U.S.C.

§ 706.

171. Defendants' conclusion in the January 2005 EPA Determination that Sections 3 and 7 met the requirements of the Clean Water Act and the provisions of 40 C.F.R. Part 131 was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA, 5 U.S.C. § 706.

172. Defendants acted contrary to the APA, in an arbitrary and capricious manner, abused its discretion, and acted otherwise not in accordance with law by concluding, without conducting, or requiring the State to conduct, the analysis required to meet the State's obligation required under the Clean Water Act to ensure that the change in water quality standards in the Phosphorus Rule would result in the attainment and maintenance of the Water Quality Standards of the Miccosukee Tribe of Indians of Florida, the downstream water user, before making the unsupported claim in its January 2005 EPA Determination that the State's new water quality standards "should achieve" the water quality standards of the Tribe.

173. By participating in the implementation of the Clean Water Act, the State of Florida has submitted its enacted water quality standards to be part of federal administrative implementation of the Clean Water Act and subject to federal administrative law. Under the Clean Water Act and federal administrative law, the function of EPA in reviewing Florida's Phosphorus Rule is not a rule-making function but, rather, an adjudicatory one of reviewing another governmental authority's decision to determine whether that decision conforms to law.

174. Under established principles of administrative law, the EPA's determination that the 2006 compliance deadline of the 1994 EFA was reasonable and necessary for Florida's water quality

standards to comply with the Clean Water Act constituted an administrative adjudication by that agency, which was based upon proper review procedures and a fully litigated evidentiary record; accordingly that EPA ruling is a final agency action governed by the doctrine of administrative res judicata.

175. The EPA is not authorized to approve the new water quality standards in the Phosphorus Rule without first determining that those changed standards are warranted either (A) by a change in environmental circumstances in the Everglades Protection Area; or, (B) by the implementation of more stringent water quality standards under the Phosphorus Rule.

176. There are no changes in the physical environment of the Everglades Protection Area that would warrant a change in Florida's water quality standards as implemented by the EPA's prior administrative approval of the changes to the water quality standards rendered by the 1994 EFA and as sanctioned by the District Court Order confirming that administrative action.

177. The Phosphorus Rule results in a lowering of the water quality standards administratively and judicially established under the changes to the water quality standards rendered by the 1994 EFA, and previously approved by EPA, including by changing the December 31, 2006 compliance deadline for the narrative and numeric criteria for phosphorus being discharged into the Everglades Protection Area that was approved by EPA as a "reasonable" compliance schedule, and by allowing continued degradation in violation of the Clean Water Act.

178. Due to Defendants' knowing and conscious failure to comply with the APA, which requires it to follow and enforce the requirements of the Clean Water Act and its implementing regulations, Plaintiff has suffered legal wrongs because of agency action, and is adversely affected

and aggrieved by agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

**WHEREFORE**, Plaintiff requests that the Court declare and order that:

a) Defendants' January 2005 EPA Determination, July 2005 EPA Determination, May 8, 2006 Determination, and May 31, 2006 Determination are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in excess of statutory authority, and without observance of procedure as required by law within the meaning of the Administrative Procedure Act, the Clean Water Act and its implementing regulations;

b) Defendants' failure to follow the procedures of the Clean Water Act and its implementing regulations is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and with observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706;

c) Remand the issue to the EPA and order it to review the Phosphorus Rule in its entirety consistent with the above findings and declarations;

d) Require Defendants to require the State of Florida to publicly notice the moderating provisions in Section 6 of the Phosphorus Rule as a variance and/or variance policy and hold the public hearing, and produce the use attainability analysis required by the Clean Water Act and its implementing regulations;

e) EPA may not approve the changes in water quality standards embodied in the Phosphorus Rule, without first determining that the changes are warranted under the doctrine of administrative res judicata by either a change in the physical environment of the Everglades Protection Area or an

40

imposition of more stringent water quality standards than the changes to the water quality standards previously implemented under the 1994 EFA;

    f) The Court retains jurisdiction with respect to EPA's review of the Phosphorus Rule;

    g) Order such other and further relief as the Court deems just and proper;

    h) Award Plaintiff litigation costs as provided under 33 U.S.C. § 1365(d), including reasonable attorney and expert witness fees;

    I) Order such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LEHTINEN, VARGAS, & RIEDI, P.A.**
Dexter Lehtinen, Esquire, Fla. Bar No. 265551
Kelly Brooks, Esquire, Fla. Bar No. 0493341
Attorneys for Plaintiff, Miccosukee Tribe
7700 North Kendall Drive, Suite 303
Miami, Florida 33156
(305) 279-1166
(305) 279-1365 (FAX)
ksb@lehtinenlaw.com

By:    Kelly Brooks
DEXTER LEHTINEN, ESQ.
  Florida Bar No. 265551
KELLY BROOKS, ESQ.
  Florida Bar No. 0493341

Dated: June 23, 2006

## Certificate of Service

I hereby certify that on the 23rd day of June, 2006, I served a true and correct copy of the Tribe's Third Amended Complaint via U.S. Mail on the following counsel of record:

_Kelly Brooks_
Kelly Brooks

**Attorneys for Defendants:**
Norman L. Rave, Jr., Esq.
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
Fax: (202) 514-8865

Philip Mancusi-Ungaro, Esq.
Office of Regional Counsel
U.S. Environmental Protection Agency
61 Forsyth Street, SW
Atlanta, GA 30303-3104
Fax: (404) 562-9486

Mary Ellen Levine, Esq.
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW (2355A)
Washington, D.C. 20460
Fax: (202)564-5477

**Attorney for Intervenor/Defendant:**
Kenneth B. Hayman, Esq.
Office of General Counsel
Department of Environmental Protection
3900 Commonwealth Blvd, M.S. #35
Tallahassee, Florida 32399-3000
Fax: (850) 245-2297

**Attorney for Friends of the Everglades:**
John E. Childe, Esq.
606 Pine Road
Palmyra, PA 17078
Fax: (717) 520-1351

**Attorney for Intervenor/Defendants New Hope Sugar Co. & Okeelanta Corp.:**
Joseph P. Klock, Esq.
Gabriel Nieto, Esq.
SQUIRE, SANDERS & DEMPSEY, LLP
including STEEL HECTOR & DAVIS LLP
200 South Biscayne Blvd.
Suite 400
Miami, Florida 33131-2398
Fax: (305) 577-7001

Robert H. Blank, Esq.
KATZ, BARRON, SQUITERRO & FAUST P.A.
2699 S. Bayshore Drive
Miami, Florida 33133-5408
Fax: (305)285-9227