**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**LEAD CASE NO: 04-21448-CIV-GOLD/McALILEY**

**MICCOSUKEE TRIBE OF INDIANS**
**OF FLORIDA,**

      **Plaintiff,**

**v.**

**UNITED STATES OF AMERICA, et al.**

      **Defendants.**
_____/

**FRIENDS OF THE EVERGLADES,**

      **Plaintiff,**

**v.**

**UNITED STATES OF AMERICA, et al.**

      **Defendants.**
_____/

## ORDER GRANTING SUMMARY JUDGMENT; CLOSING CASE

### I. SUMMARY OF THE COURT'S RULING[1]

This case, and its long history, is complex. It is a continuation of litigation over the

Everglades that started in 1988. Since that time, the litigation has resulted in numerous

court decisions,  an overall settlement agreement, and then litigation over it. To resolve the

litigation (as then pending), the Florida Legislature enacted the Everglades Forever Act in

1994, § 373.4592, Florida Statutes.   More recently, the Florida Legislature enacted

_____

[1]

A Table of Contents of this Order is included as an attachment to this Order.

amendments to the Everglades Forever Act in 2003, and the State of Florida has adopted the Phosphorus Rule, §§ 62-302.530 and 62-302.540, Florida Administrative Code, applicable to the Everglades Protection Area. Both the 2003 amendments to the Everglades Forever Act and the Phosphorus Rule are the subject of this litigation.

Notwithstanding its complexity, the matters at issue may be reduced to two essential questions. The first question is whether the Environmental Protection Agency acted arbitrarily and capriciously under the Federal Clean Water Act, 33 U.S.C. § 1251 *et. seq.* ("CWA"), and the Federal Administrative Procedures Act, 5 U.S.C. § 701, *et. seq.* ("APA"), by concluding that the 2003 amendments to the Florida's Everglades Forever Act did not change water quality standards.   The second question is whether the Environmental Protection Agency further erred  in its subsequent review of the State of Florida's Phosphorus Rule by finding compliance with the Federal Clean Water Act.

I conclude against the Environmental Protection Agency on both questions (with some limited exceptions pertinent to the Phosphorus Rule).  Contrary to the Environmental Protection Agency's written Determinations, it is my view that the Florida Legislature, in 2003, by adopting the State's draft Long-Term Plan, as proposed by the South Florida Water Management District's Governing Board, changed water quality standards under the Federal Clean Water Act, and violated its fundamental commitment and promise to protect the Everglades, by extending the December 31, 2006 compliance deadline  for meeting the phosphorus criterion for at least ten more years. Turning a "blind eye," the United States Environmental Protection Agency ("EPA") concluded that there was no change in water quality standards. The EPA is patently wrong and acted arbitrarily and capriciously in reaching its conclusion. It did so by simply reading the words of specific sections of the

2

Amended Everglades Forever Act ("Amended EFA"), rather than by connecting the dots to analyze its true effect. Its review is nothing more than a repeated imprimatur, *i.e.*, acceptance without independent analysis, based on the State of Florida's representation that the EFA Amendments did not change water quality standards.

The Environmental Protection Agency further compounded its error in its subsequent review of the State of Florida's Phosphorus Rule for compliance with Section 303 of the Clean Water Act, 33 U.S.C. § 1313. The EPA ended its November 5, 2003 Determination on the Amendments to the EFA by observing that "the 2003 amendments, and their subsequent implementation, warrant '*close scrutiny.*'" EPA November 5, 2003 Determination, p. 11 [PR-AR-11]. Instead of giving the Phosphorus Rule provisions the close scrutiny it promised, the EPA again deferred to the State of Florida, reserving its review under the CWA for later permits. Plaintiffs are correct that "by kicking the can down the road to individual permits," EPA has once again avoided its duty to protect the Everglades. It has failed to adhere to the mandates of the Clean Water Act and properly analyze whether the Phosphorus Rule was a "blanket change" to the previously approved December 31, 2006 compliance deadline for those who adopt the Long-Term Plan. It also acted arbitrarily and capriciously by failing to consider the effect of these changes on the Everglades Protection Area as a whole, and on the requisite "propagation and maintenance of a healthy, well-balanced population of fish and wildlife," as required for Class III Florida waters.

In short, what EPA has done is to allow "Florida to radically modify its water quality standards, simply disavow that a change had taken place" and then "rely on Florida's disavowal to avoid its mandatory review of the modified standards." *Fla. Pub. Interest*

*Research Group Citizens Lobby, Inc. v. EPA (FPIRG),* 386 F.3d 1070, 1089 (11th Cir. 2004). This Court is duty-bound to give "close scrutiny" to the effect of the EPA's actions. EPA November 5, 2003 Determination, p. 11 [PR-AR-11]. I have endeavored to do so in this Order.

## II. THE PARTIES, THE CASE, AND THE PENDING MOTIONS

### A.    <u>The Parties</u>

This consolidated case has been brought by two Plaintiffs: the Miccosukee Tribe of Indians of Florida ("Miccosukee Tribe") and Friends of the Everglades ("Friends").  The Miccosukee Tribe is a federally recognized Indian Tribe whose members reside and work within the Everglades.  DE 147 at 2.  Friends is an organization founded for the protection and preservation of the Everglades ecosystem, and more than 4,400 members of Friends use the Everglades on a continuing basis for both recreational and aesthetic uses.  DE 150 at 2-3.

The Plaintiffs have brought their cases, as now consolidated, against the United States, the United States Environmental Protection Agency ("EPA"), the Administrator of the EPA, and the Regional Administrator of the EPA, Region IV (all collectively referred to as "EPA").   The EPA is the federal agency charged with enforcing the Federal Clean Water Act.  The Florida Department of Environment Protection ("DEP"), New Hope Sugar Company and Okeelanta Corporation are intervenors. The Florida Department of Environmental Protection is the State's designated environmental regulatory agency.  New Hope Sugar Company and Okeelanta Corporation, together with their affiliated companies, own and farm approximately 190,000 acres within the Everglades Agricultural Area ("EAA")

which borders the Everglades Protection Area.  DE 19 at 1.  The Everglades Protection

Area (as defined in the 1994 EFA) covers approximately 3,500 square miles and consists

of Everglades National Park ("Park"), the Loxahatchee National Wildlife Refuge ("Refuge"),

and Water Conservation Areas (WCAs) 2A, 2B, 3A, and 3B.   EPA Sept. 1999

Determination at 3, 10 [EFA-AR-8].  The Refuge is also referred to as Water Conservation

Area 1 or WCA-1.

### B.   The Case

This case is now before me on the Third Amended Complaint [DE 147] by Plaintiff

Miccosukee Tribe and the two Second Amended Complaints [DE 113, DE 150] by Friends

of the Everglades.  The Miccosukee Tribe's Third Amended Complaint raises three claims

under the Federal Administrative Procedures Act, 5 U.S.C. § 701, *et. seq.* ("APA"),  with

regard to the EPA's determinations on the Amendments to the EFA and on the

Phosphorus Rule.  In Friends' Second Amended Complaint with respect to the Amended

EFA [DE 113], it brings claims under the APA, 5 U.S.C. §§ 702 and 706(1), (2)(A), (C), and

(D); and the Declaratory Judgment Act, 28 U.S.C. § 2201.  In Friends' Second Amended

Complaint with respect to the Phosphorus Rule [DE 150], it brings claims against

Defendants under the CWA, 33 U.S.C. §§ 1301(a) and (e), 1311(a), 1313(c), 1342(a);[2] the

---

[2]

The Clean Water Act (CWA) was enacted in 1972 to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  As defined in the federal regulations which implement the CWA, "water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses."  40 C.F.R. § 131.3(I). Pursuant to the same regulation, "criteria" are defined as elements of a state's water quality standards which represent the quality of water that support a designated use of a water body, and these criteria may include narrative statements and numeric concentrations or levels.  *Id.*

Endangered Species Act (ESA), 16 U.S.C. § 1440; the APA, 5 U.S.C. § 706; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

### C.    Summary of Pending Motions: Oral Argument

This Order addresses the parties' cross-motions for summary judgment on Plaintiffs' claims regarding the Amended Everglades Forever Act and the Phosphorus Rule.  With respect to the Amended EFA, the motions for summary judgment are: (1) the Miccosukee Tribe's Motion for Summary Judgment on Count I of its Third Amended Complaint and Friends of the Everglades' Motion for Partial Summary Judgment on its Second Amended Complaint [DE 226]; (2) the EPA's Cross-Motion for Summary Judgment [DE 231]; (3) DEP's Cross-Motion for Summary Judgment [DE 234]; and (4) New Hope and Okeelanta's Cross-Motion for Summary Judgment [DE 239].

With respect to the Phosphorus Rule, the motions for summary judgment are: (1) the Miccosukee Tribe's Motion for Summary Judgment on Counts II and III of its Third Amended Complaint and Friends of the Everglades' Motion for Summary Judgment on its Second Amended Complaint [DE 255]; (2) the EPA's Cross-Motion for Summary Judgment [DE 274]; (3) DEP's Cross-Motion for Summary Judgment [DE 281]; and (4) New Hope

---

When a state submits its water quality standards to the EPA for review, the standards must include: (1) the designated uses for each body of water; (2) what methods were used and analyses conducted to support the revisions to state water quality standards; (3) water quality criteria, which constitutes specific limits on pollutants which protect the designated uses for each water body and which may be expressed as either a narrative standard or a numeric concentration level; and (4) an anti-degradation policy to protect existing uses of bodies of water and high-quality water. *Id.*; 40 C.F.R. § 131.3; 40 C.F.R. § 131.6; 40 C.F.R. § 131.12.

and Okeelanta's Cross-Motion for Summary Judgment [DE 278].

I heard oral argument on all of the motions for summary judgment on April 21, 2008, April 22, 2008, and May 21, 2008.

### III. THE ADMINISTRATIVE RECORD UNDER REVIEW

The parties have argued at length about what constitutes the administrative record subject to the Court's review under the APA on the challenges to both the EFA Amendments and to the Phosphorus Rule. The Plaintiffs have sought to significantly supplement the record.[3] I conditionally allowed the record to be supplemented, subject to resolving the issue by this Order. I now deny the Plaintiffs' motions to supplement with two exceptions. I conclude that I can resolve each challenge on the record submitted by the EPA and the DEP without resorting to the Plaintiffs' supplemental material. Instead, I focus on the plain wording of the EFA Amendments and the Rule, and on the history of the case as presented by the parties. This history includes the EPA's past Determinations relating to the 1994 EFA as well as the litigation history.[4] My conclusions on each of the issues

---

[3]

Plaintiffs filed a Motion to Complete and Supplement the Administrative Record [DE 196], a Motion to Supplement the Administrative Record [DE 253], and a Motion to Complete the Administrative Record [DE 270]. I previously granted these motions in part, to allow the parties to refer to these documents in their briefs while reserving to rule on the merits of these three Motions.

[4]

The EPA has filed "Objections to Evidence Presented by Plaintiffs at Summary Judgment Hearings" [DE 322]. By way of background, both parties, at the request of the Court, had filed power point presentations to purportedly summarize the key points in their numerous briefs. The Plaintiffs, the EPA and the Intervenors have exceeded the Court's request by incorporating matters beyond the scope of the record as part of their respective power point presentations. In its objections, the EPA does not object to the use of Plaintiffs' materials as demonstrative exhibits, but does object to any use of the materials as a basis for the Court's decision on the merits. DE 322, p. 2. I concur with EPA. While I accept all

pertinent to the Plaintiffs' separate challenges to the Amendments and the Rule are based solely on the administrative record corresponding to each separate challenge.

I now address the two exceptions. First, at the hearing held on February 29, 2008 and in a subsequent order [DE 311], I instructed the parties to submit the full Everglades Protection Area Tributary Basins Conceptual Plan for Achieving Long-Term Water Qaulity Goals Final Report ("Long-Term Plan"), dated March 2003, as well as the revised Long-Term Plan, dated October 2003. Although the March 2003 Long-Term Plan was adopted and included by reference in the Amended EFA, the EPA's administrative record for the Phosphorus Rule only contained executive summaries of the March 2003 and the October 2003 Long-Term Plans, [PR-AR-32, 3-27-2003, doc. 6; PR-AR-29.28], and the EPA's administrative record for the Amended EFA contained neither full versions nor executive summaries of either Long Term Plan. At the February 29, 2008 hearing, no party objected to including the full Long-Term Plans for March 2003 and October 2003 as part of the administrative records in this case. *See* Trans. Feb. 29, 2008 at 6-9. As such, I consider the full March 2003 and October 2003 Long-Term Plans as part of my analysis on the parties' cross-motions for summary judgment.[5]

Second, in Plaintiffs' Motion to Complete the Administrative Record [DE 270], they

---

of the presentations, and supporting exhibit books, for "demonstrative purposes," I do not rely on the extraneous information contained in the power point presentations and exhibit books in reaching my findings and conclusions.

[5]

As stated at the end of this Order, the parties are instructed to file electronic versions of the full March 2003 and October 2003 Long-Term Plans. In response to my order [DE 311], the parties delivered copies of both full Long-Term Plans to the Court, but the parties did not file these documents as part of the docket in this case.

requested that I consider an EPA document dated August 2007 and entitled *Everglades Ecosystem Assessment: Water Management and Quality, Eutrophication, Mercury Contamination, Soils and Habitat – Monitoring for Adaptive Management: A R-EMAP Status Report* ("REMAP Report").  Although the REMAP Report was released to the public after EPA's May 2006 determinations on the Phosphorus Rule, the REMAP Report is based on data gathered in 2005.  Plaintiffs argue that I should consider the REMAP Report on the motions for summary judgment because the underlying data was available to the EPA when the agency conducted its review of the Phosphorus Rule for its May 2006 determinations.  The EPA and the DEP argue that I should not consider the REMAP report because it was distributed after the EPA's May 2006 determinations, and therefore EPA could not have relied on the final document.[6]

The APA dictates that "the court shall review the whole record" when reviewing a challenge to an administrative agency action, 5 U.S.C. § 706, and the Eleventh Circuit instructs that the "focal point for judicial review of an administrative agency's action should be the administrative record."  *Pres. Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  A court, however, may go beyond the administrative record in certain circumstances, such as where it appears that the agency relied on materials not included in the administrative record or where there is a strong showing of improper behavior by the agency.  *Id.* at 1246-1247, n.1.  In addition, the Eleventh Circuit has

---

[6]

EPA also argues, without supporting authority or documentation, that although the EPA collected the samples used for the REMAP report in 2005, EPA processed  the data from those samples in 2006 and statistically analyzed the data in 2007.

recognized that a court may consider extra-record materials that are necessary to determine whether the agency considered all relevant factors. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 914 n.16 (11th Cir. 2007) ("On remand, Sierra Club is free to request that the district court supplement the administrative record with these documents or consider them as extra-record material necessary to determine whether EPA considered all relevant factors in making its decision. *See, e.g., Inland Empire Pub. Lands Council v. United States Forest Serv.*, 88 F.3d 754, 760 n.5 (9th Cir. 1996) (ruling that a court reviewing agency action may look beyond the administrative record to determine if the agency examined all relevant factors); *United States v. Akzo Coating of Am.*, 949 F.2d 1409, 1428 (6th Cir. 1991) (same)."); *see also Akzo Coatings*, 949 F.2d at 1427-1428 ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."); *Sierra Club v. United States Army Corps of Eng'rs*, 935 F.Supp. 1556, 1566 (S.D. Ala. 1996) (allowing Plaintiff to submit two post-decision letters submitted to the Corps by EPA and the Fish and Wildlife Service and noting that extra-record information may be considered by a court where the agency is alleged to have "swept stubborn problems or serious criticism under the rug" or when "such information takes the form of newly discovered evidence which undermines the soundness of the agency's decision") (citing *Akzo Coatings*, 949 F.2d at 1429).

Here, the data and analysis in the REMAP Report is undeniably relevant to the Phosphorus Rule in that the Report includes information on changes in phosphorus

concentrations in the Everglades Protection Area.  Because EPA had the data for the REMAP report in its possession before it made its May 2006 determinations on the Phosphorus Rule and because the EPA itself conducted the underlying studies in 2005, I will consider the REMAP report as extra-record material necessary for this Court to determine whether the EPA considered all the relevant factors when it made its May 2006 determinations.  *See Leavitt*, 488 F.3d at 914 n.16.  Therefore, I consider the REMAP Report for this limited purpose in my review of the Motions for Summary Judgment, and I grant Plaintiffs' Motion to Complete the Administrative Record [DE 270].

## IV. STATEMENT OF THE FACTS

None of the parties dispute that this case is appropriate for summary judgment as to both the EFA Amendments [Plaintiffs (DE 226, p.1), EPA (DE 231, p. 1; DE 232, p. 2), DEP (DE 234, p. 11, DE 235 p. 2), New Hope and Okeelanta (DE 237, pp. 2-3)], and the Phosphorus Rule [Plaintiffs (DE 255, p.1), EPA (DE 274, p. 1, 276, p. 2), DEP (DE 281, p. 12, DE 282, p. 3), New Hope and Okeelanta (DE 278, p. 5 )].  Nor is there any dispute as to the material facts.

Because of the length of this Order, and the desire not to be unduly repetitive, I elect to refer to the undisputed material facts gleaned from my review of each administrative record in the respective section of the Order pertinent to  the EFA Amendments and to the Phosphorus Rule. No useful purpose would be served to restate those facts here. Moreover, the lengthy litigation history already has been fully summarized in Chief District Judge Davis' opinion in *Miccosukee Tribe Of Indians v. United States,* 1998 WL 1805539 (S.D.Fla. Sept. 14, 1998) and my own earlier order in *Miccosukee Tribe of Indians v.*

*United States,* 2006 WL 648055 (S.D.Fla. Feb. 16, 2006).  I incorporate these recitations by reference and conclude that each recitation is consistent with the parties' own statements of the case as included in their briefs.  As necessary, I have expanded on the recitation of the litigation history in the body of this Order.

## V. STANDARD OF REVIEW UNDER THE APA

The scope of review is set forth in 5 U.S.C. § 706.  Under this section, the "... reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  *Id.*  To the extent necessary, the court may hold unlawful and set aside agency action, findings and conclusions of law found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706 (2)(A).

As the Eleventh Circuit has recently pointed out, "'[t]his standard is exceedingly deferential.'" *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir. 2008)(quoting *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir. 1996)). The Eleventh Circuit has made clear that "[t]he court's role is to ensure that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" *Van Antwerp*, 526 F.3d at 360 (quoting *PEACH*, 87 F.3d at 1246).

The fine line between "deferential review" and "arbitrary and capricious" action, or action "not in accordance with law," is established by the case law.  An agency's action is arbitrary and capricious "if the agency relied on improper factors," "failed to consider important relevant factors," "offered an explanation for its decision which runs counter to

the evidence before the agency," "committed a clear error of judgment that lacks a rational connection between the facts found and the choice made," *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1279 (11th Cir. 2007), or if the action is so implausible that it cannot be ascribed to a different viewpoint or agency expertise. *Leavitt*, 488 F.3d at 911.

Courts give due deference to an agency's interpretation of a statute that it is responsible for administering if "(1) Congress has delegated interpretive authority to the agency, (2) the statute is silent or ambiguous with respect to the issue at hand, and (3) the agency's interpretation of the statute is reasonable." *Leavitt*, 488 F.3d at 911-912 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

However, under the law of this Circuit, and important to the analysis in this case, "[w]here the statute directly addresses an issue, we give the language of the statute effect and accord no deference to the agency's interpretation." *Leavitt*, 488 F.3d at 912 n.12 (citing *Chevron*, 467 U.S. at 842-43). Similarly, if an agency's interpretation conflicts with the "plain meaning" of the statute, the interpretation is not entitled to *Chevron* deference. *Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289, 1297 (11th Cir. 2008) (citing *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1261 (11th Cir. 2002) ("No deference is to be given to an agency interpretation that is at odds with the plain meaning of the statute being interpreted.")); *Leavitt*, 488 F.3d at 914 (where EPA approved Florida's list of impaired waters, "the EPA's data-cutoff decision contradicts the CWA's statutory and regulatory language such that it is not entitled to deference, *see Chevron*, 467 U.S. at 842-43"); *Friends of the Earth v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006) (reviewing EPA's interpretation of the CWA's requirement of "total maximum daily loads" for pollutants under *Chevron* and holding that EPA's approvals of seasonal or annual loads for some pollutants

must be vacated, noting that "EPA may not avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.") (citations omitted)

Agency interpretations in guidance letters, opinion letters, policy statements, agency manuals, or enforcement guidelines are not entitled to *Chevron* deference. *Leavitt*, 488 F.3d at 915 ("Because there is no indication that the EPA's guidance letter was the product of a formal agency adjudication, notice-and-comment rulemaking, or any other circumstances reasonably suggesting that Congress ever thought of guidance letters as deserving deference, the EPA's guidance letter is not entitled to *Chevron* deference.") (internal quotations omitted) (citing *United States v. Mead Corp*, 533 U.S. 218, 230-31 (2001)); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

Interpretations of a statute by an agency that is not charged with administering that particular statute or rule are not entitled to deference. *Coghlan v. Nat'l Transp. Safety Bd.*, 470 F.3d 1300, 1304 (11th Cir. 2006) ("Furthermore, there is no showing that Congress delegated authority to the FAA or NTSB to implement 2463, which is a general statute of limitations. Accordingly, those entities' construction and application of 2462 is not entitled to [Chevron] deference."); *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990) (holding that court would not defer to Secretary of Labor's interpretation of statute's provision establishing private right of action where Congress expressly established the judiciary, not the Department of Labor, as the adjudicator of private rights of action under statute).

In addition, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a

14

consistently held agency view." *Am. Wildlands v. Browner*, 94 F.Supp. 2d 1150, 1163 (D. Colo. 2000) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (stating that while an administrative agency is not disqualified from changing its position, the "consistency of an agency's position is a factor in assessing the weight that position is due")); *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 887 (11th Cir. 2003) ("The consistency of an agency's interpretation over time is a factor in determining the level of deference due."); *Fla. Manufactured Housing Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995) ("In addition, although an agency's interpretation may receive some deference even if it has changed over time, the consistency of its interpretation is an important factor in determining the amount of deference owed.")

