UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
LEAD CASE NO. 04-21448-CIV-GOLD
(CONSOLIDATED WITH 04-CV-22072, 05-CV-20663)

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA,

     Plaintiff,

v.

UNITED STATES OF AMERICA, *et al.*

     Defendants.

_____

FRIENDS OF THE EVERGLADES,

     Plaintiff,

v.

UNITED STATES OF AMERICA, *et al.*

     Defendants.

_____/

ORDER GRANTING PLAINTIFFS' MOTIONS
[DE 357]; [DE 364] IN PART; GRANTING EQUITABLE
RELIEF; REQUIRING PARTIES TO TAKE ACTION BY DATES CERTAIN

I.    Introduction

    Plaintiffs, the Miccosukee Tribe of Indians of Florida ("the Tribe") and Friends of the

Everglades ("Friends"), have filed various motions for contempt or to otherwise compel the

State and Federal Defendants to comply with this Court's July 29, 2008 Summary

Judgment Order[1] [DE 357, 364]. The Tribe and Friends, as well as Defendant the United

_____

[1]

In an Order entered on July 29, 2008 [DE 323] ("the Summary Judgment Order"), I concluded that
the Environmental Protection Agency ("EPA") acted contrary to the Federal Clean Water Act, 33
U.S.C. § 1251, *et. seq.* ("CWA") or ("Clean Water Act") and the Federal Administrative Procedures

States Environmental Protection Agency ("the EPA")[2] and the Intervenor Defendants – i.e., the Florida Department of Environmental Protection ("FDEP"), New Hope Sugar Company and Okeelanta Corporation – have submitted numerous filings, exhibits, and memoranda in support of their varying positions. *See, e.g.,* **[DE 360, 363, 366, 371, 372, 375, 377, 387, 389, 390, 391, 392, 393, and 395]**. A two-day evidentiary hearing was held on January 13 and April 5, 2010 ("Contempt Hearing"). For the reasons that follow, I grant the Plaintiffs' motions in part, impose further equitable relief, and require compliance with the milestones set forth in this Order.

## II. Findings of Fact

1. The Nation and the State of Florida have recognized the Everglades as a national treasure which requires our utmost protection. After years of study, the State of Florida has determined that the best technology available to protect the remaining Everglades is through the use of Storm Water Treatment Areas, which filter upstream discharges before they enter the Everglades Protection Area.

2. Upstream discharges containing high levels of phosphorus and other nutrient

---

Act. 5 U.S.C. § 701, *et. seq.* ("APA") or ("Administrative Procedures Act") when it determined that the 2003 amendments to Florida's Everglades Forever Act and the accompanying Phosphorus Rule did not change water quality standards in the Everglades Protection Area. I remanded with direction to the EPA, and enjoined the FDEP from granting permits that allowed discharges into, or within, the Everglades Protection Area based on the invalidated provisions and from otherwise enforcing the invalidated provisions. *See generally, Miccosukee Tribe of Indians of Florida v. United States*, 2008 WL 2967654 (S.D. Fla. July 29, 2008) (cited throughout as "**[DE 323]**").

[2]

The Tribe and Friends have brought consolidated cases against the United States, the United States Environmental Protection Agency, the Administrator of the EPA, and the Regional Administrator of the EPA, Region IV. All are collectively referred to in this Order as "the EPA."

2

pollutants enter the Everglades Protection Area[3] through six existing Storm Water Treatment Areas ("STAs") known as STA-1W, STA-1E, STA-2, STA-3/4, STA 5 and STA-6. The purpose of the STAs is to remove phosphorus and other nutrients from the upstream waters before they enter the Everglades Protection Area.[4]

3.    While the State of Florida and the United States have spent considerable resources on constructing the STAs, the STAs have only managed to slow, but not stop, the rate of destruction within the Everglades Protection Area. The hard reality is that ongoing destruction due to pollution within the Everglades Protection Area continues to this day at an alarming rate.

4.    To protect the Everglades from further significant environmental degradation, it is essential that discharges into, and within, the Everglades Protection Area not exceed more than  10 parts per billion of phosphorus ("ppb").  In federal Clean Water Act terms, the 10 ppb standard is referred to as a water quality based effluent limitation ("WQBEL"). *See* note 5, *infra.*  The STAs currently do not  meet this vital standard.  At best, the State of Florida and the EPA anticipate that, in 2016, the STAs may be operating with technology based effluent limitations ("TBELs"), which provide significantly less protection.[5]

_____

[3]

The Everglades Protection Area (as defined in the 1994 EFA) covers approximately 3,500 square miles and consists of the Everglades National Park, the Loxahatchee National Wildlife Refuge and Water Conservation Areas 2A, 2B, 3A and 3B. **[DE 323, p. 5]**.

[4]

As summarized at the Contempt Hearing by expert witness Dr. Terry Rice, the purpose of the STAs was to " . . . meet the criteria which would stop the destruction of the Everglades." **[DE 380, p. 58]**.

[5]

Mr. Michael Phillip Coram, from the FDEP, testified that TBELs establish the minimal level of treatment required for any particular category or source pollutant from an industrial facility. **[DE 380, p. 144]**.  WQBELs – also referred to as QBELs  – are water quality based effluent limitations

3

5. According to the 2010 South Florida Environmental Report, as confirmed by expert testimony at the Contempt Hearing, all the STAs allow significant discharges into the Everglades Protection Area that exceed the 10 ppb limitation. **[DE 375-1]**. Specifically, for the period of May 1, 2008 through April 30, 2009, the flow-weighted mean outflow for total phosphorus was as follows: 21 at STA -1E; 36 at STA-1W, 18 at STA-2, 13 at STA 3/4, 56 at STA 5, and 93 at STA-6. STA 1E is the largest of the six STAs.[6] *Id.* at 3. All of the STAs, except STAs 3 and 4, operate in the "Stabilization Phase," which will end when the respective STA achieves the annual total phosphorus limits as defined in the TBELs. STAs 3 and 4 are in the "Routine Operations Phase." *Id.* at 5. But even the lesser protection of TBELs do not apply until the STA is in the "Routine Operations Phase." *Id.* In other words, there are currently **no** effluent limitation limits in effect **at all** for STAs 1E, 1W, 2, 5 and 6. *See id.*

6. In 2005, the EPA prepared a comprehensive study of the Everglades known as the REMAP Report. According to REMAP, the extent, and rate, of destruction of the Everglades has increased from 1995 - 2005, with the percentage of Everglades Protection Area soils affected by phosphorous jumping from 33.7 percent to 49.3 percent during that ten-year period. **[DE 380, pp. 43, 241]**. EPA has not updated its report since 2005. There are no available studies and related mapping of the Everglades Protection Area that accurately locates and measures the current rate of decline and the additional areas

___

necessary for discharges not to cause a violation of water quality standards. *Id.* at 147.

[6]

The STAs were constructed without a final numeric phosphorus standard in place. They initially were designed to meet 50 ppb in the first phase (by 1996).This was later changed so that the STAs would meet 50 ppb by 2002, and that all STAs would be retrofitted to meet the numeric phosphorus criteria by December 31, 2006. This has not occurred.

affected.[7] Nonetheless, data extrapolated from the STA discharges supports the expert

conclusions at the Contempt Hearing that the rate of destruction of the Everglades due to

excessive phosphorus discharge is significant, grave, and unacceptable.[8] As explained by

_____

[7]

Mr. Frank L. Nearhoof, of the FDEP, has been working on Everglades related issues since the early 1990's, including on the STAs and their associated state and federal permitting. He disagrees with Drs. Rice and Jones that the loss of the Everglades from phosphorus intrusion is "irretrievable." **[DE 380, p. 241]**. I give little weight to his testimony, as it is contrary to the greater weight of scientific evidence as presented by Dr. Terry L. Rice and Dr. Ronald D. Jones, whom I find more qualified to offer expert opinions. Mr. Nearhoof holds only a Master of Science in Oceanography. His acceptance as an expert has been limited to statistical evaluation of water quality data.

Mr. Nearhoof acknowledged at the Contempt Hearing that FDEP has not completed any scientific studies with the STAs in place to determine the anticipated soil phosphorus levels through 2009. I inquired: ". . . if that 49.3 percent figure continued to move significantly higher even with the STAs in place, that would be real grounds for concern?" Mr. Nearhoof responded: "Yes, your Honor, I believe it is." **[DE 380, p. 242]**. He then conceded that FDEP has done no computer modeling to ascertain the effect of additional phosphorus intrusion through 2016. I further inquired: "But isn't it necessary to have an overall study of the potential effects of the 2016 date based on what has been occurring so far to know whether or not the Everglades is as endangered as you have heard from other witnesses?" Mr. Nearhoof responded: "Yes. We do actually have . . . that research is ongoing . . . I do not think we are exactly flying in the dark, but I can't give you like much complicated science." *Id.* at 243-44. I then asked Mr. Nearhoof about the consequences of being wrong: **"If you are wrong, [aren't] the consequences [] pretty dire out there . . . ?"** He answered: "I think you will have – **yes, they would have further impacts which would be highly undesirable in a system we are trying very, very hard to protect** and the State of Florida has remained committed to this even in tough economic times and, again, we are working very hard at it. **Unfortunately, we have not solved the scientific problem just yet.**" *Id.* at 245 (emphasis added).

[8]

Dr. Terry Rice, the former head of the Army Corps of Engineers in Jacksonville, Florida, testified at the Contempt Hearing that the Everglades is currently experiencing significant destruction because the State of Florida is not meeting the agreed-upon criteria to protect it. He stated: " . . . I do believe that is grave and I think that has been confirmed not just by the Miccosukee Tribe of Indians . . . but [also by] the National Academy of Sciences, [which] just put out a report in September 2008 that said if we didn't stop this irreversible damage, there may be no Everglades to save soon." **[DE 380, p. 65]**.

Dr. Ronald D. Jones, an acknowledged Everglades expert, confirmed this conclusion. I find his testimony credible and persuasive. He stated at the Contempt Hearing, in response to the question of what is happening today to the Everglades: "The destruction continues. The study that we did for REMAP shows the increase in soil concentrations of phosphorus over a ten-year time. It has increased by 50 percent. . . . [C]attails are continuing to expand in the Everglades and once

Dr. Terry Rice at the Contempt Hearing,

> So, we have now increased by 30 percent the amount of the Everglades that has been irreversibly damaged. If we allow continual discharge of this pollutant into the Everglades, into impacted areas which expand into unimpacted areas which become laden with phosphorus, that is irreversible damage. In my mind, that is unreasonable given the fact that it supposed to be stopped. We are supposed to be restoring the Everglades, not just stopping it and we haven't even stopped the damage, yet.

