UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 04-21448-CIV-GOLD
(and consolidated cases)

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA, a federally-recognized
Indian Tribe; and FRIENDS OF THE
EVERGLADES,

       Plaintiffs,

v.

UNITED STATES OF AMERICA, *et al.*,

       Defendants.

_____/

**OMNIBUS ORDER;**
**INDICATIVE RULING GRANTING DEFENDANT EPA'S RULE 60(b) MOTION**
**FOR MODIFICATION OF INJUNCTION [ECF No. 446]; DENYING FRIENDS'**
**MOTION FOR ORDER DECLARING PERMITS NULL AND VOID [ECF No. 533];**
**GRANTING FDEP'S MOTION FOR CLARIFICATION OF COMPLIANCE ORDER**
**[ECF No. 573]; DENYING FRIENDS' MOTION TO ADD SFWMD AS A PARTY**
**[ECF No. 477]; DENYING NEW HOPE'S MOTIONS TO STRIKE [ECF Nos. 536, 537]**

## I.      INTRODUCTION[1]

     In recent opinions, the Eleventh Circuit has acknowledged that the Everglades is

a natural treasure.[2]  Among the parties and intervenors in this case, there is general

agreement that the Everglades represents a precious resource.  However, these words

cannot remain merely aspirational.  They must be actualized through enforcement.

---

[1] To assist in reviewing the instant Order, which addresses a host of pending motions
by the parties, a Table of Contents is appended to this Order as Appendix A.  The
Indicative Order that this Court is requested to enter, and which I purport to enter upon
remand, is attached as Appendix B.

[2] *See e.g.*, *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1261 (11th Cir.
2009) ("As so often happens with natural treasures, people sought to control and
manipulate the Everglades for their own ends.").

1

Elsewise, based on undisputed scientific evidence of phosphorus nutrient levels, the Everglades will cease to exist over time.[3]

The heart of this matter remains in enforcement under the Clean Water Act ("CWA").  This authority to act has been granted by Congress to the Environmental Protection Agency ("EPA") in the first instance.  To its credit, the EPA now has come forth – following a lengthy history of inaction – with an Amended Determination that serves to protect the Everglades resource.  What also is clear is that the State of Florida and the South Florida Water Management District ("SFWMD"), notwithstanding protests to the contrary, have not been true stewards of protecting the Everglades in recent years.  The State's claim that it is being unfairly criticized is belied by, *inter alia*, the enactment of the Amended Everglades Forever Act ("EFA") to detrimentally change the State's previous water quality standards, the State's adoption of the disingenuous Phosphorus Rule to depart from the strictures of the original EFA, and the failure of the SFWMD to even implement its mandated duties under the EFA.  Most recently, the State's resistance to the water quality standards set by the EPA is evidenced by the Governor of Florida's authorization to FDEP to petition the EPA to rescind its January

---

[3] *See* **[ECF No. 404 ¶ 13]** ("However, arguing that 'something is better than nothing' ignores the undeniable scientific fact that we are falling further behind, and that time is running out.").  I expressly incorporate my prior orders **[ECF Nos. 323, 404]** by reference into this Order.  *See also Miccosukee Tribe of Indians of Florida v. U.S.*, 2008 WL 2967654 (S.D. Fla. 2008); *Miccosukee Tribe of Indians of Florida v. U.S.*, 706 F.Supp.2d 1296, 1298 (S.D. Fla. 2010).

2009 determination that the federally-imposed numeric nutrient criteria are necessary for Florida.[4]

The primary purpose of this latest Order is to put into the hands of the EPA all the resources necessary to enforce its action plan and to implement its full power under the congressional Clean Water Act.  By transferring the permitting authority to the EPA, consistent with the mandates under the Clean Water Act,[5] the objectives set forth in the Amended Determination can be achieved.

It is time now for this next significant step to occur.  The EPA has represented that it wants to act.  It must be given the opportunity to do so.  The EPA may well have to enforce the objectives as set forth in the Amended Determination, as it has recently stated it would, through further administrative and court actions – which are apparently

---

[4] Janet Zink, *Governor to EPA: Water guidelines aren't necessary here*, MIAMI HERALD, April 23, 2011, http://www.miamiherald.com/2011/04/22/2180947/governor-to-epa-water-guidelines.html.  *See also* Florida Petitions EPA on clean water standards, April 22, 2011, http://www.flgov.com/2011/04/22/florida-petitions-epa-on-clean-water-standards/.

[5] *See* **[ECF No. 404 ¶ 10]** ("if the EPA Administrator 'determines that any such revised or new standard is not consistent with the applicable requirements of this Chapter [which the EPA found in its 2009 Determination], he shall . . . notify the State and specify the changes to meet such requirements.'  *Miss. Comm'n on Natural Res. v. Costle*, 625 F.2d 1269, 1275-76 (5th Cir. 1980); 33 U.S.C. 1313(c)(3)(emphasis added). The Act also requires that 'if such changes [that comport with the Act] are not adopted by the State . . . the Administrator shall promptly prepare and prepare and publish proposed regulations setting forth a revised or new water quality standard' consistent with the Clean Water Act.  *Miss Comm'n on Natural Res.*, 625 F.2d at 1275-76; 33 U.S.C. 131 3(c)(3)-(4).  There is nothing optional about these provisions, and the Court has not been provided with an adequate justification for the EPA's failure to correct the Clean Water Act violations detailed at length in the Summary Judgment Order.  *See Sierra Club v. Hankinson*, 939 F. Supp. 865, 871 (N.D. Ga. 1996) (noting that "[w]hile . . . the Clean Water Act places 'primary reliance for developing water quality standards on the states . . . the Act requires EPA to step in when states fail to fulfill their duties under the Act.") (emphasis added) (cites and quotes omitted)").

likely since the opposing parties and intervenors are even now presently before the Eleventh Circuit seeking yet another set of appeals on various orders in this litigation.

## II.   MOTIONS ADDRESSED IN THIS ORDER

This cause is before the Court on Defendants United States of America, United States Environmental Protection Agency, the Administrator of the EPA, and the Regional Administrator of the EPA, Region IV's (collectively "EPA") Rule 60(b) Motion for Modification of Injunction ("Rule 60(b) Motion").  **[ECF No. 446]**.  The following filed Responses to EPA's 60 Motion:  Intervenor Defendant State of Florida ("State") Department of Environment Protection ("FDEP" or "Department") **[ECF No. 466]**, Plaintiff Miccosukee Tribe of Indians ("the Tribe") **[ECF No. 467]**, Plaintiff Friends of the Everglades ("Friends") **[ECF No. 468]**, and Intervenor Defendants New Hope Sugar Company and Okeelanta Corporation (collectively "New Hope") **[ECF No. 469]**.  The EPA filed four separate Replies to each Response ("Replies") **[ECF Nos. 483-486]**.

Also before the Court are two motions filed by Friends.  On September 17, 2010, Friends filed a Motion to Add South Florida Water Management District ("SFWMD" or "the District") as a Party **[ECF No. 477]**, which it served on the non-party District **[ECF No. 497]**.  On October 14, 2010, Friends filed a Notice of Non-Opposition to its Motion to Add SFWMD as a Party.  **[ECF No. 503]**.[6]  On October 27, 2010, the Tribe joined in Friends' Motion to Add SFWMD as a Party.  **[ECF No. 507]**.

On December 10, 2010, Friends filed a Motion for Entry of an Order Declaring the District's NPDES and EFA Permits Null and Void.  **[ECF No. 533]**.  The FDEP and

---

[6] The District explained that it did not respond to Friends' Motion to Add the District as a Party because, *inter alia*, the District had not been served in this case.

EPA each filed a Response to Friends' Motion (collectively "Responses") **[ECF Nos. 552, 553]**, and Friends filed a Reply in Support of its Motion ("Reply") **[ECF No. 562]**.

Finally, New Hope filed a Corrected Motion to Strike the EPA's Response to the September 14, 2010 *Sua Sponte* Order and Friends' Expert Reports **[ECF No. 537]** and a Motion for Clarification of the Compliance Order **[ECF No. 573]**.

I have jurisdiction pursuant to the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, and the federal Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.* A hearing was held on December 17, 2010, wherein the parties addressed, *inter alia*, the EPA's Rule 60(b) Motion. Having considered the Motion, Responses, Replies, relevant submissions, record, and applicable law, I DENY Friends' Motions, DENY New Hope's Motions to Strike, GRANT New Hope's Motion for Clarification, and enter an indicative order GRANTING the EPA's Rule 60(b) Motion for the reasons set forth below.

### III.    SUMMARY OF ACTIONS TAKEN BY THIS ORDER

I "deem" the permits filed by FDEP as "submitted" to the EPA for purposes of review under the Memorandum of Understanding between the EPA and FDEP. I do so under my equitable and inherent powers, and as further sanctions for non-compliance. This action in turn triggers number of legal consequences. As such, the proposed Indicative Order ("Appendix B") grants the EPA's Rule 60(b) relief, which I would enter following remand, as requested in the EPA's Submission in Response to the December 17, 2010 Order. *See* **[ECF No. 565, pp. 11-14]**. To be clear, I enter a ruling granting the relief requested in the later-filed pleading as it amends the relief sought in the EPA's original Rule 60(b) Motion.

Since I deem the permits submitted for purposes of review, I deny Friends' motion seeking declaratory relief as to the permits being null and void.  I also deny Friends' motion to add the District as a party because, *inter alia*, the EPA may take further action as necessary against the District.  I also require the parties to file a Joint Notice of Compliance following this Order for the purposes of informing the Court on their efforts to comply with this Order and the purposes set forth in the Amended Determination.  I grant FDEP's Motion for Clarification of Compliance Order so there is no ambiguity in my determination that Administrative Orders should not be used to prolong compliance with the CWA.  Finally, I deny New Hope's Motions to Strike the EPA's response to my first *sua sponte* order and the expert reports filed by Friends.

Due to the complexity of this case and the various motions addressed herein, I provide the following roadmap outlining the sequence of my analysis in this Order.  As an initial matter, though the parties are acquainted with this case, I find it necessary to set forth key factual and procedural background underlying this case, as well as Case No. 88-1886.  This is essential to recapitulate what has occurred since my April 14, 2010 Order, examine how the current situation has arisen, and explain the reasons for the actions taken in this Order.  Discussing this case's background is also imperative to put into context how significant delay and stonewalling have precluded improvements to water quality standards, keeping the Everglades at risk for decades.

Next, an overview of the permitting process is necessary in order to understand both how and why the EPA must act under its permitting authority to enforce the mandates under the Clean Water Act.  With this background in mind, this Order then

6

addresses the Rule 60(b) Motion as it seeks to modify certain portions of the April 14, 2010 Order.  I then address Friends' two motions to add SFWMD as a party and to deem the permits null and void.  Finally, I address New Hope's motions seeking clarification and striking of expert reports submitted by Friends.

<h3 align="center">IV.    FACTUAL BACKGROUND</h3>

My analysis of the pending motions takes into consideration the broad factual and procedural history of this case, in addition to litigation over the Everglades in general.  Accordingly, it is necessary to briefly highlight key points in the timeline of litigation over the Everglades to provide the overarching framework within which I analyze the pending motions.

The Everglades consists of millions of acres comprising an extensive and unique wetlands system, providing a home for threatened and endangered wildlife species. *See Miccosukee Tribe of Indians v. United States*, 1998 U.S. Dist. LEXIS 15838 at *6 (S.D. Fla. Sept. 11, 1998).  As defined in the 1994 EFA, the Everglades Protection Area covers approximately 3,500 square miles consisting of Everglades National Park, the Loxahatchee National Wildlife Refuge, and several Water Conservation Areas.

### A.    Parties

The Tribe is a federally recognized Indian Tribe whose members live and work within the Everglades.  **[ECF No. 147, p. 2]**.  Friends is an organization founded for the protection and preservation of the Everglades ecosystem, and over 4,400 members of Friends use the Everglades on a continuing basis for recreational and aesthetic purposes.  **[ECF No. 150, pp. 2-3]**.  The EPA is the federal agency charged with

enforcing the Federal Clean Water Act.  Intervenor FDEP is the State's designated environmental regulatory agency.  Intervenors New Hope Sugar Company and Okeelanta Corporation, together with their affiliated companies, own and farm approximately 190,000 acres within the Everglades Agricultural Area ("EAA") which borders the Everglades Protection Area.  **[ECF No. 19, p. 1]**.

### B.   Clean Water Act

Congress enacted the Federal Water Pollution Control Act Amendments of 1972, the Clean Water Act ("CWA"), in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  Pub. L. No. 92-500, 86 Stat. 816 (codified as amended at 33 U.S.C. § 1251 *et seq.*).  "[T]he House Report on the legislation states that '[t]he word 'integrity' as used is intended to convey a concept that refers to a condition in which the natural structure and function of ecosystems is maintained.'"  *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 921 (11th Cir. 2007) (quoting H.R. Rep. No. 92-911, at 76 (1972)).  In furtherance of those goals, the CWA bans, among other things, "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a)."  *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 162 (4th Cir. W. Va. 2010).[7]

### C.   Current factual circumstances

On January 5, 2011, Florida Governor Rick Scott signed Executive Order 11-01, directing all State agencies under the direction of the Governor to immediately suspend

---

[7] Indeed, the parties—and non-party SFWMD—are familiar with this permitting issue.  In 2004, the Supreme Court issued an opinion with respect to the Tribe and Friends' citizen suit under the CWA contending that a pumping facility operated by the District required an NPDES discharge.  *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 99 (2004).

all rulemaking except at the direction of the Office of Fiscal Accountability and Regulatory Reform, a new office established under the Executive Order. **[ECF No. 565, p. 4]** (citing Executive Order 11-1, Attachment 1 at p. 2, § I). The EPA notes that the Executive Order "could further disrupt any effort by FDEP to comply with the April 14 Order. Regardless, EPA is moving forward to provide timely notice and to promulgate such standards as directed by the April 14 Order, pursuant to Clean Water Act Section 303(c)." *Id.* (emphasis added).

Furthermore, a recent proposal to reduce taxes for the State's water management districts to decrease their budgets by 25 percent, or approximately $100 million from the SFWMD's budget, has presented another concern for not only the District, but the parties to this litigation.[8] Compounding these recent financial predicaments are the latest departures of individuals who were administratively responsible for overseeing the processes in this litigation.[9] Simply stated, the entire situation is rapidly sliding backwards.

## V.   PROCEDURAL HISTORY

The instant case was filed nearly seven years ago by Plaintiff Miccosukee Tribe on June 17, 2004. **[ECF No. 1]**.[10] In the original complaint, the Tribe filed suit to

---

[8] *See infra* fn. 29.

[9] *See infra* fn. 31.

[10] Ultimately, I accepted transfer and consolidated other cases filed in this District with Case No. 04-21448. *See* **[ECF No. 25, p. 2]** (accepting transfer of *Friends of the Everglades v. United States, et al.*, Case No. 04-22072 on September 30, 2004); *id.* at 4 (consolidating Case No. 04-22072 into the instant case following November 5, 2004 telephonic status conference). By that same order, I granted FDEP's Motion to Intervene. *Id.* I also ordered the parties to file supplemental briefs regarding whether

compel Defendants to review and disapprove the amended Everglades Forever Act ("Amended EFA") and comply with the standards set forth under the CWA.  *Id.* at ¶ 2.