Even if an agency interpretation is not entitled to *Chevron* deference, it is still entitled to "respect proportional to its power to persuade." *Leavitt*, 488 F.3d at 915 (quoting *Mead Corp*, 533 U.S. at 234-35); *see Gonzales v. Oregon*, 546 U.S. 243, 256, 268 (2006) (stating that if agency interpretation does not warrant *Chevron* deference, it is "'entitled to respect' only to the extent it has the 'power to persuade', based on the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

I now apply these standards to the EPA's Determinations on the EFA Amendments and the Phosphorus Rule. For reasons that I will discuss, I do not find that the EPA's Determinations interpreting the "plain language" of the EFA Amendments or the Phosphorus Rule are entitled to *Chevron* deference.

## VI. BACKGROUND AND  ANALYSIS OF THE EPA DETERMINATIONS

### A.      The Everglades Is Unique

Few would disagree that the Everglades[7] is unique.  It is unlike any other ecosystem

on earth.  It is a national treasure and requires our utmost protection.  The Congress of the

United States has said this. So has the Florida Legislature.  Congress has declared that

the Everglades is an "American treasure" which includes uniquely important and diverse

wildlife resources and recreational opportunities.  Water Resources Development Act of

2000, Public Law 106-541, § 602 (Dec. 11, 2000).   Congress has found that the

preservation of the pristine and natural character of the South Florida ecosystem is critical

to the regional economy.  *Id*.  Based on these findings by Congress, along with the formal

designations of Everglades National Park and Loxahatchee National Wildlife Refuge, the

entire Everglades Protection Area fits the definition of "waters of exceptional recreational

and ecological significance," as set forth in 40 C.F.R. § 131.12(3).[8]

Like the United States Congress, the Florida Legislature has acknowledged the

watershed's one-of-a-kind nature in the opening paragraph of the 1994 EFA. It proclaimed

that the Everglades is irreplaceable and stated: "The system is unique in the world and one

of Florida's greatest treasures." Fla. Stat. § 373.4592(1)(a).  Indeed, the State of Florida

has designated the Everglades National Park and the Loxahatchee National Wildlife

---

[7]

While there is some grammatical debate, I elect to refer to the "Everglades" in the singular.  *See, e.g.,* Guy Martin, *See you Later, Alligator*, N.Y. Times, Apr. 9, 2006.

[8]

40 C.F.R. § 131.12(3) provides "Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected."

Refuge[9] as "Outstanding Florida Waters" under Sections 62-302.700(9(a)(3), 9(b)(17) of the Florida Administrative Code, thereby providing these waters the highest standard of protection. Moreover, under Florida law, the Everglades National Park is also an Outstanding National Resources Water.  F.A.C. § 62-302.700(10).

But, the Park and Refuge do not stand alone.  The last remnants of the historical Everglades include Water Conservation Areas 2 and 3.  Water Conservation Area 3 primarily encompasses the tribal lands of the Miccosukee Tribe.  Of importance to this case, the Miccosukee's tribal lands are located immediately south of points of discharge into the Everglades Protection Area through South Florida Water Management District structures. The water flow is in a southerly direction into the tribal lands. Water Conservation Areas 2 and 3 are all interconnected with the Refuge and the Park, and, collectively, are defined by the Florida Legislature to be the "Everglades Protection Area." [See Appendix A to this Order for an overview of the Everglades Protection Area].

### B.  The Everglades is Endangered by Excessive Levels of Phosphorus.

The Everglades is an oligotrophic system, meaning it is naturally low in nutrients. In the case of an ecologically healthy Everglades, the system is poor in the nutrient phosphorus.  There is also a disproportionately low level of phosphorus in relation to the presence of other nutrients (nitrogen and potassium) so that the system is described as not only oligotrophic but "phosphorus limited," as well.  Thus, the nutrient-lean (oligotrophic) condition of the aquatic ecosystems is one hallmark characteristic of the

---

[9]

The Loxahatchee National Wildlife Refuge is also called Water Conservation Area 1 or WCA 1.

unspoiled Everglades.  Settlement Agreement at 7 [Case No. 88-1886, DE 1105, Ex.1].[10]

_____

10

In the 1988, the federal government sued the South Florida Water Management District ("SFWMD" or "the District") and the Florida Department of Environmental Regulation (now known as the Department of Environmental Protection (DEP)) alleging that Florida and the District were not enforcing Florida's water quality standards in Everglades National Park or the Refuge.  Specifically, the Complaint alleged that agricultural runoff water entering the Refuge and Everglades National Park through structures operated by the District violated Florida's water quality standards.  *See United States v. S. Fla. Water Mgmt. District*, 847 F.Supp. 1567, 1569 (S.D. Fla. 1992), *aff'd in part*, 28 F.3d 1563 (11th Cir. 1994).

The parties entered into a comprehensive settlement in 1991. In this Settlement Agreement, the narrative phrases "imbalance in natural populations of aquatic flora and fauna" and "imbalance of flora and fauna" were defined to include nutrient additions which result in the replacement or loss of native periphyton algal species, or native sawgrass and wet prairies being replaced with dense cattails or other nutrient-altered ecosystems. Settlement Agreement, at 3 [Case No. 88-1886, DE 1105, Ex.1].  In this Settlement Agreement, the parties agreed that the ecosystems of the Everglades National Park and the Refuge are changed by even slight increases in the concentration of phosphorus.  *Id.* at 6.  The parties also agreed that the surface water entering the Refuge contained nutrient levels which caused imbalances in violation of Florida's water quality standards.  *Id.* at 7-8.  Although the Settlement Agreement set limits and levels of phosphorus only as to the Refuge and the Park, it explicitly recognized that the "maintenance of state water quality standards within the WCAs is crucial to the ecology of the Park."  *Id.* at 7.

The interim phosphorus concentration limits and levels for the Refuge and the Park were to be attained by July 1, 1997, and the long-term phosphorus concentration limits and levels for the Refuge and the Park were to by attained by July 1, 2002. *Id.* at 4.  The Settlement Agreement further provided that inflows to the Refuge had to result in compliance with the long-term compliance levels or Florida's Class III water quality criteria, whichever was lower, by July 1, 2002.  *Id.* at 11.  Under the Settlement Agreement, the "State Parties shall take such action as is necessary so that waters delivered to the Park and the Refuge achieve state water quality standards, including Class III standards, by July 1, 2002."  *Id.* at 9.

The parties also agreed to take action if standards were not being met: under the Settlement Agreement, the Florida Department of Environmental Regulation (now DEP) agreed to enforce more stringent inflow discharge limits if, by July 1, 2002, the Refuge was not in compliance with the lower of the Class III nutrient water quality criteria or the long-term concentration levels.  *Id.* at 11.

In addition, the Florida parties agreed to initiate a regulatory program with the goal of reducing total phosphorus from the Everglades Agricultural Area into Storm Treatment Areas, which are large-scale wetland treatment systems.  *Id.* at 12, 14, 17.  Under this regulatory program, permits would be required for the discharge of water from the EAA.  *Id.*  Permit applications would be required to meet long-term phosphorus limits and institute

Undisputed scientific research  has documented that long-term exposure to excess phosphorus allows flora not adapted to oligotrophic environments to overcome the native communities over time.  Simply put, the Everglades ecosystems are changed by even slight increases in nutrient concentrations, particularly increases in the concentration of phosphorus.  *Id.* at 7.  Excess phosphorus accumulates in the peat underlying the water, alters the activity of microorganisms in the water, and disturbs the natural species composition of the algal mat (periphyton) and other plant communities in the marsh.  *Id.* at 7.  These disturbed communities deplete the marsh of oxygen and, ultimately, result in native sawgrass and wet prairie communities being replaced by dense cattail stands or other nutrient-tolerant ecosystems.  The ability of the ecosystem to serve as habitat and

---

special farming practices, called Best Management Practices ("BMPs"), designed to meet interim and long-term phosphorus limits.  *Id.* The Settlement Agreement further provided that compliance with these phosphorus limits would be determined by measuring flow and concentration at the permit applicant's property boundary.  *Id.* at 18.  The District also agreed to construct over 35,000 acres of Storm Treatment Areas ("STAs") within the Everglades Agricultural Area to reduce phosphorus discharges.  *Id.* at 12, 14.

On January, 24, 1992, Senior District Judge William M. Hoeveler allowed "limited intervention" to the Miccosukee Tribe for the purpose of permitting the Miccosukee Tribe to invoke the Court's continuing jurisdiction to enforce settlement agreement to protect rights and interests of Miccosukee Tribe.  Order, Jan. 24, 1992 [Case No. 88-1886, DE 1193].

The Settlement Agreement was then approved by Judge Hoeveler and entered as a consent decree on February 24, 1992. *United States v. S. Fla. Water Mgmt. District*, 847 F.Supp. 1567 (S.D. Fla. 1992), *aff'd in part*, 28 F.3d 1563 (11th Cir. 1994).  In his order, Judge Hoeveler recognized that the Settlement Agreement established both interim and long-term limits on phosphorus concentrations in Everglades National Park and the Refuge.  *Id.* at 1569.  In particular, Judge Hoeveler noted that "the District or [the Florida Department of Environmental Regulation, now DEP] will regulate the water quality of agricultural discharges through a permitting scheme by which permit applicants will be required to comply with the designated phosphorus load allocations and adopt best management practices aimed at reducing the levels of phosphorus in agricultural discharge."  *Id.* at 1570.

19

forage for the native wildlife is thereby greatly diminished or destroyed.  *Id.* at 7.

The effect of excess phosphorus on the Everglades is not in dispute. In the Settlement Agreement, the State of Florida acknowledged that water flowing from the Everglades Agricultural Area ("EAA") into the Refuge and the Park contained excess nutrients that violated Florida's water quality standards by causing imbalances in the natural aquatic flora and fauna.  *Id.* at 7-8.  These violations were so severe that they threatened "the ecological integrity and ultimately the survival of the Park and Refuge."  *Id.* at 7.  The water flowing from the EAA was causing "potentially devastating degradation" of Everglades waters, and "threatens to devastate the ecosystems in the Park and Refuge."  *Id.* at 8.  The Settlement Agreement established a schedule for ensuring that EAA runoff into the Everglades met state water quality standards by 2002, *id.* at 9, but this date was later changed by modifications to the Consent Decree to coincide with the date of December 31, 2006, as established by the 1994 EFA.  *See* Omnibus Order, Apr. 27, 2001 [Case No. 88-1886, DE 226, Ex.B] (Hoeveler, J.).[11]

---

[11]

In light of the 1994 EFA, the United States, the District, and the DEP jointly moved to modify the consent decree that Judge Hoeveler had issued in 1992 following the 1991 Settlement Agreement in that case.  *See* Omnibus Order, April 27, 2001 at 2 [Case No. 88-1886, DE 226, Ex.B] (Hoeveler, J.).  The Miccosukee Tribe was an intervenor in that case, and it moved to enforce the Settlement Agreement and Consent Decree and asked the Court to appoint a special master to oversee implementation.

In his Omnibus Order issued on April 27, 2001, Judge Hoeveler modified his 1992 consent decree to reflect the timetable in the 1994 EFA, noting that many of the deadlines in the 1992 consent decree had already lapsed.  *Id.* at 2, 27.  In modifying the consent decree, however, Judge Hoeveler noted that "by endorsing this extended schedule, the Court fully expects that the parties will achieve compliance as mandated by the Modified Consent Decree and the EFA."  *Id.* at 24.

In the Modified Consent Decree, the new timetables track those of the 1994 EFA. For example, the Modified Consent Decree provides that "[t]he State Parties shall take such action as is necessary so that waters delivered to the Park and the Refuge achieve

As recognized in the 1994 EFA, the "Everglades ecological system is endangered as a result of adverse changes in water quality, and in the quantity, distribution and timing of flows, and, therefore, must be restored and protected." Fla. Stat. § 373.4592(1)(a) (1994). The Florida Legislature specifically found that waters flowing into the Everglades Protection Area contain excessive levels of phosphorus, and that a reduction in levels of phosphorus will benefit the ecology of the Everglades Protection Area. Fla. Stat. § 373.4592(1)(d) (1994). Accordingly, one of the 1994 EFA's primary objectives was to reduce phosphorus levels entering into the Everglades Protection Area.

The 1994 EFA contained many of the same requirements as the Settlement Agreement, but established different timetables. *See generally* Fla. Stat. § 373.4592 (1994)(and later discussion in this Order). Section 4 of the 1994 EFA directed the South Florida Water Management District ("District") to establish the Everglades Construction Program which contained eighteen separate projects. Fla. Stat. § 373.4592(4)(a) (1994). The primary component of the project was the construction of six Stormwater Treatment Areas, or STAs, by 2003. *Id.* The STAs are thousands of acres of man-made marshes designed to filter phosphorous and other nutrients out of the EAA's water runoff before it flows into the Everglades Protection Area.

---

state water quality standards, including Class III standards, by December 31, 2006." *Id.*, Appx. A, 1 (citing page 9, paragraph 5 of the Consent Decree). In addition, the Modified Consent Decree also provides that phosphorus loads in discharges from the EAA would be reduced to the Everglades Protection Area by 80% by October 1, 2003 and to the Refuge by 85% by February 1, 1999. *Id.* at 2 (citing page 10, paragraph 8.A in the Consent Decree). The Modified Consent Decree mandates that inflows to the Refuge must result in compliance with the lower of Class III water quality criteria or long term concentration levels by December 31, 2006. *Id.* at 3 (citing page 11, paragraph 8.C of the Consent Decree).

**C**.    **The 10 ppb Standard as the Essential Limit on Water Phosphorous Concentration Discharging into the Everglades Protection Area**

The 1994 EFA codified and expanded the phosphorus reduction program of the Settlement Agreement by the adoption of the "Everglades Program." Fla. Stat. §373.4592(2)(h); (4)(a); (4)(f) (1994).  The most controversial EFA provision at the time was its program for reducing phosphorus loads to the point where they no longer caused an imbalance in the natural aquatic flora and fauna. *Miccosukee Tribe*, 1998 WL 1805539, at *6 (Davis, J.).  Like the Settlement Agreement, the 1994 EFA established a long-term research and monitoring program to develop a numeric concentration level of phosphorous that would not cause an imbalance in the Everglades Protection Area and the Everglades Agricultural Area (EAA). While the 1994 EFA required the State of Florida and the South Florida Water Management District to employ all means practicable to complete by December 31, 1998 all necessary research to numerically interpret the existing narrative standard, *id.* at § 373.4592(4)(e)(1994), the 1994 EFA did not require the agencies to finish their research until 2001, nor did it require the State to develop a numeric concentration level until 2003.

But, while all of this was going on, the 1994 EFA's Class III narrative nutrient criterion[12] remained in effect as the state water quality standard applicable to the

---

[12]

In 1968, regulations were promulgated in Florida which enumerated five classes of beneficial uses of surface waters that would be protected. These classes are: (1) Class I: Potable Water Supplies; (2) Class II: Shellfish Propagation or Harvesting; (3) Class III: Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife; (4) Class IV: Agricultural Water Supplies; (5) Class V: Navigation, Utility and Industrial Use.  F.A.C. § 62-302.400(1).  The surface waters in the WCAs and the freshwater portion of Everglades National Park are Class III waters. *Sugar Cane Growers Cooperative v. Dep't of Environmental Protection*, Case No. 03-02884RP (Final Order,

Everglades Protection Area. The 1994 EFA unequivocally provided that "**[i]n no case** shall such phosphorus criterion allow waters in the Everglades Protection Area to be altered so as to cause an imbalance in the natural populations of aquatic flora and fauna." Fla. Stat. § 373.4592(4)(e)2 (1994) (emphasis added). The words **"In no case** ...." are clear and absolute. The words, "**In no case**...." created a mandate, with power and force, that the phosphorus criterion must not allow waters in the Everglades Protection Area to alter the natural balance of flora and fauna. As discussed below, the Amended EFA and the Phosphorus Rule depart from this mandate.[13]

With regard to the need for a numeric criterion for phosphorus, the 1994 EFA stated that "[t]he phosphorus criterion shall be 10 parts per billion ("ppb") in the Everglades Protection Area in the event that the department [DEP] does not adopt by rule such criterion by December 31, 2003." Fla. Stat. § 373.4592(4)(e)2 (1994). This is referred to

---

June 17, 2004) [PR-AR-35], *aff'd, Miccosukee Tribe of Indians v. New Hope Sugar Co.*, 906 So.2d 1064 (Table) (Fla. 1st DCA 2005) at 50-51 ("Administrative Order"). The EAA and the C-139 Basin also contain Class III waters. EPA Sept. 1999 Determination at 10 [AR–PH-8] ("The narrative criterion also applies to all Class III waters tin the EAA and C-139 Basins except for the Class IV agricultural canals.")

The following narrative criterion for nutrients in Class III waters appears in Subsection 62-302.530:

> (48)(a) Nutrients – The discharge of nutrients shall continue to be limited as needed to prevent violations of other standards contained in this Chapter. Man-induced nutrient enrichment (total nitrogen or total phosphorus) shall be considered degradation in relation to the provisions of Sections 62-302.300, 62-302.700, and 62-4.242 F.A.C.

[13]

Although the 1994 EFA did not define the terms "imbalance" or "natural populations of aquatic flora and fauna," it did direct that the criterion "shall not be lower than the natural conditions of the [Everglades Protection Area]," and that the criterion "shall take into account spatial and temporal variability." Fla. Stat. § 373.4592(4)(e)(2) (1994).

as the "Default Provision;" that is, the phosphorus numeric criterion that would apply by default in the event an implementing rule was not timely adopted.  The Legislature recognized that the DEP's phosphorus criterion, whenever adopted, would supersede the 10 ppb criterion, but required that it "shall not be lower than the natural conditions of the Everglades Protection Area."  *Id*.

Lest there be any confusion on the point, the 1994 EFA's mandate to adopt a numeric interpretation of the narrative criterion, and its interim adoption of the default provision, is set forth under Section 373.4592(4)(e) (1994), entitled "Evaluation of Water Quality Standards."  Under subsection 3 of that section, the 1994 Florida Legislature imposed on the Department or the District the obligation to establish discharge limits in permits for discharges into the EAA canals and the Everglades Protection Area that were necessary to prevent an imbalance in the natural populations of aquatic flora or fauna in the Everglades Protection Area and to provide a net improvement in the areas already impacted.  Fla. Stat. § 373.4592(4)(e)(3) (1994).

In 2004, the EPA approved the default criterion of 10 ppb for the Everglades Protection Area.  EPA May 2004 Determination, at 1-2 [PR-AR-12].  This was not the first time that EPA recognized that discharges into the Everglades Protection Area with phosphorus concentrations in excess of 10 ppb to the Everglades would have adverse consequences to the ecosystem, causing imbalances in natural populations of aquatic flora and fauna.  In its Ambient Water Quality Criteria Recommendations from December 2000 [PR-AR-27], the EPA recommended a numeric criterion of 10 ppb of total phosphorus in the water column as a long-term value for the Everglades.  *See* PR-AR-27 at 7.  In its 1999 Determination Approving the Tribe's Water Quality Standards [PR-AR-10], the EPA

determined "10 ppb phosphorus is a scientifically defensible value *which is not overly protective and will protect the designated use adopted by the Miccosukee Tribe for its Tribal waters*."  EPA May 1999 Determination, at 2 (emphasis added).  Likewise, in 2005, the EPA later found "[s]cientific demonstrations have indicated that a long-term phosphorus criterion exceeding 10 ppb would not be protective of natural populations of aquatic flora and fauna in the Everglades." EPA Jan. 2005 Determination, at 5 [PR-AR-69].  Thus, without dispute, both the EPA and the Florida Legislature have recognized that if the water flowing into the Everglades Protection Area has a phosphorus concentration of 10 ppb, the phosphorus in the inflows of water would **not** cause an imbalance of the natural populations of aquatic flora and fauna.

### D.   Chief Judge Davis' Opinion (on remand)(Davis Opinion); the 1999 EPA Determination, and the December 31, 2006 Deadline

While the 1994 EFA appears at first glance to be protective, the 1994 EFA in fact further changed Florida's water quality standards by postponing compliance with the narrative and numeric standards for phosphorous through 2006 by adoption of a compliance schedule for dischargers into the Everglades Protection Area and for the District.  Of significant importance, the 1994 EFA, while recognizing that a long-term phosphorus criterion exceeding 10 ppb would not be protective of natural populations of aquatic flora and fauna in the Everglades Protection Area, nonetheless enacted a twelve-year compliance schedule for its implementation through, and including, December 31, 2006.  During that time period, the 1994 EFA altered water quality standards by effectively suspending enforcement of the narrative phosphorus criterion (and the later adopted default criterion) until the end of 2006. These issues were initially addressed in Chief Judge

Davis's 1998 opinion, *Miccosukee Tribe*, 1998 WL 1805539, and later by District Judge Patricia A. Seitz in *Friends of the Everglades v. EPA,* Case No. 00-935-CIV-SEITZ-GARBER (S.D.Fla. 2001).

### 1. **The Davis Opinion**

The Davis Opinion concluded that the 1994 EFA gave dischargers until 2006 to comply with the numeric phosphorus criteria and to otherwise meet the narrative criterion. The Davis Opinion primarily focused on the provisions which allowed permittees within the EAA and the C-139 Basin [who pay a fee under the Everglades Program and meet the Everglades BMP Program][14] to be excused from implementing additional water quality improvement measures prior to December 31, 2006. Fla. Stat. § 373.4592((f)(3) (1994). As noted in the Davis Opinion, *Miccosukee Tribe*, 1998 WL 1805539, at *7, the 1994 EFA provided that, as of December 31, 2006, all permits, including those issued prior to that date, "shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs." Fla. Stat. § 373.4592(4)(f) (1994). It mandated that "[a]s of that date, no permittee's discharge shall cause or contribute to any violation of water quality standards

---

[14]

As noted in the Davis Opinion, the 1994 EFA directs the District, in conjunction with EAA farmers, to develop and enforce a regulatory program known as Best Management Practices, or BMPs. Fla. Stat. § 373.4592(4)(f) (1994). BMPs are farming practices, such as stormwater retention, sediment control, and restrictions on use of fertilizers and pesticides, that the District determines to be the most effective way of improving water quality in agricultural discharges to a level that balances water quality improvements and agricultural productivity. Another provision establishes an Agricultural Privilege Tax on farmers doing business in the EAA and nearby areas. Farmers who use BMPs and achieve at least a 25% reduction in the amount of phosphorous coming from their land are entitled to a reduction in the tax. *Miccosukee Tribe*, 1998 WL 1805539, at *6.

in the Everglades Protection Area." *Id.*

Thus, while certain provisions of the 1994 EFA first declared that "in no case" would the phosphorus criterion allow waters in the Everglades Protection Area be altered so as to cause an imbalance, other provisions of the 1994 EFA granted a twelve year postponement from the date of enactment for compliance with the phosphorus criterion through 2006.  As EPA later commented in its September 1999 Determination,[15] *the effect was to amend the narrative and numeric standards themselves.  See* EPA Sept. 1999 Determination, at 6-7, 14-18 [EFA-AR-8].  This aspect of the 1994 EFA is important to this Court's consideration of the Amended EFA and to the changes in water quality standards that the Amended EFA enacted.