**[DE 380, pp. 42-43]**.

7. The State of Florida, in the 1994 Everglades Forever Act, Section 373.4592, Florida Statutes, committed itself to a twelve-year construction program to fix the problem and to meet the 10 ppb standard. The Everglades Forever Act assured that "**in no case**" shall the State's phosphorus criterion allow waters in the Everglades Protection Area to be altered so as to cause an imbalance in the natural populations of aquatic flora and fauna. Fla. Stat. § 373.4592(4)(e)(2), Florida Statutes (1994). The EPA, in 1999, accepted the State of Florida at its word and so has the United States District Court for the Southern District of Florida. In hearing after hearing, promises have been made that if an extension until December 31, 2006 was granted, the deadline would be met.

8. By 2003, it was apparent to all that the State's promise would not be met. Rather than directly saying this, the State of Florida, with the approval of the EPA, departed

---

you get cattails, those are the markers on the grave of the Everglades. **They don't go away, the damage is permanent and it is very important that we get the pollution stopped as soon as possible and that is just not happening.**" *Id.* at 86 (emphasis added).

When asked if the current discharges from the STAs were "destroying the quality of the receiving water," he restated: **"[The] destruction continues. The water that is coming out of the STAs . . . even when they meet the final technology based standard [as compared to meeting the numeric Phosphorus Criteria] . . . will continue to destroy the Everglades.**" *Id.* at 90 (emphasis added).

from prior commitments by changing the state law to move the target date for compliance from December 31, 2006[9] to 2016, and by loosening the standards for compliance through "moderating provisions." It did so by legislation and rule-making that was so complex as to be incomprehensible to lay persons. None of the governmental agencies involved directly told the public the hard truth: we have not solved the problem, we do not know for sure when the problem will be solved, and we do not know if the Everglades will survive by the time we can meet the 10 ppb standard (if at all).[10] If any clarity has come from the Contempt Hearing, it is this: any meaningful effort to save the Everglades will take continued will, focused expertise, and a "heavy lift" in difficult economic times.[11]

9. In my Order Granting Summary Judgment **[DE 323]**,[12] which is now final, I spent 101 pages addressing the parties' numerous cross-motions for summary judgement which went to the legality of the State of Florida's 2004 Amendments to the Everglades Forever Act, the State's adoption of the implementing "Phosphorus Rule," and the EPA's illegal determinations under the Federal Clean Water Act. As I explained at length in the

---

[9]

The date of 2016 was the estimated date when many of the Everglades construction projects were anticipated to be completed. **[DE 380, pp 234-35]**.

[11]

In a column entitled *Falling Further Behind*, Bob Herbert recently wrote that "[s]chools, highways, the electric grid, water systems, ports, dams, levees-the list can seem endless-have to be maintained, upgraded, rebuilt or replaced if the U.S. is to remain a first-class nation with a first-class economy over the next several decades . . . . But these systems have to be paid for, and right now there are not enough people at the higher echelons of government trying to figure out the best ways to raise the enormous amounts of money that will be required, and the most responsible ways of spending that money. And there are not enough leaders explaining to the public how heavy this lift will be, and why it is so necessary, and what sacrifices will be required to get the job done properly." Bob Herbert, Op-Ed., *Falling Further Behind*, N.Y. Times, Feb. 20, 2010.

[12]

I incorporate my Summary Judgment Order **[DE 323]** by reference into this Order.

7

Summary Judgment Order, the effect of the state law was to postpone the enforcement of WQBELs until the year 2016. I unequivocally concluded that this was unacceptable and contrary to the federal Clean Water Act.

The length of the Summary Judgment Order was a function of the complexity of the issues addressed and the matters at stake. After much discussion, I concluded that the State of Florida and the EPA violated the Clean Water Act in failing to protect the Florida Everglades. I told the EPA and the State of Florida the bottom-line: that *de facto* suspension of enforcement and compliance with state water quality standards for an indeterminable period is a result that cannot be permitted under the Clean Water Act. I required each to act in a manner consistent with the Clean Water Act and **with the findings and conclusions** set forth in the Order.[13]

10. I first address the EPA's actions subsequent to the issuance of the Summary Judgment Order. Although I unambiguously ordered the EPA to require the State of Florida to comply with the Clean Water Act in a manner consistent with the Order, the EPA's recent 2009 Determination has failed to do so. Instead, the EPA has chosen to read the Order in the narrowest possible of terms by picking and choosing isolated phrases. The EPA then relies on its own narrow interpretation of these phrases to avoid compliance. I express in the strongest possible terms my frustration and disappointment.

Even independent of the Summary Judgment Order, the Clean Water Act itself

---

[13]

I concluded that the Amendments to the Everglades Forever Act changed Florida's previous water quality standards. I ordered the EPA to approve or disapprove those changes in a manner consistent with the findings and conclusions set forth in the Order. **[DE 323, p. 99]**. With respect to the Phosphorus Rule, I ordered the EPA on remand to comply with its duty under the Clean Water Act to approve or disapprove the changes addressed in a manner consistent with the findings and conclusions of the Order. *Id.* at 100.

8

"**requires** EPA to determine whether [a] standard is 'consistent with' the Act's requirements" and provides that if the EPA Administrator "determines that any such revised or new standard is not consistent with the applicable requirements of this Chapter [which the EPA found in its 2009 Determination], he **shall** . . . **notify the State and specify the changes to meet such requirements**." *Miss. Comm'n on Natural Res. v. Costle*, 625 F.2d 1269, 1275-76 (5th Cir. 1980); 33 U.S.C. § 1313(c)(3)(emphasis added).  The Act also **requires** that "if such changes [that comport with the Act] are not adopted by the State . . . the Administrator **shall** promptly prepare and prepare and publish proposed regulations setting forth a revised or new water quality standard" consistent with the Clean Water Act. *Miss Comm'n on Natural Res.*, 625 F.2d at 1275-76; 33 U.S.C. § 1313(c)(3)-(4).  There is nothing optional about these provisions, and the Court has not been provided with an adequate justification for the EPA's failure to correct the Clean Water Act violations detailed at length in the Summary Judgment Order.[14]  *See Sierra Club v. Hankinson*, 939 F. Supp. 865, 871 (N.D. Ga. 1996) (noting that "[w]hile . . . the Clean Water Act places 'primary reliance for developing water quality standards on the states . . . the Act **requires** EPA to step in when states fail to fulfill their duties under the Act.") (emphasis added) (cites and quotes omitted).

    11.  Before addressing the EPA's 2009 Determination (discussed in Paragraph 12 below), I return to the Summary Judgment Order and review my findings and conclusions,

---

[14]

It also bears mentioning that "EPA can override state water quality standards by changing the effluent limits in NP[D]ES permits whenever a source interferes with water quality." *Miss Comm'n on Natural Res.*, 625 F.3d at 1276. This important principle is discussed in more detail in my Conclusions of Law. *See* Section III(B), *supra.*

9

with which the EPA was required to comply. Despite its length, the Summary Judgment

Order was clear and to the point. I found and concluded that the compliance deadline of

December 31, 2006 for the narrative and nutrient phosphorus standards in the Everglades

had come and gone. I told the EPA that it acted arbitrarily and capriciously by allowing the

State of Florida to extend the December 31, 2006 compliance deadline for meeting the

phosphorus criterion for ten more years. I stated:

> Contrary to the Environmental Protection Agency's written Determinations,
> it is my view that the Florida Legislature, in 2003, by adopting the State's
> draft Long-Term Plan, as proposed by the South Florida Water Management
> District's Governing Board, changed water quality standards under the
> Federal Clean Water Act, and violated its fundamental commitment and
> promise to protect the Everglades, by extending the December 31, 2006
> compliance deadline for meeting the phosphorus criterion for at least ten
> more years. Turning a 'blind eye,' the United States Environmental
> Protection Agency ("EPA") concluded that there was no change in water
> quality standards. The EPA is patently wrong and acted arbitrarily and
> capriciously in reaching its conclusion. It did so by simply reading the words
> of specific sections of the Amended Everglades Forever Act ("Amended
> EFA"), rather than by connecting the dots to analyze its true effect. Its review
> is nothing more than a repeated imprimatur, *i.e.* acceptance without
> independent analysis, based on the State of Florida's representation that the
> EFA Amendments did not change water quality standards.

**[DE 323, pp. 2-3]**.

I told the EPA it had to consider the "effects of these changes on the Everglades

Protection Area as a whole, and on the requisite 'propagation and maintenance of a

healthy, well-balanced population of fish and wildlife,' as required for Class III Florida

waters." *Id.* at 3. I warned the EPA that it could not reserve its CWA review  by "kicking

the can down the road to individual permits." *Id.* Quoting from the First Circuit's decision

in *Debois v. Dep't of Agric.*, 102 F.3d 1273, 1300 (1st Cir. 1996), I explained:

Simply put, the CWA provides a federal floor, not a ceiling, on environmental

10

protection. If a state seeks to provide a standard that is less stringent than the federal Clean Water Act's floor, or seeks to apply a standard in a way that is otherwise invalid under federal law, then federal agencies and federal courts are obligated to resolve the application of the federal Clean Water Act in any case that properly comes before it.

**[DE 323, pp. 78-79]**.

I criticized the EPA for not complying with the CWA  because "the EPA [did] not consider, in its 2003 Determination, whether the new Amended [Everglades Forever Act] deadline can be met, or whether reliable scientific evidence demonstrates that the Everglades can withstand ten more years of discharges that are not protective." *Id.* at 58-59 n. 43. I noted that "instead of addressing the hard questions, the EPA arbitrarily concluded that the deadline did not change." *Id.* at 77. I warned the EPA that it could not continue to ignore federal Clean Water Act requirements by pretending the State of Florida could justify its actions through "short-term variances." I directly said;

The EPA arbitrarily characterizes the type of variance under the [Phosphorus] Rule as "short-term," but that is in direct contradiction to the fact that the variance procedure under the Rule is to be applied for a period of at least 10 years, though 2016. It is irrational to consider this "short-term" when, at the same time, the EPA categorically acknowledges that any discharge above the 10 ppb standard is not protective of the Everglades. Besides, as we have seen the total cumulative **blanket variance** since the enactment of the EFA is 22 years.

*Id.* at 67 n. 49 (emphasis added).

I made clear to the EPA – in no uncertain terms – that its conclusions were arbitrary, capricious and not in accordance with law. I directly stated that the State of Florida's reliance on moderating provisions and an extended 2016 compliance schedule, without first performing a "use attainability analysis," was a **blanket variance** and contrary to the Clean Water Act. *Id.* at 70. I told the EPA "[its] conclusions are not in accordance with law

11

because the CWA does not allow State water quality standards to be replaced with 'across-the-board' technology based effluent limitations, regardless of results, **with an open-ended compliance schedule**." *Id.* at 43 (emphasis added). I said that "the 'effect' of the Amended EFA . . . is to replace the narrative and numeric phosphorus criterion with an **escape clause** that allows non-compliance, by virtue of both an extended compliance date, and during the extension, a lesser state water quality standard of compliance, namely compliance with the Long-Term Plan and 'TBELs.' " *Id.* at 46 (emphasis added). I then set aside the EPA's 2003 Determination, striking down the "*de facto* moratorium," directing the EPA to enforce the CWA, and stated as follows:

> For all these reasons, the Amended EFA changes Florida's water quality standards by authorizing continuing violations of the narrative and numeric criterion for phosphorus and other nutrients. By allowing continued harmful discharges of nutrients into the Everglades, the Amended EFA also violates the state's anti-degradation policy. The results of the EPA's position is to vacate its prior 1999 Determination and to ensure that the *de facto* suspension of enforcement and compliance with state water quality standards will continue for an indeterminable period, **a result that cannot be permitted under the CWA**."