On December 14, 2005, Friends filed its Second Amended Complaint alleging, *inter alia*, that the EPA Administrator acted arbitrarily, capriciously, and contrary to the Administrator's duties under Section 303(a)(1) of the CWA in determining that the 2003 Amendments to the State of Florida's EFA did not constitute a change in Florida water quality standards.  **[ECF No. 113 ¶ 34]**.  Friends further alleged that the Administrator acted arbitrarily and capriciously, under the APA and in violation of the CWA, by approving the State of Florida's "Phosphorous Rule."  *Id.*  While the enactment of the Amended EFA and the Phosphorus Rule have given rise to the instant suit, the origins of the litigation over the Everglades span nearly a quarter century.

### A.    *US v. SFWMD*, Case No. 88-1886

The initiation of litigation over the Everglades can be traced back to 1988, when the United States sued the FDEP and SFWMD for their failure to enforce water quality standards in the Everglades.  *See United States of America, et al. v. South Florida*

the issues in Case No. 88-1886 were inextricably intertwined with the issues in Case No. 04-21448.  *Id.*

Though I asked the parties to discuss potential impact of Case No. 88-1886 at the initial stages of this litigation, I have considered the two cases in conjunction at various points of this ongoing litigation.  *See e.g.*, **[ECF No. 379]** (requiring Plaintiffs to brief whether remedies sought in Case No. 04-21448 relate to Everglades water quality case before Judge Moreno and whether remedies sought are potentially inconsistent with orders issued in Case No. 88-1886).  Similarly, Case No. 88-1886 has addressed issues relating to the instant consolidated cases.  *See infra* § VI.E.

On July 13, 2005, after accepting transfer of a related case, *Friends of the Everglades v. United States, et al.*, Case No. 05-20663, I consolidated Case No. 05-20663 for pretrial and trial with Case No. 04-21448.  **[ECF No. 62]**.  On April 12, 2005, I granted New Hope's Motion to Intervene.  **[ECF No. 39]**.

*Water Mgmt. Dist.*, 847 F. Supp. 1567, 1569 (S.D. Fla. 1992).  The United States alleged that structures operated by the District released nutrient-rich farm runoff waters which contained high levels of phosphorous and contaminated the Loxahatchee National Wildlife Refuge and Everglades National Park.  *See id.*  This case is currently before the Honorable Federico A. Moreno, *United States of America, et al. v. South Florida Water Mgmt. Dist.*, Case No. 88-1886.  *See infra* § VI.E (discussing most recent Rule 60(b) motion in Case No. 88-1886).

### 1.    1992 Consent Decree

Four years after the United States brought suit, the parties entered into a settlement agreement, which the Honorable William M. Hoeveler approved as a Consent Decree in 1992.  *U.S. v. South Florida Water Mgmt. Dist.*, 847 F. Supp. at 1569.  As described in my earlier Order on Defendant EPA's Motion for Partial Judgment on the Pleadings,

> In the 1992 Settlement Agreement, the State of Florida acknowledged that the Everglades contained excess nutrients that negatively affected the balance of aquatic flora and fauna in violation of the water quality standards.  The 1992 Settlement Agreement established "interim and long term phosphorous concentration limits for the Park and Refuge and delineate[d] specific remedial programs designed to achieve these limits."  The 1992 Settlement Agreement created a schedule for ensuring that the water in the Everglades met Florida's water quality standards no later than 2002.  The 1992 Settlement Agreement required the State of Florida to take numerous actions to achieve the 2002 goal of compliance, including reducing the levels of phosphorous in the Everglades.

> **[ECF No. 124]** (internal citations omitted; emphasis added).

Thus, in 1992, the State and EPA initially agreed to commit to meeting the State's applicable water quality standards by one decade later, or in 2002.  As history reveals, this commitment fell through, as the present and ongoing litigation continues.

### 2.      Everglades Forever Act

Various entities, such as farming groups, opposed the plan to reduce phosphorous levels and claimed the proposal was unduly harsh on them.  *See* **[ECF No. 124, p. 6]**.  In an attempt to resolve all litigation concerning the clean-up plan, in 1994, the Florida Legislature passed the Everglades Forever Act ("EFA"), codified at Fla. Stat. § 373.4592.  The EFA set forth various deadlines to reach the goals espoused therein.  In particular, the EFA set the following applicable time limits:

- Effective immediately (in 1994) – landowners within the C-139 Basin shall not collectively exceed an annual average loading of phosphorus based proportionately on the historical rainfall for the C-139 Basin over the period of October 1, 1978 to September 30, 1988.  Fla. Stat. § 373.4592(f)(5).

- December 31, 1998 – the Department and SFWMD shall complete any additional research necessary to numerically interpret for phosphorus the Class III narrative nutrient criterion necessary to meet water quality standards in the Everglades Protection Area and evaluate existing water quality standards applicable to the Everglades Protection Area and EAA canals.  Fla. Stat. § 373.4592(e).

- December 31, 2003 – "phosphorus criterion <u>shall be 10 parts per billion</u> (ppb) in the Everglades Protection Area in the event the department does not adopt by rule such criterion by December 31, 2003[.]"  Fla. Stat. § 373.4592(e)(2) (emphasis added).

- February 28, 2003 – if the Department fails to adopt a phosphorus criterion on or before December 31, 2002, any person whose substantial interests would be affected by the rulemaking shall have the right to petition for a writ of mandamus to compel the department to adopt by rule such criterion.  Fla. Stat. § 373.4592(e)(2).

- December 31, 2006 – "all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs.  <u>As of [December 31, 2006], no permittee's discharge shall cause or</u>

contribute to any violation of water quality standards in the Everglades Protection Area." Fla. Stat. § 373.4592(f)(4) (emphasis added).

The Florida Legislature recognized in the 1994 EFA that the "Everglades ecological system is endangered as a result of adverse changes in water quality, and in the quantity, distribution and timing of flows, and, therefore, must be restored and protected." Fla. Stat. § 373.4592(1)(a) (1994). In 1994, the Florida Legislature determined that a twelve-year compliance schedule would be in accordance with promoting Florida's water quality standards.

### 3. Amended Everglades Forever Act

The Tribe's Second Amended Complaint alleges the following regarding the Amended EFA: In 2003, the Florida Legislature passed two bills amending the EFA ("Amended EFA"). **[ECF No. 72 ¶ 48]**. The Amended EFA eliminated the December 31, 2006 compliance deadline for water quality standards and levels of phosphorous for all discharges. *Id.* at ¶ 49. This established a substantial change in the State's water quality standards for the Everglades Protection Area and represented yet another instance of the State changing its water quality standards by allowing discharges until at least 2016. *Id.* at ¶¶ 53, 54.

The Tribe argued that the State "failed to notify the administrator of the EPA, as required by 33 U.S.C. § 1313(c), that by amending the 1994 EFA, the State has in effect changed water quality standards." **[ECF No. 72 ¶ 66]**. Accordingly, the EPA prematurely concluded that the Amended EFA was not a change to the State's water quality standards and was therefore not subject to approval or disapproval under the CWA. *Id.* at ¶ 73.

13

### 4.      The Phosphorous Rule

Florida's Phosphorus Rule establishes water quality standards for phosphorus within the Everglades Protection Area, including a numeric phosphorus criterion.  F.A.C. § 62-302.540(1)(a).  The Amended EFA required the FDEP to adopt a numeric criterion for phosphorous levels to prevent an "imbalance in the natural populations of aquatic flora and fauna."  **[ECF No. 72 ¶ 77]**; Fla. Stat. § 373.4592(4)(e)(2).  The Phosphorus Rule was adopted in January 2002 while the original EFA was in force.  *See* **[ECF No. 323, fn. 19]**.  Following an administrative challenge, on June 17, 2004, the Phosphorus Rule was upheld by an administrative law judge, subsequently promulgated on July 15, 2004, and amended on May 25, 2005.  *Id.*  As set forth in detail in my prior orders, I determined that the EPA's approval of the Phosphorus Rule was arbitrary and capricious.  *See e.g.*, **[ECF No. 323 § VI.G.1]**.

### B.      2009 Determination

On July 29, 2008, I entered an Order Granting Summary Judgment; Closing Case.  **[ECF No. 323]**.  By this order, I "enjoin[ed] DEP from issuing permits pursuant to those sections of the Phosphorous Rule that [were] set aside, and enjoin[ed] DEP from considering blanket exemptions or variances under the current Phosphorous Rule pending compliance with the CWA and implementing regulations."  *Miccosukee Tribe of Indians of Florida v. U.S.*, 2008 WL 2967654, at *42 (S.D. Fla. 2008).  Also on July 29, 2008, final judgment was entered in accordance with the Order Granting Summary Judgment; Closing Case.  **[ECF No. 324]**.[11]

---

[11] On August 25, 2008 and September 29, 2008, New Hope and EPA filed Notices of Appeal of my July 29, 2008 Order, respectively.  **[ECF Nos. 325, 338]**.  On December

Over one year after entry of the Order Granting Summary Judgment, on November 5, 2009, Plaintiffs filed a Corrected Motion for Civil Contempt to Compel Compliance with the Court's Order due to Defendants' failure to comply with the July 29, 2008 Summary Judgment Order. **[ECF No. 357]**. Plaintiffs requested that I re-open the case in order to find the EPA in contempt, citing two violations of the July 29, 2008 Summary Judgment Order:  (1) the EPA's failure to issue a new determination on the Amended EFA; and (2) the EPA's failure to issue a new determination on the Phosphorus Rule. *Id.* at p. 1.

On December 4, 2009, the EPA responded to my Order to Show Cause and Plaintiff's Corrected Motion for Civil Contempt. **[ECF No. 360]**. The EPA noted that one day earlier, on December 3, 2009, the Acting Regional Administrator for EPA Region 4 signed a determination and accordingly, "Plaintiffs' motion to compel are [*sic*] moot." *Id.* at pp. 1-2.  The EPA attached to its response a ten-page[12] letter from the Acting Regional Administrator to the Secretary of FDEP.  The inadequacies of the EPA's Determination were previously addressed in my April 14, 2010 Order.  *See* **[ECF No. 404 ¶ 12]**. Most notably, I pointed out that "[t]he 2009 Determination conspicuously fails to discuss how and when compliance will be met in conjunction with any effective Long-

---

10, 2008, the Eleventh Circuit granted EPA's motion to dismiss their appeal voluntarily with prejudice. **[ECF No. 341]**. On March 18, 2009, the Eleventh Circuit granted the Tribe and Friends' motion to dismiss New Hope's appeal for lack of standing. **[ECF No. 342]**.

[12] Although the correspondence is technically 11 pages, the last page fails to contain any substantive material. *See* **[ECF No. 360-1, p. 11]**. Furthermore, the first two pages of the correspondence simply summarize my July 29, 2008 Order, and it is not until the third page that the EPA actually provided a substantive analysis in response to my order. *Id.* at pp. 1-3.

Term Plan that provides enforceable milestones." *Id.* at p. 15.  I criticized the fact that the EPA failed to conduct any scientific analysis with regard to the proposed purchase of the U.S. Sugar Corporation's lands as envisioned by the State in Case No. 88-1886.[13]   *Id.* at p. 16.   In sum, EPA's Determination disapproved the EFA Amendments and portions of the Phosphorus Rule as new or revised water quality standards.  **[ECF No. 360-1]**.

On December 15, 2009, Plaintiffs filed a Motion to Compel State and Federal Defendants to Comply with the Court's Order Related to Discharge Permits and for Contempt based on Defendants' failure to comply with the July 29, 2008 Summary Judgment Order.   **[ECF No. 364]**.   The basis for Plaintiffs' Motion to Compel was FDEP's violation of the July 29, 2008 Order by continuing to allow permits for discharges of pollutants and issuing new Administrative Orders ("AOs") modify existing permits, and new Everglades Forever Act ("EFA") permits.  *Id.* at p. 1.  In addition, Plaintiffs noted that the EPA ignored my July 29, 2008 Order by allowing FDEP to act in such a manner and by failing to analyze the effect of delaying compliance in the AOs issued by the State in its 2009 Determination.  *Id.*   I subsequently held a two-day evidentiary hearing on January 13, 2010 and April 5, 2010.  **[ECF No. 404, p. 2]**.

---

[13] Ultimately, the SFWMD purchased 26,800 acres from U.S. Sugar Corp. in October 2010.  *See* Andy Reid, *U.S. Sugar Land Bought For Everglades Restoration Could Get Leased To Another Grower*, Sun Sentinel, March 9, 2011, http://www.miamiherald.com/2011/03/09/2106749/us-sugar-land-bought-for-everglades.html#ixzz1JpIgpmwg.

## VI.    RECENT PROCEDURAL BACKGROUND

### A.    April 14, 2010 Order

The failure to comply with the Clean Water Act's mandate has brought the parties to the current juncture, approximately a quarter-century after the filing of Case No. 88-1886.  Following the evidentiary hearing in the instant case, on April 14, 2010, I issued an Order Granting Plaintiffs' Motions in Part; Granting Equitable Relief; Requiring Parties to Take Action By Dates Certain ("April 14, 2010 Order").  **[ECF No. 404]**.  The April 14, 2010 Order set forth specific findings of fact and conclusions of law with respect to protection of the Everglades, incorporating by reference my July 29, 2008 Summary Judgment Order.  *Id.* at ¶ 9.

Ultimately, I remanded to the EPA with direction to issue an "Amended Determination."  **[ECF No. 404, p. 44]**.  I ordered that the Amended Determination establish "**specific milestones**" providing "**an enforceable framework for ensuring compliance** with the CWA."  *Id.* at p. 45 ¶ 2 (emphasis in original).  I fully reserved the Court's contempt powers in the event full compliance was not met consistent with the Order.  *Id.* at p. 47 ¶ 10.

On June 11, 2010, the Department filed a Notice of Appeal of the April 14, 2010 Order.  **[ECF No. 421]**.  On June 24, 2010, the EPA filed its Notice of Appeal of the April 14, 2010 Order.  **[ECF No. 430]**.  On August 30, 2010, the Eleventh Circuit granted the EPA's motion to hold the multi-party appeal in abeyance pending my resolution of the EPA's instant Rule 60(b) Motion.  **[ECF No. 459]**.  Also now pending before the Eleventh Circuit is SFWMD's petition for review challenging the legality of the Amended

Determination, which was filed on December 16, 2010, one day prior to the December 17, 2010 hearing.  *See* **[ECF No. 540]**.

### B.    Rule 60(b) Motion

On July 29, 2010, Defendants filed their Rule 60(b) Motion seeking three modifications to the April 14, 2010 Order:

> (1)    replacing the provision requiring EPA to partially withdraw Florida's Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permitting program with a new injunctive provision that would apply after existing permits have been conformed;
>
> (2)    modifying the Findings of Fact "that appear to equate the 10 parts per billion ("ppb") water quality criterion for phosphorus in the Everglades with the Water Quality Based Effluent Limits ("WQBELs");" and
>
> (3)    modifying Attachments B and C "to more closely track the 2008 Order Granting Summary Judgment and the April 14 Order."