Returning to Judge Davis' Opinion, I note his concern that the CWA and accompanying regulations did not allow states a twelve year compliance period to meet water quality standards.  He feared that by not requiring farmers to implement additional water quality measures until 2006, the 1994 EFA allowed those discharges of phosphorous that violated Florida's narrative standard for nutrients to continue until 2006.  According to Judge Davis, this was not a reasonable compliance schedule, but a *de facto* suspension of, and therefore a change in, water quality standards.  *Miccosukee Tribe*, 1998 WL 1805539, at *16 (Davis, J.).

There was another aspect of the 1994 EFA, and of Judge Davis' Opinion, as to which EPA did not comment in its 1999 Determination, but which also is of major

---

[15]

Following the Davis Opinion, the EPA, in 1999, reviewed section 4(f) of the 1994 EFA as a revision to Florida's water quality standards. The EPA's September 1999 Determination is discussed in detail in this Order.

significance to this case.  After pointing out that EAA farmers did not have to comply with the narrative and numeric levels until December 31, 2006, Judge Davis went on to state that "[i]n fact, it is not until that date that **anyone** discharging phosphorous into the Everglades must comply with state water quality standards."  *Id.* at *7.  As support, Judge Davis referred to the Section 4(f) provision discussed above (dealing with the farmers), but also directly cited to Section 373.4592(10) (1994).  Section 10 provided that **by December 31, 2006,** the Department and the District shall take such action as may be necessary so that water delivered to the Everglades Protection Area **achieved** state water quality standards.  By this provision, the District, like the farmers, was relieved of meeting the narrative and numeric phosphorous criteria for its Everglades Construction Project until 2006.

Judge Davis' conclusion was correct.[16]  Under Section 10 of the 1994 EFA, the

---

[16]

The Davis Opinion cited to numerous EPA and Department statements supporting the conclusion that water quality standards for both the farmers and the District did not have to be met until 2006.  *Miccosukee Tribe*, 1998 WL 1805539, at *7 ("Depo. of Fritz Wagener of the EPA at 26 ('Q: So simplified what you're saying is that perhaps water quality standards are not being met but they'll be met in the year 2006? A: I think that's a short characterization of that, yes.'); Depo. of Robert McGhee of the EPA at 142 ('We reviewed the compliance schedules in the Everglades Forever Act and we recognized that water quality standards have been violated, are being violated and will continue to be violated until all of the actions that are necessary to prevent those violations have been taken.'), 154-55 ('it directs them to be in compliance with water quality standards by such and such a date. So they are continually up to that point in a violation mode of water quality standards. Q: It allows them to be in a violation mode until the year 2006, right, basically? A: Yes.'); A.R. at 203 (testimony of Frank Nearhoof of the Florida Department of Environmental Protection) ('Q: And structures that are not in compliance do not have to be in compliance until 2006 under the statute. Isn't that correct? A: That's correct.'), 3989, 4013, 4105, 4107 (Department of Environmental Protection report) (intent of the EFA is that by December 31, 2006, the state and the District shall take necessary action so that water delivered to the Everglades complies with state water quality standards), 6150 (U.S. Army Corps of Engineers report) ('the District will ... ensure that all discharges, from both

District was mandated to submit to the Department a permit modification to incorporate proposed changes to the Everglades Construction Project and to the permits issued pursuant to Section 9 of the EFA.  Critically, the 1994 EFA provided that "[t]hese changes shall be **designed** to achieve state water quality standards by December 31, 2006."  Fla. Stat. §373.4592(10)(a) (1994) (emphasis added). Similar to the farmers, this was a *de facto* suspension of water quality standards as applied to the district's Everglades Construction Projects and Section 9 permits.  For whatever reason, the EPA chose not to comment on section (10) of the 1994 EFA and only addressed the effect of Section 4(f) in its September 1999 Determination.

### 2. The EPA 1999 Determination

Although the EPA had originally contended that the 1994 EFA did not result in a change in water quality standards, EPA changed its position while the Davis Opinion was on appeal with the Eleventh Circuit. It then decided to review only "certain" provisions of the 1994 EFA as revisions to Florida's water quality standards. EPA claimed that it's review could be limited because, in its view, the Davis Opinion only found portions of Section 4(f) of the 1994 EFA to be a change in water quality standards. Thus, the EPA chose not to address the identical Section 10 provisions of the 1994 EFA dealing with the District. Regardless, even if the EPA had reviewed Section 10 as a change in Florida water quality standards, it no doubt would have concluded that the change would have likewise constituted a "reasonable compliance schedule."

_____

public and private interests, to the Everglades achieve compliance with applicable state water quality standards by December 31, 2006'").

I do not take issue with the EPA for its 1999 Determination, especially given the Eleventh Circuit's unpublished affirmance of Judge Patricia A. Seitz's Order which upheld it.  *See* footnote 18 below.   For detailed and scientifically based reasons set forth in its 1999 Determination,[17] the EPA concluded that amending the narrative criterion by incorporating a reasonable compliance schedule did not violate the CWA.  But, in its 1999 Determination, the EPA also made it clear that "any **new interpretation of the phosphorus criterion, any variance, site specific alternative criterion or other similar interpretation of the EFA that changes standards would require review by EPA as a change to Water Quality Standards**." EPA Sept. 1999 Determination, at 2 n.2 [EFA-AR-8] (emphasis added).  It acknowledged that the compliance schedule "applies to not only the current narrative but also to the future numeric criterion."  *Id.* at 5 n. 9.  As the EPA framed the issue, "[w]here, as here, a state adopts as part of the standard itself a compliance schedule for a particular existing criterion, the issue for EPA's review is

---

[17]

The EPA was very specific about the record it reviewed to determine if the compliance schedule set out in the EFA was needed, was as short as practicable and did not preclude earlier compliance. In preparing its determination, EPA compiled a "record" on the "reasonableness" of a twelve year compliance schedule.  EPA Sept. 1999 Determination at 9 n.14 [EFA-AR-8]. The record addressed the size and complexity of the Everglades and the nature of the problem (*id.* at 9); the lack of technology available (*id.* at 10); the status of the BMPs and STA (*id.* at 11); the steps necessary to achieve compliance with Phase II technologies; and availability of funding (*id.* at 17). The EPA also found it significant that the twelve-year schedule outlined in the 1994 EFA for completion of the restoration program was very similar to the schedule set out in the Settlement Agreement resolving of the original Everglades litigation, and supported by the State, the federal government, and the Micosukee Tribe as reasonable (*id.* at 16). The EPA mentioned that during the hearings before Judge Hoeveler on the Motion to Amend Settlement Agreement, "a great deal of testimony was heard on the reasonableness of the 2006 compliance schedule." *Id.* at 17.  As discussed at length later in this Order, none of these factors are present in the current EPA Determinations on the Amended EFA and the Phosphorous Rule, nor does the EPA make reference to them in its later Determinations.

whether the criterion as so amended is consistent with the requirements for criteria set forth in section 303(c)(2)(A) and 40 C.F.R. § 131.11." *Id.* at 7. For reasons that I will discuss, this same question is absolutely pertinent to the EFA Amendments and to the adoption of the Phosphorus Rule, but, yet, it was not even posed by the EPA in its later Determinations on the Amendments or the Rule, let alone answered in either case.

In assessing this issue in 1999, the EPA determined that, considering the "real world effect," inclusion of an "appropriately enforced compliance schedule might in fact lead to the most expeditious achievement of the level of water quality specified by the narrative criterion and hence provide the best means for protection in the real world." *Id.* at 8. Thus, EPA concluded that "it would be possible to regard a narrative criterion with a compliance schedule as still protective if the criterion was 'currently unattainable' due to lack of available control mechanisms to ensure that the appropriate technology was developed and put into operation as soon as possible; *and the period of nonattainment was limited to the time needed to develop and implement that technology with the goal of meeting the criterion by the end of the compliance period*." *Id.* at 8 (emphasis added). Most importantly, EPA considered whether there was "an *enforceable framework* that ensured the numeric water quality criterion for phosphorus would be met by the December 31, 2006, deadline in the EFA or sooner if possible." *Id.* at 9 (emphasis added). It essentially concluded that the Everglades would be protected because "[t]he EFA incorporated a permitting scheme, and adopted provisions to ensure that by December 31, 2006, *discharges into the Everglades Protection Area will no longer cause or contribute to any violations of state water quality standards.*" *Id.* at 5 (emphasis added). It finally concluded that the "reasonableness and acceptability of the 12 year schedule also **assumed** that the December 31, 2006, deadline

31

will be met." *Id.* at 9 n.15.

Upon later review, Judge Patricia A. Seitz found that the EPA did not act arbitrarily or capriciously in deciding that the water quality standard revised by the Florida Legislature complied with the CWA based on the record before it. But, Judge Seitz stated in her conclusion that "[l]ike EPA, the Court anticipates that the state will continue to implement all necessary measures to ensure that the Everglades will be Class III waters by December 31, 2006." Order dated Oct. 18, 2001 at 21 (Seitz, J.) [Case No. 00-935, DE 77].[18] As we will see, the deadline for compliance was not met. Instead, the Florida Legislature simply changed the deadline for compliance.

### E.   The Prelude to the Amended EFA

#### 1. Events Occurring in 2003

A number of events were scheduled to occur in 2003 which remain pertinent to any consideration of the 2003 EFA Amendments. First, the default provision was set to go into effect at the end of 2003 because no substitute phosphorous rule could be timely adopted by the Florida Environmental Regulation Commission ("ERC").[19] In fact, the EFA

---

[18]

On appeal, the Eleventh Circuit concluded that the EPA did not act arbitrarily by determining that a state water quality standard can incorporate a reasonable compliance schedule for meeting the standard. *Friends of the Everglades*, Case No. 01-16482, at 3 (11th Cir. July 19, 2002) [Case No. 00-935, DE 83].

[19]

In Florida, the rulemaking body for the DEP is the ERC. *See, e.g.,* Fla. Stat. § 403.804. Like the 1994 EFA, the Amended EFA provided for rulemaking to establish a numeric criterion for phosphorus. The ERC officially began its rulemaking for a numeric phosphorus rule in January 2002, while the 1994 EFA was in force. *See* documents for December 11, 2001, and January 31, 2002, ERC meetings [PR-AR-32]. The ERC adopted the Phosphorus Rule in July 2003, and the Rule was administratively challenged as an invalid exercise of delegated authority. It was upheld by an administrative law judge on June 17, 2004. *Sugar Cane Growers Coop. v. Dep't of Envtl. Prot.*, Case No. 03-02884RP

Amendments were being enacted **while** the ERC hearings were being held.  *See* ERC

meeting documents [PR-AR-32].[20]

Second, under Florida law, the governing law, being the 1994 EFA, had to be

amended to include any new compliance deadlines and moderating provisions if those

changes were to be considered by the ERC as part of the proposed Phosphorus Rule. This

is because any rule adopted had to be in accord with the enabling statute or it would

constitute an unlawful delegation of legislative authority.[21]

Third, by December 31, 2003, the District was required, under § 373.4592(10)(a)

(1994) of the Florida Statutes, to submit an application for permit modification to

incorporate proposed changes to the Everglades Construction Project, and these changes

had to be "designed" to achieve compliance with state water quality standards by

December 31, 2006.  This meant actual compliance by the District with the narrative and

numeric criteria.

Fourth, by December 31, 2006, the Department and the District had to take such

action as may be necessary so that water delivered to the Everglades Protection Area

---

(Final Order, June 17, 2004) ("Administrative Order") [PR-AR-35].  The Phosphorus Rule
was subsequently promulgated on July 15, 2004, and amended on May 25, 2005.  The
Plaintiffs challenge the 2005 version of the Rule.

[20]

Based on the ERC meeting documents [PR-AR-32 and the index to PR-AR-32], the
first meeting took place on December 11, 2001, and the ERC's proceedings on the
Phosphorus Rule officially opened at the ERC meeting on January 31, 2002.

[21]

*See Sw. Fla. Water Mgmt. Dist. v. Save the Manatee Club, Inc.*, 773 So. 2d 594,
599 (Fla. 1st DCA 2000) (holding that a regulation must implement and be based upon a
specific delegation of authority in order to be valid).

"achieved" state water quality standards, including the phosphorus criterion.   Fla. Stat. § 373.4592(10) (1994).

Fifth, the deadline was approaching for the farmers as well; that is, by December 31, 2006, no permittee's discharge into the Everglades Protection Area and the EAA canals could cause or contribute to any violation of water quality standards in the Everglades Protection Area.

Lastly, the deadline of December 31, 2006 in the Settlement Agreement Consent Decree was quickly approaching.  Judge Hoeveler had previously modified the Consent Decree to extend the deadline until December 31, 2006 and no further request for modification of the Consent Decree was pending.

Thus, to summarize, immediately prior to the Amendments to the EFA, the default numeric phosphorus criterion was going to be applicable to the entire Everglades Protection Area, and, after December 31, 2006, no discharges could cause phosphorus concentrations higher than 10 ppb anywhere in the Everglades Protection Area. Furthermore, based on the narrative criterion, "in no case" could the nutrient concentration anywhere in the Everglades Protection Area cause an imbalance of flora and fauna after December 31, 2006.

## 2. The Draft Long-Term Plan

The beginning of the effort to amend the 1994 EFA can be traced back to the Governing Board of the South Florida Water Management District ("District") which had the obligation to submit an application for permit modification designed to achieve water quality standards by December 31, 2003.  The permit application was to be in accordance with the District's proposed Long-Term Plan.  The original draft Long-Term Plan, as submitted

34

by the District's staff, included a strategy for achieving the long-term Everglades water quality objective "to ensure that all waters discharged to the Everglades Protection Area achieve water quality standards by December 31, 2006, consistent with the requirements of [the EFA] . . . ."  Exec. Summary, March 17, 2003 Long-Term Plan, at ES-1 [PR-AR-32, 3-27-2003, doc. 6].  The Long-Term Plan was to fulfill obligations "under both the EFA  . . . and the federal Everglades Settlement Agreement . . . ."  *Id.*  Thus, the original concept of the Long-Term Plan, as presented to the District's Governing Board, was to meet established deadlines.

On March 12, 2003,  the District's Governing Board modified the Long-Term Plan. It changed the Plan's objective to achieve, through "optimization, **to the maximum extent possible**, a predicted long term geometric mean phosphorus concentration in discharges to the Everglades Protection Area . . . ."  *Id.* at ES-5 (emphasis added).  It then defined "a more **realistic pace** towards achieving the phosphorous criterion in discharges to the Everglades."  *Id.* at ES-6 (emphasis added).  The March 2003 Plan noted that, "[u]pon initial review, it appears that the revised plan objective does not substantially modify the capital improvements or scientific investigations recommended in the draft plan, **only the schedule for ultimately achieving the phosphorous criterion and its associated natural variability in discharges to the Everglades**."  *Id.* (emphasis added).[22]

---

[22]

At the March 27, 2003, hearing before the Environmental Regulation Commission ("ERC"), Commissioner Tschinkel raised her "fundamental concern" about a rumor that a meeting had been held to discuss "very serious and very specific proposed amendments to the Everglades Forever Act." PR-AR-33, Tr. 3/27/03 at 10, 14 (Transcript of ERC Hearing). She discovered through non-DEP or ERC channels that there was an "unprecedented . . . in the middle of rulemaking, an attempt by one of the parties to change the actual-the  act on which we're currently adopting the rule." *Id.* at 11. She characterized

**F.    The Amended EFA, the EPA November 5, 2003 Determination, and the Court's APA  Analysis**

The Amended EFA is an adroit legislative effort to obscure the obvious. In certain provisions, it appears to leave the narrative and default numeric criterion unchanged. However, the totality of the Amended EFA effectively suspends the enforcement of the narrative and default phosphorus criterion through 2016 and, in lieu, creates new or revised water quality criterion based upon TBELs established through BAPRT [the Long-Term Plan].

But, as adroit as it is, the amendment effort was not initially successful because the original bill had to be amended to include a second "Glitch Bill," Senate Bill 54A, enacted on July 1, 2003 [EFA-AR-2][23] that removed the more blatant changes, such that the phosphorus criterion would be achieved "at the earliest practicable date" and that the Long-Term Plan would achieve water quality standards in the Everglades Protection Area only "to the maximum extent practicable." EFA-AR-2; *see* § 373.4592(2)(a), (3)(d), (3)(e), and (10)(a).

While the Glitch Bill removed these changes, it kept the same "effect" with other language, as described below.  And, at the same time, the Glitch Bill also removed protective language which was in the initial bill.  The Glitch Bill removed language from the

---

these actions as a "very serious breach of . . . procedure," and was concerned that nobody at the DEP spoke to them about this, especially given that the ERC is "the exclusive rule-making group for the Department of Environmental Protection." *Id.* at 10, 11, 13.

[23]

The 1994 EFA was amended through two bills: CSSB No. 54-1 (Laws of Florida, Ch. 2003-394) and CSSB No. 626 (Laws of Florida, Ch. 2003-12).  Because the second bill amended provisions passed and signed into law in the first bill, the Court's discussion is directed to the final adopted bill, unless otherwise stated.

original which provided "[u]nder no circumstances shall the project or strategy [referring to the District's modification's to the Everglades Construction Project] contribute to violation of state water quality standards." *Compare* Fla. Stat. § 373.4593(10)(a) (May 20, 2003) *with* Fla. Stat. § 373.4593(10)(a) (July 1, 2003).  Without such restriction, the inference is, given the context of all the other amendments, that such project or strategy may contribute to violation of state water quality standards [meaning the narrative and numeric criterion] so long as there is compliance with the adopted Long-Term Plan.

Judge Hoeveler, who long presided over the Everglades litigation and the Settlement Consent Decree, expressed his frustration, in an order dated May 9, 2003, at the process leading to the Amended EFA.  He noted, in "dismay" that "[t]he bill was moved quickly through the legislative process, reportedly at the behest of more than forty lobbyists for the sugar industry."  Order, May 9, 2003, at 2 [Case No. 88-1886, DE 1733] (Hoeveler, J.).  Judge Hoeveler remarked that "[t]here is simply no explanation for the speed by which this was accomplished, given the fact that the deadlines remain three and a half years off." *Id.*  He commented, with great foresight, that "the treatment of the bill seemed calculated to avoid federal participation or public scrutiny."  *Id.*

### 1. <u>What the Amended EFA Accomplished and Its Effect</u>

Under established Eleventh Circuit case law, this Court has the authority to carefully review the *"effect"* of the Amendments to the EFA "on the water quality standards of Florida," that is, the practical impact, to determine whether the Amendments to the EFA constitute a change to Florida's water quality standards.  *FPIRG*, 386 F.3d at 1088 ("We agree with the plaintiffs that the district court erred by failing to conduct a thorough review

of the *effect* of the Impaired Waters Rule on the water quality standards of Florida").[24]

The Eleventh Circuit made clear, in *FPIRG*, that the district court should determine whether the practical impact of the legislation is to revise applicable water quality standards. *Id.* In order to do so, "the district court was required to look beyond the Florida Department of Environmental Protection's (DEP) characterization of the Impaired Waters Rule as a methodology or 'screening measure' that did not change the standards." *Id.* at 1088.

I apply this methodology with regard to the EPA's finding concerning the 2003 Amendments to the EFA in its November 5, 2003, Determination [PR-AR-11].[25] The EPA

---

[24]

In *FPIRG*, plaintiffs sued EPA under the citizen suit provision of the CWA to enforce the Act's requirement that the EPA review new or revised water quality standards for compliance with the CWA. The Florida DEP had adopted an administrative rule on impaired waters, and the EPA reviewed this impaired waters rule but did not determine whether it complied with the CWA. Plaintiffs argued that the rule changed Florida's water quality standards because it (1) required more than a single sample to exceed maximum pollutant concentrations before a water body was considered impaired, as opposed to just one sample before the rule; and (2) adopted specific nutrient concentrations as the primary means for assessing nutrient impairment, and added numeric criteria, which did not exist before the rule. The district court held that the impaired waters rule did not establish new or revised water quality standards or policies affecting those water quality standards. The Eleventh Circuit reversed and remanded, requiring the district court to determine how Florida's water quality standards had previously been applied and whether the impaired waters rule, as applied, changed those standards. *FPIRG*, 386 F.3d 1070.

[25]

The EPA sent DEP a letter on November 5, 2003, which included EPA's conclusions that it had no duty under the CWA to approve or disapprove the amendments to the EFA because they were not "at this time, new or revised water quality standards." EPA Nov. 5, 2003 Determination, at 1[PR-AR-11]. With this November 5, 2003, letter, EPA attached its decision document in which EPA examined subsections 2, 3(b), 3(c), 3(d), 3(e), 4(e)(2), 4(e)(3), 4(f) and 10 of the Amended EFA. The EPA concluded that the amendments to the EFA did not change the requirement in the 1994 EFA that permittees had to meet standards by December 31, 2006, and EPA also concluded that the amendments did not "at this time" establish a compliance schedule through 2016 for complying with the phosphorus criterion. *Id.* at 9.

first concluded that the Amendments did not "*at this time*" change the water quality standards of Florida, including the criteria and anti-degradation policy.  Second, the EPA determined that the Amendments do not establish a new compliance schedule, or modify an existing one, for obtaining compliance with State water quality criteria.  Third, the EPA found that the Amendments do not change the uses of the Everglades waters, even though they allow continuing discharges of pollutants from point sources into the Everglades.