***

> **The EPA has condoned, without requisite analysis, a *de facto* moratorium on compliance with the phosphorus criterion for an entire class of dischargers who implement BAPRT at least through 2016.** The extension and expansion of this compliance schedule through the Amended EFA and the Rule beyond the December 31, 2006 date, as previously approved by the EPA, is a change to water quality just as the original 1994 EFA compliance schedule constituted a change. The EPA had a duty to analyze whether the ten additional years (or more) to meet the 10 ppb phosphorus criterion was "reasonable" under the CWA, just as it did in its 1999 Determination on the significant delay wrought by the 1994 EFA, which at the time it was passed allowed twelve years for compliance. At that time, the EPA addressed the question "[d]oes Florida's narrative nutrient criterion, as amended by by the compliance schedule, still satisfy CWA section 303(c)(2)(A) and 20 C.F.R 131.11?" and [d]oes the record support the compliance schedule as reasonable?" This same question is still pertinent

and unanswered in terms of the Amended EFA and Phosphorus Rule.

***

Finally, in its Rule Determination, the EPA fails to mention, let alone consider, the cumulative impact on the phosphorus criterion, the designated use, and the anti-degradation policy of allowing such discharges based on TBELs into the Everglades Protection Area for another ten years, including from farmer permittees within the EAA and the C-139 Basin. In fact, the EPA never considers the effect of subsection 5(d) . . . which allowed farmers to pollute through 2006 and now, by virtue of the Amended EFA and this Rule provision, allows farmers, directly or indirectly, to further discharge into the Everglades Protection Area based upon TBELs establishing through BAPRT without regard to water quality standards through 2016. The significant concerns voiced in Judge Davis' Order, and evaluated in EPA's 1999 Determination have simply dropped off EPA's current radar screen.

*Id.* at 58, 77-78.

12.  The Summary Judgment Order was entered on July 29, 2008 **[DE 323]**. The EPA did not act by issuing a new "Determination of CWA Compliance" until the Tribe and Friends filed a motion for contempt on November 4, 2009 **[DE 356]**. The Tribe's motion was filed **more than one year** after the EPA voluntarily dismissed its appeal before the Eleventh Circuit Court of Appeals and **more than one and one-half years after I entered the Summary Judgment Order**, in which I expressed great frustration that the failure to comply with the Clean Water Act's mandate had lasted for 22 years and was inexcusable. It has now lasted for more than 24 years.

So, what did the EPA do in its 2009 Determination? One thing it did do was to determine  that the December 31, 2006 date remains "unchanged" from the "unamended EFA requirements." **[DE 360-1, p. 4]**. It "disapproved" the provisions of the Amended EFA, the Phosphorus Rule and the Long-Term Plan that modified the compliance date. It did specifically conclude, consistent with my Order, that the Long-Term Plan "... **does not**

13

**provide the level of information needed and finality necessary to approve it as a compliance schedule implementing water quality standards.**" *Id.* at 8 (emphasis added). Further, the EPA determined that the Amended EFA and Phosphorus Rule provisions relating to "moderating provisions" do not comply with the Clean Water Act and the EPA's implementing regulations "[b]ecause these provisions have the effect of removing a designated use without demonstrating that it is infeasible to attain the use as required by 40 CFR §131.10(g) . . . ." *Id.* Notably, it required the State of Florida ". . . to meet the requirements of the Clean Water Act, and its implementing regulations in a manner consistent with this Order, prior to the USEPA's or DEP's approval of any subsequent variance to the Phosphorus Criterion . . . " *Id.* at 10.

I take no issue with this part of the 2009 Determination. In effect, the EPA places the State of Florida in the same position it was in before the Amended EFA and the adoption of the Phosphorus Rule. It declared that the provisions that the Court declared invalid "are no longer in effect for CWA purposes," and told the State of Florida its Long-Term Plan was "disapproved" because it contained "inadequate information" needed and "finality necessary" to approve it as a compliance schedule. *Id.* at 10.

What did the EPA not do? Quite amazingly, the EPA then backed away from doing **anything else** consistent with the Summary Judgment Order, even though I ordered the EPA to " . . . comply with its duty under the Clean Water Act to approve or disapprove those changes **in a manner consistent with the findings and conclusions set forth** in this Order." **[DE 323, p. 99]** (emphasis added). Instead, the EPA concluded, at the end of its 2009 Determination, that "[b]ecause the criterion and implementing methodology

14

remain in effect for CWA purposes, **there is no need for the state of Florida or USEPA to take any further action pursuant to CWA section 303(c)." [DE 360-1, p. 10]** (emphasis added).

Simply stated, the EPA has failed to analyze the "effect" of the State of Florida's non-compliance and specify the changes necessary for compliance.[15] To say that there is no need for the State of Florida or the EPA to take any further action under the CWA is to abrogate all responsibility under the CWA. It is also directly contrary to EPA's own position taken in its 1999 Determination, in which it required the State of Florida to provide an "**enforceable framework**" which "**ensured**" that the numeric criteria for phosphorus would be met by December 31, 2006 "if not sooner if possible." EPA Sept. 15, 1999 Determination at 9, n. 15 [EFA-AR-8] (emphasis added). The EPA's most recent 2009 Determination now leaves the situation in the Everglades "rudderless."

Nowhere within the 2009 Determination does the EPA again mandate an "enforceable framework" to "ensure compliance," or even acknowledge that the State of Florida is out of compliance with the narrative and nutrient standards in the Everglades since December 31, 2006. The 2009 Determination conspicuously fails to discuss how and when compliance will be met in conjunction with any effective Long-Term Plan that provides enforceable milestones. What remains in the Long-Term Plan is the construction

---

15

In the Summary Judgment Order, I cited to Eleventh Circuit case law establishing that I have the authority to carefully review the "*effect*" of the Amendments to the EFA "on the water quality standards of the Florida." **[DE 323, pp. 37-38]**. On remand, I required the EPA to do no less in requiring the State to comply with the federal Clean Water Act. It is incredible to me that the EPA has chosen not to do so given that its own REMAP Report clearly shows the damage that has occurred from failure to meet the phosphorus criterion.

elements. But even these elements may be affected, if not indefinitely postponed, by the proposed purchase of the U.S. Sugar Corporation's lands as envisioned by the State of Florida. *See United States of America v. South Florida Water Management District*, Case No.: 88-CV-1886-FAM, **[DE 2134, pp. 1-2]** (S.D. Fla. Mar. 31, 2010). No scientific analysis has been conducted to determine if such a purchase, and the related postponement of construction projects to finance it, would either further or hinder achievement of the now mandatory Phosphorus Criteria.

In other words, after all of this litigation, and more than one year after the date of the Summary Judgment Order, the EPA belatedly issued a 2009 Determination that **merely summarizes the provisions of the Amended EFA and the Phosphorus Rule held invalid by the Court**, without providing in any clear, specific and comprehensive instructions to the State of Florida, the FDEP and the South Florida Water Management District as to what the State needs to do to comply with the Summary Judgment Order, its own 2009 Determination, and the CWA. Nowhere in the 2009 Determination does EPA even require the State of Florida to regularly measure the cumulative impacts and effects of non-compliance in the interim.

13. In the meantime, the FDEP continues to issue STA permits to the South Florida Water Management District which offer only marginal protection. The State of Florida, through its Department of Environmental Regulation – and with the blessing of the EPA – justifies non-compliance by falling back on its mantra, now echoed over the past 24 years, that some progress, through "adaptive management," is better than no progress at

all.[16]  FDEP's trump card is that if the permits for STA retrofitting are denied, phosphorus would simply continue to increase in the Everglades at a faster rate through the non-retrofitted STAs. In effect, its position throughout these proceedings can be summarized as "some progress is better than no progress at all."  The FDEP argues that over a billion dollars has been spent on "cutting-edge technology" and that substantial phosphorus removal already has occurred.  However, arguing that "something is better than nothing" ignores the undeniable scientific fact that we are falling further behind, and that time is running out.  As Dr. Rice put it, "[a]daptive management is not an excuse for never accomplishing anything." **[DE 380, p. 61]**.  To the contrary, "adaptive management" was intended to provide engineering flexibility to in order "to **meet** [the] deadline [of] December 31, 2006" – it was never intended as an excuse for avoiding it.  *Id.* (emphasis added).

14.  I turn now to the specifics of the motions before me. In the Summary Judgment Order, I enjoined FDEP "from issuing permits pursuant to those sections of the Phosphorus Rule that I have set aside, and enjoin[ed] FDEP from considering blanket exemptions or variances under the current Phosphorus Rule pending compliance with the CWA and its implementing regulations." **[DE 323, p. 97]**. I further enjoined FDEP "from **enforcing** the 'no action' provision in subsection 4 of the Phosphorus Rule, and from **utilizing** subsection 4 and 5(b)(3) of the Phosphorus Rule to avoid the 10 ppb phosphorus numeric criterion as otherwise established by the Phosphorus Rule."  *Id.* (emphasis added).  I also "enjoin[ed]

---

16

The FDEP correctly points out that the STAs include over 45,000 acres of treatment area, and an additional 12,000 acres is scheduled to be in place by the end of this calender year. Improvements to the STAs 5 and 6, which are incorporated in prior permits, would allow for the expansion of these two STAs to further improve phosphorus removal performance.

[FDEP] from granting any permits for discharges in, or within, the Everglades Protection Area under subsections 5(b)(3), 5(d) and 6 of the Phosphorus Rule, or the 'no action' provision of subsection 4(d)(2)(c)." *Id.* at 100.

15. The FDEP justifies the continuing violations by relying on invalid provisions that were included in prior permits, even though I also enjoined the FDEP from "enforcing" or "utilizing" those provisions that the Court found invalid **in addition to** prohibiting the future reliance on those provisions. *Id.* at 97. The Summary Judgment Order never condoned the use of State of Florida Administrative Orders that have the same effect as the invalidated portions of the Phosphorus Rule and the Amended EFA. Although the Administrative Orders issued by the FDEP do not specifically cite to the invalidated provisions of the Phosphorus Rule, they nevertheless rely upon the Long-Term Plan as BAPRT which, in turn, provides for TBELs as moderating provisions and for the extended compliance schedule through 2016.