**[ECF No. 446, p. 2]**.

Specifically, the EPA requests that I issue an "indicative order" suggesting my position with respect to amending the previously-issued compliance order which is currently before the Eleventh Circuit.  The EPA claims "[it] will not be able to implement some provisions of the Court's April 14 Order because it lacks statutory authority to do so[.]"  **[ECF No. 446, p. 7]**.  Following the December 17, 2010 hearing, the EPA filed a Submission in Response to the December 17, 2010 Order suggesting modifications to the Rule 60(b) modifications.  *See* **[ECF No. 565, pp. 11-14]**; *see infra* § XII.H.

### C.    Amended Determination

Subsequent to the filing of the Rule 60(b) Motion, on September 3, 2010, the EPA filed its Amended Determination.  **[ECF No. 458]**.  The Amended Determination

contained specific directions to FDEP regarding how to conform the NPDES and EFA permits.  *See* **[ECF No. 458]** (Attachment "I" "Conformed STA NPDES and EFA Permits" and Attachment "J" "Rationale for Conformed STA NPDES and EFA Permits").

On September 14, 2010, I entered a *sua sponte* order, directing the EPA to fully address "how the specific milestones set forth in the EPA's Amended Determination are directly linked to a meaningful financing plan to accomplish the necessary land acquisition and the construction to meet the deadlines imposed. . . . and how does the EPA intend to enforce its requirements?"  **[ECF No. 470]**.  *Id.* at 2.  On December 9, 2010, I entered a detailed Second *Sua Sponte* Order listing key issues and requiring the parties to be prepared to address these matters at the upcoming hearing.  **[ECF No. 531]**.  The EPA filed its Response to the Court's *Sua Sponte* Order of September 14, 2010 on the same day.  **[ECF No. 530]**; *see also* discussion of the response *infra* at § XII.L.

On November 2, 2010 – sixty days after issuance of the Amended Determination – FDEP filed its Notice of Filing Conformed Permit Documents.  **[ECF No. 512]**.  FDEP provided "sample permit documents for the STAs[.]"  *Id.* at 9.  FDEP also advised the EPA that the sample permit documents were "not being submitted for any action" and were "for informational purposes only."  **[ECF No. 530-4]** (Nov. 2, 2010 e-mail from G. Kneckt to P. Mancusi-Ungaro).  FDEP stated that it "may issue permits only if it has 'reasonable assurance' at the time of issuance that the permittee can comply with all permit conditions, including the WQBEL, by the required compliance deadline."  **[ECF No. 512, p. 3]**.

19

### D.     December 17, 2010 hearing

On December 17, 2010, the parties appeared before the Court for a hearing set in accordance with the April 14, 2010 Order. *See* **[ECF No. 543]**. Following the hearing and also on December 17, 2010, I issued an Order Requiring Submission requiring the parties to "each file a Supplemental Brief setting forth how the Court should proceed with respect to the matter of conforming permits in conjunction with the State of Florida Department of Environmental Protection's ('FDEP') Notice of Filing Conformed Permit Documents **[ECF No. 512]**." **[ECF No. 544 ¶ 1]**.

I also ordered the parties to file responses to FDEP's Notice of Compliance and Additional Considerations **[ECF No. 539]** and required FDEP to file a Supplemental Notice addressing whether FDEP must adopt the WQBEL through rule-making through the State Environmental Regulation Commission, with approval of the Florida legislature, prior to FDEP's issuance of a permit with a WQBEL. **[ECF No. 544 ¶ 2]**. I ordered the EPA to include any proposed additional language for its contemplated "Indicative Ruling" **[ECF No. 446-3]** in its response to FDEP's Notice. *Id.* Pursuant to the December 17, 2010 Order, the parties filed responses. *See* **[ECF Nos. 552-557]**.

### E.     Rule 60(b) Motion in *US v. SFWMD*, Case No. 88-1886

On March 31, 2010, Judge Moreno ordered the construction of the Everglades Agricultural Area ("EAA") A-1 Reservoir ("Reservoir") in the absence of an amendment to the Consent Decree "to deal with changed circumstances and opportunities."[14] **[ECF**

---

[14] In ordering the construction of the Reservoir, Judge Moreno recognized that this might reactivate the case before Judge Donald M. Middlebrooks. **[ECF No. 2134, p. 29]**. Judge Moreno concluded: "Of course, the parties remain free to employ Rule 60(b)(5) and seek amendment of the Consent Decree to deal with changed

No. 2134, pp. 19-20].[15]   On April 28, 2010, Defendants State of Florida and SFWMD

(collectively "State Parties") filed a Rule 60(b)(5) Motion[16] **[ECF No. 2139]**, which Judge

Moreno referred to the Special Master for a Report and Recommendation.   **[ECF No.**

**2150]**.

### 1.    Special Master's Report

On August 30, 2010, the Special Master filed a report recommending that

construction of the Reservoir cease as follows:

> Whether framed in terms of Rules 59 or 60 of the Federal Rules of Civil
> Procedure, or of reconsideration of the original order *sua sponte*, or of due
> process, I should recommend that the Court refrain from ordering
> construction of the A-1 Reservoir as a remedy for the former Consent
> Decree violations in the Refuge and instead that the timing and location of
> water storage and water conveyance be first considered as part of the
> evidence on remedies at the remedies hearing that I will be holding later in
> 2010.

**[ECF No. 2200]**.

The Special Master noted that my Order and the Amended Determination would

affect the hearings before the Special Master to the extent that:  "In several tries, the

[EPA] kept figuring out ways to support the State's permits for discharges from STAs

---

circumstances and opportunities."  *Id.*  In 2007, intervenors Sierra Club and the National
Wildlife Federation, joined with a third environmental conservation group and brought an
action before Judge Middlebrooks alleging that the Reservoir project was a CERP
project that required compliance with WRDA's procedural requirements.  *NRDC v. Van
Antwerp*, Case No. 07-80444 (S.D. Fla.).  On June 26, 2009, because the District had
stopped construction on the Reservoir, Judge Middlebrooks dismissed the suit before
him as moot, without prejudice to its refiling should construction on the Reservoir
restart.

[15] All electronic case filing number citations in this section refer to Case No. 88-1886.

[16] Motion for Relief from Order on Remedies, Motion for Leave to Present Evidence on
Alternative Remedial Measures in Lieu of Building the EAASR, and Rule 59(e) Motion
for Modification ("Motion to Amend").

into the EAA until Judge Gold finally said, 'Enough!'"  *Id.* at p. 53.  The Special Master also recognized the critical issue of funding with respect to this issue.  *Id.* ("And while not a conflicting position, it is a major change from 2006 and a reality that cannot be ignored:  plunging revenues now severely limit the remedial choices of the District.").

The Special Master summarized my April 14, 2010 Order as follows:  the United States should require the State to figure out a way to have waters entering the Everglades satisfy Florida's phosphorus numeric criterion of 10 ppb.  In relation to this issue, the Special Master noted that it was clear that:

> to attempt to achieve this goal will require many more acres of additional stormwater treatment area ["STA"]—at least as many as 40,000 *more* acres.  Compartment A-1 represents over 16,000 acres that will very likely be needed as an STA to attempt to achieve compliance with State water quality standards as approved by EPA under the Clean Water Act.

**[ECF No. 2200, p. 56]** (emphasis in original).

Based on the testimony of Gail Mitchell of the EPA's Regional Office of Region IV, who led the team that prepared the Amended Determination, the Special Master noted that the EPA is considering Compartment A-1 as part of its proposed structure to satisfying my order.  "The EAA-A1 reservoir lands are situated in the landscape within the STA-3/4 flow path so that it may be highly beneficial to be able to use those existing Florida state lands, in whole or in part, as a location for STAs to improve water quality."  *Id.* at p. 56 (citing Ex. 201 (Mitchell Declaration, p. 2)).

### 2.    Hearing before Judge Moreno & Order on Rule 60(b)(5) Motion

On September 17, 2010, Plaintiff United States and Defendant SFWMD each moved to adopt or join the Special Master's Report.  **[ECF Nos. 2206, 2207]**.  On

October 21, 2010, Judge Moreno held a hearing on the Report "to see whether there is sufficient changed circumstances that would allow [Judge Moreno] to rule under 60(b)(5) . . . the bottom line [being] whether it's a good idea to build this EAA 1 reservoir." **[ECF No. 2230, 14:14-16]**. Judge Moreno noted that "if things continuously change, and then we'll never do anything because there's always something better in the future[.]" *Id.* at 17:3-4.

On March 22, 2011, Judge Moreno issued an Order Adopting the August 30, 2010 Report of the Special Master and Granting the Rule 60(b)(5) Motion in Case No. 88-1886. **[ECF No. 2268]**. The order specifically discusses the alternate remedy as one which is "better suited to meet the requirements of the Consent Decree and the Clean Water Act as set forth in Judge Alan Gold's April 14, 2010 Order[.]" *Id.*

Following a series of hearings, the Special Master concluded that the Reservoir would not longer materially benefit the Loxahatchee Refuge. The Special Master determined that the Clean Water Act litigation at issue in this case represents "a change in circumstances that should be considered in deciding the State Parties' Rule 60(b)(5) motion." *Id.* at 5. Specifically, Judge Moreno's order notes that "[t]he United States presented testimony before the Special Master that the EPA is looking to use the Compartment A-1, the location of the Reservoir, as part of its proposed structure to meet [the April 14, 2010] order." *Id.* (emphasis added). In sum, reviewing the instant case and Case No. 88-1866 in conjunction, the order notes that "the Special Master concurred with the State Parties that the practical effect is that [the April 14, 2010] Order

and [Judge Moreno's] Order compelling construction of the EAA A-1 Reservoir cannot work well together." *Id.* at 6.

Although the two cases before the undersigned and Judge Moreno are separate, the orders entered and the progression of litigation in each respective case remain integral to the overall success of saving the Everglades.  To the extent Judge Moreno's order references this case and my prior orders, the recent order in Case No. 88-1886 represents one method in progressing toward preservation of the Everglades and compliance with the orders entered in both cases, including the Consent Decree, July 29, 2008 Summary Judgment Order, and April 14, 2010 Order.  Specifically, termination of the Reservoir construction will allow for freeing up funds and efforts to be directed elsewhere—with anticipation that this provides the parties with greater ability to achieve the objectives in the Amended Determination.

## VII.    EPA RESPONSE TO FIRST *SUA SPONTE* ORDER

On September 14, 2010, I entered a *sua sponte* order, directing the EPA to fully address "how the specific milestones set forth in the EPA's Amended Determination are directly linked to a meaningful financing plan to accomplish the necessary land acquisition and the construction to meet the deadlines imposed. . . . and how does the EPA intend to enforce its requirements"  **[ECF No. 470]**.

EPA suggests that if permits contain compliance schedules, non-compliance will allow EPA, FDEP, or citizen plaintiffs to seek injunctive relief through enforcement proceedings.  If permits do <u>not</u> contain compliance schedules, EPA or citizen plaintiffs can initiate an enforcement action based on non-compliance with WQBEL.  The EPA

24

agrees with the District's $1.5 billion estimate for constructing an expanded treatment acreage facility, but believes the District can reduce costs by alternatives such as more stringent controls on sources of phosphorus.  The EPA claims it is premature to engage in fact-finding on the District's financial capacity because the District can later demonstrate fiscal impossibility in a permitting proceeding or enforcement action.  The EPA "has no reason to conclude that the ultimate goal of achieving expeditious cleanup of the Everglades cannot financially be achieved."  **[ECF No. 530, p. 4]**.

The EPA explains that permits must be issued for each STA incorporating the WQBEL for phosphorus.  The EPA indicates that my response to FDEP's Notice of Filing Conformed Permits **[ECF No. 512]** could determine whether FDEP or the EPA ultimately issue permits, how long it will take to put final permits in place, and what process will be followed.  The EPA argues that once permits are in place, the Clean Water Act provides enforcement mechanisms to ensure that the District complies with requirements of the final permits.

In its response, the EPA also identifies two types of final, effective, and enforceable permits:  1) permits without compliance schedules and 2) permits with compliance schedules.  The EPA's position is that once final and effective permits are in place—regardless of whether they include compliance schedules—a variety of enforcement mechanisms are available to EPA, the State, and citizen plaintiffs to ensure timely compliance with the WQBEL.

## VIII.   PERMITTING BACKGROUND

The State issues NPDES permits from the EPA under a "[NPDES] Memorandum of Understanding Between the State of Florida and the United States Environmental Protection Agency" **[ECF No. 375-2]**, executed in 1995 ("Memorandum of Understanding"). *See* **[ECF No. 380, pp. 187-88]**.   In Section IX of the Memorandum of Understanding, EPA acknowledges that:

> [the FDEP] has no veto authority over acts of the state legislature and therefore [EPA] reserves the right to initiate procedures for withdrawal of approval of the State program in the event that the state legislature enacts any legislation or issues any directive which substantially impairs the FDEP's ability to administer the NPDES program or to otherwise maintain compliance with NPDES program requirements.

**[ECF No. 375-2, p. 181]**.   The Memorandum of Understanding requires that: "[i]f the terms of any permit, including any permit for which review has been waived by the EPA, are affected in any manner by administrative or court action, the Department shall immediately transmit a copy of the permit, with the changes identified to the EPA and shall allow (30) days for EPA to make written objections to the changed permit pursuant to Section 402(d) of the CWA." *Id.* at 14-15.   The NPDES permits each contain a "re-opener clause" requiring revisions if a new effluent standard, limitation, or water quality standard issued or approved contains different conditions or is otherwise more stringent than any condition in the permits. *See e.g.*, **[ECF No. 404, p. 27]**.

Currently, each STA discharging into the Everglades Protection Area has a State-issued permit authorizing such discharges. **[ECF No. 530, p. 16]**.   Each permit is accompanied by a State Administrative Order ("AO") establishing a schedule for construction, enhancement, and/or stabilization of the STAs.   However, the AO also

relieves the District from having to immediately comply with the otherwise applicable WQBEL identified in the permit.

In the April 14, 2010 Order, I held that the current compliance schedules in the permits are inconsistent with the approved water quality standards. **[ECF No. 404, pp. 45-46]**. The April 14, 2010 Order directed FDEP to conform the permits to comply with my Orders and the Amended Determination within 60 days after issuance of the Amended Determination, *i.e.*, by November 2, 2010. *Id.*

The Amended Determination describes a two-step process for implementing the WQBEL and associated remedial measures in light of my rejection of the compliance schedules in the existing Administrative Orders. The first step is to modify existing NPDES permits for STAs to incorporate revised WQBEL. The second step is to initiate administrative or judicial enforcement action if discharges from STAs do not meet WQBEL.

### A.    Permit procedures

The EPA has issued regulations addressing operations of NPDES permit scheme. *See* 40 C.F.R. § 122.1 *et seq.* Permits are issued by EPA or the state itself, *e.g.*, FDEP through CWA's NPDES program. *See* 33 U.S.C. § 1342 (federally approved permitting system). "Regardless of the issuer, every NPDES permit is statutorily required to set forth, at the very least, 'effluent limitations," that is, certain 'restriction[s] . . . on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters.'" *Waterkeeper Alliance, Inc. v. United States EPA*, 399 F.3d 486, 491 (2d Cir. 2005)

(quoting *S. Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004) ("Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters.").