To understand why EPA's conclusions are arbitrary, capricious and not in accordance with law, it is first necessary to understand  what the plain words of the statute say.  To do so, I must apply accepted principles of statutory construction in a manner consistent with Florida law.  EPA has not undertaken such an analysis.  In any event,  I am not obligated to give EPA *Chevron* deference when it, as a federal agency, is interpreting a Florida statute, as compared to the CWA or its own regulations. Furthermore, we are not dealing with a state statute, or a state  implementing regulation, which has the force and effect of federal law and which can be enforced by the EPA in federal court.  *See* discussion at p. 12-15 above.  *Cf. Sierra Club v. Adm'r*, 496 F.3d 1182, 1186 (11th Cir. 2007) (concluding that the fact that the Georgia Rule is a state regulation is not an obstacle to according *Chevron* deference in this case because the Georgia Rule is part of a state implementation plan made pursuant to the Clean Air Act which has the force and effect of federal law and may be enforced by the EPA in federal court).  However, before commenting on Florida's statutory construction principles, I first address DEP's argument that Plaintiffs' challenges to the Amended EFA are moot in light of the adoption of the

_____

Phosphorus Rule and the EPA's Determination that certain provisions are changes in water quality standards.

      **2. The Amendments to the EFA Constitute a Change in State Water Quality Standards, are not Dependant Upon Adoption of a Rule by the Environmental Regulation Commission, and Constitute a New or Revised Compliance Schedule**

In its briefs, DEP argues that EPA's subsequent determination that the Phosphorus Rule's changes to Florida's water quality standards are consistent with the CWA renders moot the question of whether EPA followed its statutory duty in reviewing the EFA Amendments authorizing the promulgation of that Rule. *See* DEP brief, DE 234, p. 28. I disagree.

The doctrine of mootness derives directly from Article III of the Constitution, under which the exercise of judicial power depends upon the existence of a case or controversy. *SEC v. Med. Comm. for Human Rights*, 404 U.S. 403, 407 (1972). When a case no longer presents a controversy with respect to which the court can give meaningful relief, the case must be dismissed. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (citations and internal quotations omitted).

The EFA, as amended, has never been invalidated. In light of the EPA's acceptance of the Amended EFA as making no changes to Florida's water quality standards, the Amended EFA continues to serve as a statutory basis for further regulatory changes to our water quality standards – *e.g.*, if the current Phosphorus Rule were to be rescinded by DEP. Thus, this Court must determine whether EPA performed its legal duty to review the EFA Amendments as a potential change in water quality standards and for consistency with the CWA. The Rule itself is authorized by and depends on the

40

Amendments, and therefore any analysis of the Rule is inextricably intertwined with an analysis of the Amendments.  I have both the authority and the duty to assure that any future Florida regulations affecting water quality standards are based on statutory authority which has been reviewed comprehensively by the agency entrusted by Congress to enforce the CWA.[26]

Clearly, Plaintiffs' claims relating to EPA's review of the EFA Amendments are not moot – I am able to provide "meaningful relief" (e.g., by requiring EPA to follow its duties according to the CWA) and I specifically reject DEP's suggestion that no controversy remains (DE 251, p. 13, fn 12).

### 3. Statutory Construction and Interpretation of the Amended EFA

I now turn back to statutory construction and interpretation of the Amended EFA. "It is axiomatic that all parts of a statute must be read together in order to achieve a consistent whole; courts should avoid readings that would render part of a statute

---

[26]

EPA has a duty, under § 303(c)(3) of the CWA (33 U.S.C. § 1313(c)(3)), to review any of Florida's actions which change water quality standards and, as is clear from the EPA's own statements in its November 2003 determination, the EPA itself was unsure whether the Amendments had effected such changes.  "[S]hould subsequent events or new information indicate that *these amendments* may effect changes in Florida's water quality standards, [EPA] will reconsider *their status* at that time." EPA Nov. 5, 2003 Determination, cover letter (emphasis added) [PR-AR-11].  EPA essentially deferred evaluation of parts of the EFA Amendments because it had "no basis for acting on these provisions at this time," *id.*, at 8, but noted that "if future actions *alter our understanding of the EFA*," *id.*, at 12 (emphasis added), review would occur at that time – a deferral which is contrary to EPA's statutory obligations. The Eleventh Circuit has noted that "there is no guarantee that the EPA will conduct thorough reviews of future [state regulatory actions]." *FPIRG*, 386 F. 3d at 1088 (EPA's subsequent review of a partial listing of Florida's polluted waters, generated by reference to an earlier rule promulgated by the state, did not moot the question of whether EPA's review of the rule itself was conducted in compliance with the CWA as to whether the rule changed Florida's water quality standards).

meaningless." *Sierra Club v. St. Johns River Mgmt.*, 816 So. 2d 687, 693 (Fla.5thDCA 2002) (citing *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 455-456 (Fla. 1992)).  Likewise, "Courts must avoid any construction of a statute that would produce an unreasonable, absurd, or ridiculous consequence."  *St. Johns,* 816 So. 2d at 693.  "'[A]ll parts of a statute must be read *together* in order to achieve a consistent whole,' and '[w]here possible, courts must give effect to *all* statutory provisions and construe related statutory provisions in harmony with one another.'" *Borgner v. Brooks,* 284 F.3d 1204, 1208 (11th Cir. 2002) (emphasis in original) (quoting *Young v. Progressive Se. Ins. Co.,* 753 So. 2d 80, 84 (Fla. 2000)).  Statutes should be construed to give each word effect and courts should avoid readings that would render part of statutes meaningless.  *Warner v. City of Boca Raton,* 64 F.Supp.2d 1272, 1283 (S.D.Fla. 1999).

Moreover, when the legislature amends a statute, it is presumed that the legislature intends to change the law.  *Smith v. Fla. Dep't of Corr.*, 961 So. 2d 1050, 1052 (Fla. 1st DCA 2007); *State v. Hart*, 372 So. 2d 174, 176 (Fla.2d DCA 1979); *Carlilie v. Game & Fresh Water Fish Comm'n,* 354 So. 2d 362, 364 (Fla. 1978).  When the legislature amends a statute by omitting words, it is presumed that they intended for the statute to have a different meaning from the meaning it had before the amendment.  *Aetna Cas. & Surety Co. v. Buck,* 594 So. 2d 280, 283 (Fla. 1992).  In the case of conflicting provisions, the latter expression will prevail over the former unless a well-recognized exception applies, *Sharer v. Hotel Corp. of Am.*, 144 So. 2d 813 (Fla. 1962), and, where an amendatory section of a statute takes the place of an original section, it operates together with the unchanged portions of the statute according to the nature of the changed language. *Beckwith v. Bd. of Pub. Instruction of Dade County*, 261 So. 2d 504, 507 (Fla. 1972).

Applying these well-recognized principles of statutory construction, I conclude that the EPA has misread the essential provisions of the EFA and its Amendments. I also find that the EPA's conclusions are "not in accordance with law" because the CWA does not allow State water quality standards to be replaced with "across-the-board" technology-based effluent limitations, regardless of results, with an open-ended compliance schedule.

### 4.   The Amended EFA's Long-Term Plan Provisions

It all starts with the Amended EFA's adoption of the "Long-Term Plan." By definition, the "Long-Term Plan" or "Plan" is the District's "Everglades Protection Area Tributary Basins Conceptual Plan for Achieving Long-Term Water Quality Goals Final Report", dated March 2003, as modified by the Amended EFA. Fla. Stat. § 373.4592(2)(j) (2003). Even though the Florida Legislature adopted the "March 2003" version, the Amended EFA authorizes the Long-Term Plan to be revised by the South Florida Water Management District ("District"), itself, the primary discharger into the Everglades Protection Area. The revisions only need be approved by the DEP. Fla. Stat. § 373.4592(3)(b) (2003) ("Revisions to the Long-Term Plan shall be approved by the department [DEP].")[27]

In turn, Section 3 of the Amendments declares that the Long-Term Plan is the "best

---

[27]

The Amendments provide that revisions to the Long-Term Plan shall be incorporated through an "adaptive management approach" including a process development and engineering component to identify and implement incremental "optimization" measures for further phosphorus reduction. Fla. Stat. § 373.4592(3)(b) (2003). The Legislature defines "optimization" to mean "maximizing the potential treatment effectiveness of the STAs through measures such as additional compartmentalization, improved flow control, vegetation management, or operational refinements, in combination with improvements where practicable in urban and agricultural BMPs, and includes integration with Congressional authorized components of the Comprehensive Everglades Restoration Plan or "CERP." Fla. Stat. § 373.4592(2)(l)(2003).

available phosphorus reduction technology," referred to in the Amendments as "BAPRT." The Amendments define BAPRT to mean "a combination of BMPs and STAs which include a continuing research and monitoring program to reduce outflow of phosphorus so as to achieve the phosphorus criterion in the Everglades Protection Area." Fla. Stat. §373.4592(2)(a) (2003).[28] Section 3 equates the Long-Term Plan to BAPRT. It states that "[t]he Legislature finds that the most reliable means of optimizing the performance of STAs and achieving reasonable further progress in reducing phosphorus entering the Everglades Protection Area is to utilize a long-term planning process." Fla. Stat. § 373.4592(3)(b) (2003). It then declares that "the Long-Term Plan provides the best available phosphorus reduction technology [BAPRT] based upon a combination of the BMPs and STAs described in the Plan provided that the Plan shall *seek* to achieve the phosphorus criterion in the Everglades Protection Area." The Long-Term Plan is to be "implemented" with *"the planning goal and objective of achieving the phosphorus criterion to be adopted pursuant to subparagraph 4(e)2." Id.*[29] (emphasis added).

Under the clear wording of the Amendments, the requirement is no longer to

---

[28]

The complete Long-Term Plan allows discharges into the Everglades Protection Area from all basins of any total phosphorus concentration until 2016. It contains no cap on discharges and anticipates discharges above 10 ppb until at least 2056. PR-AR-29.28 ES-3. It does not define a required inflow concentration anywhere. It is also a "moving target" and already has been amended at least twice since its adoption by the Florida Legislature. *See* PR-AR-29.28 (Oct. 2003 Long-Term Plan); PR-AR-73, p.7 (referencing a Nov. 16, 2004 Long-Term Plan). Notably absent from the Long-Term Plan is any discussion of what happens in 2016 if the evolving "estimated performance" of the Long-Term Plan is not met because of insufficient funding or other considerations.

[29]

Subsection 4(e)2 of the Amended EFA addresses both the default provision for the phosphorus criterion and the rulemaking requirements that would supersede the default provision. *See* Fla. Stat. § 373.4592(4)(e)2 (2003).

"achieve" the phosphorus criterion, that is, to *meet* it, but to "*seek to achieve* the phosphorus criterion," as a planning goal and objective, and, thereby, not actually meet it. Of importance, the Florida Legislature refers to the Long-term Plan itself as "the best available phosphorus reduction technology." Fla. Stat. § 373.4592(3)(b) (2003).  If this was not clear enough, the  Legislature then restates what is already included in the Long-Term Plan.  The Legislature  officially recognizes that "[t]he Long-Term Plan contains an initial phase and a 10-year second phase." Fla. Stat. § 373.4592(3)(d) (2003).  It requires that "[T]he Long-Term Plan shall be implemented for an *initial 13-year phase* (2003-2016) and shall achieve water quality standards relating to the phosphorus criterion in the Everglades Protection Area as determined by a network of monitoring stations established for this purpose."[30]

The Amended EFA, then, is a mandate that the State of Florida "implement" the Long-Term Plan, which itself constitutes moderating provisions and a compliance schedule that  removes the December 31, 2006 deadline and substitutes "an initial phase" through 2016.[31] The heart of the matter is that the  new compliance  schedule is legislatively

---

[30]

After the first ten year phase, the Florida Legislature contemplates an additional ten year "second phase." The Act provides  "The Legislature intends that a review of this act at least 10 years after implementation of the initial phase is appropriate and necessary to the public interest."  It further states  that "[t]he review is the best way to ensure that the Everglades Protection Area is achieving state water quality standards, including phosphorus reduction, and the Long-Term Plan is using the best technology available." Fla. Stat. § 373.4592((3)(e) (2003).

[31]

Other sections of the Amended EFA, when read together with Section 3,  make clear that the December 31, 2006, compliance date was abandoned and replaced with the Long-Term Plan, which will not be fully implemented until 2016, or beyond. For example, compare subsection 10(a) of the 1994 EFA ("by December 31, 2006 . . . take such action

incorporated into water quality standards for dischargers who meet the statutory requirements, as opposed to authorizing compliance schedules in individual permits on a case-by-case basis. The "effect" of the Amended EFA, therefore, is to replace the narrative and numeric phosphorus criterion with an escape clause that allows non-compliance,[32] by virtue of both an extended compliance date, and, during the extension, a **lesser** state water quality standard of compliance, namely, compliance with the Long-Term Plan and "TBELs". The lesser quality standard is then mandated for future permits for discharges into the Everglades Protection Area.

To further explain, discharges under Florida law, including under the 1994 EFA and the Amended EFA, are governed by permits. Both Sections 4 and 10 of the Amended EFA reference permits for discharges into and within the Everglades Protection Area. Section 4(e)(3) permits are issued by the Department or the District for discharges into the EAA canals and into the Everglades Protection Area, and Section 10 Long-Term Compliance permits are issued by the Department to the District for point source discharges.[33] The

―――――――――――――

as may be necessary so that water delivered . . . **achieves** . . . the phosphorus criterion,") with the 2003 Amended EFA subsection 10 language ( "By December 31, 2006 . . . take such action as may be necessary to **implement the pre-2006 projects and strategies of the Long-Term Plan** so that water delivered . . . **achieves** . . . phosphorus criterion **and moderating provisions**."). *See also* subsection (3)(b)(10)(" the Long-Term Plan . . . **shall seek** to achieve the phosphorus criterion in the Everglades Protection Area . . . with **the planning goal and objective of achieving** the phosphorus criterion"). The emphasis is not achieving, but on "seeking" to achieve, which is only an aspiration.

[32]

As later discussed, the Phosphorus Rule, based on the Amended EFA, makes it clear that discharge limits are to be based upon "TBELS" established through BARPT and "shall not require water quality based effluent limitations through 2016." F.A.C. § 62-302.540(5)(d) ("Phosphorus Rule").

[33]

Chief Judge Davis noted in his opinion that while the CWA only allows the EPA to

Amended EFA unequivocally provides in both Sections 4 and 10 that during the implementation of the initial phase of the Long-Term Plan [*i.e.*, through 2016], permits issued by the department (DEP) shall be based on BAPRT, and **shall** include technology-based effluent limitations consistent with the Long-Term Plan.   *See* Fla. Stat. §§ 373.4592(4)(e)(3) and 10(a) (2003).[34] This provision  is not discretionary, but mandatory, by virtue of the word "shall" in context with the remaining EFA Amendments.

"Technology-based effluent limitations" or "TBELs" are defined by the Amended EFA to mean "the technology-based treatment requirements as defined in Rule 62-650.200, Florida Administrative Code."[35] By definition, TBELS are **less** restrictive than the

---

directly enforce standards against point sources, the CWA still applies to nonpoint sources. The EPA's own Water Quality Standards Handbook states that nonpoint sources may not cause a violation of state water quality standards. *Miccosukee Tribe*, 1998 WL 1805539, at *18 (Davis, J.).   I further concur with Judge Davis' observation that "[t]he CWA [Clean Water Act] would be nothing more than a paper tiger if it didn't apply to nonpoint sources. It would make no sense to have an act that highly regulated the sources of some pollutants, but gave others *carte blanche* to pollute at will.  The congressionally stated goals of the CWA show it applies to *all* sources of pollutants. 33 U.S.C. §1251(a) (CWA goal is to 'restore and maintain the chemical, physical and biological integrity of the Nation's waters.'" *Id.*  Judge Davis stated, and I agree as it relates to this case, "the record does not support the EPA's conclusion that the EFA is consistent with the CWA. By allowing nonpoint sources to violate state water quality standards until 2006, the EFA violates both the letter and spirit of the Clean Water Act." *Id.*

[34]
Section 373.4592(4)(e)(3) provides that "[d]uring the implementation of the initial phase of the Long-Term Plan, permits issued by the department **shall** be based on BAPRT and shall include technology-based effluent limitations consistent with the Long-Term Plan." (emphasis added).  Similarly, section 373.4592(1)(a) provides "[d]uring the implementation of the initial phase of the Long-Term Plan, permits issued by the department **shall** be based on BAPRT, and **shall** include technology-based effluent limitations consistent with the Long-Term Plan, as provided in subparagraph 4(e)(3)." (emphasis added).

[35]
The Administrative Code provision defines "TBELs" as "minimum waste treatment requirement, established by the Department, based on treatment technology." F.A.C. § 62-

narrative and numeric phosphorus criterion which are defined to be "Water Quality Based Effluent Limitations ("WQBELs")."[36] Thus, during the period through 2016, permits may issue even if neither the narrative nor the numeric phosphorus criterion is met so long as there is compliance with the Long-Term Plan and implementation of TBELs. The change in compliance schedule, coupled with the changes in criteria, are changes in state water quality standards. The target for protecting the Everglades is no longer the phosphorus criterion, but a future plan that candidly concedes that discharges will be above the default provision of 10 ppb. Fla. Stat. § 373.4592(3)(b) (2003); Ex. H, Long-Term Plan at ES-3 [PR-AR-29.28].

### 5. <u>Moderating Provisions: a Fourth Component of Water Quality Criteria</u>

The controlling water quality standard for the State of Florida after the EFA Amendments were enacted mandated that DEP include moderating provisions in all permits issued by DEP. Fla. Stat. § 373.4592(4)(e), (10)(2003). The Legislature also authorized DEP to include moderating provisions in the Phosphorus Rule, but it is clear from the language of the statute that the moderating provisions were, essentially, the Long-Term Plan. Fla. Stat. § 373.4592(4)(e)3 (2003). The EFA Amendments are clear on their face that they replace the 1994 EFA's requirement that water discharges to the Everglades Protection Area must meet the phosphorus narrative criterion of no imbalance of aquatic flora and fauna by December 31, 2006, by implementing the Long-Term Plan. The same

---

650.200 (13).

[36]

"Water quality based effluent limitation" ("WQBEL") means an effluent limitation, which may be more stringent than a technology-based effluent limitation, that has been determined necessary by the Department to ensure that water quality standards in a receiving body of water will not be violated." F.A.C. § 62-650.200.

applies to the default criterion.

Prior to the 2003 Amended EFA, moderating provisions were defined under the Florida Administrative Code to be a component of "water quality standards. "[37] The Florida Administrative Code specifically defined  "water quality" to include "... the moderating provisions contained in this Rule and in F.A.C. Rule 62-4, adopted pursuant to Chapter 403, F.S," in addition to designated present and future beneficial uses (classification of waters), the numeric and narrative criteria applied to the specific water uses or classification and the Florida anti-degradation policy.  F.A.C. §§ 62-302.200 (29) and (3)). Before the 2003 Amendments to the EFA were enacted, the State's "moderating provisions" **were limited** under Florida law to "mixing zone, zone of discharge, site specific alternative criteria, exemption, and equitable allocation provisions." *See* F.A.C. §§ 62-302.300(10)(b)(2), (10)(d).   These "administrative" moderating provisions were not "statutory" and did not trump the narrative and default criteria by providing mandated requirements that were to be included in all permits for discharges into the Everglades

---

[37]

Under Florida law, a water quality standard is composed of  four separate components that include classified uses, water quality criteria, an anti-degradation policy, and  moderating  provisions.  F.A.C. § 62-302.200(30).

Beginning in 1979, Florida's administrative rules also added an antidegradation policy which provides, in part, that "[p]ollution which causes or contributes to new violations of water quality standards or to continuation of existing violations is harmful to the waters of this State and shall not be allowed.  Waters having water quality below the criteria established for them shall be protected and enhanced."  F.A.C. § 62-302.300 (15).  This antidegradation policy applies to both OFWs and non-OFW waters.  *See* id. The antidegradation policy specifically addresses nutrients and states that "excessive nutrients (total nitrogen and total phosphorus) constitute one of the most severe water quality problems facing the State."  *Id.* at (13).  The Rule further provides that it shall be the Department's policy to limit the introduction of man-induced nutrients into the State's waters, with  particular  consideration  given  to  waters  which  contain  low  nutrient concentrations.  *Id.*

Protection Area.  The EFA Amendments, however, have changed the status of moderating provisions.

The new, Amended EFA  statutory "moderating provisions" go significantly beyond what is in the Florida Administrative Code. The distinction is critical because the State of Florida uses the term "standards" to imply that the CWA's three water quality standards elements of (1) criterion, (2) designated uses and (3) anti-degradation requirements are being met, when, under the Amended EFA, moderating provisions trump those three elements. Thus, the Legislature created and authorized a fourth component to the water quality standards, "moderating provisions," which is contrary to the CWA.[38]

### 6. The EPA's Position on Moderating Provisions

Subsection (4)(e)(2) of the Amended EFA sets forth moderating provision for impacted and unimpacted areas within the Everglades Protection Area.  Moderating provisions are designed to "moderate" or temper the impact of the phosphorus criterion on the regulation of discharges into the Everglades Protection Area and, as discussed above, are specifically allowed as the result of legislative amendment enacted in 2003.

---

[38]

The term "moderating provisions" appears  nowhere in the Clean Water Act and its implementing regulations.  The CWA contains only three  water quality standards: (1) the designated use; (2) the criteria, either in narrative or numeric form, and (3) an anti-degradation policy. *See* 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(b), (f), (I); 131.10; 131.11; 131.12. Because the moderating provisions changed the water quality standards, they should have been reviewed by EPA under Section 303 ( c) of the CWA. But, the EPA, having concluded that the EFA Amendments were dependent upon the adoption of the Phosphorus Rule, made no analysis of the impact of the EFA Amendments on each element of water quality standards. The only analysis done by the EPA (concerning whether the EFA Amendments changed the anti-degradation policy) was contained summarily in a footnote in the EFA Determination. "The 2003 amendments to the EFA do not revise Florida's anti-degradation requirements." EPA Nov. 5, 2003  Determination, at n.12 [PR-AR-11]. This is patently arbitrary and capricious.