16. The FDEP's new Administrative Orders contain discharge provisions, amend the NPDES permits, and replace the original Administrative Orders issued when the NPDES permits were first issued. A review of these Administrative Orders,[17] and the FDEP's new Everglades Forever Act permits, demonstrates that they contain the disapproved moderating provisions and compliance schedule. Although adopted via separate but

---

17

Annexed to this Order as **"Attachment A"** is a summary of the STA permits at issue. In its 2009 determination, the EPA identified three NPDES permits issued for STAs 2, 5, and 6 on September 4, 2007 as being "consistent with" the Summary Judgment Order. **[DE 360-1, p. 2 n. 2]**. The EPA failed to recognize that the State of Florida had issued Administrative Orders ("AOs") in 2009, after the issuance of the Summary Judgment Order, that amended those NPDES permits. In addition, the State issued new EFA permits (pursuant to Section 373.4592, Florida Statutes), that are governed by the Administrative Orders. The relevant portions of the permits and Administrative Orders are attached as Exhibits to Plaintiffs' Reply in Support of its Motion for Contempt **[DE 363]**.

strikingly similar Administrative Orders for the STAs, the extended compliance schedule is a blanket variance that allows the discharger not to meet the 10 ppb phosphorus criterion through 2016 by relying on BAPRT (i.e., the Long-Term Plan). This extended deadline (i.e., through 2016) was adopted in every permit issued for discharge to the Everglades Protection Area both before, and after, the Summary Judgment Order. These Administrative Orders do exactly what Section 5(d) of the Phosphorus Rule sought to do even though I enjoined its use.[18]

17.    More specifically, on March 17, 2009, following the issuance of the Summary Judgment Order, the FDEP issued Administrative Order AO-010-EV for Stormwater Treatment Area 2 (STA-2) "Establishing a Compliance Schedule Pursuant to Sections 403.088(2)(f), 403.061(8), 403.151 and 373.5492, Florida Statutes." **[DE 363-2, p. 1]**. It did so pursuant to its authority to administer Florida's National Pollution Discharge Elimination System Program (NPDES). *Id.* The Administrative Order recites Florida law relative to the Amended EFA, the Long Term Plan, and the Phosphorus Rule (which I invalidated, in part, in the Summary Judgment Order).

The new Administrative Order for STA-2 contains provisions which are mirrored in the Administrative Orders later issued by FDEP for STAs 5 and 6. *Compare* **[DE 363-2]** *with* **[DE 363-4]**. Part II of the Administrative Order includes numerous "findings" which reference the Long-Term Plan as the basis for extending the compliance date through

---

18

Subsection 5(d) provided, in pertinent part, that "[d]ischarge limits for permits allowing discharges into the [Everglades Protection Area] shall be based upon TBELs established through BAPRT and shall not require water quality based upon effluent limitations through 2016." **[DE 323, p. 66]** (citing F.A.C. § 62-302.540(5)(d)).

2016 and allowing for the use of TBELs as moderating provisions. The Administrative Order relies on Florida Statute § 403.088 as the basis for its authority to do so. **[DE 363-2, ¶ ¶ 7-15]**. Part III(II) of the Administrative Order establishes the "interim discharge limits," and Part III(III) establishes December 31, 2016 as a "reasonable time" for compliance. *Id.* at 8-11. It further "orders," in Paragraph 17, that "this Administrative Order, upon issuance, shall supersede and replaces the originally issued [Administrative Order]." *Id.* at 5.

More specifically, the FDEP recognized in Paragraph 8 that a 10 parts per billion numeric criterion for phosphorus exists for the Everglades Protection Area, "as approved by the EPA in 2005." *Id.* at 2. Without reference to this Court's Summary Judgment Order, or the injunction entered against it, the AO states that ". . . discharges may not be able to immediately achieve the permit effluent limit. **This Order provides a reasonable period of time for the District to achieve compliance with the permit effluent limit**." *Id.* at ¶ ¶ 8, 28.[19] (emphasis added).

Ignoring the plain language of the Summary Judgment Order, FDEP justified a compliance date of 2016 by stating, among other grounds, that "[p]ost-2006 improvements, enhancements, and strategies, which will continue through 2016, are also included in the Long Term Plan." *See* **[DE 363-2, at ¶ 10]**. In Paragraph 16 of the AO, FDEP states that

---

19

The Administrative Orders require that the discharges from the STAs "shall meet TBELS based upon BAPRT," and recognize BAPRT as the Long Term Plan. **[DE 363-2, at ¶ ¶ 7, 23]**; **[DE 363-4 at ¶ ¶ 7, 23]**. Discharges need only meet TBELS based upon BAPRT during stabilization, per the Long-Term Plan. *Id.* This directly mirrors the "no action" provision of Section 4(d)(2)(c) of the Phosphorus Rule, which I invalidated and which the EPA, in its 2009 Determination, declared invalid. In addition, contrary to the EPA's position, neither of the AOs for the STA 2 and 5/6 permits has an enforceable WQBEL; they only claim that one will be developed. *Id.* at ¶ 21. Instead, discharges to the Everglades Protection Area that comply with the conditions of the AO, "shall not be deemed in violation of water quality standards." *Id.* at ¶ 30.

"[I]n lieu of the annual average discharge limitation [for phosphorus required in the NPDES Permit for STA 2] the permittee [South Florida Water Management District] shall comply with . . . the conditions as set forth in this Order."   Paragraph 17 then states: "This Administrative Order, upon issuance, shall supersede and replace [prior AOs]. Only those discharges authorized by NPDES Permits [for STA 2] are authorized through this Order." The 2009 AOs issued by FDEP only require the permittee in all cases (i.e., the South Florida Water Management District) to comply with the "reporting requirements and conditions" set forth in the AOs in lieu of the annual average discharge limitation for phosphorus. *See, e.g.,* **[DE 363-2, at ¶ 16]**; **[DE 363-4 at ¶ 16]**.

In sum, I find that these AO provisions are in direct conflict with my injunction against FDEP. Moreover, contrary to the directives contained Summary Judgment Order, the AOs for the STA 2 and 5/6 permits contain many of the provisions of subsections 5(c), 5(d) and 6 of the Phosphorus Rule – as well as certain provisions of the Amended EFA – that were expressly invalidated in the Summary Judgment Order.[20]

18.   Identical Administrative Orders were issued by FDEP for Storm Water Treatment Areas 5 and 6 on January 29, 2009. **[DE 363-4]**.

19. In its 2009 Determination, the EPA recognizes, in a footnote, that FDEP issued NPDES permits for Stormwater Treatment Areas 2, 5 and 6 on September 4, 2007, while this case was pending. **[DE 360-1, p. 2 n.2]**. The EPA acknowledges that "[t]hose permits included water quality based effluent limits ('WQBELs'), compliance schedules, and interim

---

[20]

For instance, the discharge limit is established through a TBEL formula that is based on the Long-Term Plan as BAPRT. **[DE 363-4 at ¶ ¶ 23, 24, Tables 3, 4, 5, 6]**; **[DE 363-2 at ¶ 23, 24, Tables 3 and 4]**.

21

limits." *Id.* Despite the fact that the accompanying Administrative Orders issued with the NDEPS permits specifically allow for moderating provisions and a compliance schedule through 2016, the EPA – contrary to my finding that moderating provisions and the 2016 extended compliance schedule constitute "blanket variances," – concluded that "[t]he [State's] permits did **not** include moderating provisions or variances." *Id.* This conclusion is patently incorrect and is stricken. The 2009 Determination then states that "this approach is **consistent** with the Court's statements concerning 'authorizing compliance schedules in individual permits on a case by case basis.' " *Id.* (quoting **[DE 323, pp. 45-46]**) (emphasis added). Again, the EPA is wrong.[21]

I find that the EPA and the FDEP have read out-of-context, and incorrectly rely upon, a single phrase in the Summary Judgment Order to improperly justify moderating provisions and an extended compliance schedule in the subject STA permits. The EPA and the FDEP reached this conclusion notwithstanding that, on remand, I ordered that, as a condition to granting an extension of the compliance schedule, the State of Florida would have to undertake a "use attainability analysis" in accordance with the Clean Water Act and its implementing regulations if the State planned to downgrade or create subcategories of

---

[21]

The Summary Judgment Order stated in full: "The Amended EFA, then, is a mandate that the State of Florida 'implement' the Long-Term Plan, which itself includes moderating provisions and a compliance schedule that removes the December 31, 2006 deadline and substitutes 'an initial phase' though 2016. The heart of the matter is that the new compliance schedule is legislatively incorporated into water quality standards that dischargers who meet the statutory requirements, *as opposed to authorizing compliance schedules in individual permits on a case-by-case basis.* The 'effect' of the Amended EFA, therefore, is to replace the narrative and numeric phosphorus criterion with an escape clause that allows non-compliance by virtue of both an extended compliance date, and, during the extension, a **lesser** state water quality standard of compliance, namely, compliance with the Long-Term Plan and 'TBESs.' The lesser quality is then mandated for future permits for discharges into the Everglades Protection Area." **[DE 323, pp. 45-46]**.

use subsequent to the December 31, 2006 deadline. To date, the State has not undertaken any such study.

Moreover, as I discussed in the Summary Judgment Order, a compliance schedule may be allowed only under limited circumstances, on a case-by-case basis during the permitting process, if certain criteria are met. *See, e.g.,* 40 C.F.R. 122.47 (allowing for limited schedules of compliance); *see also* 40 C.F.R. 124.51(b), 124.52, 124.62. In this case, the compliance deadline the EPA approved as reasonable **ended** on December 31, 2006. In the Summary Judgment Order, I ordered the EPA " . . . to require the State of Florida to meet the requirements of the Clean Water Act, and its implementing regulations, in a manner consistent with this Order, prior to FDEP's or EPA's approval of any **subsequent** variance to the Phosphorus Criterion . . . ." **[DE 323, p. 100]**. As such, before the FDEP could approve any further variances in new AOs, it was required to perform a use attainability analysis for the discharges into the Everglades Protection Area from STAs 1E, 1W, 2, 3/4, 5 and 6, because those discharges continue to exceed the Phosphorus Criterion.[22]

---

22

For instance, Section II(5) of the Administrative Order for STA 1E provides that: (i) "At the end of the stabilization period, discharges . . . shall meet technology based effluent limitations (TBELs) in accordance with Section 373.4592(10)(a), F.S."; (ii) "Based on . . . BAPRT . . . an initial TBEL for phosphorus of a long-term flow-weighted mean of 50 ppb"; (iii) "Under the State's Long-Term Plan, the goal is to achieve the 10 ppb phosphorus criterion . . . through the interative adaptive implementation process set forth in the Long-Term Plan"; (iv) "The initial 50 ppb TBEL will be revised as appropriate, consistent with the iterative implementation of BAPRT, until such time as the TBEL can achieve compliance with the 10 ppb phosphorus criterion." **[DE 363-6, pp. 6-7]**.