### B.    State-issued permits

For permits issued by the State, FDEP provides public notice and opportunity for comment on a draft permit.  FDEP then reviews any comments and transmits proposed permit to EPA.[17]  The EPA reviews and, if necessary, objects to state-issued permits.  If the EPA objects within ninety days of transmittal of the permit, no permit shall issue unless the EPA's objections are resolved within specific timeframes.  If the EPA's objections are not resolved, the **exclusive authority to issue the permit transfers to the EPA** and the EPA begins the federal permitting process.

However, if the EPA does not object to the draft permit or objections are resolved, FDEP publishes a notice of final permit issuance.  Interested parties have fourteen days from publication of notice to request an administrative hearing before a State Administrative Law Judge ("ALJ").  If a hearing is requested, terms of the permit are automatically stayed pending resolution of the hearing.[18]  The ALJ then issues a recommendation to the Secretary of FDEP, who may accept the recommendation or

---

[17] A "proposed" permit is prepared by the State after public comment.  40 C.F.R. § 122.2.  A "draft" permit is prepared for public notice and comment.  The EPA may agree, as it did in the Memorandum of Agreement between EPA and FDEP, to review "draft" permits rather than proposed permits.  *Id.* at § 123.44(j).

[18] According to EPA, a hearing "can take months."  **[ECF No. 512, pp. 9-10]** (citing Fla. Stat. § 120.60(3)).  The hearing is a *de novo* proceeding and the ALJ reviews FDEP's action to determine whether the action is an "invalid exercise of delegated legislative authority." Fla. Stat. § 120.56(1)(a).

remand the matter to the ALJ.  After the administrative process concludes, permits become effective and enforceable, but may be subject to judicial review in State court.

### C.    EPA-issued permits

For permits issued by the EPA, the EPA first publishes a proposed NPDES permit.  The EPA then allows for public comment period of at least thirty days.  The EPA responds to any significant public comments prior to issuing "final" permit decision.  The EPA-issued permit is subject to federal administrative review procedures, including administrative review by the EPA's Environmental Appeals Board ("EAB")[19] which must be sought within thirty days of permit issuance.[20]   Once the administrative review process is complete (including proceedings in response to any remand by the EAB), the permit becomes final and effective upon the Region's issuance of a final permit decision.

### D.    Variance and immediate commencement of enforcement against FDEP

The EPA identifies a third option, water quality standards variance, but disapproves this option because it would temporarily relax the State's water quality standards and the WQBEL.  A variance would require a multi-faceted and lengthy process (*e.g.*, making determinations under state law, requiring EPA review under

---

[19] *See City of Pittsfield v. United States EPA*, 614 F.3d 7 (1st Cir. 2010) (EAB did not abuse its discretion in denying city's petition seeking review of the EPA's grant of NPDES permit for wastewater treatment plant because city procedurally defaulted when its petition failed to identify its specific objections to permit or to articulate why EAB should assume jurisdiction).

[20] Contested and unseverable permit conditions are stayed during the pendency of the administrative process.

CWA, and public hearing).   Finally, a variance could require amending the consent decree in Judge Moreno's case.

The EPA also notes that the enforcement option suggested by Friends— immediate commencement of an enforcement action against the District—is not available.   The EPA may commence an enforcement action when someone has discharged pollutants without a permit or in violation of an existing permit pursuant to 33 U.S.C. § 1319.   However, since there are existing NPDES permits for STA discharges, the EPA cannot bring an immediate enforcement action because there is no evidence that there is a violation of the existing permit terms.   *See* 33 U.S.C. § 1342(k).

I agree with the EPA's disapproval of the variance option.   I have previously set forth my stance on use of such variances.   *See e.g.*, **[ECF No. 404, p. 11]** ("I warned the EPA that it could not continue to ignore federal Clean Water Act requirements by pretending the State of Florida could justify its actions through 'short-term variances.'").   Any further postponement of a long-delayed process is unwarranted at this point, whether through use of variances or Administrative Orders.   *See infra* § XII.K.

## IX.   JURISDICTION

A federal court must always determine whether it has jurisdiction to hear a case.   *See, e.g., Arbaugh v. Y & H Corp.*, 546 U.S. 500, 507 (2006); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005) ("Indeed, it is well-settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").   As such, even when there is no dispute between the parties with respect

30

to jurisdiction, federal courts have an independent duty to ensure that subject-matter jurisdiction exists.

In the instant case, I exercise jurisdiction through equitable and inherent powers under the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, and the federal Administrative Procedures Act, 5 U.S.C. § 701, *et seq.  See also Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1983) ("read[ing] the [Clean Water Act] as permitting the exercise of a court's equitable discretion, whether the source of pollution is a private party or a federal agency, to order relief that will achieve *compliance* with the Act.") (emphasis in original).

## X.    LEGAL STANDARD

For the sake of brevity and efficiency, I expressly incorporate by reference all applicable legal standards as set forth in my prior orders with respect to my authority to enforce my prior orders and issue injunctive relief for cases brought under the APA. *See e.g.*, **[ECF No. 323 § VIII]**, **[ECF No. 404 § III.C]**.[21]

Rule 60(b) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding[.]"  Generally, filing a notice of appeal divests the district court of jurisdiction over those aspects of the case that are the subject of the appeal.  *Doe v. Bush*, 261 F.3d 1037, 1064 (11th Cir. 2001).  However, district courts may take action "in furtherance of the appeal."  *Lairsey v. Advance*

---

[21] Since this Order first addresses the EPA's Rule 60(b) Motion, the applicable legal standards as to the other motions are discussed in the respective sections of this Order. *See infra* §§ XII.I-L.

*Abrasives Co.*, 542 F.2d 928, 930 (5th Cir. 1976)[22] (citations omitted).  District courts may also entertain motions on matters collateral to those on appeal.  *Doe*, 261 F.3d at 1064 (citing *Weaver v. Fla. Power & Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999)).  The Eleventh Circuit has held that "district courts retain jurisdiction after the filing of a notice of appeal to entertain and deny a Rule 60(b) motion."  *Mahone v. Ray*, 326 F.3d 1176, 1180 (11th Cir. 2003).  However, in the context of granting Rule 60(b) relief,

> . . . following the filing of a notice of appeal[,] district courts do not possess jurisdiction to grant a Rule 60(b) motion.  Accordingly, a district court presented with a Rule 60(b) motion after a notice of appeal has been filed should consider the motion and assess its merits.  It may then deny the motion or indicate its belief that the arguments raised are meritorious.

*Mahone*, 326 F.3d at 1180.

## XI.   PARTIES' POSITIONS ON RULE 60(B) MOTION

### A.   The EPA

The existing provision in the April 14, 2010 Order requires the EPA to partially withdraw Florida's CWA NPDES permitting program **[ECF No. 404, pp. 46-47 ¶ 4]**.[23] Under the EPA's proposed new provision, the following procedure would apply for new or modified NPDES permits for STA discharges:  First, the State submits new permits or permit modifications prepared for proposal to the EPA for review.  If necessary, the EPA makes any required corrections prior to proposal.   The State, after receipt and consideration of public comment, submits permits to the EPA for review.   The EPA

---

[22] All cases decided by the United States Court of Appeals for the Fifth Circuit before September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[23] The EPA claims it is not initiating program withdrawal proceedings in the Amended Determination because of its Rule 60(b) motion.  **[ECF No. 458-4, p. 53]**.

exercises its existing statutory authority to review permits for compliance with the CWA, implementing regulations, the Court's Orders, and the Amended Determination. If the EPA determines a permit does not conform and the EPA objects to permit, the authority to issue such permit transfers to the EPA, unless the EPA confirms in writing that the State has fully addressed the EPA's objections.

The EPA argues that "this approach should produce the same functional outcome as partial program withdrawal whereby EPA would issue the permits." **[ECF No. 446, p. 10]**. This new provision would apply after existing permits have been conformed pursuant to Paragraph 3 of Section III.D of the April 14, 2010 Order. The "EPA believes that federal permitting can serve as an effective tool where a state is unwilling or unable to issue permits that fully comply with all applicable Clean Water Act requirements." **[ECF No. 565, p. 8]**. I agree, in part because I have determined that the State is unwilling or unable to issue permits in compliance with the CWA.

**B.     Miccosukee Tribe**

The Miccosukee Tribe argues that the Rule 60(b) motion is a further attempt to delay compliance with the EPA's legal obligations. **[ECF No. 467, p. 3]**. Miccosukee opposes the Motion on the basis that the Compliance Order is not a new final order from which the EPA can seek relief under Rule 60(b).[24] Miccosukee urges that even if

---

[24] As the EPA points out in its Reply to the Tribe's Response, Rule 60(b) states, in pertinent part, that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding[.]" As set forth in my discussion of the applicable legal standard, *supra* § X, since the parties have filed notices of appeal, I may indicate my belief that the arguments in the EPA's Rule 60(b) Motion are meritorious, or as the EPA has suggested, issue an indicative ruling.

Rule 60(b)(6) is applicable to the Compliance Order, the EPA cannot demonstrate the requisite "exceptional circumstances" for requested relief.

### C.    Friends

Friends only opposes the first form of requested relief in the EPA's Rule 60(b) Motion, requiring the EPA to withdraw the State's NPDES permitting authority within the Everglades Protection Area.  Friends argues that the EPA does possess the authority to initiate proceedings to withdraw state NPDES permitting delegation on a partial, or less than a statewide, basis.[25]  **[ECF No. 468]**.

### D.    FDEP

FDEP's position is that although both the EPA and FDEP believe the QBEL can be attained, the Amended Determination's QBEL cannot be effectuated immediately. **[ECF No. 545, 43:3-4; 44:16-18]**.  Based on this, FDEP claims it cannot issue "false" permits containing the QBEL as set forth in the Amended Determination.  *Id.* at 43:17-20.  FDEP identifies the reasonable assurance required for a permit in the form of a compliance schedule.  *Id.* at 43:23-25.

### E.    New Hope

New Hope opposes the first two proposed revisions offered by the EPA.  **[ECF No. 469]**.  New Hope characterizes the relief sought as a strategic move on the part of the EPA to "micromanage" the State's permitting procedures.  *Id.* at p. 3.  Although New Hope challenges my April 14, 210 order, "New Hope does not dispute that EPA must comply with the 2008 Order.  However, compliance should mean issuing determinations

---

[25] While Friends sets forth the bases for its belief that the EPA may partially withdraw delegation to the State of the permitting programs, **[ECF No. 468 § II.B]**, I decline to adopt this position.

limited to the language of water quality standards that are consistent with the 2008 Order." **[ECF No. 469, p. 2]**.

## XII.   ANALYSIS

### A.   The EPA's commitment

The EPA's opening sentence in its Rule 60(b) Motion indicates that it is "fully committed to ensuring that the Everglades meet the water quality standards for phosphorus as quickly as possible." **[ECF No. 446, p. 1]**.  An initial point of discussion during the December 17, 2010 hearing was the extent of the EPA's commitment to its Amended Determination.  *See* **[ECF No. 545, 15:23-16:2]** ([The Court:] "But I need to ask directly how committed is the EPA now to carrying out the amended determination, fighting for its legality at the Eleventh Circuit, and immediately proceeding to its implementation . . . .").  As expressed in its recent briefing and at the December 17, 2010 hearing, ". . . [the] EPA is absolutely committed[.]"  *Id.* at 17:6.[26]

At the December 17, 2010 hearing, I raised concerns regarding whether the EPA was prepared to unequivocally maintain its position regarding its commitment should the State attempt to dissuade EPA from carrying on its very specific responsibilities.  **[ECF No. 545, 20:5-13]**.  I pointed to two examples outside of the specific confines of this case and the Everglades.  First, I noted that in *Fla. Wildlife Fedn., Inc. v. Jackson*, 2009 U.S. Dist. LEXIS 123651 (N.D. Fla. Dec. 30, 2009), a consent decree set numeric nutrient criteria for lakes and flowing waters in the State of Florida pursuant to Section

---

[26] I also take this opportunity to note that FDEP has also indicated its intent to work toward resolving the issues plaguing the Everglades.  *See e.g.,* **[ECF No. 539, p. 28]** ("The Department is acting expeditiously to comply with the terms of this Court's Orders. . . . and remains committed to the long-term endeavor of restoring America's Everglades.").

303(c) of the CWA.  Although the final rulemaking was initiated, the State asked the EPA to delay implementation of water pollution rules because the rules would be detrimental to the state's already fragile economy.  The EPA agreed to delay execution of the rules for approximately 1.5 years.  I referenced another situation that arose just prior to the hearing, when the EPA announced on December 9, 2010 that it needed until July 2011 and April 2012 to further analyze studies with respect to smog and toxic emission rules that were supposed to take effect in December 2010.[27]  With the backdrop of serious economic pressures in mind, I then asked the EPA if it was committed to its Amended Determination in light of these potential financial hurdles.[28]  *See* **[ECF No. 545, pp. 20-21]**.  As the EPA represented, it is "committed . . . to do everything that is within our authority to see that the blueprint and the Amended Determination becomes [*sic*] a reality . . . ."  *Id.* at 21:10-12.[29]  I also note that the first

---

[27] *See* John M. Broder and Sheryl Gay Stolberg, *E.P.A. Delays Tougher Rules on Emissions*, N.Y. TIMES, Dec. 9, 2010, http://www.nytimes.com/2010/12/10/science/earth/10epa.html.

[28] I note that efforts to restore the Everglades are not without financial obstacles.  *See e.g.*, Andy Reid, *U.S. Sugar Land Bought for Everglades Restoration Could Get Leased to Another Grower*, SUN SENTINEL, March 9, 2011, http://www.miamiherald.com/2011/03/09/2106749/us-sugar-land-bought-for-everglades.html#ixzz1JpIgpmwg (discussing proposal to cut taxes for the State's water management districts to reduce their budgets by 25 percent, or approximately $100 million from the SFWMD's budget).  For this reason, an increased level of commitment from the EPA and the State is necessary, in light of the avowals to achieve compliance with the mandates of the CWA.

[29] Indeed, in response to my first *sua sponte* order, the EPA indicated that "[it] has no reason to believe that the necessary remedies are not fiscally achievable."  *See* **[ECF No. 532 § I.B]** (agreeing with District's estimate that improvements required by Amended Determination would cost $1.5 billion).  In fact, the EPA identifies alternative compliance measures to reduce costs to the District, as set forth in the Amended Determination.  *Id.* at p. 11 (citing **[ECF No. 458-1, pp. 14-15]**.  The EPA opines that

commitment outlined in the Memorandum of Understanding between the EPA and FDEP under Section III.B, "EPA Responsibilities," is that "EPA will commit, to the maximum extent possible, funding to the FDEP to support the FDEP's responsibilities under the NPDES program." **[ECF No. 468-1, p. 6]**.

### B.    Whether the Amended Determination is mandatory

At the hearing, the EPA represented that the Amended Determination is not entirely mandatory in that "there are different pieces" to the Amended Determination, some which are mandatory and others which "require additional regulatory steps before they can be directly enforced." **[ECF No. 545, 16:25-17:3]**.

It is undisputed that the parties have expended considerable efforts toward conservation of the Everglades and litigating this case.   I am mindful of the correspondence between the parties, as well as the SFWMD, in coming to agreements and scheduling meetings so that the efforts to preserve the Everglades can move forward.[30]   However, there remain certain roadblocks that evidence a lack of cooperation among the participants responsible for administering restoration and conservation efforts.   *See e.g.*, **[ECF No. 514, p. 2]** (District's November 2, 2010

---

these alternatives "would likely reduce the costs of the remedies to significantly less than $1.5 billion."  *Id.* at p. 13.