Subsection (4)(e)(2) provides, in part:

> The department's rule adopting a phosphorus criterion may include moderating provisions during the implementation of the initial phase of the Long-Term Plan authorizing discharges based upon BAPRT providing net improvement to impacted areas. Discharges to unimpacted areas may also be authorized by moderating provisions, which shall require BAPRT, and which must be based upon a determination by the department that the environmental benefits of the discharge clearly outweigh potential adverse impacts and otherwise comply with antidegradation requirements. Moderating provisions authorized by this section shall not extend beyond December 2016 unless further authorized by the Legislature pursuant to paragraph (3)(d).
> Fla. Stat. § 373.4592(4)(e)(2) (2003).

The EPA states in its 2003 Determination that subsection (4)(e)(2) was modified to "authorize," but not require the inclusion of moderating provisions as part of the future rule-making to establish a phosphorus criterion. It found the same thing to be true in subsection 10. It states that the Amendments to the EFA do not define "the type of moderating provision to be developed, the extent of change allowed through the moderating provisions, or whether the moderating provision applies to outflow from phosphorus sources or to the ambient water quality criteria supporting the designated uses of the EPA." EPA Nov. 5, 2003 Determination at 8 [PR-AR-11]. Thus, the essence of EPA's Determination, and the arguments included in its various briefs, is that references to "moderating provisions" only create the "possibility" of future enactment of these "moderating provisions" and "do not themselves change the designated uses or water quality criterion criteria of the [Everglades Protection Area] at this time." *Id.* at 8. As the EPA puts it, "by using the word 'may' the statute simply authorizes DEP to create such provisions if the Department, in the exercise

51

of its discretion, determines they are appropriate." DE 231, at 15.[39]

The EPA's limited discussion of the 2003 EFA Amendments essentially substitutes future rule-making and future permitting to avoid reviewing the present legislative authorizations as *de facto* changes in water quality standards required to be reviewed under the CWA. The changes to the "Long-Term Plan" under the Amended EFA are dismissed by EPA as imposing no compliance schedule "at this time." EPA Nov. 5, 2003 Determination, at 9 [PR-AR-11]. The EPA likewise dismisses the Amended EFA's legislative findings as being inconsequential without future rule-making in place:

> While these [findings] clearly contemplate that the Long-Term Plan for reducing phosphorus entering the [Everglades Protection Area] will extend beyond 2006 (the initial phase runs until 2016, and there is to be a second phase after that), in our view, they do not set a new, later compliance date without further rule-making.
>
> EPA Nov. 5, 2003 Determination, at 10 [PR-AR-11].

While the 1999 EPA Determination ratified a definite December 31, 2006, deadline for compliance with the CWA, the EPA concludes in its 2003 Determination that the previously imposed compliance deadline can be evaded simply by not referring to or changing the compliance schedule itself. The EPA says there is no change to the compliance schedule because "[t]he amended language does not specifically refer to the 2006 deadline . . . ." EPA Nov. 5, 2003 Determination, at 11 [PR-AR-11].

The EPA's conclusion is arbitrarily and wrongly premised upon the incorrect

---

[39]
The Tribe and Friends argue with merit that the Amended EFA was "craftily drafted" to attempt to evade EPA review. DE 247, at 5. They further assert "EPA either does not see the State's true intent or chooses to turn a blind eye to the truth and its duties under the Clean Water Act. EPA's review, which consisted of reading the words of specific sections of the Amendments, rather than connecting them to analyze its true effect, was arbitrary and capricious." *Id.*

assumption that even though the Amendments tell DEP what the moderating provisions are (the Long-Term Plan), how long they should be in place (at least through 2016), and that the Long-Term Plan is BAPRT for purposes of permitting, they are "not binding" on the State because the State's proposed rule on the phosphorus numeric criterion had not been promulgated at the time the Amendments to the EFA had passed.  When viewed as a whole, the Amended EFA mandates the moderating provisions in the Phosphorus Rule. The EPA avoids scrutinizing the statute as a whole and instead focuses on a cramped analysis of the word "may."  Given the context, the use of the word "may" instead of "shall" is gamesmanship and seemingly an effort by the State to avoid EPA scrutiny.  The EPA ignores that the key components of the moderating provisions had to be explicitly included in the Amended EFA in order for the Phosphorus Rule to survive an administrative challenge as an unlawful delegation of legislative authority. When read as a whole, the EFA Amendments create a mandatory duty that changes water quality standards.

### 7.   <u>**"May" means "Shall"**</u>

While the statutory mandate operates independently of subsection (4)(e) to change Florida's water quality standards, subsection 4(e), nonetheless, must be considered in *pari materia* to all of the Amended EFA  statutory changes. The EPA's Determination does not consider, given the totality of the Amended EFA statutory requirements and framework, whether the word "may" actually means "shall" for statutory purposes in the context of subsection 4(e).  By taking the word "may" in Section 4 and examining it in isolation from all other revisions to the EFA, the EPA has acted arbitrarily and capriciously, and in a manner inconsistent with applicable law.

Based on my review, the EFA Amendments establish on their face, in accordance

with their plain terms,  that the Florida Legislature actually mandated that the Long-Term Plan, the moderating provision chosen by the Legislature, be implemented without delay and directed that it be included in all permits issued by the DEP. Fla. Stat. §§ 373.4592(3)(b), 3(c), 3(d), 3(e), 4(e), and 10 (2003).   The Florida Legislature also mandated that all permits would be issued based on the provisions of the Long-Term Plan, which includes the compliance schedule contained therein (and now adopted by statute) and the projected discharges of phosphorus which exceed the default numeric criteria. The moderating provisions are immediately applicable through the adopted Long-Term Plan as BAPRT, along with its TBELS and the requirement to incorporate them into all permits issued.

EPA improperly gives little effect to the mandatory, non-discretionary components of  subsection (4)(e)(2), which require that, during the implementation phase of the initial phase of the Long-Term Plan,  discharges under the proposed rule must be "**based upon BAPRT**" (the Long-Term Plan) providing net improvement to impacted areas; that discharges to unimpacted areas may also be authorized by moderating provisions, "which **shall require BAPRT**;" that, under subsection 4(e)(3), and that "[d]uring the implementation of the initial phase of the Long-Term Plan, permits issued by the department **shall be based on BAPRT**, and shall include technology based effluent limitations consistent with the Long-Term Plan."  These mandatory components, in light of other EFA Amendments, spell out that the Amended EFA mandates moderating provisions and now elevates them to statutory status as a component of Florida's water quality

54

standards.[40]

Subsection 10 then repeats the key language in the permitting section (as discussed above), and then requires the District, **by December 31, 2006**, to take such action to implement the pre-2006 projects and strategies of the Long-Term Plan so that water delivered to the Everglades Protection Area achieves the phosphorus criterion **and moderating provisions.**  Nothing qualifies this requirement with language such as, *e.g.*, "if moderating provisions are adopted by rule." Not only that, but the 2003 Amended EFA requires, **by December 31, 2003**, the District "**shall**," under subsection 10(a), submit an application for permit modification to achieve state water quality standards, including the phosphorus criterion **and moderating provisions**.  Why would the Florida Legislature require the District to submit an application to include "moderating provisions" prior to the adoption of the Phosphorus Rule if they were not already mandatory under the EFA Amendments?

The only logical conclusion, consistent with the plain wording of the statute, is that such application for permit modification must include moderating provisions as specified in the Amended EFA and the Long-Term Plan, regardless of whether a rule is adopted by that time. The other obvious inference from the structure of the statute is that it mandates that moderating provisions be put in the Phosphorus Rule. Neither of these sections discuss applying moderating provisions on a case-by-case basis, as EPA contends, nor

---

[40]

While one subsection of the statute states that DEP "may" implement moderating provisions in the phosphorus rule in 4(e), other sections of the Amended EFA dictate that the Long-Term Plan shall be implemented "without delay," and declare that "all permits" issued must incorporate BAPRT, which is the Long-Term Plan itself.  *See* Fla. Stat. §§ 373.4592(2)(j), (3)(b), (3)(d), (3)(e), (4)(e), (10) and (10)(a).

do they give any discretion to DEP to base permits on anything other than BAPRT, which are technology-based effluent limitations consistent with the Long-Term Plan. When read as a whole, the EFA Amendments change water quality standards by negating the criterion, mandating that discharges be allowed that are incompatible with the anti-degradation policy, and by changing the designated use of the water body until at least 2016. These changes are not discretionary.

While the word "may" in a statute creates a presumption of some degree of discretion, this presumption can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purposes of the statute. *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 198-199 (2000)(The word "may" in a statute "usually implies some degree of discretion, but this common-sense principle of statutory construction . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute"); *Usmani v. U.S. Attorney Gen.*, 483 F.3d 1147, 1150-1151 (11th Cir. 2007) (The word "may" in a statute creates a presumption of some degree of discretion, but "this presumption can be defeated by indications of legislative intent to the contrary or obvious inferences from the structure and purpose of the statute")(quoting *DirectTV, Inc. v. Brown*, 371. F.3d 814, 817 (11th Cir. 2004)); *see also Myles v. State*, 602 So. 2d 1278, 1281 (Fla. 1992) ("We realize, as the court below noted, that the statute in question uses the word 'may' in talking about electronic communications. However, it is settled that the word 'may' is not always permissive, but may be a word of mandate in an appropriate context."); *Comcoa, Inc. v. Coe*, 587 So.2d 474, 477 (Fla. 3d DCA 1991) ("Specifically, an imperative obligation is sometimes regarded as imposed by a statutory provision notwithstanding that it is couched

in permissive, directory, or enabling language.")  Such is the case here.

### 8.  Subsection 4(f) and the Farmers

The EPA (and Intervenors) also misread Section 4(f).  Much attention was previously given to Section 4(f) of the 1994 EFA in Chief Judge Davis' Opinion, and in the 1999 EPA Determination, because of the potential for harm to the Everglades from discharges from the Everglades Agricultural Area.  Now, the EPA relies on the language of 4(f) to conclude that because this section was "not changed" by the 2003 EFA Amendments, there has been no change in the December 31, 2006, compliance schedule. EPA also makes the same argument in relation to subsection 10(a) where it contends that this section still requires water quality standards to be met by December 31, 2006. The EPA is wrong in its interpretation of the law on both accounts.

Subsection 4(f)(4) had required that, by December 31, 2006, all permittees' discharges were prohibited from causing or contributing to any violation of water quality standards in the Everglades Protection Area. The key language is "cause or contribute to a violation of water quality standards."  EPA  ignores that the Amended EFA now defines water quality standards to include the Long-Term Plan [BAPRT], which is a compliance schedule that allows all permittees to substitute the Long-Term Plan for actually meeting the phosphorus criterion in all water delivered to the Everglades Protection Area by December 31, 2006.[41]  This statutory scheme exists "independent" of rulemaking and is self-implementing by virtue of Sections (3)(b)-(e), 4(e)(3), and (10)(a). Thus,  a permittee's

---

[41]

At oral argument, the DEP and EPA did not even know if the Farmers  had met the December 31, 2006, deadline or if that date was being enforced by DEP.  *See, e.g.*, May 21, 2008 Hearing Tr. at 50-52.

discharge cannot cause or contribute to a violation of "water quality standards in the Everglades Protection Area," Fla. Stat. § 373.4592(4)(f)(4), since the Long-Term Plan, along with its TBELs and compliance schedule, establishes a new water quality standard that supersedes the narrative and numeric phosphorus criterion, or at best, makes compliance optional. Given this analysis, the administrative record does not support the EPA's finding that the Amended EFA §§ 373.4592(4)(f) (3) and (4) requires EAA farmers to meet state water quality standards by 2006 rather than 2016.[42]

For all of these reasons, the Amended EFA changes Florida's water quality standards by authorizing continuing violations of the narrative and numeric criterion for phosphorus and other nutrients. By allowing continued harmful discharges of nutrients into the Everglades, the Amended EFA also violates the state's anti-degradation policy. The result of the EPA's position is to vacate its prior 1999 Determination and to ensure that the *de facto* suspension of enforcement and compliance with state water quality standards will continue for an indeterminate period, a result that cannot be permitted under the CWA.[43]

---

[42]

The view that a section of the Amended EFA that "governs permits" cannot change water quality standards is incorrect. Section 4(f) of the 1994 EFA, which governed permitees in the Everglades Agricultural Area, was previously found by the EPA to be a change in water quality standards after EPA was required by the Court to review it, because it changed the compliance schedule for meeting the phosphorus criterion until December 31, 2006. EPA Sept. 1999 Determination [EFA-AR-8]. The EPA argues that the 2003 EFA Amendments include no such comparable and unequivocal suspension language. The "shall not be required to implement water quality standards" of subsection 4(f)(3) has the same effect as permitting BAPRT through 2016. In both cases, there is no requirement to meet the phosphorus criterion. Both provisions suspend the narrative and default numeric phosphorus criterion, even though the wording is different. What is crucial is the "effect."

[43]

Based on my ruling that EPA's 2003 Determination that the Amended EFA does not change Florida's water quality standards is arbitrary and capricious, I need not reach the

The EPA's finding that the Amended EFA does not change Florida's water quality standards is arbitrary, capricious, and not supported by the administrative record. Pursuant to 5 U.S.C. § 706(s), the Court will set aside the EPA's Determination.

### G.   The State of Florida's Phosphorus Rule:  F.A.C. § 62-302.540

#### 1.   Introduction

The parties' second set of cross-motions for summary judgment relate to the EPA's CWA review of Florida's Phosphorus Rule ("Rule"), F.A.C. § 62-302.540. The Rule originally was adopted by the State of Florida Environmental Regulation Commission ("ERC") on July 15, 2004.  It was later amended on May 25, 2005.  As finally adopted, the Phosphorus Rule establishes water quality standards for phosphorus, including a numeric phosphorus criterion, within the Everglades Protection Area.  F.A.C. § 62-302.540 (1)(a). The water quality standards adopted  include the following elements: "(1) a numeric interpretation of the Class III narrative nutrient criterion for phosphorus; (2) the establishment of moderating provisions for permits authorizing discharges into the EPA in compliance with water quality standards, including the numeric phosphorus criterion; and (3) a method for determining achievement of the numeric phosphorus criterion, which takes into account consideration of spatial and temporal variability, natural background conditions

------------

Plaintiffs' argument that the EPA is barred by administrative res judicata from changing the compliance schedule. I concur with the merit of Plaintiffs' argument, however, independent of any res judicata effect, that the EPA cannot evade its prior findings on the previously imposed compliance deadline by simply resorting to mechanisms such as future rule-making and permitting. Unlike its analysis in the 1999 Determination, the EPA does not consider, in its 2003 Determination,  whether the new Amended EFA deadline can be met, or  whether reliable scientific evidence demonstrates that the Everglades could withstand ten more years of discharges that are not protective.

and confidence in laboratory results." F.A.C. § 62-302.540(1)(b)(1-3). This Order will address the EPA Determinations on the Phosphorus Rule with regard to each of these elements.

Before turning to these issues, I mention as further background that the Rule consists of eight sections. EPA reviewed these sections in four separate Determinations.[44]

---

[44]

1.    DEP's submission of sections of the Phosphorus Rule to EPA

On January 12, 2005, DEP submitted the Phosphorus Rule to the EPA pursuant to the CWA. In DEP's accompanying letter, the DEP's general counsel represented that DEP was submitting sections (3), (4), (6) and (7) for review pursuant to the CWA and 40 C.F.R. 131.13. DEP Jan. 12, 2005 Letter, at 1-3 [PR-AR-18]. With respect to subsections (6)(a) and (6)(b), the letter noted that these subsections provide moderating provisions which may be issued on a case-by-case basis in association with permits issued under section (5) of the Phosphorus Rule. *Id.* at 2.

The letter explained that DEP was not submitting the following sections for review under the CWA as a change in water quality standards: section (1), entitled "Purpose and Scope;" section (2), entitled "Findings;" section (5), entitled "Long-Term Compliance Permit Requirements for Phosphorus Discharges into the EPA;" and section (8), entitled "Contingencies." *Id.* at 2. Along with the Rule and the general counsel's letter, DEP submitted a document entitled "Technical and Regulatory Information in Support of the State of Florida's Adopted Phosphorus Criterion Contained in Rule 62-302.540 F.A.C" to facilitate EPA's review.

2.    EPA's January 24, 2005 Determination on the Phosphorus Rule

Following DEP's January 12, 2005 submission, EPA sent DEP its Determination on the Phosphorus Rule on January 24, 2005. EPA Jan. 24, 2005 Determination [PR-AR-69]. EPA's letter noted that the attached Determination reviewed only sections (3), (4), (6) and (7) because those were the sections submitted for review by DEP.

EPA noted in its letter that, for the purposes of CWA review, "the water quality criterion as well as these policies and procedures must, together, assure the designated use of the water body, as a whole, is protected. *Id.* at 1. In its Determination, the EPA approved the submitted sections of the Phosphorus Rule, with the exception of subparagraph (4)(c)(1), because EPA concluded that this subparagraph limited the applicability of the phosphorus criterion to certain portions of the Refuge.

3.    EPA's July 27, 2005 Determination

Following EPA's January 24, 2005 Determination, Florida adopted revisions to the Phosphorus Rule on May 5, 2005, and DEP submitted these revisions to EPA. *See* EPA July 27, 2005 Determination, at 1 [PR-AR-70]. Based on EPA's review of the revisions, it determined that the Phosphorus Rule no longer limited the applicability of its criterion to only the interior portions of the Refuge. *Id.* at 2. On July 27, 2005, EPA approved the

revisions as being consistent with the CWA and 40 C.F.R. § 131 and withdrew its January 24, 2005, disapproval of subparagraph (4)(c)(1). *Id.* The EPA wrote that it had completed its review of the Phosphorus Rule. *Id.*

4.    DEP's May 5, 2006 letter to EPA on the Phosphorus Rule

On May 5, 2006, DEP's general counsel sent a letter to EPA which "reiterate[d]" their recent conversations regarding subsections (1), (2), and (5) of the Phosphorus Rule. DEP May 5, 2006 Letter at 1 [PR-AR-72]. In this letter, the general counsel again represents that subsections (1) and (2), respectively entitled "Purpose and Scope" and "Findings," do not contain any regulatory requirements and do not change Florida's water quality standards. *Id.* at 2. In addition, the letter states that subsections (5)(a)-(c) are not changes to Florida water quality standards because they only restate existing Florida law. *Id.*

With respect to subsection (5)(d), DEP's letter asserts that this subsection "contains permitting provisions and requires the permittee to use the best available phosphorus reduction technology ("BAPRT") to achieve compliance with the 10 ppb criterion as soon as practicable." *Id.* DEP's general counsel further represents that "[i]f the permittee is unable to provide reasonable assurance that a TBELs based on BAPRT is sufficient to meet the criterion, then the permit must be accompanied by an appropriate mechanism (such as a moderating provision, variance, compliance schedule, etc.) that does not require the permittee to immediately meet an effluent limit based on the 10 ppb." *Id.*

5.    EPA's May 8, 2006 Determination

After I granted a stay in this case on March 23, 2005, the EPA reviewed subsections (1), (2) and (5) of the Phosphorus Rule to determine if they are new or revised State water quality standards. EPA May 8, 2006 Determination, at 1 [PR-AR-71]. In its May 8, 2006 Determination, the EPA concluded that subsections (1), (2) and (5)(a)-(c) are not new or revised water quality standards. *Id.* However, EPA determined that paragraph (5)(d) was a new or revised water quality standard and stated that it would approve or disapprove that provision in a subsequent determination, depending on whether (5)(d) was consistent with the CWA. *Id.*

6.    EPA's May 31, 2006 Determination

On May 31, 2006, EPA issued its Determination in which it approved paragraph (5)(d) of the Phosphorus Rule as a new or revised water quality standard based on its conclusion that paragraph (5)(d) is consistent with the CWA. EPA May 31, 2006 Determination, at 1 [DE 141 at 4]. According to the EPA, Paragraph (5)(d) provides that discharge limits for discharges into the Everglades Protection Area shall be based on technology based effluent limitations (TBELs), established through best available phosphorus reduction technology (BAPRT). *Id.* at 2 [DE 141 at 5].

Paragraph (5)(d) also provides that discharge limits for permits allowing discharges into the Everglades Protection Area "shall not require water quality based effluent limitations through 2016." F.A.C. § 62-302.540(5)(d) ("Phosphorus Rule"). The EPA interpreted this language, "[c]onsistent with the FDEP's interpretation of this provision," to be limited to situations where a moderating provision had been granted by DEP for an individual permit and approved by EPA. EPA May 31, 2006 Determination at 3 [DE 141

It was arbitrary and capricious for the EPA to consider each section of the Rule in isolation and not review the Rule as a comprehensive, integrated whole for compliance with the CWA and its implementing regulations.  An integrated  consideration of the Rule reveals that it is layered with "avoidance mechanisms" that are linked together and function to excuse non-compliance with the 10 ppb phosphorus criterion.  In order to understand the effect of the Rule, these mechanisms must be viewed in conjunction with each other, not separately.

What the EPA was called upon to do, and what this Court must review in terms of EPA's administrative actions, is to determine whether the Rule follows the mandate of the CWA and protects the Everglades from long-term phosphorus concentrations above 10 ppb, which causes an imbalance in the Everglades' aquatic flora and fauna. EPA Jan. 2005 Determination, at 5 [PR-AR-69].  Where, as discussed below, the Rule affords even parts of the Everglades no protection from long-term phosphorus concentrations above 10 ppb, EPA's approval of the Rule as protective of the designated use of the "water body as a whole," *id.* at 2, is arbitrary and capricious, regardless of the length of the administrative record involved.

In its January 2005 Determination [PR-AR-69], EPA conducted a selective review of only Sections 3 ("Definitions"), 4 ("Phosphorus Criterion"), 6 ("Moderating Provisions") and 7 ("Document Incorporated by Reference") as revisions to water quality standards, and

---

at 6] (citing DEP's May 5, 2006 letter).  EPA referred to this type of provision as an "authorizing provision," and stated that EPA first reviews an authorizing provision and then subsequently reviews each application of the provision to a particular discharger. *Id.* at 4. In concluding its Determination, EPA approved paragraph (5)(d) as a water quality standard because it found that paragraph (5)(d) implements subsection (6) in a manner consistent with 40 C.F.R. § 131.10.

approved them as consistent with the CWA, except for subsection 4(c)(1). This subsection concerned the compliance methodology for achieving the phosphorus criterion in the Refuge (WCA 1). After revision, the EPA approved that subsection in its July 27, 2005, Determination [PR-AR-70].