In the Administrative Order for STA 2, Paragraph 23 provides: "23. During the Routine and Stabilization Phase, exceedances of the TBEL may occur; however, the STA shall be deemed in compliance with this Order and the permits(s), as long as the actions described in this condition and Paragraph 19 of this Order are being taken in conjunction with all other applicable permit conditions not modified by this Order." **[DE 363-2, ¶ 23]**.

23

Thus, it is clear that the EPA's 2009 Determination is inconsistent with, and in violation of, the Summary Judgment Order, as no use attainability analyses have been conducted. **[DE 380, p. 35]**. I did not recognize, or otherwise allow for, an "escape clause" by way of "individual permits," which effectively negate the remainder of the 101-page Summary Judgment Order. I did not, and will not, allow the State of Florida to create a blanket variance through the guise of a "compliance schedule" set forth in AOs without following the procedure required under the Clean Water Act and its implementing regulations. Operating under the assumption that such tactics are permissible, the EPA concluded in its 2009 Determination that the FDEP is in compliance with the terms of the Court's injunction related to the issuance of the NPDES permits.[23] I strike this conclusion.

20. In the Summary Judgment Order, I discussed, at length, that the South Florida Water Management District was statutorily obligated, by December 31, 2006, to take such actions to implement the pre-2006 projects and strategies of the Long Term Plan so that

---

Similar provisions are included in Administrative Orders for STA 3, 4 5 and 6. For example, in Administrative Orders for STAs 3 and 4: (i) "8. Although the NPDES permit for STA-3/4 . . . requires compliance with the water quality criterion for phosphorus . . . these standards may not be immediately achieved by STA-3/4 discharges"; (ii) "The Florida Legislature has declared the combination of Stormwater Treatment Areas (STAs) and Best Management Practices (BMPs) to be the best available technology for achieving the interim goals of the Everglades restoration program, pursuant to Section 373.4592(a)(g) of the EFA"; (iii) "12. Post Stabilization Operations . . . discharges from STA-3/4 . . . shall meet an annual flow-weighted average total phosphorus concentrations at the outflow stations of less than or equal to 76 ppb for each water year . . . . In addition, the discharges shall not exceed . . . . 50 ppb for three or more consecutive years"; and (iv) "13. Long Term Compliance. Pursuant to Subsection 373.4592(10)(a) of the EFA, the District shall submit to the Department a permit modification to incorporate proposed changes to the Everglades Construction Project and NPDES Permit . . . by December 31, 2003."

[23]

The EPA stated that it " . . . understands that FDEP is complying with this provision of the Order .... [and] has not issued any permits utilizing these provisions of the Phosphorus Rule and has indicated they do not plan to." **[DE 360-1, p. 2]**. This language is stricken.

water delivered to the Everglades Protection Area achieves the phosphorus criterion. Not only that, **by December 31, 2003**, the South Florida Water Management District was required under subsection 10(a) of the Amended EFA to submit an application for **permit modification to achieve state water quality standards including the phosphorus criterion.** None of this has occurred.

The South Florida Water Management District has not taken any action to meet Clean Water Act requirements by filing for – and obtaining – permit modifications to bring existing permits for STAs 1E, 1W, and 3/4 into compliance. In fact, the South Florida Water Management District has chosen to ignore this Court's Summary Judgment Order. This was made clear at the Contempt Hearing. Tracey Piccone, Chief Consulting Engineer, testified that the District has done nothing to comply and still follows the prior Phosphorus Rule, which I invalidated, in significant part. In preparing key portions of the 2010 draft report to the Florida Legislature on the Florida Everglades, Ms. Piccone, a principal author, stated that "it **didn't click** that I was saying something that went against your order." **[DE 380, p.112]** (emphasis added). Indeed, the South Florida Water Management District has failed to officially report to the Florida Legislature that its key Amended EFA provisions, and the implementing Phosphorus Rule, are contrary to the Clean Water Act. The FDEP has also neglected to officially report these facts, and the EPA, in its 2009 Determination, has not instructed them to do so. While Plaintiffs request that I bring the South Florida Water Management District into this case as a party, I decline to do so **at this time**. Instead, I will require the EPA, on remand, to mandate permit modifications consistent with the Everglades Forever Act and the federal Clean Water Act.

21. The State of Florida issues NPDES permits from the EPA under a "National Pollutant Discharge Elimination System Memorandum of Understanding Between the State of Florida and the United States Environmental Protection Agency" **[DE 375-2]**, executed in 1995 ("Memorandum of Understanding"). *See* **[DE 380, pp. 187-88]**.  Prior to the Memorandum of Understanding, the EPA would issue NPDES permits to permit the actual discharge of pollutants from a "point source" and the State of Florida would issue separate permits under state law. *Id.* at 141-42.  The STAs fall under the "default" category of industrial NPDES permits. *Id.*

After the Memorandum of Understanding was executed, EPA's role was to review the draft permit and state if it had any comments or objections. *Id.* at 162, 199.  In the event of objections, the State is given a period of time how it will resolve the objection.  *Id.*  If Florida does not resolve the objection within a period of time, the authority for the permit passes to the EPA. *Id* at 199.

EPA claims that it lacks authority to require a state to revoke or modify a permit that was previously issued, or to object to any state-issued permit that is not part of the state's NPDES program. *Id.* at 200.[24]  The EPA's position is contrary to the Clean Water Act's

---

24

At the Contempt Hearing, Mr. Marshall L. Hyatt, an EPA environmental scientist and technical authority on NPDES, stated, as I have heard often before, that the Clean Water Act allows the use of compliance schedules if a water quality based effluent limit cannot be "immediately" achieved, and that compliance schedules are not "extraordinary." **[DE 380, p. 201]**.  Otherwise, Mr. Hyatt's testimony plows old ground and is not consistent with the Summary Judgment Order or even the 2009 EPA Determination. For reasons unclear to me, if not short of astonishing, Mr. Hyatt was completely unaware of the Summary Judgment Order and of the EPA's 2009 Determination. *Id.* at 212. I inquired: "Wouldn't be of some interest to you in terms of whatever testimony you are giving to me to see what I wrote about these matters that now have been addressed by your own agency, as compared to your opinion?" Mr. Hyatt: "It would be, your Honor." The Court: "Why haven't you done that to prepare your testimony today?" Mr. Hyatt: "I thought my role in this case was to provide an interpretation of the permits and the administrative orders that were sent to

26

implementing regulations, *see supra* at III(b), the Memorandum of Understanding, and the "re-opener" provisions of the NPDES permits.

In Section IX of the Memorandum of Understanding, the EPA acknowledges that the "[FDEP] has no veto authority over acts of the state legislature and therefore [the EPA] reserves the right to initiate procedures for withdrawal of approval of the State program **in the event that the state legislature enacts any legislation or issues any directive which substantially impairs the FDEP's ability to administer the NPDES program or to otherwise maintain compliance with NPDES program** requirements." **[DE 375-2, p.18]** (emphasis added). The Memorandum of Understanding requires that: "[i]f the terms of any permit, including any permit for which review has been waived by the EPA, are affected in any manner by administrative or court action, the Department shall immediately transmit a copy of the permit, with the changes identified to the EPA and shall allow (30) days for EPA to make written objections to the changed permit pursuant to Setion 402(d) of the CWA." *Id.* at 14-15.

Moreover, the NPDES permits each contain a "re-opener clause" that requires revisions if a new effluent standard, limitation or water quality standard issued or approved contains different conditions or is otherwise more stringent than any condition in the permits. *See, e.g.,* **[Jan. 13, 2010 Hearing, Pl.'s Ex. 17 at ¶ VII(E)]**.[25]

_____

EPA." *Id.* at 215-16. I find Mr. Hyatt's testimony to be of little value other than to confirm that no enforceable water quality based effluent limitation standards exits for the Everglades Protection Area and will not be in effect until 2016. *Id.* at 265. We are now long past whether Florida's amended date of 2016 for compliance is lawful and "routine."

25

The "Reopener Clause" provides that "[t]he permit shall be revised, or alternatively, revoked and reissued . . . to comply with any applicable effluent standard or limitation issued or approved under Sections 301(b)(2)(c) and (D), 304(b)(2), and 307(a)(2) of the Clean Water Act, as amended, if the

27

Notwithstanding the findings and conclusions set forth in the Summary Judgment Order regarding the actions of the Florida Legislature in the Amended Everglades Forever Act, as further recognized by the EPA in its 2009 Determination, the EPA has taken no steps to initiate procedures for withdrawal of approval of the State program as it pertains to NPDES permitting vis-a-vis the Everglades Protection Area. Nor has the EPA required the State of Florida to revise outstanding STA NPDES permits based on this Court's Summary Judgment Order, Section IV(I) of the Memorandum of Understanding, the "re-opener clauses" contained in the NPDES permits issued by the State of Florida, or the CWA's implementing regulations.

22.   Because the State of Florida has violated the Summary Judgment Order and evidenced a consistent disregard for the requirements of the CWA in the Everglades Protection Area, it is essential that responsibility for CWA compliance through the issuance of NPDES permits be returned to the EPA until such time as the State of Florida is in full compliance with the CWA (as shall be determined by the EPA and this Court following further evidentiary hearing).   Furthermore, prior violations of the CWA in NPDES permits issued by the State of Florida must be rectified to prevent further destruction of the Everglades, and future NPDES permits for discharges into, or within, the Everglades Protection Area must be issued in accordance with the CWA and its implementing regulations, as interpreted by this Court.   State permitting authority may not be used to

---

effluent standard, limitation, or water quality standard so issued or approved: (a) contains different conditions or is otherwise more stringent than any condition in the permit; or . . . (2) [T]he permit may be reopened to adjust effluent limitations or monitoring requirements should future water quality based effluent limitation (WQBEL) determinations, water quality studies, Department approved changes in water quality standards, or other information show a need for a different limitation or monitoring requirement." *See, e.g.,* **[Jan. 13, 2010 Hearing, Pl.'s Ex. 17 at ¶ VII(E)]**.

trump federal CWA requirements under the guise of state-issued AOs or EFA permits. A key component to the re-issuance of prior NPDES permits – and the issuance of new NDPES permits for discharges into, or within, the Everglades Protection Area – must be an enforceable framework that "ensures" compliance with the Phosphorus Criterion. This is no more than what the EPA demanded in 1999 and later abandoned in its subsequent Amended EFA and Phosphorus Rule Determinations. It is the primary focus of this Order that the EPA again mandate such a framework with specific directions upon remand.