[30] *See e.g.*, **[ECF No. 541]** (Letter from Carol Wehle, SFWMD Executive Director, to Gwendolyn Keyes Fleming, EPA Regional Administrator (Dec. 14, 2010) coordinating date to "sit down again and further discuss our respective concerns."); **[ECF No. 560]** (Letter from Carol Wehle, SFWMD Executive Director, to Gwendolyn Keyes Fleming, EPA Regional Administrator (Jan. 7, 2011) "assur[ing EPA] of the District's full commitment to facilitating a path forward" and offering availability to meet with EPA in January 2011).  The parties have not submitted any filings indicating whether such meeting actually occurred or what further efforts the EPA or SFWMD have taken with respect to the plans discussed in the January 7, 2011 correspondence.

response to the Amended Determination indicating that it was "unable to commit to the Amended Determination as currently crafted and [wa]s also unable to submit an alternative[.]").  Despite some resistance, it appears that the progress that has been made can be an indication of cooperation and open channels of communication in the future.  With an acknowledgement as to the work that has been done, there remains a significant road ahead.  Protection of the Everglades requires a major commitment which cannot be simply pushed aside in the face of financial hardships, political opposition, or other excuses.  These obstacles will always exist, but the Everglades will not—especially if the protracted pace of preservation efforts continues at the current pace.

**C.   Necessity of immediate action**

As the Florida Legislature recognized in the Everglades Forever Act,

> The Statement of Principles of <u>July 1993</u> among the Federal Government, the South Florida Water Management District, the Department of Environmental Protection, and certain agricultural industry representatives formed a basis to <u>bring to a close 5 years of costly litigation</u>. That agreement should be used to begin the cleanup and renewal of the Everglades ecosystem.

Fla. Stat. § 373.4592.

It is now 2011, or eighteen years after EPA, the District, and the Department recognized in 1993 that it was time to "bring to a close <u>5</u> years of costly litigation," which has now expanded to twenty-three years of costly litigation over many of the same issues that were first brought to this Court's attention in Case No. 88-1886 and reappeared in different forms in the instant case and those consolidated therein. Promises have been made, and not kept, and now the parties find themselves in a

38

similar situation as in 1988 when the case was brought—static and stagnant indeterminacy with respect to one of our nation's most prized and vulnerable natural resources.

As I made clear in my prior orders, it is necessary to enact and enforce the appropriate water standard and QBEL now, and to have immediate conformance of the permits for the purpose of enforcing all terms therein.  The Amended Determination identifies two avenues to obtain final, effective, and enforceable permits.  First, EPA could issue permits that contain the QBEL from the Amended Determination without compliance schedules for attaining the QBEL, with the assumption that the QBEL is required immediately upon the permit being effective.  An alternative option is issuing permits containing the QBEL and compliance schedules for meeting the QBEL through implementation of necessary remedial measures.  Under this second course, FDEP envisions a process outlined in its Notice of Compliance and Additional Considerations. **[ECF No. 539]**.  For the reasons discussed *infra*, I determine that the use of compliance schedules, including Administrative Orders, will not achieve the objectives of preserving the Everglades—goals that have been overlooked in the face of recent mounting economic pressures.

The proper avenue to proceed with is the first, wherein the EPA shall issue permits without compliance schedules such that the QBEL is immediately enforceable. As discussed during the December 17, 2010, interminable time delays will force further postponements with respect to the EPA's ability to enforce the conformed permits. Under the first option, the EPA is not subject to the state law impediments and has

39

authority under Clean Water Act § 402(d) to issue the permits if the State submits draft permits that fail to comply with the Act.  I determine that the State has submitted permits that must now be subject to the EPA's review.

FDEP's position is that it must provide "draft" permits because it cannot provide reasonable assurances required to issue conformed permits pursuant to Florida law. Essentially, the EPA's position is that until and unless FDEP provides conformed permits, the EPA is without authority to act.  *See* **[ECF No. 484, p. 4, fn. 3]**.  In particular, I highlight the EPA's suggestion that I deem the "conformed permit documents" filed by FDEP on November 2, 2010 to be "draft permits" for purposes of review under the Memorandum of Understanding.  *See* **[ECF No. 530, fn. 14]**.  The EPA has notified the FDEP that it reserved its full 90 days for review pursuant to the memorandum of agreement and Clean Water Act § 402(d).  *Id.*  Because this is the mechanism by which the EPA and the State can initiate the process of conforming the permits—since the FDEP believes the permits are without reasonable assurances—and because of the epic history of prolonging procedures to improve water quality standards in the Everglades, this is the most appropriate and efficient course of action at this time.

By presenting "conformed permit documents," FDEP has presented a situation in which the parties—and consequently, the efforts to comply with the CWA—remain in "limbo" because FDEP's position is that the filed permits are for informational purposes only and do not constitute a submission to EPA for EPA's review.  The ninety-day period within which the EPA may review the permit documents would have begun on November 2, 2010 when the permits were submitted, and the EPA would have had until

January 31, 2011 to review the permits.  As the EPA represented at the December 17, 2010 hearing, "EPA stands ready to do so within that period of time."  As with other deadlines set in this case, that time has come and gone, and the impetus is now upon the EPA to perform the actions which it has committed itself to doing.

As this Court, other courts within this District, the Eleventh Circuit, and the Supreme Court have recognized, the efforts to save the Everglades have been long-lasting.  *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. at 101-102 ("The phosphorous-related impacts of the [Central and South Florida Flood Control] Project are well known and have received a great deal of attention from state and federal authorities for more than 20 years.  A number of initiatives are currently under way to reduce these impacts and thereby restore the ecological integrity of the Everglades.").  At the time the hearing was originally set seven months ago in April 14, 2010, this case remained at a standstill.  Since then, the Amended Determination has come into existence to serve as a stimulus for the EPA and State to act and move toward reviewing permits to ensure timely and immediate compliance with the WQBEL in the Everglades.

At the core of this matter is the issue of permitting authority, and whether the State or the EPA should step into the role of primarily issuing permits that shall enforce the mandates of the CWA.  The State, and to a significant extent, the EPA, cannot merely continue to push off deadlines.  This is a serious matter of national importance, the ignorance of which will result in continued and permanent degradation to a unique resource.  In short, the EPA must now take the reigns of the permitting issues and take

41

action as to what it has committed itself to doing.  The State and the EPA must work together, in conjunction with the other parties and intervenors in this action, to move forward and avoid any further standstill or delay.

The EPA has come a long way from its prior determination filed in this litigation, which was a cursory ten-page letter addressed to the FDEP and signed only subsequent to Plaintiffs' Motion for Contempt.  Granted, it was not difficult to improve upon this prior determination.  However, I do find that the Amended Determination represents a more committed effort on the part of the EPA to specifically comply with my April 14, 2010 Order.  For this reason, it is necessary to ensure that the EPA acts within its permitting authority to take the significant and necessary steps toward the very actions it has committed itself to through the Amended Determination.

### D.     Effect of March 23, 2011 Order in Case No. 88-1886

The EPA fully acknowledges in the Amended Determination that whether the Reservoir must be constructed to completion depended on Judge Moreno's then-forthcoming order.[31]  The EPA views the A-1 land as a way to comply with the WQBEL. *See* **[ECF No. 458-1, p. 56]** ("USEPA has considered the EAA A1 Reservoir land as an

---

[31] Indeed, the although EPA did mention the possibility that Judge Moreno may not adopt the Special Master's Report recommending that the construction of the A-1 Reservoir be terminated, the EPA did not fully discuss its options if Judge Moreno orders the Reservoir to be completed.  *See* **[ECF No. 458-1, pp. 36-37]** (the EPA considered including an option in this Amended Determination for utilizing the A1 site as a deep reservoir in the event the Consent Decree Court rules to deny the State's motion for relief in building the A1 site as a reservoir. Such an option has been developed by USEPA and can be provided at such time that a decision to deny the State's motion is issued. . . . Based on the Special Master's Report, USEPA is including in the Amended Determination one remedy based on an STA expansion in the A1 compartment. Should the Consent Decree Court rule to deny the State's motion, the alternative remedy for A1 as a deep storage reservoir can be provided in a timely fashion.) (emphasis added).

important option for expanding STA 3/4, thereby compressing the timeframe for compliance with the WQBEL").

Although construction of the Reservoir has begun and ceased, Judge Moreno agreed with the Special Master that it is not in the best interests of the Everglades to continue or complete the Reservoir.  In part, completion of the Reservoir will require improvements to canals.  The parties in Judge Moreno's case propose an alternative for the A-1 area where the Reservoir is currently located, that is, a stormwater treatment area ("STA").

The EPA's proposal for the STA 2, STA 3/4 and Compartment B areas assumes that the A1 site will be utilized in full as a 15,000-acre STA, *e.g.*, that Judge Moreno will adopt the Special Master's report, which he has now done.  The EPA sets various milestones based on an assumption that Judge Moreno rules on the Reservoir issue by September 30, 2011.  As set forth *supra*, Judge Moreno issued the Order Adopting the August 30, 2010 Report of the Special Master and Granting the Rule 60(b)(5) Motion on March 23, 2011.  **[Case No. 88-1886; ECF No. 2268]**.  Accordingly, the EPA's milestones can be immediately implemented.  "EPA believes the WQBEL can be attained in STA 3/4 and Comp B NBO by <u>December 31, 2014</u> if the A1 site is first utilized as an **interim shallow storage reservoir**[32], <u>and later converted to an STA</u>."  **[ECF No. 458-1, p. 37]**.  (emphasis added).

The EPA in its Amended Determination appears to hinge its proposed actions and timetable based on Judge Moreno's then-forthcoming order.  *See*, *e.g.*, Amended

---

[32] The parties in Judge Moreno's case did not focus on whether the A-1 area could be used as an interim shallow storage reservoir given its current status.  EPA assumes that the A-1 site can be constructed as a shallow storage reservoir by March 13, 2014.

Determination at p. 32 ("Before any progress can be made on design and construction of an expanded STA on the A1 site, the Court in the Consent Decree Case must grant the State's motion for relief from building the site as a reservoir."), *id.* at pp. 33, 35 ("USEPA is assuming that a detailed design for converting the use of the A1 and part of the A2 compartments from a reservoir to a STA can begin as soon as the Consent Decree Court rules on the A1 case."); *id.* at p. 35 ("Before any progress can be made on design and construction of an expanded STA on the A1 site, the Court in the Consent Decree Case must grant the State's motion for relief from building the site as a reservoir."); *id.* at p. 50 ("USEPA is awaiting the Consent Decree Court's ultimate disposition of this matter.").

To the extent the EPA regarded Judge Moreno's order as a prerequisite to taking action, Judge Moreno has issued his order and the time to act is <u>now</u>.  As this prerequisite has been fulfilled, there is no reason for further delay on the part of the EPA.

### E.    Amended Determination

In Section V of the Amended Determination, EPA discusses NPDES and EFA permits and recognizes that it has "<u>oversight authority over the State's program</u> to help ensure its effective implementation, including the authority to object to state permits and issue a federal permit where a state's proposed permit is outside the guidelines and requirements of the CWA."  **[ECF No. 458-1, p. 44]**.

Here, the EPA's basis for moving for relief under Rule 60(b) is because it believes that certain elements of the April 14 Order "exceed EPA's statutory authority

and may present significant legal risk in any subsequent legal challenge." **[ECF No. 446, p. 1]**.  Following the December 17, 2010 hearing, the EPA, in accordance with my order of the same date, proposed modifications to the requested relief in its original Rule 60(b) Motion.  In order to begin the analysis of Defendants' Rule 60(b) Motion, I first examine the Amended Determination.

The directives set forth in the EPA's Amended Determination include specific instructions from the EPA to FDEP regarding how to conform the existing STA permits to ensure that the discharges do not exceed the phosphorus criteria.  The EPA also directs FDEP to remove references to the stricken portions of the Everglades Forever Act and Phosphorus Rule.  Further, the EPA instructs FDEP to include a QBEL adequate to ensure water quality compliance, updated pollution prevention and operation plans, and enhanced monitoring requirements in each STA permit.  The EPA identifies specific remedial measures necessary for each STA discharge to achieve the desired QBEL in its Amended Determination.

The Amended Determination also indicates that levels of total phosphorus at inflows to the Loxahatchee National Wildlife Refuge and Water Conservation Areas 2 and 3 have decreased since 1980.  However, the entirety of the Everglades Protection Area does not yet meet the nutrient criteria, and scientific publications conclude that the soil total phosphorus concentrations have actually worsened in portions of the Everglades Protection Area.  Thus, further reductions of total phosphorus in the inflows of the Everglades are clearly necessary.  The EPA, through its Amended Determination,

has instructed FDEP on how to conform existing STA permits to ensure that discharges do not cause any exceeding of the phosphorus criteria.

### 1.   Water quality standard

The approved water quality standard is 10 parts per billion ("ppb") long-term geometric mean.  I ordered the EPA to direct the State to correct certain deficiencies in the water quality standard contained both in the Phosphorus Rule and the Everglades Forever Act.  The EPA has done so in the Amended Determination.  Furthermore, the EPA has indicated that should the State fail to comply with the previously-set deadlines which are reiterated in the Amended Determination, "**EPA <u>will</u> initiate the process to promulgate that water quality standard itself**."   **[ECF No. 545, 18:25-19:1]** (emphasis added).   The deadlines for correcting deficiencies in the rule and in the statute are January 1, 2011 and July 1, 2011, respectively.

Since the January 1, 2011 deadline to correct deficiencies in the rule has now come and gone, it is now time for the EPA to adhere to its word and step into the role of advancing the water quality standard.   *See* **[ECF No. 545, 19:7-14]** (in the event of FDEP's failure to complete the process by January 1, 2011, "EPA is prepared to and, indeed, has already begun preparing for the process of promulgating the rule itself."). The EPA also represented at the December 17, 2010 hearing that ". . . with respect to water quality standards, the Amended Determination is mandatory."  *Id.* at 19:15-16. The EPA explained that "the ultimate level of water quality that we want to see in the receiving waters of the Everglades . . . is not directly applicable or enforceable against dischargers."  *Id.* at 22:7-10.  According to the EPA, this requires a multi-step process

wherein the water quality standard must be translated into an effluent limitation or QBEL to be incorporated into a permit.

FDEP also urges that I "direct the parties to regard EPA's WQBEL as guidance to FDEP concerning the general approach to be considered in deriving a proper WQBEL through established State-law procedures." **[ECF No. 539, p. 11]**.  Indeed, in December 2010, FDEP indicated that "[it] would initiate its WQBEL development process **within the next few weeks**, and would pursue it to completion **as promptly as possible**.  The Department had been working for **several years** toward development of a WQBEL for phosphorus discharges to the Everglades." *Id.* (emphasis added).  FDEP also noted that "in its EFA permit for STA-1E and STA-1W, issued November 2007, the Department had committed to establishing a WQBEL by ***December 31, 2010***, and had been working with EPA, the District and other interested stakeholders in early 2010 to develop a WQBEL prior to that date." *Id.* (emphasis in original; footnote omitted).