Initially, the EPA declined to review Section 1 ("Purpose and Scope"); Section 2 ("Findings"), and Section 5 ("Long-Term Compliance Permit Requirements for Phosphorus Discharge into EPA"). EPA Jan. 2005 Determination, at 11 [PR-AR-69]. Nonetheless, after this Court's order of February 16, 2006 [DE 124], EPA elected to review these sections. It concluded that Sections 1, 2 and 5 (a) through (c) were **not** changes in water quality standards, but that subsection 5(d) (setting discharge limits for permits) was a change in water quality standards. EPA May 8, 2006 Determination [PR-AR-71]. It concluded that subsection 5(d) did not conflict with the CWA because it was "not an authorizing provision for compliance schedules." EPA May 31, 2006 Determination, at 23 [DE 141].

I find that the EPA was arbitrary and capricious and in violation of the CWA in concluding that portions of subsections 1, 2, 3, and 5 were not changes in water quality criterion. I also find that EPA was arbitrary and capricious, and in violation of the CWA, when it determined that subsections 5(d) and 6, which were changes in water quality, were in compliance with the CWA. I affirm, however, the EPA's conclusions adopting the use of a long-term geometric mean of 10 ppb, as implemented through the Four-Part Test and data screening. I start the discussion with these affirmances.

## 2. The 10 PPB Phosphorus Criteria Itself is Valid

F.A.C. § 62-302.540(4)(a) establishes a numeric criterion for phosphorus for waters

of the Everglades Protection Area.[45] The record is replete with determinations and findings that a 10 ppb of total phosphorus in the water column as a long term value, taking into account spatial and temporal variability, is protective of the designated use and of the natural flora and fauna in the Everglades and complies with 40 C.F.R. Section 131.1. PR-AR-69 at 5.   Much scientific literature supports this conclusion, including an EPA publication from December 2000, entitled *Ambient Water Quality Criteria Recommendations Information Supporting the Development of State and Tribe Nutrient Criteria for Wetland in Nutrient Ecoregion XII, EPA* 822-B-00-23.   The EPA acted consistent with the CWA in finding that these conclusions are reasonable. PR-AR-70 at 6-10. The record likewise supports the EPA's conclusion that limits higher than 10 ppb are not protective and would likely lead to an imbalance of aquatic flora and fauna in the water body. *See* EPA Jan. 2005 Determination at 5 [PH-AR-69] ("Scientific demonstrations have indicated that a long-term phosphorus criterion exceeding 10 ppb would not be protective of natural populations of aquatic flora and fauna in the Everglades.")

Plaintiffs' challenges to the Rule do not go to the 10 ppb criterion as such (other than to the use of a geometric mean), but to the remaining provisions of the Rule (4(b)-(f) which *avoid* application of the 10 ppb criterion. These remaining paragraphs of Subsection 4 address how achievement of that criterion shall be determined, adjustment of achievement methods, and data screening.

---

[45]

The numeric criterion for criterion for Class III waters is "a long-term geometric mean of 10 ppb, but shall not be lower than the natural conditions of the [Everglades Protection Area] and shall take into account spatial and temporal variability." F.A.C. § 62-302.540(4)(a) (Phosphorus Rule).

I first address those portions of the Rule which pertain to permits and moderating provisions. I then return to consider the Plaintiffs' arguments on the methods of achieving the phosphorus criterion.[46]

### 3.   Permits and Moderating Provisions

> **a.   EPA Arbitrarily and Capriciously Approved a Rule that Contains a Blanket Exemption From Compliance and a Change in the Compliance Schedule Until 2016 as an Element of Water Quality Standards.**

While agency action is generally entitled to deference under the proper circumstances, the agency action at issue here consists of legal interpretations by the EPA in its CWA review of the Rule.  If that interpretation is "not in accordance with law," in light of the plain wording of the CWA and the Rule, notions of deference are without meaning. Also, although an agency's interpretation of its own regulation is usually given substantial deference, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Cmty. Hosp. Of Monterey Peninsula v. Thompson,* 323 F.3d 782, 792 (9th Cir. 2003)(citing *I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421 n. 30 (1981)).

---

[46]

The Defendants place considerable emphasis on the final order of the administrative law judge in *Sugar Cane Growers Cooperative v. Department of Environmental Protection*, Case No. 0302884RP (Final Order, June 17, 2004)(PR-AR-35), *aff'd, Miccosukee Tribe of Indians v. New Hope Sugar Co.*, 906 So.2d 1064 (Table)(Fla.1st DCA 2005).  While this Order is without doubt comprehensive in addressing state law administrative issues, it is neither controlling, nor particularly helpful because this case is about the federal CWA and its implementing regulations as applied to the Environmental Protection Agency. The ultimate issue decided by the administrative judge did not deal with federal law, but with "... whether the Proposed Rule is an invalid exercise of delegated legislative authority ...."  *Id.* at 85, ¶ 194. Where useful for background purposes, I have cited to the administrative order for reference.

At the same time, when an  interpretation is based on a rational explanation, even if I disagree, deference is required.

### b. Subsection 5(d) of the Rule

Subsection 5(d) of the Rule addresses Long-Term Compliance Permit Requirements for Phosphorus Discharges into the Everglades Protection Area. This provision, on its face, forecloses the inclusion of additional or more stringent effluent limitations to achieve water quality standards through 2016.[47]  It provides:

> Discharge limits for permits allowing discharges into the EPA shall be based upon TBELS established through BAPRT and shall not require water quality based effluent limitations through 2016. Such TBELs shall be applied as effluent limitations as defined in subsection 22-302.200(10), F.A.C.

Thus, until 2016, discharge limits for permits allowing discharges into the Everglades Protection Area shall be based on TBELs [Technology Based Effluent Limitations] established through BAPRT [the Long-Term Plan], **not** the long term geometric mean of 10 ppb phosphorus. This Rule subsection follows and applies Sections 4(e)(3) and 10(a) of the Amended EFA which provide that "[d]uring the implementation of the initial phase of the Long-Term Plan, permits issued by the department shall be based on BAPRT, and shall include technology based effluent limitations consistent with the Long-Term Plan ...."

---

[47]

In its November 5, 2003 Determination, the EPA concluded that the subsection 4(e)(3) amendatory language ["During the implementation of the initial phase of the Long Term Plan, permits issued by the department shall be based on BAPRT, and shall include technology-based effluent limitations consistent with the Long Term Plan"] does not "on its  face foreclose inclusion of additional, or more stringent effluent limitations to achieve water quality standards." EPA Nov. 5, 2003 Determination, at 10 [PR-AR-11].  The 5(d) Rule does exactly that  by stating that discharges into the Everglades Protection Area "shall not" require water quality based effluent limitations through 2016.

§§373.4592(4)(e)(3) and 10(a).[48] The provisions [implementing BAPRT and not requiring specific discharge limits for phosphorus] are in violation of the requirements of the CWA, §§ 301(b)(1)( c), 402(a)(1) and (2), and 510 and circumvent 40 C.F.R. § 122.44(d)(1)( i), (ii), (iii), and vii(A), and 40 C.F.R. §122.44(d)(5).  The provisions are also in direct conflict with the express mandate of the CWA, which requires imposition of WQBELs when TBELs are inadequate. 33 U.S.C. § 1312(a); 40 C.F.R. § 122.44(d).  Such across the board application is contrary to the Clean Water Act and regulations which allow  variances[49] to apply only to permit holders that make a request, while the underlying water quality standard remains in effect for the remainder of the water body. *See Idaho Mining Ass'n v.*

---

[48]

The Court's reading of the clear language is supported by  a key finding of the Rule itself. The Environmental Regulation Commission found that the Rule must "incorporate a 'flexible approach' towards the application of the numeric phosphorus criterion for phosphorus in order to guide the implementation of  phosphorus reduction in the Everglades Protection Area." F.A.C. § 62-302.540 (2)(l).  The Commission claimed that its "flexible approach" is authorized by Florida law and EPA Regulations set forth at 40 C.F.R. Part 131, and that it exercised its authority by "including in this rule both a numeric interpretation of the phosphorus criterion and [by] . . . permitting and moderating provisions."

[49]

A water quality standard variance is a short-term exemption from meeting the otherwise applicable water quality standards. PR-AR-69 at 11 (citing 40 C.F.R. §131.13) Under EPA regulations, a variance is pollutant specific and must be reviewed every three years.  PR-AR-69 at 13 (citing 40 C.F.R. 131.20(a); PR-AR-4 at 5-11. The EPA water quality handbook states that the State must demonstrate that meeting the standard is unattainable as part of the procedure for obtaining a variance. PR-AR-4 at 5-11 to 5-12. The EPA arbitrarily characterizes the type of variance under the Rule as "short-term," but that is in direct contradiction to the fact that the variance procedure under the Rule is to be applied for a period of at least 10 years, through 2016. It is irrational to consider this "short-term" when, at the same time, the EPA categorically acknowledges that any discharge above the 10 ppb standard is not protective of the Everglades. Besides, as we have seen, the total cummulative blanket variance since the enactment of the EFA is now 22 years.

*Browner*, 90 F.Supp.2d 1078, 1103 n.11 (D. Idaho 2000).[50]

### c. Subsection 6 of the Rule

If a discharger is unable to provide reasonable assurance that a TBELS based on

BAPRT is sufficient to meet subsection 5(d), then the discharger may rely on subsections

6(a)(1) and 6(a)(5).[51] These subsections establish "moderating provisions" which permit

---

[50]

In Idaho, the EPA created the rule for Idaho cold water criteria for certain water bodies. The district court found: "EPA's variance procedure at 40 C.F.R. § 131.35(d) ... is another method by which water quality criteria may be adjusted to reflect local conditions without affecting the intended level of protection of a particular water body. Pursuant to this procedure, the Regional Administrator is authorized to grant individual NPDES permit holders variances from water quality standards where the permit holder demonstrates that certain conditions render attainment of the standards infeasible. *See* 40 C.F.R. § 131.33(d)(3). *However, the variance applies only to the permit holder requesting the variance, and the underlying water quality standard remains in effect. 40 C.F.R. § 131.33(d)(1)."* (emphasis added).

In contrast, under the Phosphorus Rule, the underlying water quality criteria is modified across-the-board by the subsection 5(d) and subsection 6 provisions. While the Rule may establish 10 ppb, that is not what is mandated. Thus, a permittee that follows the Long-Term Plan need not do anything, including a use attainability analysis, to receive an extended compliance schedule in impacted areas until 2016, and beyond that date in unimpacted areas, regardless of the biological impacts of the discharges to the Everglades and the imbalance that is caused.

[51]

Paragraph 5(a) of the Rule also implicates the Court's discussion. It provides that "[I]n addition to meeting all other applicable permitting criteria, an applicant must provide reasonable assurances that the discharge will comply with state water quality standards as set forth in this section." EPA interprets this section to require a permit applicant "to provide reasonable assurance that the discharge will comply with the phosphorus *criterion* established in subsection 4 of the Rule." PR-AR-71 at 9. However, the actual Rule language, on its face, does not require compliance with the "criterion," but with the "standard" *in this section*. Subsection 5(b)(3), being in that section, provides that discharges into the EPA *shall be deemed* in compliance with state water quality standards upon a demonstration that the discharges comply with the moderating provisions provided by the Rule. Thus EPA's interpretation fails as a matter of law. While the EPA continues, throughout its Determinations on the Rule, to refer to "water quality standards," it does so without regard to the State's use of the term "water quality standard" to include moderating provisions (a component of water quality under State law) which is not recognized as such under the CWA. This is also arbitrary and capricious and not in accordance with law.

discharges into or within the "impacted areas" of the Everglades Protection Area until December 31, 2016, "using net improvement" and beyond that date in unimpacted areas for hydrorestoration purposes.  Under this provision, the numeric phosphorus criterion becomes a "planning goal."[52] Instead of meeting the 10 ppb criteria, discharges into impacted areas "shall be permitted" using net improvement as a moderating provision. Even if the phosphorus numeric criterion (and the narrative criterion) are not met in accordance with the Rule's achievement methodology, the Rule is unequivocal that "[n]o action shall be required, provided the net improvement or hydropattern restoration provisions of subsection (6) below are met."  No action translates into "no enforcement" of the protective 10 ppb criteria.[53]

The phrase "net improvement" is not defined in the Rule, but the Rule provides that "[i]mplementation of BAPRT *will* result in net improvement in the impacted areas of the EPA" regardless of whether such "net improvement" causes in an imbalance of Everglades aquatic flora and fauna.  F.A.C. § 62-302.540 (6)(a)(3).[54] To use an example, if a discharge

---

[52]

Subsection (6)(a)(3) provides that the Long-Term Plan shall constitute BAPRT, and that "[T]he 'planning goal' of the Long-Term Plan is to achieve compliance with the criterion set forth in subsection (4) of this rule [the phosphorus criterion]."

[53]

The parties argue at length concerning whether the NPDES permits for STA 2, 5 and 6 constitute evidence that subsections 5(d) and 6 create a "blanket exemption" from permitting requirements. I do not reach this question because I rely on the clear language of the Rule itself.

[54]

Under subsection (1)(h) of the Rule, the Long-Term Plan constitutes a "comprehensive program to optimize the STAs and BMPs to achieve further phosphorus reductions and thereby accomplish implementation of Best Available Phosphorus Reduction Technology (BAPRT)."  This means that, in impacted areas, discharges are permitted so long as the STAs and BMPs are "optimized."  The Rule completes this circle by declaring that "[o]ptimization of existing STAs, in conjunction with BMPs, is currently the

was at 50 ppb but reduced through BAPRT to 40 ppb, there is a net improvement, although the "net improvement" is not protective at the established 10 ppb as accepted by the EPA. Nonetheless, the Rule is unequivocal that "Until 2016, . . . permits **shall** include technology-based effluent limitations consistent with the Long-Term Plan." This section must be read in *para materia* with subsection (5)(b)(3) which provides that "discharges into the EPA will be '*deemed*' in compliance with state water quality standards upon a demonstration that . . . *discharges will comply with moderating provisions of this rule*." Thus, even if the phosphorus levels in the discharge will **not** be at or below the phosphorus levels set forth in the Rule (*see* subsection 5(b)(1)), or even if such discharges **will cause or contribute to exceedences** of the phosphorus criterion set forth in the Rule (*see* subsection 5(b)(2)), the discharges will be *allowed* so long as such discharge complies with moderating provisions.[55] This "blanket exemption," without the State first performing a "use attainability analysis" is contrary to the CWA.

### 4. The EPA has failed to Act In Accordance with Law by Not Requiring the State of Florida to Perform a "Use Attainability Analysis" as a

---

most cost-effective and environmentally preferable means to achieve further phosphorus reductions to the EPA and to restore impacted areas." F.A.C. § 62-302.540 (2)(e)(2).

[55]

The Rule provides for a second form of moderating provision dealing with discharges into or within "unimpacted areas." These type of discharges are permitted for "hydropattern restoration purposes" if a permit applicant can show that (1) the discharge will be able to implement or cause to be implemented BAPRT; (2) the environmental benefits of establishing the discharge clearly outweigh the potential adverse impacts that may result in the event the phosphorus level in the discharge exceeds the criterion; and (3) the discharge complies with anti-degradation requirements. Unlike the moderating provisions for impacted areas, there is no date comparable to 2016. The clear inference is that moderating provisions for unimpacted areas can be permitted indefinitely, regardless of whether the 10 ppb criteria is achieved.

**Precondition to Adopting a Blanket Exemption or Variance Procedure in the Phosphorus Rule**

Subsection 5(d) and the "moderating provisions" of subsection 6 create "blanket exemptions or variances." The EPA itself recognized this in its letter to the DEP, dated July 7, 2003, in which it provided its comments on the draft Phosphorus Rule.  EPA July 7, 2003 Letter, at 4-5 [PR-AR-13]. For reasons that remain undisclosed, the EPA does not refer to this letter, or the State's failure to address the concerns set forth, in any of its Determinations.

In referring in its commentary to what are now renumbered subsections (5)(d), (6)(a)(1) and 6(a)(5), the EPA acknowledged  that "[t]hese sections specify that through 2016 discharges "shall be" permitted based on TBELs established through BAPRT." *Id.* at 4 [PR-AR-13].  Of importance, the EPA went on to say "[t]he effect of this provision is to *automatically grant compliance* with the criteria for discharges implementing BAPRT whether or not the discharger needs the extended time frame for compliance. The apparent presumption in the Rule is that all discharges will need the additional 10 years from 2006 to achieve compliance with the criterion." *Id.* (emphasis added).

Neither the CWA, nor its implementing regulations, refer to "moderating provisions." The EPA assumed moderating provisions were equivalent to "variances," although neither the Amended EFA nor the Phosphorus Rule uses the word "variance." While it is correct that the CWA provides relief from a criterion in certain circumstances, it must first be demonstrated that the criterion cannot be met. To determine this, the CWA provides that (1) states may authorize variances from the applicable water quality standard if a state can justify that the current use and supporting criterion is not attainable at the time for any one

71

of the reasons specified in 40 C.F.R. § 131.10(g); or (2) states may authorize a compliance schedule for discharges to comply with discharge limits in 40 C.F.R. §122.47. The CWA regulations specifically provide that a state "must" conduct a use attainability analysis, as specified in §131.3(g), when it proposes to adopt subcategories of uses specified in Section 101(a)(2) of the Act which require less stringent criteria. *See* 40 C.F.R. §131.10(j)(2) (to that effect).

I address now the first option. Under 40 C.F.R. §131.10(g), states may remove a designated use which is not an existing use, *or establish sub-categories of a use*, if the state can demonstrate that attaining the designated use is not feasible because of one of six reasons.[56]  In its July 7, 2003, commentary on the draft Rule [PR-AR-13], the EPA reviewed the options available to the State of Florida in its draft Rule, including this option. While the EPA recognized that a "temporary variance" may be granted to an "individual discharger," it warned the Florida DEP that:

> In far less common situations, a temporary variance from the protective

---

[56]

The reasons for not being feasible include: (1) naturally occurring pollutant concentrations prevent the attainment of the use; (2) natural, ephemeral, intermittent or low flow conditions of water levels prevent the attainment of the use, unless these conditions may be compensated for by the discharge of sufficient volume of effluent discharges without violating State water conservation requirements to enable uses to be met; (3) human caused conditions or sources of pollution prevent the attainment of the use and cannot be remedied or would cause more environmental damage to correct than to leave in place; (4) dams, diversions or other types of hydrologic modifications preclude the attainment of the use, and it is not feasible to restore the water body to its original condition or to operate such modification in a way that would result in a way that would result in the attainment of the use; (5) physical conditions related to the natural features of the water body, such as the lack of a proper substrate cover, flow, depth, pools, riffles, and the like, unrelated to water quality, preclude attainment of aquatic life protection uses, or (6) controls more stringent than those required by Section 301(b) and 306 of the Act would result in substantial and widespread economic and social impact.

criterion for a group of discharges, such as a category of discharges facing similar treatment needs, may be granted upon approval by EPA (i.e., **a blanket variance**). The EPA approval **requires** an adequate demonstration/justification based on the factors at 40 C.F.R. §131.10(g). **If it is the intent of this Rule to provide a "blanket variance" for all discharges into the EPA through 2016, the § 131.10(g) demonstration/justification must be provided to EPA in conjunction with the Rule.**

*Id.* at 4.

The EPA recommended to the Florida DEP that the language of Section 6 [as renumbered] be modified to avoid a "blanket variance." The EPA said the language should read "The following moderating provisions may be applied to the extent justified under the law on a "case-by-case" basis for discharges into or within the EPA for the phosphorus criterion set forth in the Rule.  *Id.* at 5.  In other words, the EPA specifically requested  the Florida DEP to change the language to say that they would be implemented on a case-by-case basis, instead of across-the-board.  The EPA stated that it was "... **concerned that it may be difficult for FDEP to provide the adequate justification needed to support a §131.10(g) variance, particularly on a "blanket" basis**." *Id.* (emphasis added).[57]

The justification referred to by the EPA can only be considered through a use attainability analysis. Such an analysis is a "structured scientific assessment of factors

---

[57]

The EPA, in its July 7, 2003, letter to Florida DEP further commented on the effect of a "blanket variance." It stated: "[I]f the Rule treats the moderating provision as a "blanket variance," EPA will likely have to review these documents (the Long-Term Plan), **as part of the Rule review process**, to determine if regulatory requirements for the demonstration and justification for a "blanket variance" have been satisfied. Since the Long-Term Plan is subject to change, using it to demonstrate specific findings may trigger additional reviews as the Long-Term Plan is changed." EPA July 7, 2003 Letter  at 5 [PR-AR-13] (emphasis added). No such detailed  review of the Long-Term Plan occurred as part of the Rule review process, nor have any adopted revisions to the Long-Term Plan been submitted to the EPA for further review.

affecting the attainment of the use which may include physical, chemical, biological, and economic factors as described in § 131.10(g)."   40 C.F.R. § 131.3(g).   The process requires a notice and opportunity for a public hearing. 40 C.F.R. § 131.10(e).

Here, the record is undisputed, and it was conceded at oral argument, that the State of Florida did not conduct a use attainability analysis.   Nevertheless, it adopted blanket moderating provisions that created **subcategories** of impacted and unimpacted waters within the Everglades Protection Area, where all waters are Class III and Outstanding Florida Waters.  In the impacted  areas, less stringent criteria (TBELs based on BAPRT) were required.  By creating impacted and unimpacted areas of Class III waters in the Everglades Protection Area, the Phosphorus Rule establishes two subcategories of designated use for the Everglades without complying with federal regulations and following the procedure for downgrading a use.  40 C.F.R. § 131.10(g).[58]

The Florida DEP did not accept the EPA's recommended language change. Instead of changing the language, the DEP General Counsel wrote to the EPA and stated in a letter, written after the Rule was adopted, what the Rule did not say. He said: "Any issuance of a moderating provision under Paragraph (6)(a) or (6)(b) will be in association with permits on a case-by-case basis." DEP January 12, 2005 Letter, at 2 [PR-AR-18].

---

[58]

The very concept of "impacted" areas contradicts the use for "maintenance of a healthy, well-balanced population of fish and wildlife," required by the Class III designation. The idea seems to be if you degrade it, you can continue to do so. The goal of the CWA is to stop the polluted discharges, not to downgrade or ignore the designated use. Accordingly, a state may only take such liberty in implementing a water quality standard that creates a more stringent, or more protective, stance than the federal guidelines. *Dubois v. Dep't of Agric.*, 102 F.3d 1273, 1300 (1st Cir. 1996)("States may not set standards that are less stringent than the CWA.")