23.  There has been considerable discussion in the briefing as to the relationship between this case and the case pending before the Honorable Federico A. Moreno, styled *United States of America v. South Florida Water Management District,* Case No.: 88-CV-1886-FAM (S.D. Fla.) ("the Moreno Case"). To be sure, both cases  directly concern the problems facing the Everglades. The crucial distinction is that the Moreno Case turns on a consent decree created pursuant to *State law* – not the Clean Water Act.  Thus, while the Federal Clean Water Act implications here subsume certain matters pertinent to the Moreno Case, this federal statutory action – which concerns the entire Everglades Protection Area – casts a wider net

Both cases address, however, a crucial similarity: the fact that the December 31, 2006 deadline promised in the Consent Decree and mandated in the EPA 1999 Determination has not been met.  It is because the State of Florida has failed to meet the deadline, and, instead, attempted to extend it and override the Consent Decree by virtue of the Amended EFA and Phosphorus Rule, that both Judge Moreno and I find ourselves in these enforcement proceedings. While the parallel proceedings share certain features, they are not identical, nor are the available remedies the same, though careful

29

consideration should be given to accomplishing related goals in a manner consistent with the Congressional mandate set forth in the CWA. [26]

What is crucial is that the deadlines in both cases again be reconciled. The EPA ignores any mention of the Moreno Case in its 2009 Determination, although the EPA considered the Consent Decree at length in its 1999 Determination. In fact, the EPA 1999 Determination found that the extension of the December 31, 2006 deadline was justified, in part, under the federal Clean Water Act because the parties had agreed to amend the compliance date to December 31, 2006 under the Consent Decree. **[DE 323, p. 30 n. 17]**. It again is time for the EPA to reconcile the obligations and commitments under the Consent Decree – to which the United States is a party – with the Amended Determination mandating CWA compliance. The time has long past for the parties to attempt to "whip-saw" between the two cases for whatever leverage is convenient at the moment.

I commend my colleague, Judge Moreno, for his "Order Granting Motion to Adopt the Special Master's Report, Motion Seeking Declaration of Violations, and Motion for Declaration of Breach of Commitments," entered on March 31, 2010. *See United States of America v. South Florida Water Management District*, Case No.: 88-CV-1886-FAM, **[DE 2134]** (S.D. Fla. Mar. 31, 2010). He has set in motion a procedure that will address many of the challenges alluded to in these proceedings, including how the State of Florida intends to meet its construction obligations under the Long-Term Plan if monies are diverted to

---

26

"A consent decree must be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 387 (1992). The same reasoning applies if federal statutory obligations are more restrictive than the terms of a consent decree. Thus, the Consent Decree should work hand-in-hand to ensure consistence and compliance with the Clean Water Act.

purchase U.S. Sugar Corporation lands, and the need to formulate "realistic deadlines" to implement the Consent Decree. He has directed the Special Master to address "admitted violations," including the failure to meet phosphorus limits.

It is the intent of this Court to use its enforcement powers under the Clean Water Act to work in conjunction with, and complement – if not exceed – the goals included in the Consent Decree. I echo Judge Moreno, who quotes from Judge William M. Hoeveler in the original 1992 Consent Decree, that "[t]he time has come, indeed has passed, when admitted problems facing the Everglades must be addressed." *Id.* at 1.

## III. Conclusions of Law

### A. Glacial Slowness of the EPA as the State of Florida Violates the CWA

Congress passed the Federal Water Pollution Control Act ("the Clean Water Act" or "CWA") in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251. In order to achieve that objective, Congress declared it a "national goal" that "the discharge of pollutants into the navigable waters be eliminated by 1985." *Id.* When Congress expresses its intent, that intent is of utmost importance. In such a situation, the court's role is to enforce the legislative will when called upon to do so. *TVA v. Hill*, 437 U.S. 153, 194 (1978).

EPA's regulatory program for water protection focuses on two potential sources of pollution: point sources and non-point sources. Point source pollution was addressed in the 1972 amendments to the Act, through which Congress prohibited the discharge of any pollutant from any point source into certain waters unless that discharge complies with the Act's specific requirements. 33 U.S.C. § § 1311(a), 1362(12). Under this approach,

31

compliance is focused on technology-based controls for limiting the discharge of pollutants through the National Pollution Discharge Elimination System ("NPDES") permit process.

While it is correct the CWA envisioned "short-term" and "long-term" goals for compliance, such goals, at most, can mean a few years, not decades. *Hankinson*, 939 F. Supp. at 867 (expressing frustration with state of Georgia's failure to comply with CWA for over sixteen years and ordering EPA to take certain steps to ensure prompt compliance). The EPA set a deadline for the State of Florida to comply with the CWA for pollutant discharges into the Everglades Protection Area by December 31, 2006. This date represented a compromise that was reluctantly accepted by the Courts of this District. *See United States of America v. South Florida Water Management District*, Case No.: 88-CV-1886-FAM, **[DE 226]** (S.D. Fla.) (Hoeveler, J.)("By modifying this extended schedule, the Court fully expects that the parties will achieve compliance as mandated by the Modified Consent Decree and the EFA."); *Friends of the Everglades v. United States,* Case No.: 00-CV-0935-PAS, **[DE 77, p. 21]** (S.D. Fla. Oct. 18, 2001) (Seitz, J.)[Case No. 00-CV-935, DE 77] ("Like EPA, the Court anticipates that the state will continue to implement all necessary measures to ensure that the Everglades will be Class III waters by December 31, 2006.").

The EPA's 2009 Determination does not fully comply with the Summary Judgment Order. I ordered the EPA to approve or disapprove changes in the Amended EFA and the Phosphorus Rule in a manner consistent with the Court's findings and conclusions. The EPA simply continues to repeat words, this time of the Summary Judgment Order, without addressing the glaring CWA violations or requiring the State to comply with the existing water quality standards, including the narrative standard for nutrients, the anti-degradation

policy, and the numeric Phosphorus Criterion in the remaining portions of the Rule upheld by this Court. The EPA's 2009 Determination, while re-establishing the December 31, 2006 compliance date, nonetheless found " . . . no need for the State of Florida or USEPA to take any further action pursuant to the CWA Section 303(c) [codified at 33 U.S.C. § 1313(c)]."

**[DE 360-1, p. 10]**.

The 2009 Determination inexplicably ignores that the December 31, 2006 compliance date has come and gone by more than three years. It provides no direction to the State of Florida regarding its non-compliance. The net result is to leave compliance "open-ended" for what may be yet another generation.

I conclude that the EPA has failed to proceed with the utmost diligence required to discharge its statutory duty. It has chosen to "drag its feet" on issuing the Court-ordered Determination while allowing the State of Florida to continue to rely on old permits, and issue new AOs that are laden with "avoidance mechanisms." This dereliction of duty is contrary to the Clean Water Act. Nothing can justify a schedule so slow as to defeat the CWA's goals; yet this is precisely what the EPA's inaction vis-a-vis the State of Florida's phosphorous practices has done. *Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962, 967 (W.D. Wash. 1996)("Although Courts have allowed additional time when CWA deadlines are missed, nothing in the law could justify so glacial a pace."); *see also Hankinson*, 939 F. Supp. at 867. To accept the EPA's position of further, indefinite, and virtually open-ended extension of the time for compliance, without a showing of evident impossibility, would effectively repeal the clearly expressed Congressional mandate.

Under the CWA, the EPA has a mandatory duty to act, particularly after concluding

33

in the 2009 Determination that " . . . the provisions that the Court declared invalid are no

longer in effect for CWA purposes . . . . " **[DE 360-1, p. 10]**. It is obligated to require the

State of Florida to establish the **manner and method** of obtaining enforceable WQBELs

within a time certain. See Hankinson, 939 F. Supp. at 871-72 (cites and quotes omitted)

(noting that "the [CWA] requires EPA to step in when states fail to fulfill their duties under

the Act."); Miss. Comm'n on Natural Res., 625 F.2d at 1275-76 (noting that CWA requires

that "if such changes [that comport with the CWA] are not adopted by the State . . . the

Administrator **shall** promptly prepare and prepare and publish proposed regulations"

consistent with the CWA) (cites and quotes omitted) (emphasis added); Southern Ohio

Coal Co. v. Office of Surface Min., Reclamation and Enforcement, Dept. of the Interior, 20

F.3d 1418, 1428 (6th Cir. 1994) (noting the EPA must "ensure [state programs'] compliance

with federal standards . . . [and] must either issue a compliance order or bring a civil

enforcement action seeking appropriate relief" whenever the agency learns of a "violation

of the CWA or a NPDES permit"). I am not ordering the EPA to do what is impossible. It

already had determined the December 31, 2006 was a reasonable compliance deadline.

It now must enforce what has been unreasonably delayed. Its inaction is arbitrary and

capricious, contrary to the CWA, and in violation of the Summary Judgment Order.[27]

## B. The EPA's and FDEP's Arguments to Avoid Enforcement Are Without Merit.

Although the EPA and the FDEP claim that the State has not issued any permits that

---

[27]

In light of these conclusions, I may now compel the EPA to perform the action unlawfully withheld or unreasonably delayed, and may also set aside its failure to act as an abuse of discretion. 5 U.S.C. § 706(1)-(2); Idaho Sportsmen, 951 F.Supp. at 967.

34

uses the invalidated provisions of the Amended EFA,[28] I unequivocally conclude that the Administrative Orders issued for Stormwater Treatment Areas 2, 5 and 6, and the pre-existing permits contain the disapproved provisions on moderating provisions and an extended compliance schedule through 2016. The new AOs for the STA 2 and STA 5/6 NPDES permits, and the new EFA permits, rely on the Long-Term Plan moderating provisions and the extended 2016 compliance schedule.

The AOs for STAs 2 and 5/6 amend the permits to allow the TBEL, which is above 10 ppb and not enforceable until 2016. I will not permit the EPA to allow the State of Florida to circumvent the mandate of the Summary Judgment Order through the use of AOs that rely on the impermissible escape clauses in the Amended EFA and the Phosphorus Rule. I categorically reject the argument that the FDEP did not violate the Summary Judgment Order because it issued only amended "Administrative Orders," and not the "permits" to the South Florida Water Management District. Notably, the FDEP's own witness candidly admitted that the "administrative orders" are inextricably bound up with the State's NDEPS issued permits.[29] The District's March 2009 South Florida Environmental Report, which was

---

28

The EPA states in its 2009 Determination that "USEPA understands that FDEP is complying with this provision of the Order." **[DE 360-1, p. 2]**. The EPA then claims that "FDEP has not issued any permits utilizing these provisions of the Phosphorus Rule and has indicated that they do not plan to do so." *Id.* The EPA Determination further states that the NPDES permits issued for STA 2, 5 and 6, while this case was pending, "did not include moderating provisions or variances." *Id.* at 2 n. 2. These findings are arbitrary and capricious and contrary to both law and the greater weight of the evidence presented at the Contempt Hearing. The 2009 Determination conducts no analysis of the AOs that amended the permits and fails to provide any basis whatsoever for the conclusory assertion that the permits do not include moderating provisions or an extended compliance date.