## 2.  Discharge limit – water quality based effluent limitation ("WQBEL")

As defined in the Florida Administrative Code, "'[w]ater quality based effluent limitation' ("WQBEL") means an effluent limitation, which may be more stringent than a technology-based effluent limitation, that has been determined necessary by the Department to ensure that water quality standards in a receiving body of water will not be violated."  F.A.C. § 62-650.200.[33]  This discharge limit is the effluent limitation that applies to the STAs before they discharge into the receiving bodies in the Everglades.

---

[33] As discussed in the July 29, 2008 Summary Judgment order, the Amended EFA extended the applicable compliance date while simultaneously lowering the state water quality standards by compliance with the Long-Term Plan and TBELs.  *See* **[ECF No. 323 pp. 45-46]**.

In order to directly apply and enforce the 10 ppb water quality standard to dischargers, the water quality standard must be converted to a QBEL.  The QBEL must then be included in a permit, which would be directly applicable to those discharging pollutants into the Everglades.  Enforcement of the WQBEL, vis-à-vis permits, can occur through such means as citizen suits or by the EPA and FDEP.[34]

As noted in the July 29, 2008 Summary Judgment Order, TBELs are less restrictive than the WQBELs.  **[ECF No. 323, pp. 47-48]**.  By requiring permits to include TBELs, the Amended EFA essentially allowed for issuing permits through 2016, even if neither the narrative nor the numeric phosphorus criterion is met so long as there was compliance with the Long-Term Plan and implementation of TBELs.  *Id.*  As I found in that order, the change in compliance schedule and criteria amounted to changes in state water quality standards—along with an admission that discharges would exceed 10 ppb.  *Id.* at p. 48 (citing Fla. Stat. § 373.4592(3)(b) (2003)).  The CWA requires imposition of WQBELs when TBELs are inadequate.  33 U.S.C. § 1312(a); 40 C.F.R. § 122.44(d).

On March 1, 2011, the Technical Oversight Committee ("TOC")—formed as a result of the July 11, 1991 Settlement Agreement in Case No. 88-1886—held a

---

[34] For example, pursuant to Section 309(a)(3) of the CWA, the EPA may "issue an order requiring such person [in violation of the CWA] to comply with [the CWA], or . . . bring a civil action in accordance with subsection (b) of this section."  33 U.S.C. § 1319(a)(3).  Pursuant to Section 309(b), the EPA may file a civil action seeking injunctive relief for violations of the CWA or penalties pursuant to Section 309(d).  *See also* 33 U.S.C. § 1319(g) (discussing EPA's ability to assess administrative penalties for violations of the CWA or a permit issued thereunder).  In addition to the EPA's potential remedies, citizen suits are authorized pursuant to 33 U.S.C. § 1365 against those who are "alleged to be in violation of (A) an effluent standard or limitation . . . ."  33 U.S.C. § 365(a)(1).

Quarterly Meeting.[35]  In its own words, "[t]hough TOC does not bind any party or person as an independent authority, it does provide a public forum to evaluate technical information, particularly as it relates to water quality management and compliance tracking in the Everglades Protection Area."[36]  During the TOC's March 1, 2011 meeting, the Everglades National Park representative motioned "for the TOC to recommend the FDEP 'adopt, as the maximum annual discharge limit for the Refuge, the Water Quality-Based Effluent Limit identified in the USEPA's Amended Determination, dated September 3, 2010.'"[37]  Following discussion and presentation, the TOC did not pass the motion to recommend that FDEP adopt the WQBEL in the EPA's Amended Determination.

At the December 17, 2010 hearing, the EPA represented that "[it] has determined that if dischargers comply with that QBEL [identified by the EPA in the Amended Determination] at the end of the pipe that **we will be able to achieve the water quality standard** and, in particular, **the discharges from those effluent sources will not cause exceedances of the water quality standard**."   **[ECF No. 545, 22:15-24]** (emphasis added).

---

[35]       Everglades        Technical        Oversight        Committee, http://my.sfwmd.gov/portal/page/portal/xweb%20about%20us/toc (last visited April 25, 2011).   The purpose of the TOC is "to review and recommend applied research, monitoring and compliance conducted pursuant to the terms of the Settlement Agreement and to consider technical advice and assistance from consultants and appropriate state and federal agencies regarding Everglades Program activities."  *Id.*

[36] *Id.*

[37] *See* SFWMD Library & Multimedia, March 1, 2011 Meetings Archive, Minutes, http://my.sfwmd.gov/portal/pls/portal/portal_apps.repository_lib_pkg.repository_browse?p_keywords=tocmeeting20110301&p_thumbnails=no.

F.      Permitting authority

The Eleventh Circuit has held that a district court's decision to vacate permits under the Administrative Procedures Act is not an abuse of discretion where the original decision to grant the permits is arbitrary and capricious.  *See Sierra Club v. Van Antwerp*, 362 Fed. Appx. 100, 107 (11th Cir. 2010) ("After finding that the Corps's decision to grant the permits was arbitrary and capricious, the district court vacated the permits.  We find that the district court did not abuse its discretion under the APA by vacating the permits.").  Indeed, where a court has determined that an agency has failed to act, the court may declare as such and instruct the agency to take certain action. *See Sierra Club v. Strock*, 495 F. Supp. 2d 1188, 1208 (S.D. Fla. 2007) ("To be clear, this Court is not dictating what the agency's future decision should be; rather this Court has determined that the agency has failed to perform its important duties.").  The CWA requires that the EPA act where the states have failed to do so.  See *Hankinson*, Sierra Club v. Hankinson, 939 F. Supp. 865, 871-72 (N.D. Ga. 1996 ("the [CWA] requires EPA to step in when states fail to fulfill their duties under the Act.") (citations and quotations omitted).

As a preliminary matter, the Memorandum of Understanding between the EPA and FDEP sets forth that:

> EPA acknowledges that the FDEP has no veto authority over acts of the Stale legislature and therefore reserves the right to initiate procedures for withdrawal of the State NPDES program approval in the event that the State legislature enacts any legislation or issues any directive which substantially impairs the FDEP ability to administer the NPDES program or to otherwise maintain compliance with NPDES program requirements.
>
> **[ECF No. 468-1, p. 29]**.

50

Discharges under Florida law, including under the 1994 EFA and the Amended EFA, are governed by permits. The permits at issue are those that have already been issued—which I found not to comply with the CWA—and now need to be conformed. The permits are the key for enforcing and carrying out the mandates of the CWA. In order to initiate the permitting procedure, FDEP had to submit draft permits to the EPA pursuant to the Memorandum of Agreement between the EPA and FDEP.

The permits are the crux of the system involving the 10 ppb water quality standard, the applicable QBEL, and ultimately, enforcement of the permits. In order to effectuate the goals of preserving the Everglades, valid and enforceable permits must <u>immediately</u> be put into place. Pursuant to my order requiring supplemental briefing, the EPA filed a submission indicating that one of two options includes that "the Court to declare that FDEP's filing of sample permit documents on November 2, 2010 constituted the submission of draft permits to EPA, thus triggering EPA's review process." **[ECF No. 554, p. 3]**. The EPA also suggests that I can (again) "order FDEP to comply with [the] April 14 Order by submitting draft permits to EPA in accordance with the MOA, which would then trigger EPA's review of the permits, objections if appropriate, and assumption of authority to issue the permits if EPA's objections are not adequately addressed by FDEP." *Id.* **I decline to take the EPA's second suggested route, and instead proceed with the first option "deeming" the permits submitted to best move the permitting process along in accordance with the objectives of my prior orders and the Amended Determination.**

FDEP has presented a situation in which the parties remain in "limbo" because FDEP's position is that its filed permits are for informational purposes only and do not constitute a submission to the EPA for the EPA's review.   The EPA sent correspondence advising FDEP that should I rule that the Department's submission constitutes draft permits submitted to for the EPA's review, the EPA preserved its rights to take the full 90 days to review.  *See* **[ECF No. 532, p. 91]** (Letter from Gwendolyn Keyes Fleming, EPA Regional Administrator, to Mimi A. Drew, FDEP Secretary (Dec. 2, 2010)).   Since the 90-day period would have begun on November 2, 2010 when the permits were submitted, the EPA would have had until January 31, 2011 to review the permits.   The EPA represented at the December 17, 2010 hearing that "EPA stands ready to do so within that period of time."  **[ECF No. 545, 29:12-24]**.

FDEP claims the EPA's federal permit scenario is unworkable because it would "consume an extraordinary amount of time and resources to work through the necessary federal administrative hearings, judicial review of EPA's objection, federal permit-issuance hearings, administrative appeals of EPA's permits and judicial review of decisions emanating from those appeals."  **[ECF No. 539, p. 16]**.  FDEP's suggested alternative is a state process because EPA and FDEP agree that State permits with AOs implementing case-by-case compliance schedules is lawful.  FDEP points to the following benefits for a State process:   final permits with firm effluent limits, fully enforceable interim obligations and milestones, shorter period of time to produce permits and results.

However, FDEP's alternative to use a state process does not solve the issues addressed in my original April 14, 2010 Order.  Since AOs relieve the District from having to immediately comply with the otherwise applicable WQBEL identified in the permits, there is no guarantee SFWMD will take actions to work toward achieving the milestones set forth in the Amended Determination.

Through my exercise of equitable and inherent powers, and as a sanction for the State's non-compliance, I determine that it is necessary for the EPA to act under its authority to review the permits and initiate the long-delayed procedure of reviewing permits to conform to the CWA.  The failure to use good faith to effectuate the mandates of this Court's prior orders and the Amended Determination is unacceptable.  Since the EPA has represented that it was prepared to object to the permits, I find that the most efficient way to move forward is to **deem the permits submitted for purposes of the EPA's review**.  Indeed, Friends has demonstrated that review of FDEP's submitted permits is possible.  *See* **[ECF No. 558-1]** (Expert Report of Thomas E. Lodge, Ph.D., CEP comparing conformed NPDES permit offered by the EPA in Attachment I of the Amended Determination and the corresponding permit submission by FDEP).[38]  Further, according to the EPA, "issuance of NPDES permits is not subject

---

[38]  In particular, Dr. Lodge's report reveals that the FDEP omits specific language relating to compliance with the narrative phosphorus standard in the version it filed.  The report indicates that "[o]mitting reference to the specific rule and the narrative standard for causing an imbalance of natural populations of flora and fauna significantly reduces protection of the Everglades."  **[ECF No. 558-1, p. 3]**.  Further, the report notes that FDEP omitted language regarding submission of Total Phosphorus samples to assess whether facilities are operating within the operational envelope in order for the District to review potential causes of exceedances in annual inflow volumes or phosphorous loads.  *Id.* at p. 4.  According to the Report, in omitting such language, it is thus

to the state-law 'reasonable assurance' constraint." **[ECF No. 530, p. 23]**.  The EPA has gone as far to state that it "could issue permits that require immediate compliance with the WQBELs <u>without</u> adopting compliance schedules."  *Id.* (emphasis added).  With this framework in mind, the EPA's oversight of the permits should not be hindered by the FDEP's reasonable assurance argument because such concerns can be addressed by both FDEP and the EPA following review of the permit documents which have been filed with this Court.

The EPA's position is that it is necessary to arrive at a point where final and effective permits exist so that they can be enforced.  At the December 17, 2010 hearing, the EPA suggested that the EPA, the United States through the Justice Department, citizens through citizen suits, or FDEP could bring actions to enforce the permits **[ECF No. 545, 18:13-16]** through a variety of "enforcement tools" such as administrative enforcement, judicial enforcement, civil penalties, and injunctive relief.  *Id.* at 23:19-20. I determine that the permitting procedure is most appropriate through the means of the EPA at this juncture.

### G.      Failure to comply with April 14, 2010 Order

I could not have said it clearer in my April 14, 2010 Order that I enjoined FDEP from certain conduct and required the EPA to direct FDEP to undertake certain processes to achieve compliance with the water quality standards under the Clean Water Act.  I unequivocally ordered the EPA to direct the State to take specific action. The State's response was to assert that it cannot take the action as required and thus,

---

"impossible to determine whether the STA is operating within or outside of the operational envelope." *Id.*

to fail to fully comply with my prior Orders.  Accordingly, now I must further use the equitable inherent powers as described *infra* and in my prior orders to put into the EPA's hands the steps to move forward.

### 1.    Conform existing permits by November 2, 2010

In particular, with regard to conforming the existing NPDES permits, the April 14, 2010 Order required that:

> The EPA, in its Amended Determination, shall direct the State of Florida to **conform all NPDES permits for STAs I , 2, 3, 4, 5 and 6** — along with the accompanying Administrative Orders and Everglades Forever Act permits listed in Attachment A to this Order — **to the Clean Water Act, the Summary Judgment Order and this Order so as to eliminate all reference to the non-conforming elements of the Long-Term Plan**, the moderating provisions and the extended compliance schedule through 2016, and to **require compliance with the phosphorus narrative and numeric criterion in a manner consistent with the Clean Water Act and the forthcoming Amended Determination.  All such permits shall be conformed not later than sixty (60) days of the date of the Amended Determination <u>and</u> shall be promptly filed with this Court.**

**[ECF No. 404, p. 46 ¶ 3]**.

Accordingly, the April 14, 2010 Order unambiguously required the permits <u>to be conformed</u> within sixty days of the EPA's Amended Determination.  In its Amended Determination, the EPA instructed the State to comply with my prior order and provided "specific direction as to what should be included in those permits."  On November 2, 2010, in accordance with the time requirement of sixty days after issuance of the Amended Determination, FDEP filed a Notice of Filing Conformed Permit Documents. **[ECF No. 512]**.  FDEP also provided the documents to the EPA, but advised the "sample permit documents" were "not being submitted for any action" and were "for informational purposes only."  **[ECF No. 530-4]**.  As Friends has pointed out, **the**

documents filed by FDEP **are not reflective of the requirements as set forth in the EPA's Amended Determination**.  *See* **[ECF No. 558, p. 7]** (citing Expert Report of Thomas E. Lodge, Ph.D., CEP **[ECF No. 558-1]**).

### 2.    Amend Phosphorus Rule by January 1, 2011

The April 14, 2010 Order similarly required the EPA on remand to "require the State of Florida to commence and complete rule-making for the Phosphorus Rule within 120 days from the date of the Amended Determination[.]"  **[ECF No. 404, pp. 44-45 ¶ 1]**.  In the EPA's Amended Determination, consistent with this requirement, the EPA specifically required that:

> FDEP is directed to complete its rulemaking by January 1, 2011.  If FDEP has not finalized revisions to the Phosphorus Rule consistent with Attachment E by this date, USEPA will initiate rulemaking to promulgate the necessary revisions pursuant to CWA section 303(c) consistent with the Court's 2010 Order (at 44 - 45).

**[ECF No. 458-1 § II]**.

As of the date of entry of this Order, it is not clear that the State has completed the rulemaking as required by the April 14, 2010 Order and the Amended Determination.  Nor is the Court aware of the EPA initiating its own rulemaking procedures now that the January 1, 2011 deadline—much like many other time limits set in this case—has elapsed.[39]

---

[39] The Amended Determination also required FDEP to submit its first annual report on March 1, 2011 summarizing "TP water quality, vegetation, and soils data from each transect monitoring site.  The report must provide a summary of whether the TP conditions at each site are improving, worsening, or remaining unchanged." **[ECF No. 458-1, p. 48]**.  It is not clear whether FDEP prepared this report.