Rather than relying on the plain language of the Rule and comprehensively analyzing its effect on the entire Everglades Protection Area in terms of designated use, water quality criterion and the anti-degradation policy, EPA arbitrarily relied upon the after-the-fact letter from the DEP attorney.[59] The EPA relied on the assurance that "shall not require WQBELs through 2016" did not mean what it said and would apply only for a particular permit. PR-AR-71 at 24; PR-AR-72 at 1, 3. While the DEP attorney's letter admits that a moderating provision pursuant to subsection (6) of the Rule, or other variance, would temporarily make the criterion less stringent than 10ppb, EPA capriciously ignores that subsections 5(d) and 6 do the very same thing by changing the compliance schedule.  It is incredulous that EPA would place its imprimatur on an attorney's after-the-fact and self-serving letter which concludes that the Rule (which specifically followed  the Amended EFA) did not authorize a new compliance schedule when the clear language explicitly said otherwise. Because the DEP attorney's conclusion is contrary to the clear wording of the Rule, I place no weight or reliance on its lawyer's so-called "administrative interpretation."[60]

---

[59]

In its determination that the Rule complies with the mandates of the CWA, the EPA determined that the moderating provisions represent a "variance authorizing provision," rather than a blanket exemption excusing non-compliance with the phosphorus criterion for entire categories of discharges. EPA May 31, 2006 Determination, at 4. In making its determinations, EPA relied at least in part on an interpretation urged by an attorney for Florida DEP in two informal letters dated January 12, 2005 [PR-AR-18] and May 5, 2006 [PR-AR-72 at 3].  The EPA adopted the Florida DEP's interpretation linking Sections 5(d) and 6 and referring to the moderating provisions as "variance procedures,"  finding that Florida DEP's own interpretation of its rules is "authoritative," notwithstanding that the DEP's interpretation was in a letter entirely detached from the formal rule-making process.

[60]

EPA relies on *Defenders of Wildlife v. EPA*, 415 F.3d 1121, 1127-28 (10th Cir. 2005) to support that it is entitled to rely on the State's interpretation of its own regulations.

I further reject, and find arbitrary and capricious, the EPA's explanation that the subsection 5(d) and 6 provisions simply constitute a "policy" that merely identifies the "methods for implementing such a policy . . . ." 40 C.F.R. § 131.12(a). *See Nw. Envtl. Advocates v. EPA*, 268 F.Supp.2d 1255, 1265 (D. Or. 2003)("An omnibus reference that the state's entire water quality standards will be implemented" cannot rationally be read as a 'policy' that specifically identifies the 'methods for implementing such a policy . . . .' 40 C.F.R. § 131.12(a))." The EPA cannot escape the notice and comment requirements for changing its variance regulation at 40 C.F.R. §131.10 "by labeling a major substantive legal addition to it a mere interpretation." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000).

### 5.  The EPA has Acted Arbitrarily, and Not In Accordance With Law, by Failing to Conclude that the Removal of  Water Quality Based Effluent Limitations Through 2016 Constitutes a *De Facto* Change in Compliance Schedule Requiring a Determination of Reasonableness.

The EPA has condoned, without the requisite analysis, a *de facto* moratorium on compliance with the phosphorus criterion for an entire class of dischargers who implement

---

This case is not persuasive or controlling. Here, only the Florida Environmental Regulation Commission was empowered to speak for the State of Florida, as the standards setting body on the Rule, not an attorney for the agency in advocating an after-the-fact rule interpretation. Besides, the Rule is not ambiguous, such that it would require an interpretation. Additionally, letter interpretations by agencies of their regulations are generally  held to be less reliable than officially adopted agency provisions and thus less deserving of deference. *See Leavitt*, 488 F.3d at 915 (declining to grant *Chevron* deference to agency guidance letter because it was not the product of a formal agency adjudication, notice-and-comment rule-making, or any other circumstances reasonably suggesting that Congress ever thought of guidance letters as deserving deference). This is particularly true when it is not the EPA's own interpretation of its rules but an interpretation relied on by the EPA coming from the state. It would be odd, indeed, if a federal court had to give *Chevron* deference to a DEP lawyer who is advocating a position to convince the EPA not to follow the law.

BAPRT at least through 2016.  The extension and expansion of this compliance schedule through the Amended EFA and the Rule beyond the December 31, 2006 date, as previously approved by the EPA,  is a change to  water quality standards just as the original 1994 EFA compliance schedule constituted a change.[61]  The EPA had a duty to analyze whether the ten additional years (or more) to meet the 10 ppb phosphorus criterion was "reasonable" under the CWA, just as it did in its 1999 Determination on the significant delay wrought by the 1994 EFA, which at the time it was passed allowed twelve years for compliance.  At that time, the EPA addressed the question "[d]oes Florida's narrative nutrient criterion, as amended by the compliance schedule, still satisfy CWA section 303(c)(2)(A) and 40 C.F.R. 131.11?" and [d]oes the record support the compliance schedule [as reasonable]?" PR-AR-9 at 7-9.  This same question is still pertinent and unanswered in terms of the Amended EFA and Phosphorus Rule.

Instead of addressing the hard questions, the EPA arbitrarily concluded that the deadline did not change. PR-AR-71 at 23.[62]   A review of the Phosphorus Rule, and the Amended EFA, establishes on their face that the December 31, 2006, deadline had

---

[61]

To the extent that EPA may now claim that the adoption of the Long-Term Plan in the Phosphorus Rule should be construed as a "reasonable" compliance schedule, it failed to do so in the Determinations, and may not now do so in its briefs.

[62]

The EPA makes the untenable argument that authority for the "compliance schedule" in permits rests with § 403.088(2)(e) of the Florida Statutes and, therefore, it follows that the language in subsections 5 and 6 do does not create a compliance schedule. DE 298 at 3, 4. While § 403.088(2)(e) gives general authority for compliance schedules for an individual permit on a case-by-case basis, the Phosphorus Rule carries out the across-the-board legislative mandate that WQBELs shall not be met until 2016, as long as all permittees follow the requirements of subsections 5 and 6 of the Rule.  Section 403.088(2) of the Florida Statutes does not apply to the Amended EFA's and the Rule's blanket exemption.

changed, and  that there is no longer a date certain when the phosphorus criterion will even be met.  A clear reading of the Rule establishes without ambiguity that subsections 5(d) and 6 extend the compliance deadline previously approved by the EPA.  The EPA's argument to the contrary fails any test of reason. The State of Florida would have no reason to include the December 31, 2016, extension part of the water quality standards in the Amended EFA and the Rule if the 2006 deadline had remained in effect.

Finally, in its Rule Determinations, the EPA fails to mention, let alone consider, the cumulative impact on the phosphorus criterion, the designated use, and the anti-degradation policy of allowing such discharges based on TBELs into the Everglades Protection Area for another ten years, including from farmer permittees within the EAA and the C-139 Basin.  In fact, the EPA never considers the effect of subsection 5(d) on the EAA Best Management Practices under Section 373.4592(4)(f) (entitled "EAA best management practices") which allowed farmers to pollute through 2006 and now, by virtue of the Amended EFA and this Rule provision, allows farmers, directly or indirectly, to further discharge into the Everglades Protection Area based upon TBELs established through BAPRT without regard to water quality effluent standards through 2016. The significant concerns voiced in Judge Davis' Order, and evaluated in EPA's 1999 Determination, have simply dropped off EPA's current radar screen.

Nothing could justify a schedule so slow and "glacial" as to defeat the CWA's goals. *See Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962, 967 (W.D. Wash. 1996) (finding that "nothing in the law could justify so glacial a pace" in discussing a 25-year schedule for development of TMDLs under the CWA.). "Simply put, the CWA provides a federal floor, not a ceiling, on environmental protection. If a state seeks to provide a

78

standard that is less stringent than the federal Clean Water Act's floor, or seeks to apply

a standard in a way that is otherwise invalid under federal law, then federal agencies and

federal courts are obligated to resolve the application of the federal Clean Water Act in any

case that properly comes before it." *Dubois v. Dep't of Agric.,* 102 F.3d 1273, 1300 (1st

Cir. 1996).

### 6.  Geometric Mean and Method for Achieving the Numeric Phosphorus Criterion.

#### a.  Achievement of Criterion in Everglades National Park.

Achievement of the phosphorus criterion in the Park is based on the methods set

forth in Appendix A of the Settlement Agreement Consent Decree unless the Settlement

Agreement is rescinded or terminated.  F.A.C. § 62-302.540(4)( c). The Department is

required to review data from inflows into the Park at locations established pursuant to

Appendix A of the Settlement Agreement. The phosphorus concentration limits for inflows

into the Park must not violate those limits.  *Id.*  The Plaintiffs do not even challenge this

methodology, and had previously consented to the Settlement Agreement which adopted

it.

#### b. Achievement of Criterion in the Refuge is Arbitrary and Capricious.

The measurement of achievement of the phosphorus criterion in the Refuge,

however, is another matter. The EPA ignored in its final Rule determinations that a

significant portion of the Everglades Protection Area is composed of the Refuge which has

a  more  protective classification of water quality than Class III.  The Loxahatchee National

Wildlife Refuge (WCA 1) is an Outstanding Florida Water.  F.A.C. § 62-302.700(9)(a)(3),

9(B)(17). This classification means that the State "shall afford the highest protection to

such waters and no degradation is to be permitted." F.A.C. § 62-302.700(1). Moreover,

the Refuge is subject to the Consent Decree that also governs Everglades National Park.

What is critical (in addition to concerns regarding Water Conservation Areas 2 and 3) is

that subsection 5 and 6 moderating provisions apply to, and would automatically allow,

discharges into the impacted areas of the Refuge[63] under blanket variances. *See* May 21,

2008 Hearing Tr., at 17-18.[64] This is an inappropriate subcategory of the Outstanding

---

[63]

      Subsection 5(c) of the Rule provides that discharges into the Park must not result in a violation of the concentration limits established for the Park in Appendix A of the Settlement Agreement Consent Decree as determined through the methodology set forth in subsection 4. I read this provision to prevail over subsection 5(d) and subsection 6 moderating provisions, such that discharges into the Park's impacted areas or unimpacted areas would not be permitted as blanket variances if the concentration limits established for the Park in Appendix A of the Consent Decree are not met. Admittedly, the Rule is not totally clear on this question because the moderating provisions apply to the entire Everglades Protection Area, and the Rule itself refers to "impacted areas" in the Everglades National Park. *See* subsection (4)(b)("Achievement of the phosphorus criterion for waters in the EPA shall be determined separately in impacted and unimpacted areas in . . . the Everglades National Park.") However, the same protective provisions that apply to the Park are not set forth in the Rule for the Refuge, which is designated an Outstanding Florida Water and therefore entitled to a higher level of protection than Class III Waters.

[64]

The following is an exchange from the May 21, 2008, oral argument:

> Court: In fact, the EPA sent out this letter to the department saying here are the various ways that this problem we have with regard to permits based on BAPRT through 2016 can be addressed, and if it's a blanket variance, then there has to be, according to the EPA, consideration of the § 131.10(g) demonstration justifications with public hearing, right?
> Mr. Rave: That's correct, Your Honor.
> Mr. Mancusi-Ungaro: That's correct.
> The Court: That wasn't done.
> Mr. Rave: That's correct, because after consulting with the state and getting the state's interpretation of what that provision meant, we determined that it would have to be applied on a case-by-case basis.
> The Court: If I determine that not only your methodology but also your conclusion was contrary to law and arbitrary and capricious and, in fact, blanket variance provisions were set, then EPA never considered whether

Florida Water designated use under the CWA.  The effect would be to expand impacted areas into pristine areas and allow greater expansion of these impacted areas for the additional ten years permitted by the EFA Amendments and the Phosphorus Rule.[65]

In its July 7, 2003, letter on the draft Phosphorus Rule, the EPA made these exact points to Florida DEP.  The EPA recommended deletion from the draft Rule of those portions which did not sufficiently protect the Refuge.  EPA July 7, 2003 Letter, at 2-3 [PR-AR-13].  It stated:

> This section also provides that phosphorus concentrations in inflows to the Refuge can exceed the criterion if the discharge concentration does not exceed the Technology Based Effluent Limitation (TBELS) which is based on Best Available Phosphorus Reduction Technology (BAPRT).  As noted above, discharges of phosphorus above the criterion of 10 ppb could have an adverse impact on receiving waters.  In addition, the Refuge is designated an Outstanding Florida Water (OFW) under the Florida water quality standards (62-302.700), (sic) discharges are not allowed to 'significantly degrade' the water body (see 62-4.242(2)(a))."

*Id.* at 3.

The EPA ignored the effect of its own earlier warning and, further, did not even consider, in its final Determinations,  whether the subsection 5(d) and 6 blanket variance provisions violated the Settlement Agreement and Consent Decree to which the United

---

that would be a violation of the settlement agreement as well in any determination.
Mr. Rave: That's correct, Your Honor.

May 21, 2008 Hearing Tr. at 17-18.

[65]

While EPA claims that for some basins, specific progress will be achieved sooner than 2016, this claim is contradicted by the Long-Term Plan which shows that the 10 ppb phosphorus criterion will not be met by 2056 in all basins analyzed. PR-AR-69 at 14; Exhibit K; PR-AR-29.28, Table ES-3.

States is a party.[66]   Such action is arbitrary and capricious and not supported by any

scientific rationale.[67]

Of significant importance, if the standard tests are not met for measuring

achievement, "no action" is required in the Refuge, provided that net improvement or

hydropattern restoration provisions of the moderating provisions of subsection 6 are met.

*See* F.A.C. § 62-302.540(4)(d)(2).   The EPA did not even consider whether this "escape

clause" constitutes a change of designated use in the Refuge, a change in criterion, a

violation of the CWA's anti-degradation provisions, or a violation of the Settlement

Agreement. This is arbitrary and capricious, and contrary to the CWA.

> ### c. EPA Properly Determined that the Criterion Measured by a Geometric Mean, and Implemented Through the Four-Part Test, is Protective of the Designated Uses.

I now turn to considering the Rule's methodology for measuring the achievement

of the phosphorus criterion in the Class III Florida Waters of Conservation Areas 2 and 3,

which include the Tribe's historical ancestral lands.  I find no issue under the CWA with the

---

[66]

The Rule provides that "achievement," meaning "measurement" of the phosphorus criterion in Everglades National Park would be based on the methods as set forth in Appendix A of the Settlement Agreement. F.A.C. § 62-302.540(4)(c). There is no exclusion of the Park from subsection 5(d) and the subsection 6 moderating provisions. Rather, these provisions apply for discharges into or within the Park.

[67]

The EPA also acted contrary to its own procedures. In August of 1994, the EPA updated its *Water Quality Standards Handbook* [EFA-AR-9]. The EPA WQS Handbook makes clear that state relief procedures that are a part of water quality standards "must be consistent with the requirements of 48 C.F.R. § 131. *See* 40 C.F.R. § 131.13 ("States may, at their discretion, include in their state standards, policies generally affecting their application and implementation." But, the EPA will continue to approve state-granted relief, if, among other things, the State demonstrates that meeting the standard is "unattainable" based upon one or more of the grounds outlined in 40 C.F.R. § 131.10(g) for removing a designated use.

use of a geometric mean, coupled with a multiple-step test and data screening. I do, however, have significant CWA concerns with other aspects of the Rule's achievement methodology.

The Plaintiffs challenge the measurement of the phosphorus criterion utilizing the "geometric mean" as contemplated by the Amended EFA and the Rule. The Plaintiffs' main objection is that the use of a geometric mean follows multiple screening levels against high phosphorus measurements, so that it re-screens data that is already screened several times. DE 294, p. 5.

I do not find the use of a "geometric mean" to be in violation of the CWA, or that the EPA's approval of it is arbitrary or capricious. Although the Plaintiffs criticize the use of a geometric mean, rather than an arithmetic mean, they present no compelling scientific evidence that use of a geometric mean is not protective of the designated use. Plaintiffs also do not address the fact that the studies on which the criterion is based found that water concentrations with a geometric mean of 10 ppb supported a balanced biological community typical of the low nutrient Everglades environment. The EPA's approval of the criterion is thus supported by the evidence in the record and should be affirmed.

It is noteworthy that the "geometric mean" standard was included in the 1994 EFA. It was never challenged by the Plaintiffs following adoption. Also, the record establishes that the use of a geometric mean is a conventional way of determining numeric criteria and elements in water quality standards that govern ambient water quality, as well as compliance with such standards. *See also*, Administrative Order, at 132.

Because the criterion is expressed in terms of a long-term average concentration, the Rule also contains an achievement methodology intended to limit the amount of

temporal and spatial variability allowed in meeting the standard. Specifically, the achievement methodology provides that the criterion is met if the five year geometric mean averaged across all stations is less than or equal to 10 ppb and (1) the annual geometric mean averaged across all stations is less than or equal to 10 ppb for three of five years, (2) the annual geometric mean averaged across all stations is less than or equal to 11 ppb, and (3) the annual geometric mean at all individual stations is less than or equal to 15 ppb. Subsection 4(d) (the "Four-Part Test").[68] In considering the matter, the EPA concluded, that the criterion, as implemented by the Four-Part Test, is protective of the designated use, particularly since all four parts must be met for the water body to meet the criterion.

While Plaintiffs raise a number of cogent arguments which attack the "Four-Part Test," I cannot ignore, in my limited review function, that the record evidence sufficiently establishes that Florida DEP and EPA performed statistical analysis of the Four-Part Test and determined that compliance with the test accurately measures water conditions that support a balanced population of flora and fauna. PR-AR-18 at 5-6; PR-AR-30; PR-AR-31; *Nat'l Wildlife Fed'n v. EPA,* 286 F.3d 554, 560 (D.C. Cir. 2002) ("particular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise").[69] Accordingly, I do not find that the EPA's Determination as to the Four-part

---

[68]

    The fourth part of the test is that "individual stations in the network shall be deemed to be unimpacted for purposes of this rule if the five-year geometric mean is less than or equal to 10 ppb and the annual geometric mean is less than or equal to 15 ppb." F.A.C. § 62-302.540 (4)(d).

[69]

    Plaintiffs criticize the fact that one of the analyses performed for the EPA to evaluate the Four-Part Test only examined data from the Park and Refuge. However, the EPA also relied on a statistical analysis of the Four-Part Test conducted by the State in WCA-2 and WCA-3. PR-AR-18 at 6-7.

Test is arbitrary, capricious or not in accordance with law.

          **d. EPA's Approval of the Data Screening Provisions Is not Arbitrary or Capricious**

      In order to ensure that anomalous events do not unduly skew the average value, the Rule also provides for a data screening methodology. Subsection 4(f) of the Rule provides that data from monitoring stations will be reviewed and excluded if it does not meet minimum requirements for data quality or if the data is atypical due to extreme events such as fire, flood, drought, or hurricanes; temporary human or natural disturbances such as air boat traffic, authorized restoration activities, alligator holes, or bird rookeries; or hydrologic conditions outside the range of conditions establishing the criterion.   The EPA has reviewed the Rule's data screening provision and has determined that the exclusion of these types of data is appropriate, and not in violation of the Clean Water Act,  in ensuring that monitoring data provide an accurate depiction of conditions in the water body that would actually affect the integrity of the water, as opposed to temporary or localized aberrations that are not truly reflective of typical ambient conditions. While the Plaintiffs raise a number of concerns, none rise to a level that supports arbitrary and capricious action by the EPA, especially given the record on appeal which supports this aspect of the EPA's Determination.

      **7.   The EPA's Approval of a Portion of Subsection 4(d)(3) of the Rule [Providing for "No Action" if the Criterion is Not Met Provided Moderating Provisions Are Met] is Arbitrary and Capricious and Not Protective of the Water Body**

      I   underscore that the "achievement methodology" discussed above is without practical significance in the Rule because, under the Rule, "no action" is required if the criterion is **not achieved**, provided that the subsection 6 moderating criteria are met.  ("If

these limits are not met [phosphorus criterion], no action shall be required, provided that the net improvement or hydropattern restoration provisions of subsection (6) below are met.") F.A.C. § 62-302.540(4)(d)(2).  I already have discussed the impact of this provision on the Refuge.  It also is of equal concern in regard to the Class III waters of WCAs 2 and 3, particularly to the Tribe as a downstream water user.

The subsection 4(d)((2) avoidance mechanism screens out high measurements in "impacted areas" and excuses non-compliance until 2016 (and indefinitely in unimpacted areas) so long as a discharger follows the "Long-Term Plan" or provides hydropattern restoration. This provision, when coupled with the subsection 6 provisions, violates the CWA. The  inclusion of this provision is not scientifically defensible, and it is not protective of designated uses. *See NRDC v. EPA*, 16 F.3d 1395, 1402 (4th Cir. 1993) (EPA's duty under the CWA "is to ensure that the underlying criteria, which are used as the basis of a particular state's water quality standard, are scientifically defensible and are protective of designated uses.").

In reviewing this avoidance mechanism, it is important to note that the Rule provides that achievement of the phosphorus criterion "shall be determined separately in impacted and unimpacted areas in each . . . water bod[y] . . . ." F.A.C. § 62-302.540(4)(a).  This means that the achievement methodology is to be done separately for each water body and then done separately in each impacted area and unimpacted area of each water body. Because all discharge points are in impacted areas, this separation of the water body and moderating provisions for impacted areas assures discharge permits for *all* discharges into the Everglades Protection Area, regardless of phosphorus concentrations, provided the dischargers follow the Long-Term Plan.

The record provides no reasonable assurance that the designated use of the "water body as a whole" is being protected.  By allowing for "no action," the Rule creates a change in designated use. The EPA acted contrary to the CWA by approving such a convoluted dichotomy.

The situation becomes even more grievous when, as here, there is not even a sound scientifically-based standard and methodology for identifying the actual location and extent of impacted and unimpacted areas within each basin.  The phrase "impacted areas" is defined to mean those areas of the Everglades Protection Area where total phosphorus concentrations in the upper 10 centimeters of the soils is greater than 500 mg/kg. Subsection (3)(d). The Rule is not accompanied by a formal and scientifically complete mapping of the Everglades Protection Area showing the location of "impacted areas;" however, informal computer based mapping shows extensive impacted areas in Water Conservation Areas 1 (the Refuge), 2 and 3 as well as some small areas within the Park. *See* Map from Feb. 2003 presentation by DEP to ERC [PR-AR-32, 2-27&28-2003, File No. 11], attached to this Opinion as Appendix B.