29

Mr. Phillip Coram, the Deputy Director of the Division of Water Resource Management with the Florida Department of Environmental Regulation, also testified that Administrative Orders are considered part-and-parcel of the NPDES permits, although he stated that he could only testify "generally" and lacked specific knowledge about the STA permits and Administrative Orders at

presented to the State Legislature, also acknowledges that "the long-term **permits issued by the FDEP include administrative orders**, which provide an adequate period of time for the District to achieve the newly adopted numeric phosphorus criterion." **[DE 380, p. 115]** (emphasis added).[30]

The FDEP next argues that, while the NDPES program requires QBELs, the State's accompanying Administrative Order may continue to  grant relief from any violation **under state law**. **[DE 380, p. 169]**.  The short answer is that Florida law does not trump the federal Clean Water Act.  The FDEP has not been delegated, nor could it be delegated, any power authority under the Memorandum of Understanding to violate the federal law.[31] *Southern Ohio Coal Co.,* 20 F.3d at 1428 (noting the EPA must "ensure [state programs'] compliance with federal standards . . . [and] must either issue a compliance order or bring a civil enforcement action seeking appropriate relief" whenever the agency learns of a

---

issue. **[DE 380, p. 150]**.

[30]

EPA's witness, Mr. Marshall L. Hyatt, also confirmed that the State of Florida's Administrative Orders, which supersede prior Administrative Orders, are "integral part[s] of the NPDES permit[s]." **[DE 380, p. 218]**. Similarly, district courts from outside of this Circuit have recognized that extrinsic documents can be incorporated into an NPDES permit by reference. *See Carson Harbor Village, Ltd. v. Unocal Corp.,* 990 F. Supp. 1188, 1197 (C.D. Cal. 1997), rev'd on other grounds, 270 F.3d 863 (9th Cir. 2001) (indicating that provisions from extrinsic documents can be incorporated by reference into an NPDES permit).

[31]

Plaintiffs' Exhibit 21 from the January 13, 2010 hearing, the "Statement of Legal Authority for Florida's National Pollutant Discharge Elimination System (NPDES) System," was a part of the State of Florida's application to the EPA for delegated approval. **[DE 380, p. 180]**. It makes clear that the FDEP may adopt rules necessary to implement the NPDES permitting program "in accordance with federal law." *Id.* at 180-81. The legislature has also expressed its preference for consistency, as demonstrated in Section 403.0885(2), Florida Statutes, which demands harmony between state and federal law, providing that other sections of Chapter 403 apply to NPDES discharges *only if* such provisions "do not conflict with federal requirements."

"violation of the CWA or a NPDES permit."); *Hankinson*, 939 F. Supp. at 872 (concluding that EPA may not take actions – or fail to take actions – that allow states to violate the Clean Water Act).

When FDEP issues an NDPES permit (and an accompanying Administrative Order) it stands in the shoes of the EPA and must meet federal requirements.[32] *See Southern Ohio Coal Co.,* 20 F.3d at 1428 (stating that the Clean Water Act allows "a state [to] administer the NPDES permit program within its borders" only if the "state program meets federal criteria set forth in the CWA and implementing regulations"). As such, FDEP it may not violate the federal Clean Water Act any more than the EPA can ignore federal Clean Water Act requirements in its Determinations on the Amended Everglades Forever Act and Phosphorus Rule. In the Summary Judgment Order, I specifically held that "[t]he provisions [implementing BAPRT and not requiring specific discharge limits for phosphorus] are also in direct conflict with the express mandate of the CWA, which requires imposition of WQBELs when TBELs are inadequate." **[DE 323, p. 67]** (citing 33 U.S.C. § 1312(a); 40 C.F.R. § 122.44(d)).

The FDEP justifies its action by relying on the testimony of Mr. Phillip Michael Coram, the Deputy Director for the Division of Water Resource Management of the Department of Environmental Regulation, who conceded that he had been assuming the permissibility of the extended compliance schedules, **[DE 380, p. 171]** (". . . both Florida law . . . and I think federal law also in the regulations allow compliance schedules and giving permittees a

---

32

The Court questioned: "You have another hat, don't you? You are performing, in effect, a function that would otherwise have to be performed by a federal agency? Mr. Coram: "That is correct." The Court: "So, you have a federal hat on as well as a state hat, don't you?" Mr. Coram: "Yes . . . yes, I see it that way." **[DE 380, pp. 184-185]**.

period of time to come into compliance. So, in that case, I don't believe the compliance

schedules are inconsistent [with federal law].)."   Despite this mistaken assumption, Mr.

Coram correctly acknowledged upon further examination that where the Court and the EPA

have determined that federal law is inconsistent with state law, the permits issued pursuant

to the inconsistent state law must be brought into compliance with federal law:

> **Q**: So, what do you do in terms of what has been issued on these permits,
> including administrative orders that relied on something that you thought was
> right, but now is wrong?
> **A**: Well, I couldn't rely on them any more.
> **Q**: Do you issue more administrative orders relying on them?
> **A:** No, I don't think you could issue the administrative orders relying on
> provisions that the Court has determined to be invalid.  I don't think --
> **Q**: What is your responsibility now?
> **A**: On the new administrative orders, they would have to be consistent.
> **Q**: That is your view?
> **A**: That is my view. The permits, typically what happens is they are changed
> at the time of permit renewal. That's been my experience, that they are
> changed at the time of permit renewal.
> **Q**: So, it is not a matter of making something retroactive. It is bringing
> something into compliance. In other words, if you have a new standard that
> is in effect at the time of the new administrative order, then that new standard
> has to be applied?
> **A**: Yes, sir.
> **Q**: Even if the permit was issued with an old administrative order in the past.
> Is that a fair statement.
> **A**: That is a fair statement.

The notion that previously-issued NPDES permits found to be violative of the Clean

Water Act must be brought into compliance with federal law is not a novel one, and I

unequivocally reject the suggestion that the violative AOs – which are incorporated into the

NPDES permits at issue – cannot be disturbed. *See* 40 C.F.R. 122.62(a) (noting that, "if

cause exists," NPDES permits can be "modif[ied] or revoke[d] and reissue[d]" and citing,

*inter alia*, availability of "new information . . . [that] was not available at the time of permit

issuance . . . [that] would have justified the application of different permit conditions"  as a

cause for "modification or termination"); *see also* 40 C.F.R. 122.64(a) (listing "causes for terminating a[n] [NPDES] permit during its term" and noting that an NPDES permit can be terminated if "the permitted activity endangers . . . the environment and can only be regulated to acceptable levels by permit modification or termination").[33]  While I recognize that the "Clean Water Act places primary reliance for developing water quality standards on the states," the states remain accountable for ensuring compliance, and "the Act requires EPA to step in when states fail to fulfill their duties under the Act." *Hankinson*, 939 F. Supp. at 871-72 (cites and quotes omitted).  Here, the State of Florida has failed to fulfill its duties under the Act by issuing NPDES permits that do not comply with the Clean Water Act and its implementing regulations.  As such, the NPDES permits – including the AOs – must be "override[n]" and/or modified as necessary to ensure compliance with the Act.  *Miss. Comm'n on Natural Resources*, 625 F.3d at 1276 ("EPA can override state water quality standards by changing the effluent limits in NP[D]ES permits . . . "); *see also Hankinson*, 939 F. Supp. at 871-72.  While I leave the specific "substance and manner of achieving [CWA] compliance entirely to the EPA," *Alaska Center for Environment v. Browner*, 20 F.3d 981, 986-87 (9th Cir. 1994), compliance *must be achieved*, and it appears to this Court that doing so will require the modification (or termination and re-issuance) of the violative NPDES permits (and AOs).

_____

33

"States are required to adopt equivalent procedures for permit modification [and termination]." *Culbertson v. Cotas American, Inc.*, 913 F. Supp. 1572 (N.D. Ga. 1995) (citing 40 C.F.R. § 123.25).

## C. The Court's Power to Enforce

A court has the power to enforce its orders.[34] *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir. 1991)(citing *Shillitani v. United States*, 384 U.S. 364 (1966)). Compliance with a court's order is mandatory. *Mercer v. Mitchell,* 908 F.2d 763, 787 (11th Cir. 1990). In devising a remedy to enforce its orders, a court faces "the difficult task of avoiding both remedies that may be too intrusive . . . and those that may prove ineffectual." *N.A.A.C. v. Sec'y Hous. & Urban Deve.,* 817 F.2d 149, 159 (1st Cir. 1987). While I concur with Plaintiffs that I can enforce my orders by means of contempt, I can also resort to my equitable powers to accomplish the same purposes before imposing civil sanctions calibrated to coerce compliance.[35] While I am prepared to take that step, if necessary, I turn one more time to my equitable and inherent powers under the Clean Water Act and the federal Administrative Procedures Act.

In the Summary Judgment Order, which is now the law of the case, I invoked my equitable powers due to the "rare circumstances" of the case, and because of the

---

[34]

I reject FDEP's contention that the Court lacks jurisdiction over it, especially given that the Summary Judgment Order is now law of the case. Although FDEP was an intervenor in the case, as I have previously explained, "[an] intervenor is treated as if [it] were an original party and has equal standing with the original parties." *Bayside Ford Truck Sales, Inc. v. Ford Motor Co. (In re Ford Motor Co.)*, 471 F.3d 1233, 1246 (11th Cir. 2006)(quoting *Marcaida v. Rasco,* 569 F.2d 828, 831 (5th Cir. 1978).

[35]

I leave for another day, as may be necessary, to address the Court's power to impose coercive fines, including attorney's fees, to enforce its orders, and to determine if, and when, it is necessary to bring the South Florida Water Management District into these proceedings through the All Writs Act, 28 U.S.C. § 1651. Such action may be necessary in the event the South Florida Water Management District takes actions in redistributing resources which preclude the construction of necessary facilities to meet phosphorus criterion, or, following the issuance of this Order, continues to govern itself by the extended 2016 compliance schedule and the invalidated provisions of the Phosphorus Rule in requesting NPDES permits.

intransigence of the EPA and the State of Florida to follow the Congressional mandate set

forth in the CWA. **[DE 323, pp. 92-93]**. I explained:

> Federal law does not authorize anything like a twenty-two year compliance
> schedule, which is what the 1994 EFA, the Amended EFA and the
> Phosphorus Rule now allow with regard to achieving the narrative and
> numeric phosphorus criterion (the original EFA took effect in 1994 but
> compliance is not contemplated until 2016) (footnote omitted). The actions
> included in the 1994 EFA, coupled with its schedule of construction projects,
> were intended to result in the attainment by December 31, 2006, of the level
> of water quality as established by the narrative criterion and the later the
> default numeric phosphorus criterion. Prior to its latest round of
> Determinations, the EPA had consistently found that the attainment by 2006
> was necessary to protect and maintain the designated uses of the Everglades
> system. Both this District Court and the Eleventh Circuit Court of Appeals
> relied on these assurances to affirm the reasons for extension.