### H.    Rule 60(b) Motion

#### 1.    Partial withdrawal of NPDES permitting program with a new injunctive provision that would apply after existing permits have been conformed

Friends does not oppose the requested relief sought in Sections II and III of the EPA's Rule 60(b) motion and focuses on the permitting requirements in Section I.  *See* **[ECF No. 468]**.  The same is true for FDEP, which argues that I lack jurisdiction to grant EPA's requested relief.  **[ECF No. 466]**.  New Hope does not address the EPA's request to modify Attachments B and C.  **[ECF No. 469]**.  The Tribe opposes all three portions of the relief sought.  **[ECF No. 467]**.

The EPA seeks a new injunctive provision that would apply after existing permits have been conformed pursuant to paragraph 3 of the Amended Determination.  The process envisioned by the EPA operates as follows:  With respect to any <u>new or modified</u> NPDES permits for STA discharges, the State must submit such permits or permit modifications prepared for proposal to EPA for review and, if necessary, correction prior to proposal.  The State, after receipt and consideration of public comment, submit any such permit to EPA for its review under CWA section 402(d).  EPA must then exercise its existing statutory authority to review those permits for compliance with the Clean Water Act, implementing regulations, the Court's Orders, and the Amended Determination.  If the EPA determines that such permit would fall "outside the requirements and guidelines" of the CWA as provided by CWA section 402(d), and the EPA objects to those permits, the authority to issue such permit would transfer to

the EPA, unless the EPA has notified the State in writing that it has promptly and adequately responded to EPA's objections.

In support of the proposed alternative structure, the EPA claims that it lacks statutory authority to effectuate a partial withdrawal of a NPDES permit program limited to one specific geographic area. **[ECF No. 446 § I.A]**. CWA Section 402(c)(4) provides that the EPA can lawfully withdraw Florida's authority to issue permits for the STAs only if it withdraws Florida's *entire* permitting program. *See* 33 U.S.C. § 1342(c)(4)(A) ("a State partial permit program approved under subsection (n)(3) of this section only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn[.]"). Based on the EPA's assurances that "[its] approach would leave <u>intact</u> and would not affect the Court's injunctive approach as described in paragraph 3 of section III.D of the April 14 Order **[ECF No. 404, pp. 45-46]** for existing permits, including the deadline for achieving conformance 60 days after EPA issues its Amended Determination[,]" I remind the EPA that it has set forth its commitment toward implementing the goals as delineated in the Amended Determination.

### 2.    Modify Findings of Fact "that appear to equate the 10 ppb water quality criterion for phosphorus in the Everglades with WQBELs"

The EPA requests that I modify Finding of Fact No. 4 **[ECF No. 404, p. 3]** "to the extent that it mistakenly equates the WQBELs needed to ensure compliance with the phosphorus criterion with the criterion itself." **[ECF No. 446, p. 16]**. Specifically, the EPA seeks modification to add the following language in boldface type:

4. To protect the Everglades from further significant environmental degradation, it is essential that discharges into, and within, the Everglades

Protection Area not **result in an** exceed**ance of the phosphorus water quality standard of** 10 parts per billion ("ppb").   In federal Clean Water Act terms, **the "WQBELs" are the** water quality based effluent limitations **necessary for discharges not to cause a violation of the 10 ppb water quality standard**.  *See* note 5, *infra*. The STAs currently do not meet this vital need.   At best, the State of Florida and EPA anticipate that, in 2016, the STAs may be operating with technology based effluent limitations ("TBELs"), which provide significantly less protection.

**[ECF No. 446, p. 16]** (proposed additional text in boldface).

The 10 ppb figure was derived from numerous determinations and findings that have been made a part of the record in this case.  *See e.g.*, **[ECF No. 323, p. 64]**.  Any limitations exceeding 10 ppb would not support the goal of balancing aquatic flora and fauna in the water body.  *Id.* (citing EPA Jan. 2005 Determination at 5).   Because I determine that the EPA must step into its role of overseeing the permitting process, and the EPA has represented that modifications in the Rule 60(b) relief are necessary to accomplish the objectives in the Court's prior orders and the Amended Determination, I modify this Finding of Fact for the purpose of facilitating the EPA's ability to initiate the permitting process.

### 3.    Modify Attachments B and C "to more closely track the 2008 Order Granting Summary Judgment and the April 14 Order"

Finally, the EPA requests modification of Attachments B and C to the April 14 Order.  **[ECF No. 446 § III]**.  Specifically, the EPA seeks to strike certain language and retain language previously stricken from the attachments to the April 14, 2010 Order. Because I determine that these modifications would not frustrate the overall purpose of the April 14, 2010 Order, and because I find it necessary for the EPA to use its available

resources to effectuate the Amended Determination to the best of its ability, these modifications are suitable as part of the overall suite of revisions the EPA seeks.

## I.      Motion for Entry of an Order Declaring Permits Null And Void

Friends seeks an order declaring the District's permits null and void on the grounds that the Department failed to conform the Permits as required by my prior orders.  **[ECF No. 533, p. 1]**.  According to FDEP, "absent a ruling from this Court that the Department is not prohibited from utilizing an Administrative Order ('AO') or alternative method of providing 'reasonable assurance' of the permittee's compliance with the permit, the Conformed Permit Documents can ***not*** be issued under Florida law." **[ECF No. 552, p. 3]** (emphasis in original; citing **[ECF Nos. 512, 539]**).  FDEP refers to its filing as a Notice of Filing Conformed Permit Documents **[ECF No. 512]**.  However, these are actually not permits but rather suggestive, informative, and "drafts."  Accordingly, the Tribe indicates that FDEP has not complied with my order.  Because I determine that there is a preferable route to expediting the permitting process by deeming the permits submitted for purposes of the EPA's review, I find that there is no need to grant Friends' motion.

As I stated at the December 17, 2010 hearing, permits—and specifically the act of conforming permits in order to fulfill the requirements of my prior orders—are the key to this case.  *See* **[ECF No. 545, 24:15-18]** ("Let's get to the heart of the matter and, that is, the issue of conforming permits and making them enforceable which is what [EPA] told [the Court] is the crucial step that we need to address.").  My prior order was abundantly clear in requiring EPA to direct FDEP to conform the permits within 60 days.

In order to achieve the goal of conforming permits, the EPA has set forth two avenues to obtain final, effective and enforceable permits—with and without compliance schedules. *See supra* § XII.C.  In light of these two proposals, I was unambiguous at the December 17, 2010 hearing when stating that

> At some point or another, I need to make clear and through some means . . . that it's this Court's position that I'm going with Option 1 because I foresee that just like the litigation that the Water Management District has started yesterday, everything that is going to happen within a state process is going to result in interminable time delays which have to run their course before EPA can act.

**[ECF No. 545, 26:11-18]**.

The Department characterizes Friends' Motion as one that seeks a "contempt finding against the Department."  **[ECF No. 552, p. 2]**.  The Department cites the Compliance Order to argue that I did not require the Department to "*issue* conformed permits," but rather merely indicated that the permits needed to be "*filed*," which the Department has done.  *Id.* at 2, fn. 2 (emphasis in original).  The Department argues that it cannot issue the conformed permit documents under Florida law because it lacks "reasonable assurance" of the permittee's compliance with the permit.  I disagree with the Department's claim that "the most expeditious and efficient means to establish enforceable effluent limitations for discharges to the Everglades is for the State to maintain primary permitting authority over the STAs."  *Id.* at p. 4.

The EPA states that "there is no present need for the Court to declare the State permits invalid.  As discussed at the December 17, 2010 hearing, other orderly and defensible procedures exist to move the permitting process forward."  **[ECF No. 553, p.**

2].[40]  I agree and the reason I decline to enter an order declaring them null and void is so they can be considered immediately reviewable and so the process may proceed swiftly.

Consistent with my April 14, 2010 Order, wherein I concluded that the State's violation of the Summary Judgment Order and consistent disregard for the requirements of the CWA in the Everglades required "responsibility for CWA compliance through the issuance of NPDES permits be returned to the EPA until such time as the State of Florida is in full compliance with the CWA," this remains the case today.  The permits cannot go through the State system, for they will be forestalled and they will not comply. The EPA, however, has represented that it will be able to effectively carry out the permitting system to the stage it needs to be in for preservation of the Everglades.

The EPA noted at the December 17, 2010 hearing that if I clarify or confirm my order requiring FDEP to submit permits to EPA for review, "[F]DEP should send all of the documentation that's required under the regulations and memorandum of understanding that is supposed to accompany a draft submission to EPA so that are no further hiccups in the process."  **[ECF No. 545, 50:3-9]**.

Because I determine that the permits have been deemed submitted, it is unnecessary for me to conclude that they are null and/or void.  The wheels have been

---

[40]  At the December 17, 2010 hearing, Friends suggested that considering FDEP's noncompliance with the April 14 Order, it may be appropriate to find that it is EPA's burden to respond without requiring any determination by the Court of whether the permits are drafts or in compliance with the Amended Determination.  *See* **[ECF No. 545, 38:13-39:2]** (citing **[ECF No. 484, fn. 3]**; *see also* **[ECF No. 545, 39:13-14]** ("So it would be directing the EPA to do no more than what it said it would do in its Amended Determination.").

set in motion, and the EPA is now obligated under its very own rules to initiate the permitting procedure of review, public comment, etc.

### J.      Motion to Add SFWMD as a Party

In my April 14, 2010 Order, I noted that

> I leave for another day, as may be necessary, to address the Court's power to impose coercive fines, including attorney's fees, to enforce its orders, and to determine if, and when, it is necessary to bring the South Florida Water Management District into these proceedings through the All Writs Act, 28 U.S.C. 1651.  Such action may be necessary in the event the South Florida Water Management District takes actions in redistributing resources which preclude the construction of necessary facilities to meet phosphorus criterion, or, following the issuance of this Order, continues to govern itself by the extended 2016 compliance schedule and the invalidated provisions of the Phosphorus Rule in requesting NPDES permits.

**[ECF No. 404, fn. 35]**.

Friends has now moved to join the District as a party pursuant to Federal Rule of Civil Procedure 21.  *See* **[ECF No. 497]** (Notice of Service of Motion to Add South Florida Water Management District as a Party upon counsel for SFWMD).   As discussed *supra* § II, Plaintiff Miccosukee Tribe has joined in this motion.  **[ECF No. 507]**.

### 1.      SFWMD's response to Amended Determination

The Director of the SFWMD wrote two letters to EPA officials, both dated November 2, 2010.[41]   SFWMD claims that "EPA was not provided sufficient time to

----

[41] The Director also addressed correspondence to this Court dated September 30, 2010 which essentially states the accomplishments of the State and the District while noting that the projects and schedules in the Amended Determination are "not achievable within our existing revenue streams."  **[ECF No. 498, p. 5]**.  *See also* **[ECF No. 527-1]** (Letter from Gwendolyn Keyes Fleming, EPA Regional Administrator to Carol Wehle,

perform a comprehensive planning process" and encourages EPA to "allow for flexibility and adaptive management so that additional and appropriate planning and modifications **can be made over time.   It is possible that new technology, partnering opportunities or other optimization efforts will be identified interest he future that would warrant plan adaptation.**"   **[ECF No. 514-1, pp. 4-5]** (emphasis added).  This appears to be yet another excuse to cause further delay.[42]

In the second letter, SFWMD "declin[es] the opportunity to provide an alternative proposal for achieving the water quality targets devised by the federal government for Florida's Everglades.  In the end, the District was unwilling to accept the undue and unreasonable financial burden that EPA's $2 billion proposal places on South Florida's taxpayers."  **[ECF No. 517-1, p. 1]**.  Essentially, SFWMD points to financial constraints as a reason why the Amended Determination cannot be implemented.[43]

---

SFWMD Executive Director (Nov. 26, 2010) responding to SFWMD's correspondence declining to submit alternative remedies).

[42] As Judge Moreno noted during the October 21, 2010 hearing in Case No. 88-1886, if the parties constantly await new or improved technology, there will be little likelihood of actual progress.

[43] This concern is reiterated in recent correspondence from the District to the EPA.  *See* **[ECF No. 581-1, p. 3]** (discussing estimated cost of STAs "between $1.5 to $2 billion to South Florida taxpayers" and describing the District as "experiencing a collapse in tax revenues due to South Florida's economic and property value declines").   Friends submitted a report regarding the District's financing capacity, which New Hope has moved to strike.  *See* **[ECF Nos. 534-2, 537]**.  The Report was prepared in response to the November 2, 2010 letter from the Executive Director of the SFWMD to the EPA wherein the District argues that it lacks the capacity to finance the projects that the EPA has determined are necessary to achieve compliance with the CWA.  **[ECF No. 534-2]**.

### 2.    Applicable law

Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  "Dropping or adding a party to a lawsuit pursuant to Rule 21 is left to the sound discretion of the trial court."  *Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1045 (11th Cir. 1986) (citing *Williams v. Hoyt*, 556 F.2d 1336, 1341 (5th Cir. 1977), *cert. denied*, 435 U.S. 946 (1978)).  "But [Rule 21] no more permits joinder of parties, than [Rule 15(d)] permits the supplementation of the record, in the circumstances here: after the trial is over, judgment has been entered, and a notice of appeal has been filed."  *Summers v. Earth Island Inst.*, 555 U.S. 483 (2009).

### 3.    Analysis

I recognized the ability to bring the SFWMD into these proceedings pursuant to my authority under the All Writs Act, 28 U.S.C. § 1651, in my prior order, and Friends accurately notes that the language of Rule 21 indicates that I may add a party "at any time."  With the framework of the All Writs Act and Rule 21 in mind, several factors guide my determination that adding the District as a party to this action is inappropriate at this time.  In reviewing the pertinent actors in this case, it is clear that SFWMD must play a serious role in this matter.  Friends points out that "the District, as it points out in its Petition to the Eleventh Circuit, is 'statutorily-mandated' to be a full participant in Everglades restoration including in the development and implementation of the Comprehensive Everglades Restoration Plan."  **[ECF No. 477, p. 5]** (citing District's Petition for Writ of Prohibition or Mandamus to the District Court at 22 and Water

Resources Development Act of 2000, Public L. No. 106-541, 114 Stat. 2572 & Fla. Stat. §§ 373.1501-1502).  I also agree with the Tribe's statement that "the District is in a position to frustrate the implementation of this Court's Summary Judgment Order and, more importantly, its April 14, 2010 Compliance Order." **[ECF No. 507, p. 4]**.

Friends' Notice of Non-Opposition to its Motion to add SFWMD as a Party indicated that no responses or objections were served to the Motion by any party, Intervenor, or by the District even though the District provided the Court with a response to EPA's Amended Determination. **[ECF No. ¶ 4]** (citing **[ECF No. 501]**).  Indeed, at the Court's invitation, counsel for the District, along with the Executive Director of the District, were present at the December 17, 2010 hearing.  *See* **[ECF No. 9:15-10:1]**. Counsel indicated that the Executive Director was present "for the limited purpose of responding to the Court's personal invitation and to assist the Court in any way she can within her means." *Id.* at 10:2-4.  Counsel noted that the District has not been served nor been made a party to the instant proceeding. *Id.* at 10:4-7.