In its letter of July 7, 2003 to the Florida DEP, the EPA expressed its concerns regarding the definition of "impacted areas" as not being scientifically established or sufficiently protective, and  as constituting an inappropriate assignment of a subcategory of the Florida Class III designated use.  These concerns were never responded to by the Florida DEP.   The EPA acted arbitrarily and capriciously by ignoring its own recommendations and allowing the Phosphorus Rule to be adopted in a manner that violated the CWA.

The July 7, 2003 letter stated in part:

The draft rule essentially sets up two subcategories of Florida's Class III designated use for the Everglades: an "impacted use and an "unimpacted use." The subcategories may differ in how the protective criterion is applied (depending on whether certain amendments to Section 5 are accepted or not), but the primary difference is in the availability of the "net improvement" moderating provision. In the current draft Rule, use of the moderating provision is more restricted for "unimpacted" areas. **Since the moderating provision is intended to allow discharges of phosphorus above the protective criterion of 10 ppb, additional adverse impacts to the receiving waters of the Everglades Protection Area could occur. Therefore, a scientifically defensible definition of "impacted" is critical.** The draft Rule identifies "impacted areas" as areas of the [Everglades Protection Area] where the total phosphorus soil concentration is greater than 500 mg/kg. Site-specific data from the EPA indicate pristine (unimpacted) areas with soil concentrations in excess of 500 mg/kg and 600 mg/kg. (See Reddy et al. 1991, Craft and Richardson 1993, Walker and Kadlec 1996, EPA 2000b, FDEP and SFWMD 2002). **In addition some of the WCA-2A stations which the Department considered "unimpacted" for the purpose of deriving the 10 ppb criterion would now be redefined as "impacted."**

**By using 500 mg/kg as the definition of "impacted areas," pristine (unimpacted) areas will be identified as 'impacted.' This could allow an inappropriate application of the "net improvement" moderating provision, and as such, would be viewed under the CWA as an inappropriate assignment of a subcategory of the Florida Class III designated use."**

RECOMMENDATION: The use of greater than 600 mg/kg soil phosphorus concentration is recommended as an indicator of impairment concurrent with other indicators such as "adjacent to an inflow and the presence of cattail or other biological indicators of imbalance."

EPA July 7, 2003 Letter, at 2 [PR-AR-13] (emphasis added).

The program data that did exist in 2005 (during the EPA review) indicated that the area of the Everglades with soil total phosphorus concentrations exceeding 500 mg/kg was 24.5 percent (plus/minus 6.4 percent) of the 2,063 square miles sampled. This data was summarized in EPA's recent REMAP Report which indicates that the impacted areas are rapidly expanding throughout the Everglades. *See* REMAP Report at page 62, fig. 47 [DE

270]; *cf.* DEP Technical Regulatory Information in Support of the Rule attached to the submission to EPA dated January 12, 2005  [PR-AR-18].

Expressed in lay terms, continuing to discharge phosphorus into the impacted areas at levels beyond what is protective will cause the impacted areas to expand into the more pristine unimpacted areas.  The unimpacted areas then become impacted areas which then allow for further discharge above the protective standard under the Rule. Because "no action" is required if the prescribed 10 ppb limits are not met, the process can continue at least through 2016 in impacted areas. It may continue indefinitely "without action" in the more pristine, unimpacted areas with hydropattern restoration (more water flow) since that moderating provision is not time-barred under the Rule.

The cumulative effect fails to protect the designated use, violates anti-degradation principles and negates the phosphorus criterion. The EPA's approval of such a scheme is arbitrary and violates Sections 4(b)-(e) of the CWA.  It is in direct contravention to the CWA's requirement for EPA to institute progressively more stringent effluent discharge guidelines so as to "tighten the noose for polluters."  *Citizens Coal Council v. EPA*, 66 F.3d 784, 789 (6th Cir. 2006).[70]

**8. EPA's Conclusion that Sections 1, 2 and 5(a-c) of the Phosphorus**

_____

[70]

The EPA also violated 40 C.F.R. § 131.10(b) by failing to consider the effects on the downstream water user, the Miccosukee Tribe, since a significant portion of the impacted areas lie directly above the Tribe's lands. "In designating uses of a water body and the appropriate criteria for those uses, the State shall take into consideration the water quality standards of downstream waters and shall ensure that its water quality standards provide for the attainment and maintenance of the water quality standards of downstream waters." 40 C.F.R. § 131.10(b). The record does not even contain an overlay of the Tribe's lands in relation to the computer generated estimate of impacted areas within WCA 3.

**Rule are Not Changes in Water Quality Standards is Arbitrary and Capricious**

I have previously found that EPA acted arbitrary and capriciously by parsing its review of the Phosphorus Rule. While the EPA reviewed certain provisions as changes in water quality, it declined to review other provisions until ordered to do so. At this juncture, I conclude that EPA further acted arbitrarily and capriciously by not considering that the subsections (1), (2) and (5)(a-c), which directly interrelate with subsections 5(d) and 6, likewise constitute changes in Florida's water quality standards under the CWA. The EPA acted arbitrarily in not reviewing the interrelationship between subsections 5(d) and 6 with the following additional sections of the Phosphorus Rule: (I) subsection (1)(b)(2) (establishing moderating provisions as an element of water quality standards); (ii) subsection (2)(e)(2)(h) (providing that the Long-Term Plan accomplishes BAPRT); (iii) subsection (2)(e)(l) (finding that the Rule must incorporate a flexible approach towards the application of the numeric phosphorus criterion); (iv) subsection (3)(a), (b),(c), (d), (h), and (I) (establishing definitions directly applicable to changes in water quality standards); and (v) subsection 5(a), (b)(2) and (c)(which, when taken together, permit discharges as moderating provisions).[71] These provisions, when coupled with the changes in water quality already recognized by EPA in subsections 5(d) and (6), alter the narrative criterion and the designated use by creating subclasses of Class III and Outstanding Florida Waters. Accordingly, under the CWA, the EPA had a duty to further evaluate these changes in

---

[71]

See discussion above explaining why subsections 5(a), (b)(3), and ( c) of the Rule change the narrative criterion and negate the 10 ppb numeric criterion, because they deem compliance with these water quality criterion to be achieved if the discharger simply meets the moderating provision criteria.

accordance with CWA criteria.

## VII. FRIENDS' ENDANGERED SPECIES ACT CLAIM

Plaintiffs have challenged the EPA under the Endangered Species Act (ESA), 16 U.S.C. § 1540(g), in Count III of the complaint filed by Plaintiff Friends of the Everglades.[72] EPA argues that this Court lacks jurisdiction because Plaintiffs have failed to comply with the notice requirement of the ESA.[73]  The ESA provides that "[n]o action may be commenced . . . [under this citizen suit section of the ESA] prior to sixty days after written notice of the violation has been given to the Secretary and to any alleged violator of [this section of the ESA]." 16 U.S.C. § 1540(g)(2)(A).  Plaintiff Friends' complaint is silent as to any action taken to fulfill this statutory notice requirement and, as such, I dismiss this claim as specifically plead under the ESA.

However, Plaintiffs claim that such notice was not required, as their action is premised on the Administrative Procedures Act (APA), and that they are invoking the provisions under the ESA not for jurisdiction but rather to demonstrate that EPA's actions were not in accordance with law.  While this argument is interesting, it is nevertheless the case that Count III of Plaintiffs' Complaint provides no support for such formulation of the

---

[72]

Plaintiff Friends' Second Amended Complaint incorrectly cites 16 U.S.C. § 1440(g) as a basis for jurisdiction and references 16 U.S.C. § 460 in the request for relief under Count III (DE 150).

[73]

EPA argues that even if I had jurisdiction, there is no basis for a finding that the ESA was violated because EPA complied with the ESA during its review of the Phosphorus Rule by consulting with the United States Fish and Wildlife Service (Service).  EPA admits, however, that it did not separately consult with the Service as to section (5)(d) of the Phosphorus Rule (DE 274, p. 50, fn 9), because EPA determined that neither sections (1), (2), nor (5)(a) through (5)(c) are changes to Florida's water quality standards.  DE 298, p.13.

claim and therefore dismissal is appropriate.

## VIII.  INVOCATION OF EQUITABLE POWERS

Federal law does not authorize anything like a twenty-two year compliance schedule, which is what the 1994 EFA, the Amended EFA and the Phosphorus Rule now allow with regard to achieving the narrative and numeric phosphorus criterion (the original EFA took effect in 1994 but compliance is not contemplated until 2016).[74] The actions included in the 1994 EFA, coupled with its schedule of construction projects, were intended to result in the attainment by December 31, 2006, of the level of water quality as established by the narrative criterion and the later the default numeric phosphorus criterion. Prior to its latest round of Determinations, the EPA had consistently found that the attainment by 2006 was necessary to protect and maintain the designated uses of the Everglades system. Both this District Court and the Eleventh Circuit Court of Appeals relied on these assurances to affirm the reasons for extension.

Any further delay in enforcement must necessarily raise heightened concerns, if not skepticism, and result in careful judicial scrutiny.  Such scrutiny appears warranted when it was the EPA itself,  just a few years previously, that concluded that the "**reasonableness and acceptability" of the initial 12 year schedule promulgated by the 1994 EFA assumed that the December 31, 2006, deadline would be met,** and that "there was an enforceable framework that 'ensured' the numeric water quality criterion for phosphorus

---

[74]

40 C.F.R. § 122.47 addresses "schedules of compliance" leading to compliance with the CWA and regulations. The regulations state that NPDES permits issued to a "new source" or "new discharger" shall contain a compliance schedule only when necessary to allow a reasonable opportunity to attain compliance and only for three years. Nothing in this record shows that the dischargers are "new sources" or "new dischargers."

would be met by the December 31, 2006, deadline in the EFA or sooner if possible." EPA Sept. 15, 1999 Determination, at 9, n.15 (emphasis added) [EFA-AR-8]. I now conclude that any further undue delay through endless, undirected rounds of remands to EPA to do its duty, which it steadfastly has refused to do, is, alone, insufficient, and that it is imperative that this Court exercise its equitable powers to avoid environmental injury to the Everglades through the implementation of the Amended EFA and the Phosphorus Rule as a result of the use of blanket exemptions.

Cases involving environmental injuries are particularly suited to injunctive relief. *Alaska Center for the Env't v. Reilly*, 796 F.Supp. 1374, 1377 (W.D. Wash. 1992) ("Moreover, the Supreme Court has found that environmental injury is uniquely deserving of injunctive relief: 'Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.'") (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987))

Under the law of this Circuit, injunctions fall into at least three categories: First, "traditional" injunctions, used to remedy breaches of common law, statutory, or constitutional rights, may be granted if the moving party shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092,1097 (11th Cir. 2004) (further stating that for a permanent injunction, the plaintiff

must show actual success on the merits instead of just a likelihood).  Second, courts may

grant statutory injunctions where a statue specifies that a court may grant an injunction to

enforce the statute, and these injunctions may be granted based on the statute's own

criteria plus a consideration of the traditional requirements for injunctions.  *Id.* at 1098-99.

Third, courts may grant injunctions pursuant to the All Writs Act, 28 U.S.C. § 1651, which

states, "The Supreme Court and all courts established by Act of Congress may issue all

writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the

usages and principles of law."  *Id.* at 1099.  The All Writs Act empowers courts to issue

injunctions to effectuate or protect their judgments, and to "prevent the frustration of orders

it has previously issued in its exercise of jurisdiction otherwise obtained."  *Id.* at 1100, n.11

(quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 171 (1977)).  Under the law of this

Circuit, a writ issued under the All Writs Act may be directed at a non-party if that party is

"in a position to frustrate the implementation of a court order or the proper administration

of justice, and . . . even those who have not taken any affirmative action to hinder justice."

*Klay*, 376 F.3d at 1100 (quoting *N.Y. Tel. Co.*, 434 U.S. at 174).  Furthermore, courts are

empowered to grant such a writ "whenever it is calculated in the court's sound judgment

to achieve the ends of justice entrusted to it, and not only when it is necessary in the sense

that the court could not otherwise physically discharge its . . . duties."  *Id.* (internal citations

omitted) (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).

In a case brought under the APA, a district court has the authority to issue an

injunction to effect relief.  *Friends of the Wild Swan v. EPA*, 74 Fed. Appx. 718, 721-722

(9th Cir. 2003) ("In waiving sovereign immunity, the APA specifically anticipates injunctive

relief without limiting it to specific sections.  *See* 5 U.S.C. § 702.  Hence, we reject

Appellants' argument that, under the APA, 5 U.S.C. § 706(2), courts are not authorized to impose injunctive relief."); 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that is against the United States or that the United States is an indispensable party.")

The Supreme Court has suggested that in rare circumstances, it is appropriate in cases brought under the APA for courts to go beyond simply remanding a matter back to the agency. *See Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985) (stating that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").  Based on this decision and a court's equitable powers in general, Circuit courts have upheld district court decisions to remand with specific instructions to the agencies in cases brought under the APA.  *See Earth Island Inst. v. Hogarth*, 494 F.3d 757,770 (9th Cir. 2007) (stating "[w]e agree with the district court that the government's intransigence in following Congress' mandate [on "dolphin-safe" labeling of tuna] renders this case one of the rare circumstances where generic remand is not appropriate" and vacating the Secretary's finding of no adverse impact) (citing *Florida Power & Light,*, 470 U.S. at 744); *Sierra Club v. EPA*, 346 F.3d 955, 960, 963 (9th Cir. 2003) (where EPA issued final rule finding that a particular area in California would have attained national ambient air quality standards by the applicable date pursuant to the Clean Air Act, if not for emissions emanating from outside the United States, the Ninth Circuit held that this was an exceptional case in which it was proper to remand with instructions, and remanded with instructions that EPA classify the particular area as a serious

nonattainment area) (citing *Florida Power & Light*, 470 U.S. at 744); *Friends of the Wild Swan,*, 74 Fed. Appx. at 721-722 (holding that court did not abuse its discretion in imposing of a schedule for development of TMDLs pursuant to the CWA and limiting the issuance of new permits, because it was supported by Montana's history of delay and EPA's repeated failure to require the state to timely develop TMDLs, where court adopted a schedule that the state legislature had initially adopted); *Alaska Center for the Env't v. Browner*, 20 F.3d 981, 986-87 (9th Cir. 1994) (upholding district court decision which ordered EPA to submit report to Court on the adequacy of water quality monitoring in Alaska and propose a schedule for establishment of TMDLs because the district court acted with restraint in requiring only the steps necessary for development of TMDLs, in the face of thirteen year delay, and because court left substance and manner of achieving compliance to EPA); *Abramowitz v. EPA*, 832 F.2d 1071, 1072-73 (9th Cir. 1988) ("We conclude that the EPA exceeded its authority under the Clean Air Act by approving the control measures without determining whether those measures would demonstrate attainment by the December 31, 1987 statutory deadline. Because we find no evidence in the record to indicate that EPA intends to take final action before 1988, we remand this case with the specific instruction that EPA disapprove the relevant portions of the [State Implementation Plan] and face up to implementing the measures which are to be triggered by failure to meet attainment requirements."), *superseded by statute,* 1990 Amendments to Clean Air Act; *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 500 (D.C. Cir. 1988) (stating "To be sure, the [Supreme] Court suggested that under 'rare circumstances' it might be appropriate for the court to conduct its own inquiry, reach its own conclusion, and order more intrusive relief," but declining to do so because neither party requested it,

and remanding for the district court to establish an expedited schedule for further rulemaking).

In this Order, I have concluded that the EPA has acted arbitrarily and capriciously in finding that  portions of the Phosphorus Rule (as discussed above) are consistent with the CWA, and that the Amended Everglades Forever Act (and certain provisions of the Phosphorus Rule) do not constitute a change in water quality standards under the CWA. As such, and as provided in the APA, I shall set aside the pertinent EPA's Determinations and remand to the EPA for further specific action consistent with Part IX of this Order.

In addition, finding this case as one where a generic remand is not alone appropriate, I enjoin the DEP from issuing permits pursuant to those sections of the Phosphorus Rule that I have set aside, and enjoin the DEP from considering blanket exemptions or variances under the current Phosphorus Rule pending compliance with the CWA and its implementing regulations.  I further enjoin the DEP from enforcing the "no action" provision in subsection 4 of the Phosphorus Rule, and from utilizing subsection 4 and 5(b)(3) of the Phosphorus Rule to avoid the 10 ppb phosphorus numeric criterion as otherwise established by the Phosphorus Rule.

I grant this injunction pursuant to the court's authority under the APA, which clearly contemplates injunctive relief.  *See Friends of the Wild Swan*, 74 Fed. Appx. at 721-722 (holding that district court did not abuse its discretion in limiting the issuance of new permits, because it was supported by Montana's history of delay and EPA's repeated failure to require the state to timely develop limits for specific pollutants).  I additionally grant this injunction based on my conclusion that the Plaintiffs have met the requirements for a "traditional" injunction: based on my analysis in this Order: (1) Plaintiffs have shown

actual success on the merits, (2) irreparable injury to the Everglades and to Plaintiffs will

be suffered unless this injunction issues, (3) the threatened injury to the Plaintiffs and the

Everglades outweighs whatever damage this injunction may cause the opposing parties,

and (4) this injunction would not be adverse to the public interest. *See Klay*, 376 F.3d at

1097.

The Florida DEP is properly a subject of this injunction because, as an intervenor,

DEP is treated as if it were an original party to the litigation. *Bayshore Ford Truck Sales,*

*Inc. v. Ford Motor Co. (In re Ford Motor Co.)*, 471 F.3d 1233, 1246 (11th Cir. 2006) ("Once

a court grants intervention, whether of right or by permission, the 'intervenor is treated as

if [it] were an original party and has equal standing with the original parties.") (quoting

*Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978)).[75]

## IX. JUDGMENT AND ORDERS OF THE COURT

It is hereby **ORDERED AND ADJUDGED**:

1. Summary judgment is granted in favor of the Tribe and Friends on their Motion

for Summary Judgment on the EFA Amendment issues [DE 226], in the manner, and for

the reasons, set forth in this Order. The motion is granted to the extent that the Court finds

the Amendments to the Everglades Forever Act change Florida's previous water quality

---

[75]

Although the South Florida Water Management District (the "District") is not a party or an intervenor in this action, I will consider a motion, as may be necessary,  by the Plaintiffs to enjoin the District from issuing permits discharging into, or within, the Everglades Protection Area, in a manner inconsistent with the provisions of this Order, based on my powers under the All Writs Act.  Because the District is empowered to grant permits under certain circumstances, the District is "in a position to frustrate the implementation of a court order or the proper administration of justice . . . ." *Klay*, 376 F.3d at 1100.

standards and orders Defendant EPA to comply with its duty under the Clean Water Act to approve or disapprove those changes in a manner consistent with the findings and conclusions set forth in this Order.

2. The Cross-Motions for Summary Judgment filed by the EPA, DEP and New Hope/Okeelanta [DE 231, 234 and 239] on the EFA Amendment issues are denied, in the manner, and for the reasons, set forth in this Order.

3. Summary judgment is granted, in part, and denied in part, for the Tribe and Friends as pertaining to the Motion for Summary Judgment on the Phosphorus Rule issues [DE 255], in the manner, and for the reasons, set forth in this Order. In Paragraph 6 below, I clarify which provisions of the Phosphorus Rule are valid, and which provisions are invalid, under the CWA.

4. Summary judgment is granted, in part, and denied in part, for the EPA and the DEP as pertaining to their Cross- Motions for Summary Judgment on the Phosphorus Rule issues [DE 274 and 281], and denied as to New Hope/Okeelanta on its Motion for Summary Judgment [DE 278], in the manner, and for the reasons, set forth in this Order.

5. The Tribe and Friends' Motions to Complete and Supplement the Record [DE 253 and 270] are denied, subject to the two exceptions discussed in Part III (above) of this Order. In accordance with footnote 5 above, the parties are instructed to file electronic versions of the full March 2003 and October 2003 Long-Term Plans with the Clerk of the Court within 30 days from the date of this Order.

6. I affirm the EPA Determinations finding that subsections 4(a) and 4(d)(1) and 4(d)(2), except as stated in this paragraph, comply with, and meet the requirements of, the Clean Water Act. For reasons stated in this Order I conclude that the portion of subsection

4(d)(2)(c) (providing "[i]f these limits are not met, no action shall be required, provided that the net improvement or hydropattern restoration provisions of subsection (6) below are met") does not meet the provisions of the Clean Water Act and is thereby declared invalid. I further conclude, for reasons stated in this Order, that subsections 5(b)(3)("Discharges will comply with moderating provisions as provided in this rule"), 5(d) and 6 do not meet the provisions of the Clean Water Act and are hereby declared invalid. The EPA Determinations finding to the contrary are hereby set aside.

7. On remand, the EPA shall require the State of Florida to meet the requirements of the Clean Water Act, and its implementing regulations, in a manner consistent with this Order, prior to DEP's or EPA's approval of any subsequent variance to the Phosphorus Criterion as established by subsections 4(a), ( c), (d)(1) and (2) [with the exception of the "no action" provision], and 5(a),(b)(1) or (2) of the Phosphorus Rule.

8. The EPA's Determinations that Sections 1, 2 and 5(a-c) of the Phosphorus Rule are not changes in water quality standards under the CWA are hereby set aside, for the reasons set forth in this Order. Accordingly, I order the EPA on remand to comply with its duty under the Clean Water Act to approve or disapprove those changes in a manner consistent with the findings and conclusions set forth in this Order.

9. The Defendant EPA's motion for summary judgment [DE 274, p. 48-51] is granted against Plaintiff Friends' Endangered Species Act Claim, that claim as included Friends' Second Amended Complaint is dismissed.

10. The DEP is enjoined from granting any permits for discharges in, or within, the Everglades Protection Area under subsections 5(b)(3), 5(d) and 6 of the Phosphorus Rule, or the "no action" provision of subsection 4(d)(2)(c).

11.  This case is CLOSED.

**ORDERED** this 29th day of July, 2008.

_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
U.S. Magistrate Judge Chris M. McAliley
All counsel of record