***

> Any further delay in enforcement must necessarily raise heightened concerns,
> if not skepticism, and result in careful judicial scrutiny. Such scrutiny appears
> warranted when it was the EPA itself, just a few years previously, that
> concluded that the "reasonableness and acceptability" of the initial 12 year
> schedule promulgated by the 1994 EFA assumed that the December 31,
> 2006, deadline would be met, and that "there was an enforceable framework
> that 'ensured' the numeric water quality criterion for phosphorus would be met
> by the December 31, 2006, deadline in the EFA or sooner if possible." EPA
> Sept. 15, 1999 Determination, at 9, n. 15 (emphasis added) [EFA-AR-8]. **I
> now conclude that any further undue delay through endless, undirected
> rounds of remands to EPA to do its duty, which it steadfastly has
> refused to do, is, alone, insufficient, and that it is imperative that this
> Court exercise its equitable powers to avoid environmental injury to the
> Everglades through the implementation of the Amended EFA and the
> Phosphorus Rule as a result of the use of blanket exemptions.**

**[DE 323, pp. 92-93]**.

In "rare circumstances" it can be appropriate for "the court to conduct its own inquiry,

reach its own conclusion, and order more intrusive relief." *Nat'l Tresury Employees Union

v. Horner,* 854 F.2d 490, 500 (D.C.Cir. 1988). After reviewing the evidence presented at

the Contempt Hearing, I conclude that this case presents one of those "rare circumstances."

When an agency "does not reasonably accommodate the policies of a statute or reaches a decision that is 'not one that Congress would have sanctioned,' . . . a reviewing court must intervene to enforce the policy decisions made by Congress." *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1326 (D.C.Cir.1988) (citations omitted), cert. denied, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). This general rule applies with equal force to the EPA in the context of the Clean Water Act, as the United States Supreme Court expressly recognized in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318, 102 S. Ct. 1798, 72 L.E.2d 91 (1983) ("read[ing] the [Clean Water Act] as permitting the exercise of a court's equitable discretion, whether the source of pollution is a private party or a federal agency, to order relief that will achieve *compliance* with the Act.") (emphasis in original).

In the wake of *Weinberger*, a number of appellate and district courts throughout the country acknowledged and affirmed the broad equitable and remedial powers vested in district courts to ensure compliance with the Clean Water Act. For example, in *Alaska Center for the Environment v. Browner*, 20 F.3d 981, 986-87 (9th Cir. 1994), the Ninth Circuit recognized the district court's remedial powers to remedy an "established wrong" under the Clean Water Act where there was a thirteen-year delay in implementing a compliant TMDL program in Alaska. The Ninth Circuit stated:

> In its published opinion in *ACE II*, the district court explained the remedial action it ordered, fully addressing the same contention the EPA raises in this appeal. The EPA argues that the district court exceeded its remedial powers under § 505 of the CWA when it ordered the EPA "to submit to the court its report" on the adequacy of water quality monitoring in Alaska, and to "propose a [long-term] schedule for the establishment of TMDLs" for Alaskan waters. ACE II, 796 F. Supp. at 1381. The EPA stresses that the language of the CWA does not specifically require it to prepare or present a report on water quality monitoring, and further contends that the statute relegates the pace at which TMDLs shall be established entirely to the EPA's discretion.

42

***

> **The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong.** *Weinberger v. Romero-Barcelo*, **456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In this case the established wrong is the failure of the EPA to take any steps to establish the TMDLs mandated by Congress for more than a decade. In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps. In selecting the remedy that it did, the district court acted with great restraint in requiring only that steps undeniably necessary to the development of TMDLs in Alaska be accomplished by deadlines that are far more lenient than those contained within the CWA itself.**

*Id.* at 986 (emphasis added).

Cases from within this Circuit have reached similar conclusions vis-a-vis courts' equitable and remedial powers pursuant to the Act. In *Sierra Club v. Hankinson*, the district court found that the State of Georgia had – for over sixteen years – failed to comply with the TMDL requirements of the Clean Water Act. 939 F. Supp. at 867. The court concluded that the EPA's failure to disapprove of Georgia's non-compliance violated the Administrative Procedures Act, and that the EPA's failure to promulgate compliant TMDLs violated the Clean Water Act because "the Act requires the EPA to step in when states fail to fulfill their duties under the Act." 939 F. Supp. at 872. In granting summary judgment in favor of Plaintiffs, the *Hankinson* court noted that the "[Clean Water Act] allows a district court to order the relief it considers necessary to secure *prompt compliance* with the Act," and subsequently "ordered the EPA to issue complete TMDLs on a relatively strict five-year schedule." 939 F. Supp. at 868 (cites and quotes omitted) (emphasis added); *Sierra Club v. Hankinson*, 351 F.3d 1358, 1360 (11th Cir. 2003). Having found a clear and continuing

43

violation of the Clean Water Act, I now apply my equitable powers to accomplish the difficult task of "order[ing] the relief [I] consider[] necessary to secure *prompt compliance* with the Act." *Hankinson,* 939 F. Supp. 868.

### D. Actions Necessary to Remedy an Established Wrong

Similar to the *Alaska Center* case, the "established wrong" here is the failure of the EPA and the State of Florida to comply with the CWA for more than two decades. In tailoring the relief granted here, the EPA and the FDEP are directed to take specific set forth below to immediately carry out the mandate I already have issued. In selecting the remedy, I conclude that these steps are undeniably necessary to the development and implementation of WQBELs for the Everglades Protection Area. In issuing general directives to ensure compliance with the CWA, I, **at this time**, leave to the EPA the specific substance and manner of achieving compliance. I am prepared, however, to take such additional steps as necessary – and retain jurisdiction to do so – in the event the EPA and the FDEP again fail to act in accordance with the Summary Judgment Order and this Order.

The steps are:

1. On remand, the EPA shall issue an Amended Determination ("Amended Determination") **not later than Friday, September 3, 2010** that meets the requirements of this paragraph and the paragraphs that follow. The Amended Determination shall specifically direct the State of Florida to correct the deficiencies in the Amended EFA and the Phosphorus Rule that have been invalidated in a manner consistent with **Attachments B and C to this Order**. The EPA shall require the State of Florida to commence and complete rule-making for the Phosphorus Rule within 120 days from the date of the Amended Determination and shall require amendments to the Amended EFA to be enacted

44

by July 1, 2011. In the event the State of Florida fails to timely act, the EPA shall provide timely notice, and the EPA Administrator "shall promulgate such standard[s]" pursuant to 33 U.S.C. § 1313(c).

2.    The EPA Administrator, through the Amended Determination, shall notify the State of Florida that it is out-of-compliance with the narrative and nutrient standards for the Everglades Protection Area. The Amended Determination shall provide clear, specific and comprehensive instructions to the State of Florida on the manner and method to obtain enforceable WQBELS within a time certain, consistent with the Clean Water Act and its implementing regulations, the Summary Judgment Order and this Order. The Amended Determination shall specify without equivocation that compliance must occur in accordance with **specific milestones to be established in the Amended Determination** that provides an **enforceable framework for ensuring compliance** with the CWA and its applicable regulations.  Furthermore, it  shall require the State of Florida to measure on a yearly basis the cumulative impacts and effects of phosphorus intrusion beyond the 10 ppb standard within the Everglades Protection Area until such time as full compliance with the 10 ppb standard is achieved. I underscore that the EPA must establish **specific milestones** to ensure that the State of Florida does not continue to ignore, and improperly extend, the compliance deadline for meeting the phosphorus narrative and numeric criterion in the Everglades Protection Area.

3. The EPA, in its Amended Determination, shall direct the State of Florida  to conform all NPDES permits for STAs 1, 2, 3, 4, 5 and 6 – along with the accompanying Administrative Orders and Everglades Forever Act permits listed in **Attachment A** to this Order – to the Clean Water Act, the Summary Judgment Order and this Order so as to

45

eliminate all reference to the non-conforming elements of the Long-Term Plan, the moderating provisions and the extended compliance schedule through 2016, and to require compliance with the phosphorus narrative and numeric criterion in a manner consistent with the Clean Water Act and the forthcoming Amended Determination. All such permits shall be conformed not later than sixty (60) days of the date of the Amended Determination and shall be promptly filed with this Court.

4. On remand, the EPA, in its Amended Determination, shall immediately initiate and carry out its authority under Section IX of the Memorandum of Understanding to withdraw approval of the State program pertaining to the issuance of any new NPDES permits for discharges into, or within, the Everglades Protection Area, or for any further modifications to existing NPDES permits (including through State of Florida Administrative Orders) – other than to carry out the requirements of Paragraph 3, above – until such time as the State of Florida is in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order, and the forthcoming Amended EPA Determination.

5. Other than to carry out the requirements of Paragraph 3, above, the FDEP is enjoined from issuing any new NPDES permits, or modifications to existing NPDES permits – through State of Florida Administrative Orders, Everglades Forever Act permits or otherwise – for STAs that discharge into, or within, the Everglades Protection Area **until such time** as the State of Florida is found by the EPA and this Court to be in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, and this Order. All new Administrative Orders and Everglades Forever Act permits issued under the laws of the State of Florida must conform to, and comply with, the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order and the

forthcoming Amended EPA Determination.

6. In order to assure compliance with this Order, the Court will retain jurisdiction and will set a date by which the EPA must report on the the manner and method of obtaining enforceable WQBELs within a time certain within the Everglades Protection Area. The Defendants are hereby placed on notice that failure to comply with the terms of this Order will not be tolerated, and that in the event of such a failure, the Court will promptly issue an Order to Show Cause why the EPA and FDEP Administrators should not be held in civil contempt and subjected to appropriate sanctions.

7. The EPA Administrator, the EPA Regional Administrator for Region IV, and the Executive Director of the FDEP shall personally appear before this Court on **Thursday**, **October 7, 2010 at 9:00 am** to report to the Court on compliance with this Order. The Executive Director of the South Florida Water Management District is invited to appear on that time and date to discuss the District's efforts to conform the Long-Term Plan with the EPA's Amended Determination and its compliance with permit modifications to achieve state water quality standards including the phosphorus criterion.

8. All provisions of the 2009 Determination which have been stricken by this Order shall be excluded from the Amended Determination.

9. No dates set forth in this Order will be extended absent a stay from the Eleventh Circuit Court of Appeals.

10. The Court reserves to fully exercise its contempt powers in the event full compliance is not met consistent with this Order.

11. Plaintiff's Motions **[DE 357]; [DE 364]** are GRANTED IN PART AND DENIED IN PART in accordance with the terms of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida this 14th day of April, 2010.

HON. ALAN S. GOLD
U.S. DISTRICT JUDGE

cc
Counsel of Record
Magistrate Judge McAliley
Executive Director of the South Florida Water Management District
The EPA Administrator
The EPA Administrator of Region IV
The Executive Director of the State of Florida Department of Environmental Protection

48