However, to add SFWMD as a party to this litigation would be unfitting at this time.  This case was closed by entry of final judgment on July 29, 2008 following my order granting summary judgment.  **[ECF No. 324]**.  As the Miccosukee Tribe acknowledges in its joinder to Friends' Motion to Add SFWMD As a Party, the District was never named as a defendant to this action. **[ECF No. 507, p. 2]**.  Further, the Tribe recognizes that judgment has already been entered in this case.  *Id.* at pp. 1, 3.  The parties have filed various appeals which are currently pending.  The District is also

66

undergoing its own internal changes, which I strongly hope will not forestall preservation of the Everglades any longer.[44]

Given the current status of this closed case, the fact that various appeals are pending, and my indication that the EPA will have to pursue further enforcement actions in the event that the objectives as outlined in the Amended Determination are not executed, I determine that it is not necessary to add the District as a party in the instant matter at this stage.  It is clear that the District must be involved in implementing the forthcoming measures as they relate to the Everglades.  I also note that despite its status as a non-party to this action, the District has agreed to meet with representatives of the EPA.  One can only hope that this is the beginning of a series of cooperative measures between the District, the EPA, and others whose role is necessary in the restoration of the Everglades.

### K.    Motion for Clarification of Compliance Order

FDEP filed a Motion for Clarification of the Compliance Order seeking clarification "that the Compliance Order is not intended to prohibit the Department from using Administrative Orders ('AOs') to establish case-specific compliance schedules,

---

[44] For example, recently, on April 14, 2011, Carol Wehle, executive director of the SFWMD, announced she will be leaving the SFWMD.  Christine Stapleton and Joel Engelhardt, *Water District Chief Carol Wehle Announces Sudden 'Retirement'*, MIAMI HERALD, April 13, 2011, http://www.miamiherald.com/2011/04/13/2166381/water-district-chief-carol-wehle.html#ixzz1JVVPj9Fq.

Similarly, the resignation (effective February 12, 2011) of Peter Silva, who appeared on behalf of the EPA at the December 17, 2010 hearing as the Assistant Administrator, should not hinder the EPA's overall responsibility for implementing the directives in the Amended Determination.  Indeed, the EPA "assures the Court that Mr. Silva's recently-announced departure (effective February 12, 2011) has no bearing on this case or on EPA's continuing efforts to achieve water quality standards in the Everglades Protection Area as expeditiously as possible."  **[ECF No. 572, p. 2]**.

which are necessary for the Department to have the reasonable assurance required to issue conformed permits pursuant to Florida law." **[ECF No. 573, p. 2]**.  FDEP's position is that if I confirm that the April 14, 2010 Order "does not prohibit the use of AOs to enforce compliance schedules, the Department will begin the administrative process and notice the draft permits containing EPA's WQBEL." **[ECF No. 566, p. 3]**. FDEP then describes the administrative process of finalizing the draft permits following notice and comment, opportunity for public hearings, and any administrative challenges or judicial review.  *Id.*  However, notably, FDEP acknowledges that "**[t]he same process and outcome would result from EPA's issuance of federal permits**, although EPA's process in all probability would take longer to achieve final permits and compliance schedules." *Id.* (emphasis added).

The Tribe argues that clarification is unnecessary because both the Summary Judgment Order **[ECF No. 323]** and the Compliance Order **[ECF No. 404]** unambiguously prohibit the use of the extended compliance schedules that DEP seeks to implement here, which violate the Clean Water Act. **[ECF No. 576]**.[45]  The Tribe is correct.  I have unambiguously set forth in these two key prior orders that the use of Administrative Orders is improper as they are used to further delay deadlines that have already been extended and re-extended on various occasions.  For example, as the Tribe recognizes, I stated in the April 14, 2010 Order that:

> Here, the State of Florida has failed to fulfill its duties under the Act by issuing NPDES permits that do not comply with the Clean Water Act and its implementing regulations.  As such, the NPDES permits – **including the AOs – must be "override[n]" and/or modified as necessary to**

---

[45] Friends' Response to FDEP's Motion for Clarification **[ECF No. 579]** joins in the responses filed by the Tribe **[ECF No. 576]** and the EPA **[ECF No. 577]**.

**ensure compliance with the Act**. *Miss. Comm'n on Natural Resources*, 625 F.3d at 1276 ("EPA can override state water quality standards by changing the effluent limits in NP[D]ES permits . . . "); *see also Hankinson*, 939 F. Supp. at 871-72.  While I leave the specific "substance and manner of achieving [CWA] compliance entirely to the EPA," *Alaska Center for Environment v. Browner*, 20 F.3d 981, 986-87 (9th Cir. 1994), compliance must be achieved, and it appears to this Court that doing so will require the **modification (or termination and re-issuance) of the violative NPDES permits (and AOs)**.

**[ECF No. 404, p. 39]** (emphasis added).

It is also necessary to distinguish the use of Administrative Orders for existing NPDES permits (and their accompanying Administrative Orders as identified in Attachment A to the April 14, 2010 Order) and the use of Administrative Orders going forward for issuing new permits.  It appears that FDEP seeks clarification regarding the latter.  For the sake of providing clear and express direction to all parties, I address the use of AOs in both the existing permits that must be conformed and any future permits to be issued.

As the Tribe properly notes, my prior order expressly prohibited the State from using Administrative Orders to prolong necessary compliance with the CWA.  *See* **[ECF No. 404, p. 24]** ("I did not, and will not, allow the State of Florida to create a blanket variance through the guise of a 'compliance schedule' set forth in AOs without following the procedure required under the Clean Water Act and its implementing regulations."). FDEP cites language of my April 14, 2010 Order as a basis for arguing that I authorized the use of Administrative Orders.  *See* **[ECF No. 573, pp. 3-4]** (citing **[ECF No. 404, p. 23]**.  However, the FDEP ignores the very next sentence following the language of the April 14, 2010 Order which it cites, in which I noted that "[i]n this case, the compliance

69

deadline the EPA approved as reasonable **ended** on December 31, 2006." **[ECF No. 404, p. 23]** (emphasis in original).  As set forth in Paragraph 4, I required the EPA in the Amended Determination to

> . . . immediately initiate and carry out its authority under Section IX of the Memorandum of Understanding to withdraw approval of the State program **pertaining to the issuance of any <u>new</u> NPDES permits** for discharges into, or within, the Everglades Protection Area, **or for any further modifications to <u>existing</u> NPDES permits (including through State of Florida Administrative Orders)** – other than to carry out the requirements of Paragraph 3, above – until such time as the State of Florida is in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order, and the forthcoming Amended EPA Determination.
>
> **[ECF No. 404, p. 46]** (emphasis added).
>
> Similarly, the April 14, 2010 Order also enjoined the FDEP
>
> . . . from issuing any **new NPDES permits, or modifications to existing NPDES permits – through State of Florida Administrative Orders,** Everglades Forever Act permits or otherwise – for STAs that discharge into, or within, the Everglades Protection Area until such time as the State of Florida is found by the EPA and this Court to be in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, and this Order.  **All new Administrative Orders and Everglades Forever Act permits issued under the laws of the State of Florida** must conform to, and comply with, the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order and the forthcoming Amended EPA Determination.
>
> *Id.* at pp. 46-47 (emphasis added).

Moreover, as the EPA points out, the use of water quality standards variance (a position advocated by the Tribe) is similarly inappropriate to achieve the timely attainment of the WQBEL.  Relaxing the water quality standards, and correspondingly, the WQBEL, represents an approach that would only serve to delay the process of compliance with the water quality standards.  As such, to the extent that FDEP seeks to

use AOs to further delay the long-overdue December 31, 2006 compliance deadline approved by the EPA—whether in existing or new permits—such action is contrary to the directives of my prior orders.  To be abundantly clear, the instant Order specifically determines that based on the prior use—which may arguably be characterized as abuse—of Administrative Orders to prolong the time within which compliance with the CWA must occur, the use of Administrative Orders is expressly disapproved.

### L.    Motion to Strike

Okeelanta Corporation and New Hope Sugar Company filed a Motion to Strike Defendant EPA's "Response" to the Court's *Sua Sponte* Order of September 14, 2010 and Friends of the Everglades' Notice of Filing Expert Reports **[ECF No. 536]** and a Corrected Motion to Strike **[ECF No. 537]**.  As mentioned during the hearing, I appreciated the EPA's response **[ECF No. 530]** which was filed simultaneously with the entry of my second *sua sponte* order **[ECF No. 531]** and I found the EPA's response helpful and informative.  **[ECF No. 656, 24:7-9]**.  Indeed, it appears that the key issues were addressed following my *sua sponte* orders, especially with respect to the mechanisms by which I could lay groundwork for the permitting procedure to move forward.

On December 13, 2010, Friends filed a Notice of Filing Expert Reports, submitting expert materials "in partial response to the Court's Second *Sua Sponte* Order."  **[ECF No. 534]**.  Friends filed two expert reports, one responding to Dr. Iricanin's Technical Document Regarding the US-EPA's September 3, 2010 Amended Determination and a Report regarding the District's financing capacity in response to the

November 2, 2010 letter from the District to the EPA, alleging that the District lacks the capacity to finance the projects that the EPA has determined are necessary to achieve compliance with the Clean Water Act.  *Id.* at Exs. A & B.  I did not rely exclusively or heavily upon the expert reports to arrive at the conclusions contained within this Order, and the reports were submitted in "partial response" to my second *sua sponte* order which set forth a variety of issues that I wanted the parties to be prepared to address at the December 17, 2010 hearing.  In sum, I do not find that New Hope has provided an adequate basis for striking these reports.  The reports set forth additional background information that can serve as a basis for the parties to expand their discussions and efforts to comply with the Amended Determination and the CWA as a whole. Accordingly, there is no basis to grant New Hope's Motions to Strike as they pertain to the expert reports and especially as they seek to strike the EPA's response, and the Motions must be denied.

## XIII.   CONCLUSION

I am cognizant of the present and ongoing economic difficulties presently facing the parties and intervenors.  Based on Judge Moreno's recent order, this Court is well aware of the financial hardships facing efforts to preserve the Everglades.  In light of the release of additional funds as a result of the grant of the Rule 60(b)(5) relief in Case No. 88-1886, which the parties themselves recognize can be used to further the efforts to comply with the April 14, 2010 Order, there is opportunity to exercise resourceful judgment.

There is no possibility of reversing the damage that has been done to the Everglades, and there is only the chance to preserve what remains in its current state. This is nothing new to the parties.  I have set forth the extensive procedural history of this case and litigation over the Everglades, the utmost importance of the Everglades as a national treasure, and the dire need to act immediately in my prior orders.  *See e.g.*, **[ECF Nos. 323, 404]**.  I take this opportunity now to once again reiterate and incorporate by reference the significant efforts made in those orders to emphasize just how imperative it is for the parties to focus their efforts on making real and actual steps and act on their promises and representations.  In order to effectuate this Court's prior and final orders, and to avoid allowing the parties to frustrate any opportunities to do so, I have determined that a key component of this matter through the means of the permitting procedure, must now be a focus of the EPA.  To not find in this manner will simply amount to sanctioning the repeated failures of non-action by the parties.

The roots of the ongoing and enduring Everglades litigation originate from a period of over one quarter century ago.  This represents a serious need for the parties in this action—as well as non-parties with substantial interests in the future of the Everglades—to stop delaying.  It is now, and has been for a while, time to take concrete and substantial progress toward preserving the Everglades before this national treasure is permanently destroyed to the extent of irreparable destruction.

Based on the foregoing, it is hereby ORDERED AND ADJUDGED that:

1.     In  accordance  with  Federal  Rule  of  Civil  Procedure  62.1(a)(3),  upon consideration of Defendants' Rule 60(b) Motion for Modification of Injunction

**[ECF No. 446]** and the responses thereto, I enter an indicative ruling that would GRANT the Rule 60(b) Motion consistent with this Order and in accordance with the attached Indicative Order if the matter is remanded to me for that purpose by the United States Court of Appeals for the Eleventh Circuit.

2.    Friends of the Everglades' Motion for an Order Declaring the District's NPDES and EFA Permits Null and Void **[ECF No. 533]** is DENIED.

    a.    The "conformed permit documents" filed by Florida Department of Environmental Protection ("FDEP") on November 2, 2010 are deemed submitted for purposes of review under the Memorandum of Understanding entered into between the EPA and FDEP **[ECF No. 468-1]**.

    b.    The EPA is directed to review the permits filed by the FDEP and take all necessary action to conform the permits in accordance with the instant Order and the Court's prior orders **[ECF Nos. 323, 404]** and in conjunction with established procedures set forth under the Memorandum of Understanding entered into between the EPA and FDEP.

    c.    No later than **Friday, July 1, 2011**, the parties shall submit a Joint Notice of Compliance specifically detailing the steps that have been taken in accordance with the instant Order, the Amended Determination, and the Court's prior orders **[ECF Nos. 323, 404]**.  The Notice of Compliance shall include the EPA's description of its progress in effectuating the objectives set forth in the Amended Determination with specific explanations of what the EPA has done, what further action is necessary, and when such action

shall be accomplished.  The Notice of Compliance shall set forth upcoming deadlines and actions, provide a description of pertinent meetings or discussions between representatives of each party, and indicate whether the EPA intends to pursue an enforcement action against the State.  The Notice of Compliance shall include a detailed timeline of the procedures applicable to the State and EPA's actions in accordance with this Order.  The text of any legislative material referenced within the Notice of Compliance shall be appended thereto.

3.    The State of Florida Department of Environmental Protection's Motion for Clarification of the Compliance Order **[ECF No. 573]** is GRANTED.

a.    Consistent with the language of the instant order and this Court's prior orders **[ECF Nos. 323, 404]**, the Department's use of Administrative Orders to establish case-specific compliance schedules in issuing conformed permits is disfavored.

b.    The Department shall exercise all reasonable means to achieve reasonable assurance <u>without</u> the use of Administrative Orders and individual compliance schedules for National Pollutant Discharge Elimination System permits for discharges into the Everglades.

c.    The EPA, in reviewing all permits submitted by the Department, shall similarly refrain from approving use of Administrative Orders in conjunction with permits.  The EPA shall act consistent with the standards set forth in

the Memorandum of Understanding between the EPA and the State and within the EPA's permitting and reviewing authority.

4.    Friends of the Everglades' Motion to Add South Florida Water Management District as a Party **[ECF No. 477]** is DENIED.

5.    Okeelanta Corporation and New Hope Sugar Company's Motion to Strike Defendant EPA's "Response" to the Court's *Sua Sponte* Order of September 14, 2010 and Friends of the Everglades' Notice of Filing Expert Reports **[ECF No. 536]** is DENIED AS MOOT.

6.    Okeelanta Corporation and New Hope Sugar Company's Corrected Motion to Strike Defendant EPA's "Response" to the Court's *Sua Sponte* Order of September 14, 2010 and Friends of the Everglades' Notice of Filing Expert Reports **[ECF No. 537]** is DENIED.

7.    No dates or requirements set forth in this Order will be extended absent a stay from the Eleventh Circuit Court of Appeals.

DONE AND ORDERED in Chambers at Miami, Florida, this 26th day of April, 2011.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:    Counsel of record
       Kirk L. Burns, Counsel for South Florida Water Management District
       3301 Gun Club Road, MSC 1410
       West Palm Beach, Florida 33406
       **[courtesy copy sent from Chambers via U.S. mail]**