UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 04-21448-CIV-GOLD
(and consolidated cases)

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA, a federally-recognized
Indian Tribe; and FRIENDS OF THE
EVERGLADES,

          Plaintiffs,

v.

UNITED STATES OF AMERICA, *et al.*,

          Defendants.

_____/

## ORDER ON RULE 60(B) MOTION FOR MODIFICATION
## OF INJUNCTION FOLLOWING REMAND

THIS MATTER is before the Court upon Order of the Eleventh Circuit Court of Appeals, dated June 14, 2012 **[ECF No. 651]**, whereby the cause was remanded in part for the limited purpose of allowing the district court to enter the order granting EPA's motion for Fed. R. Civ. P. Rule 60(b) relief.   Following the remand, this Court requested the parties to further explain certain events which have occurred since I last held a status conference on January 12, 2012.   The parties have filed submissions regarding their respective positions on those events, which positions are of record as **Docket Entries 656 through 659**.   Having heard from the parties, I find no necessity to hold an additional status conference, which I previously set by Order dated June 21, 2012. Accordingly the status conference is hereby cancelled.

Upon consideration of Defendants' Rule 60(b) Motion for Modification of Injunction **[ECF No. 446]** and the responses thereto, oral argument presented at the hearing held on December 17, 2010, and the EPA's submission of January 14, 2011

and the responses thereto, the EPA's Rule 60(b) Motion is GRANTED.  The Court's

April 14, 2010 Order **[ECF No. 404]** is hereby modified as follows:

      1.      Finding of Fact 4 **[ECF No. 404, p. 3]** is revised as follows:

4. To protect the Everglades from further significant environmental degradation, it is essential that discharges into, and within, the Everglades Protection Area not ~~exceed more than~~ result in an exceedance of the phosphorus water quality standard of 10 parts per billion ("ppb"). In federal Clean Water Act terms, the ~~10 ppb standard is referred to as a~~ "WQBELs" are the water quality based effluent limitation ~~("WQBEL")~~s necessary for discharges not to cause a violation of the 10 ppb water quality standard. *See note 5, infra.*  The STAs currently do not meet this vital standard. At best, the State of Florida and EPA anticipate that, in 2016, the STAs may be operating with technology based effluent limitations ("TBELs"), which provide significantly less protection.

      2.      The following paragraphs of the injunctive relief **[ECF No. 404, pp. 44-47]**

      are revised as follows:

3.   The EPA, in its Amended Determination, shall direct the State of Florida to conform all NPDES permits for STAs 1, 2, 3, 4, 5 and 6 – along with the accompanying Administrative Orders and ~~Everglades Forever Act permits~~ listed in **Attachment A** to this Order – to the Clean Water Act, the Summary Judgment Order and this Order so as to eliminate all references to the non-conforming elements of the Long-Term Plan, the moderating provisions and the extended compliance schedule through 2016, and to require compliance with the phosphorus narrative and numeric criterion in a manner consistent with the Clean Water Act and the forthcoming Amended Determination. All such permits shall be conformed not later than sixty (60) days of the date of the Amended Determination and shall be promptly filed with this Court.

~~4. On remand, the EPA, in its Amended Determination, shall immediately initiate and carry out its authority under Section IX of the Memorandum of Understanding to withdraw approval of the State program pertaining to the issuance of any new NPDES permits for discharges into, or within, the Everglades Protection Area, or for any further modifications to existing NPDES permits (including through State of Florida Administrative Orders) – other than to carry out the requirements of Paragraph 3, above – until such time as the State of Florida is in full compliance with the Clean Water Act, its implementing regulations, the Summary Judgment Order, this Order, and the forthcoming Amended EPA Determination.~~

~~5. Other than to carry out the requirements of Paragraph 3, above, the FDEP is enjoined from issuing any new NPDES permits, or modifications to existing NPDES permits - through State of Florida Administrative Orders, Everglades Forever Act permits or otherwise – for STAs that discharge into, or within, the Everglades Protection~~ Area **until such time** ~~as the State of Florida is found by the EPA and this Court to be in full compliance with the Clean Water Act, its implementing regulations, the Summary~~

~~Judgment Order, and this Order. All new Administrative Orders and Everglades Forever~~ ~~Act permits~~ <u>Any new or revised NPDES permits and their associated administrative</u> <u>orders</u> issued under the laws of the State of Florida must conform to, and comply with, the Clean Water Act, its implementing regulations, the Summary Judgment Order, and this Order and the forthcoming Amended EPA Determination~~.~~<u>, and must follow the</u> <u>procedures set forth in the Memorandum of Agreement between FDEP and EPA.</u>

3.     Attachments B and C are replaced with Attachments 1 and 2 hereto.

4.     This Court's Order of April 14, 2010 **[ECF No. 404]**, as now modified by

this Order, and this Court's Omnibus Order **[ECF No. 585]**, dated April 26,

2011, setting forth the reason for granting the EPA's Rule 60(b) motion,

and issuing further orders of Court, are hereby adopted and incorporated

by reference in their entirety in this Order as if set forth in full.

5.     The status conference set by this Court's Order of June 21, 2012 **[ECF**

**No. 652]** is hereby cancelled.

6.     Per the instructions of the Eleventh Circuit Court of Appeals, a certified

copy of this Order on Remand shall be forwarded to the Eleventh Circuit

Clerk of Court accompanied by an updated indexed district court docket

sheet.


DONE AND ORDERED in Chambers at Miami, Florida, this 11th day of July,

2012.


_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT COURT JUDGE

cc:    Eleventh Circuit Court of Appeals, Clerk of Court
            (related to your Case No. 11-12215)
       U.S. Magistrate Judge Jonathan Goodman
       Counsel of record

## Attachment 1 – Revisions to Amended Everglades Forever Act

373.4592  Everglades improvement and management.—

**(1)  FINDINGS AND INTENT.—**
(a)  The Legislature finds that the Everglades ecological system not only contributes to South Florida's water supply, flood control, and recreation, but serves as the habitat for diverse species of wildlife and plant life. The system is unique in the world and one of Florida's great treasures. The Everglades ecological system is endangered as a result of adverse changes in water quality, and in the quantity, distribution, and timing of flows, and, therefore, must be restored and protected.
(b)  The Legislature finds that, although the district and the department have developed plans and programs for the improvement and management of the surface waters tributary to the Everglades Protection Area, implementation of those plans and programs has not been as timely as is necessary to restore and protect unique flora and fauna of the Everglades, including the Everglades National Park and the Arthur R. Marshall Loxahatchee National Wildlife Refuge. Therefore, the Legislature determines that an appropriate method to proceed with Everglades restoration and protection is to authorize the district to proceed expeditiously with implementation of the Everglades Program.
(c)  The Legislature finds that, in the last decade, people have come to realize the tremendous cost the alteration of natural systems has exacted on the region. The Statement of Principles of July 1993 among the Federal Government, the South Florida Water Management District, the Department of Environmental Protection, and certain agricultural industry representatives formed a basis to bring to a close 5 years of costly litigation. That agreement should be used to begin the cleanup and renewal of the Everglades ecosystem.
(d)  It is the intent of the Legislature to promote Everglades restoration and protection through certain legislative findings and determinations. The Legislature finds that waters flowing into the Everglades Protection Area contain excessive levels of phosphorus. A reduction in levels of phosphorus will benefit the ecology of the Everglades Protection Area.
(e)  It is the intent of the Legislature to pursue comprehensive and innovative solutions to issues of water quality, water quantity, hydroperiod, and invasion of exotic species which face the Everglades ecosystem. The Legislature recognizes that the Everglades ecosystem must be restored both in terms of water quality and water quantity and must be preserved and protected in a manner that is long term and comprehensive. The Legislature further recognizes that the EAA and adjacent areas provide a base for an agricultural industry, which in turn provides important products, jobs, and income regionally and nationally. It is the intent of the Legislature to preserve natural values in the Everglades while also maintaining the quality of life for all residents of South Florida, including those in agriculture, and to minimize the impact on South Florida jobs, including agricultural, tourism, and natural resource-related jobs, all of which contribute to a robust regional economy.
(f)  The Legislature finds that improved water supply and hydroperiod management are crucial elements to overall revitalization of the Everglades ecosystem, including Florida Bay. It is the intent of the Legislature to expedite plans and programs for improving water quantity reaching the Everglades, correcting long-standing hydroperiod problems, increasing the total quantity of water flowing through the system, providing water supply for the Everglades National Park, urban and agricultural areas, and Florida Bay, and replacing water previously available from the coastal ridge in areas of southern Dade County. Whenever possible, wasteful discharges of fresh water to tide shall be reduced, and the water shall be stored for delivery at more optimum times. Additionally, reuse and conservation measures shall be implemented consistent with law. The Legislature further recognizes that additional water storage may be an appropriate use of Lake Okeechobee.
(g) The Legislature finds that the Statement of Principles of July 1993, the Everglades Construction Project, and the regulatory requirements of this section provide a sound basis for

the state's long-term cleanup and restoration objectives for the Everglades. It is the intent of the Legislature to provide a sufficient period of time for construction, testing, and research, so that the benefits of the Everglades Construction Project will be determined and maximized prior to requiring additional measures. The Legislature finds that STAs and BMPs are currently the best available technology for achieving the interim water quality goals of the Everglades Program. A combined program of agricultural BMPs, STAs, and requirements of this section is a reasonable method of achieving interim total phosphorus discharge reductions. The Everglades Program is an appropriate foundation on which to build a long-term program to ultimately achieve restoration and protection of the Everglades Protection Area.

(h) The Everglades Construction Project represents by far the largest environmental cleanup and restoration program of this type ever undertaken, and the returns from substantial public and private investment must be maximized so that available resources are managed responsibly. To that end, the Legislature directs that the Everglades Construction Project and regulatory requirements associated with the Statement of Principles of July 1993 be pursued expeditiously, but with flexibility, so that superior technology may be utilized when available. Consistent with the implementation of the Everglades Construction Project, landowners shall be provided the maximum opportunity to provide treatment on their land.

**(2) DEFINITIONS.—**As used in this section:

(a) "Best available phosphorus reduction technology" or "BAPRT" means a combination of BMPs and STAs which includes a continuing research and monitoring program to reduce outflow concentrations of phosphorus so as to achieve the phosphorus criterion in the Everglades Protection Area.

(b) "Best management practice" or "BMP" means a practice or combination of practices determined by the district, in cooperation with the department, based on research, field-testing, and expert review, to be the most effective and practicable, including economic and technological considerations, on-farm means of improving water quality in agricultural discharges to a level that balances water quality improvements and agricultural productivity.

(c) "C-139 Basin" or "Basin" means those lands described in subsection (16).

(d) "Department" means the Florida Department of Environmental Protection.

(e) "District" means the South Florida Water Management District.

(f) "Everglades Agricultural Area" or "EAA" means the Everglades Agricultural Area, which are those lands described in subsection (15).

(g) "Everglades Construction Project" means the project described in the February 15, 1994, conceptual design document together with construction and operation schedules on file with the South Florida Water Management District, except as modified by this section and further described in the Long-Term Plan.

(h) "Everglades Program" means the program of projects, regulations, and research provided by this section, including the Everglades Construction Project.

(i) "Everglades Protection Area" means Water Conservation Areas 1, 2A, 2B, 3A, and 3B, the Arthur R. Marshall Loxahatchee National Wildlife Refuge, and the Everglades National Park.

(j) "Long-Term Plan" or "Plan" means the district's "Everglades Protection Area Tributary Basins Conceptual Plan for Achieving Long-Term Water Quality Goals Final Report" dated March 2003, as modified herein."

(k) "Master permit" means a single permit issued to a legally responsible entity defined by rule, authorizing the construction, alteration, maintenance, or operation of multiple stormwater management systems that may be owned or operated by different persons and which provides an opportunity to achieve collective compliance with applicable department and district rules and the provisions of this section.

(l) "Optimization" shall mean maximizing the potential treatment effectiveness of the STAs through measures such as additional compartmentalization, improved flow control, vegetation management, or operation refinements, in combination with improvements where practicable in

2

urban and agricultural BMPs, and includes integration with Congressionally authorized components of the Comprehensive Everglades Restoration Plan or "CERP".

(m)   "Phosphorus criterion" means a numeric interpretation for phosphorus of the Class III narrative nutrient criterion.

(n)   "Stormwater management program" shall have the meaning set forth in s. 403.031(15).

(o)   "Stormwater treatment areas" or "STAs" means those treatment areas described and depicted in the district's conceptual design document of February 15, 1994, and any modifications as provided in this section.

(p)   "Technology-based effluent limitation" or "TBEL" means the technology-based treatment requirements as defined in Rule 62-650.200, Florida Administrative Code.

**(3)  EVERGLADES** ~~LONG TERM~~ **PHOSPHORUS CONTROL** PLAN.—

(a)The Legislature finds that the Everglades Program required by this section establishes more extensive and comprehensive requirements for surface water improvement and management within the Everglades than the SWIM plan requirements provided in ss. 373.451-373.456. In order to avoid duplicative requirements, and in order to conserve the resources available to the district, the SWIM plan requirements of those sections shall not apply to the Everglades Protection Area and the EAA during the term of the Everglades Program, and the district will neither propose, nor take final agency action on, any Everglades SWIM plan for those areas until the Everglades Program is fully implemented. Funds under s. 259.101(3)(b) may be used for acquisition of lands necessary to implement the Everglades Construction Project, to the extent these funds are identified in the Statement of Principles of July 1993. The district's actions in implementing the Everglades Construction Project relating to the responsibilities of the EAA and C-139 Basin for funding and water quality compliance in the EAA and the Everglades Protection Area shall be governed by this section. Other strategies or activities in the March 1992 Everglades SWIM plan may be implemented if otherwise authorized by law.

~~(b) The Legislature finds that the most reliable means of optimizing the performance of STAs and achieving reasonable further progress in reducing phosphorus entering the Everglades Protection Area is to utilize a long-term planning process. The Legislature finds that the Long-Term Plan provides the best available phosphorus reduction technology based upon a combination of the BMPs and STAs described in the Plan provided that the Plan shall seek to achieve the phosphorus criterion in the Everglades Protection Area. The pre-2006 projects identified in the Long-Term Plan shall be implemented by the district without delay, and revised with the planning goal and objective of achieving the phosphorus criterion to be adopted pursuant to subparagraph (4)(e)2. in the Everglades Protection Area, and not based on any planning goal or objective in the Plan that is inconsistent with this section. Revisions to the Long-Term Plan shall be incorporated through an adaptive management approach including a process development and engineering component to identify and implement incremental optimization measures for further phosphorus reductions.   Revisions to the Long-Term Plan shall be approved by the department.   In addition, the department may propose changes to the Long-Term Plan as science and environmental conditions warrant.~~

~~(c)  It is the intent of the Legislature that implementation of the Long-Term Plan shall be integrated and consistent with the implementation of the projects and activities in the Congressionally authorized components of the CERP so that unnecessary and duplicative costs will be avoided. Nothing in this section shall modify any existing cost share or responsibility provided for projects listed in s. 528 of the Water Resources Development Act of 1996 (110 Stat. 3769) or provided for projects listed in section 601 of the Water Resources Development Act of 2000 (114 Stat. 2572). The Legislature does not intend for the provisions of this section to diminish commitments made  by the State of Florida to restore and maintain water quality in the Everglades Protection Area, including the federal lands in the settlement agreement referenced in paragraph (4)(e).~~

(d) The Legislature recognizes that the Long-Term Plan contains an initial phase and a 10-year second phase. The Legislature intends that a review of this act at least 10 years after implementation of the initial phase is appropriate and necessary to the public interest. The review is the best way to ensure that the Everglades Protection Area is achieving state water quality standards, including phosphorus reduction, and the Long-Term Plan is using the best technology available. A 10-year second phase of the Long-Term Plan must be approved by the Legislature and codified in this act prior to implementation of projects, but not prior to development, review, and approval of projects by the department.

(e) The Long-Term Plan shall be implemented for a initial 13-year phase (2003-2016) and shall achieve water quality standards relating to the phosphorus criterion in the Everglades Protection Area as determined by a network of monitoring stations established for this purpose. Not later than December 31, 2008, and each 5 years thereafter, the department shall review and approve incremental phosphorus reduction measures.

**(4) EVERGLADES PROGRAM.—**

(a) Everglades Construction Project.—The district shall implement the Everglades Construction Project. By the time of completion of the project, the state, district, or other governmental authority shall purchase the inholdings in the Rotenberger and such other lands necessary to achieve a 2:1 mitigation ratio for the use of Brown's Farm and other similar lands, including those needed for the STA 1 Inflow and Distribution Works. The inclusion of public lands as part of the project is for the purpose of treating waters not coming from the EAA for hydroperiod restoration. It is the intent of the Legislature that the district aggressively pursue the implementation of the Everglades Construction Project in accordance with the schedule in this subsection. The Legislature recognizes that adherence to the schedule is dependent upon factors beyond the control of the district, including the timely receipt of funds from all contributors. The district shall take all reasonable measures to complete timely performance of the schedule in this section in order to finish the Everglades Construction Project. The district shall not delay implementation of the project beyond the time delay caused by those circumstances and conditions that prevent timely performance. The district shall not levy ad valorem taxes in excess of 0.1 mill within the Okeechobee Basin for the purposes of the design, construction, and acquisition of the Everglades Construction Project. The ad valorem tax proceeds not exceeding 0.1 mill levied within the Okeechobee Basin for such purposes shall also be used for design, construction, and implementation of the initial phase of the Long-Term Plan, including operation and maintenance, and research for the projects and strategies in the initial phase of the Long-Term Plan, and including the enhancements and operation and maintenance of the Everglades Construction Project and shall be the sole direct district contribution from district ad valorem taxes appropriated or expended for the design, construction, and acquisition of the Everglades Construction Project unless the Legislature by specific amendment to this section increases the 0.1 mill ad valorem tax contribution, increases the agricultural privilege taxes, or otherwise reallocates the relative contribution by ad valorem taxpayers and taxpayers paying the agricultural privilege taxes toward the funding of the design, construction, and acquisition of the Everglades Construction Project. Notwithstanding the provisions of s. 200.069 to the contrary, any millage levied under the 0.1 mill limitation in this paragraph shall be included as a separate entry on the Notice of Proposed Property Taxes pursuant to s. 200.069. Once the STAs are completed, the district shall allow these areas to be used by the public for recreational purposes in the manner set forth in s. 373.1391(1), considering the suitability of these lands for such uses. These lands shall be made available for recreational use unless the district governing board can demonstrate that such uses are incompatible with the restoration goals of the Everglades Construction Project or the water quality and hydrological purposes of the STAs or would otherwise adversely impact the implementation of the project. The district shall give preferential consideration to the hiring of agricultural workers displaced as a result of the Everglades Construction Project, consistent with

4

their qualifications and abilities, for the construction and operation of these STAs. The following milestones apply to the completion of the Everglades Construction Project as depicted in the February 15, 1994, conceptual design document:

1. The district must complete the final design of the STA 1 East and West and pursue STA 1 East project components as part of a cost-shared program with the Federal Government. The district must be the local sponsor of the federal project that will include STA 1 East, and STA 1 West if so authorized by federal law;

2. Construction of STA 1 East is to be completed under the direction of the United States Army Corps of Engineers in conjunction with the currently authorized C-51 flood control project;

3. The district must complete construction of STA 1 West and STA 1 Inflow and Distribution Works under the direction of the United States Army Corps of Engineers, if the direction is authorized under federal law, in conjunction with the currently authorized C-51 flood control project;

4. The district must complete construction of STA 3/4 by October 1, 2003, ~~however, the district may modify this schedule to incorporate and accelerate enhancements to STA 3/4 as directed in the Long-Term Plan;~~

5. The district must complete construction of STA 6;

6. ~~The district must, by December 31, 2006, complete construction of enhancements to the Everglades Construction Project recommended in the Long-Term Plan and initiate other pre-2006 strategies in the plan; and~~

6̲7̶. East Beach Water Control District, South Shore Drainage District, South Florida Conservancy District, East Shore Water Control District, and the lessee of agricultural lease number 3420 shall complete any system modifications described in the Everglades Construction Project to the extent that funds are available from the Everglades Fund. These entities shall divert the discharges described within the Everglades Construction Project within 60 days of completion of construction of the appropriate STA. Such required modifications shall be deemed to be a part of each district's plan of reclamation pursuant to chapter 298.

(b)  Everglades water supply and hydroperiod improvement and restoration.—

1.  A comprehensive program to revitalize the Everglades shall include programs and projects to improve the water quantity reaching the Everglades Protection Area at optimum times and improve hydroperiod deficiencies in the Everglades ecosystem. To the greatest extent possible, wasteful discharges of fresh water to tide shall be reduced, and water conservation practices and reuse measures shall be implemented by water users, consistent with law. Water supply management must include improvement of water quantity reaching the Everglades, correction of long-standing hydroperiod problems, and an increase in the total quantity of water flowing through the system. Water supply management must provide water supply for the Everglades National Park, the urban and agricultural areas, and the Florida Bay and must replace water previously available from the coastal ridge areas of southern Dade County. The Everglades Construction Project redirects some water currently lost to tide. It is an important first step in completing hydroperiod improvement.

2. The district shall operate the Everglades Construction Project as specified in the February 15, 1994, conceptual design document, to provide additional inflows to the Everglades Protection Area. The increased flow from the project shall be directed to the Everglades Protection Area as needed to achieve an average annual increase of 28 percent compared to the baseline years of 1979 to 1988. Consistent with the design of the Everglades Construction Project and without demonstratively reducing water quality benefits, the regulatory releases will be timed and distributed to the Everglades Protection Area to maximize environmental benefits.

3. The district shall operate the Everglades Construction Project in accordance with the February 15, 1994, conceptual design document to maximize the water quantity benefits and improve the hydroperiod of the Everglades Protection Area. All reductions of flow to the Everglades Protection Area from BMP implementation will be replaced. The district shall

5

develop a model to be used for quantifying the amount of water to be replaced. The timing and distribution of this replaced water will be directed to the Everglades Protection Area to maximize the natural balance of the Everglades Protection Area.

4. The Legislature recognizes the complexity of the Everglades watershed, as well as legal mandates under Florida and federal law. As local sponsor of the Central and Southern Florida Flood Control Project, the district must coordinate its water supply and hydroperiod programs with the Federal Government. Federal planning, research, operating guidelines, and restrictions for the Central and Southern Florida Flood Control Project now under review by federal agencies will provide important components of the district's Everglades Program. The department and district shall use their best efforts to seek the amendment of the authorized purposes of the project to include water quality protection, hydroperiod restoration, and environmental enhancement as authorized purposes of the Central and Southern Florida Flood Control Project, in addition to the existing purposes of water supply, flood protection, and allied purposes. Further, the department and the district shall use their best efforts to request that the Federal Government include in the evaluation of the regulation schedule for Lake Okeechobee a review of the regulatory releases, so as to facilitate releases of water into the Everglades Protection Area which further improve hydroperiod restoration.

5. The district, through cooperation with the federal and state agencies, shall develop other programs and methods to increase the water flow and improve the hydroperiod of the Everglades Protection Area.

6. Nothing in this section is intended to provide an allocation or reservation of water or to modify the provisions of part II. All decisions regarding allocations and reservations of water shall be governed by applicable law.

7. The district shall proceed to expeditiously implement the minimum flows and levels for the Everglades Protection Area as required by s. 373.042 and shall expeditiously complete the Lower East Coast Water Supply Plan.

(c) STA 3/4 modification.—The Everglades Program will contribute to the restoration of the Rotenberger and Holey Land tracts. The Everglades Construction Project provides a first step toward restoration by improving hydroperiod with treated water for the Rotenberger tract and by providing a source of treated water for the Holey Land. It is further the intent of the Legislature that the easternmost tract of the Holey Land, known as the "Toe of the Boot," be removed from STA 3/4 under the circumstances set forth in this paragraph. The district shall proceed to modify the Everglades Construction Project, provided that the redesign achieves at least as many environmental and hydrological benefits as are included in the original design, including treatment of waters from sources other than the EAA, and does not delay construction of STA 3/4. The district is authorized to use eminent domain to acquire alternative lands, only if such lands are located within 1 mile of the northern border of STA 3/4.

(d) Everglades research and monitoring program.—

1. The department and the district shall review and evaluate available water quality data for the Everglades Protection Area and tributary waters and identify any additional information necessary to adequately describe water quality in the Everglades Protection Area and tributary waters. The department and the district shall also initiate a research and monitoring program to generate such additional information identified and to evaluate the effectiveness of the BMPs and STAs, as they are implemented, in improving water quality and maintaining designated and existing beneficial uses of the Everglades Protection Area and tributary waters. As part of the program, the district shall monitor all discharges into the Everglades Protection Area for purposes of determining compliance with state water quality standards.

2. The research and monitoring program shall evaluate the ecological and hydrological needs of the Everglades Protection Area, including the minimum flows and levels. Consistent with such needs, the program shall also evaluate water quality standards for the Everglades Protection Area and for the canals of the EAA, so that these canals can be classified in the manner set

6

forth in paragraph (e) and protected as an integral part of the water management system which includes the STAs of the Everglades Construction Project and allows landowners in the EAA to achieve applicable water quality standards compliance by BMPs and STA treatment to the extent this treatment is available and effective.

3. The research and monitoring program shall include research seeking to optimize the design and operation of the STAs, including research to reduce outflow concentrations, and to identify other treatment and management methods and regulatory programs that are superior to STAs in achieving the intent and purposes of this section.

4. The research and monitoring program shall be conducted to allow the department to propose a phosphorus criterion in the Everglades Protection Area, and to evaluate existing state water quality standards applicable to the Everglades Protection Area and existing state water quality standards and classifications applicable to the EAA canals. In developing the phosphorus criterion, the department shall also consider the minimum flows and levels for the Everglades Protection Area and the district's water supply plans for the Lower East Coast.

5. Beginning January 1, 2000, the district and the department shall annually issue a peer-reviewed report regarding the research and monitoring program that summarizes all data and findings. The department shall provide copies of the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives.  The report shall identify water quality parameters, in addition to phosphorus, which exceed state water quality standards or are causing or contributing to adverse impacts in the Everglades Protection Area.

6. The district shall continue research seeking to optimize the design and operation of STAs and to identify other treatment and management methods that are superior to STAs in achieving optimum water quality and water quantity for the benefit of the Everglades. The district shall optimize the design and operation of the STAs described in the Everglades Construction Project prior to expanding their size. Additional methods to achieve compliance with water quality standards shall not be limited to more intensive management of the STAs.

(e)  Evaluation of water quality standards.—

1.  The department and the district shall employ all means practicable to complete by December 31, 1998, any additional research necessary to:

a.  Numerically interpret for phosphorus the Class III narrative nutrient criterion necessary to meet water quality standards in the Everglades Protection Area; and

b.  Evaluate existing water quality standards applicable to the Everglades Protection Area and EAA canals.

2.  In no case shall such phosphorus criterion allow waters in the Everglades Protection Area to be altered so as to cause an imbalance in the natural populations of aquatic flora or fauna. The phosphorus criterion shall be 10 parts per billion (ppb) in the Everglades Protection Area in the event the department does not adopt by rule such criterion by December 31, 2003. However, in the event the department fails to adopt a phosphorus criterion on or before December 31, 2002, any person whose substantial interests would be affected by the rulemaking shall have the right, on or before February 28, 2003, to petition for a writ of mandamus to compel the department to adopt by rule such criterion. Venue for the mandamus action must be Leon County. The court may stay implementation of the 10 parts per billion (ppb) criterion during the pendency of the mandamus proceeding upon a demonstration by the petitioner of irreparable harm in the absence of such relief. The department's phosphorus criterion, whenever adopted, shall supersede the 10 parts per billion (ppb) criterion otherwise established by this section, but shall not be lower than the natural conditions of the Everglades Protection Area and shall take into account spatial and temporal variability. ~~The department's rule adopting a phosphorus criterion may include moderating provisions during the implementation of the initial phase of the Long-Term Plan authorizing discharges based upon BAPRT providing net improvement to impacted areas.  Discharges to unimpacted areas may also be authorized by moderating provisions, which shall require BAPRT, and which must be based upon a determination by the department~~

7

~~that the environmental benefits of the discharge clearly outweigh potential adverse impacts and otherwise comply with antidegradation requirements.  Moderating provisions authorized by this section shall not extend beyond December 2016 unless further authorized by the Legislature pursuant to paragraph (3)(d).~~

3. The department shall use the best available information to define relationships between waters discharged to, and the resulting water quality in, the Everglades Protection Area. The department or the district shall use these relationships to establish discharge limits in permits for discharges into the EAA canals and the Everglades Protection Area necessary to prevent an imbalance in the natural populations of aquatic flora or fauna in the Everglades Protection Area, and to provide a net improvement in the areas already impacted. ~~During the implementation of the initial phase of the Long-Term Plan, permits issued by the department shall be based on BAPRT, and shall include technology-based effluent limitations consistent with the Long-Term Plan.~~  Compliance with the phosphorus criterion shall be based upon a long-term geometric mean of concentration levels to be measured at sampling stations recognized from the research to be reasonably representative of receiving waters in the Everglades Protection Area, and so located so as to assure that the Everglades Protection Area is not altered so as to cause an imbalance in natural populations of aquatic flora and fauna and to assure a net improvement in the areas already impacted. For the Everglades National Park and the Arthur R. Marshall Loxahatchee National Wildlife Refuge, the method for measuring compliance with the phosphorus criterion shall be in a manner consistent with Appendices A and B, respectively, of the settlement agreement dated July 26, 1991, entered in case No. 88-1886-Civ-Hoeveler, United States District Court for the Southern District of Florida, that recognizes and provides for incorporation of relevant research.

4. The department's evaluation of any other water quality standards must include the department's antidegradation standards and EAA canal classifications. In recognition of the special nature of the conveyance canals of the EAA, as a component of the classification process, the department is directed to formally recognize by rulemaking existing actual beneficial uses of the conveyance canals in the EAA. This shall include recognition of the Class III designated uses of recreation, propagation and maintenance of a healthy, well-balanced population of fish and wildlife, the integrated water management purposes for which the Central and Southern Florida Flood Control Project was constructed, flood control, conveyance of water to and from Lake Okeechobee for urban and agricultural water supply, Everglades hydroperiod restoration, conveyance of water to the STAs, and navigation.

(f)  EAA best management practices.—

1. The district, in cooperation with the department, shall develop and implement a water quality monitoring program to evaluate the effectiveness of the BMPs in achieving and maintaining compliance with state water quality standards and restoring and maintaining designated and existing beneficial uses. The program shall include an analysis of the effectiveness of the BMPs in treating constituents that are not being significantly improved by the STAs. The monitoring program shall include monitoring of appropriate parameters at representative locations.

2. The district shall continue to require and enforce the BMP and other requirements of chapters 40E-61 and 40E-63, Florida Administrative Code, during the terms of the existing permits issued pursuant to those rules. Chapter 40E-61, Florida Administrative Code, may be amended to include the BMPs required by chapter 40E-63, Florida Administrative Code. Prior to the expiration of existing permits, and during each 5-year term of subsequent permits as provided for in this section, those rules shall be amended to implement a comprehensive program of research, testing, and implementation of BMPs that will address all water quality standards within the EAA and Everglades Protection Area. Under this program:

a. EAA landowners, through the EAA Environmental Protection District or otherwise, shall sponsor a program of BMP research with qualified experts to identify appropriate BMPs.

b.  Consistent with the water quality monitoring program, BMPs will be field-tested in a sufficient number of representative sites in the EAA to reflect soil and crop types and other factors that influence BMP design and effectiveness.

c.  BMPs as required for varying crops and soil types shall be included in permit conditions in the 5-year permits issued pursuant to this section.

d.  The district shall conduct research in cooperation with EAA landowners to identify water quality parameters that are not being significantly improved either by the STAs or the BMPs, and to identify further BMP strategies needed to address these parameters.

3.  The Legislature finds that through the implementation of the Everglades BMPs Program and the implementation of the Everglades Construction Project, reasonable further progress will be made towards addressing water quality requirements of the EAA canals and the Everglades Protection Area. Permittees within the EAA and the C-139 Basin who are in full compliance with the conditions of permits under chapters 40E-61 and 40E-63, Florida Administrative Code, have made all payments required under the Everglades Program, and are in compliance with subparagraph (a)8., if applicable, shall not be required to implement additional water quality improvement measures, prior to December 31, 2006, other than those required by subparagraph 2., with the following exceptions:

a.  Nothing in this subparagraph shall limit the existing authority of the department or the district to limit or regulate discharges that pose a significant danger to the public health and safety; and

b.  New land uses and new stormwater management facilities other than alterations to existing agricultural stormwater management systems for water quality improvements shall not be accorded the compliance established by this section. Permits may be required to implement improvements or alterations to existing agricultural water management systems.

4.  As of December 31, 2006, all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs. As of that date, no permittee's discharge shall cause or contribute to any violation of water quality standards in the Everglades Protection Area.

5.  Effective immediately, landowners within the C-139 Basin shall not collectively exceed an annual average loading of phosphorus based proportionately on the historical rainfall for the C-139 Basin over the period of October 1, 1978, to September 30, 1988. New surface inflows shall not increase the annual average loading of phosphorus stated above. Provided that the C-139 Basin does not exceed this annual average loading, all landowners within the Basin shall be in compliance for that year. Compliance determinations for individual landowners within the C-139 Basin for remedial action, if the Basin is determined by the district to be out of compliance for that year, shall be based on the landowners' proportional share of the total phosphorus loading. The total phosphorus discharge load shall be determined as set forth in Appendix B2 of Rule 40E-63, Everglades Program, Florida Administrative Code.

6.  The district, in cooperation with the department, shall develop and implement a water quality monitoring program to evaluate the quality of the discharge from the C-139 Basin. Upon determination by the department or the district that the C-139 Basin is exceeding any presently existing water quality standards, the district shall require landowners within the C-139 Basin to implement BMPs appropriate to the land uses within the C-139 Basin consistent with subparagraph 2. Thereafter, the provisions of subparagraphs 2.-4. shall apply to the landowners within the C-139 Basin.

(g)  Monitoring and control of exotic species.—

1.  The district shall establish a biological monitoring network throughout the Everglades Protection Area and shall prepare a survey of exotic species at least every 2 years.

2.  In addition, the district shall establish a program to coordinate with federal, state, or other governmental entities the control of continued expansion and the removal of these exotic

9

species. The district's program shall give high priority to species affecting the largest areal extent within the Everglades Protection Area.

**(5) ACQUISITION AND LEASE OF STATE LANDS.—**

(a)  As used in this subsection, the term:

1.  "Available land" means land within the EAA owned by the board of trustees which is covered by any of the following leases: Numbers 3543, 3420, 1447, 1971-5, and 3433, and the southern one-third of number 2376 constituting 127 acres, more or less.

2.  "Board of trustees" means the Board of Trustees of the Internal Improvement Trust Fund.

3.  "Designated acre," as to any impacted farmer, means an acre of land which is designated for STAs or water retention or storage in the February 15, 1994, conceptual design document and which is owned or leased by the farmer or on which one or more agricultural products were produced which, during the period beginning October 1, 1992, and ending September 30, 1993, were processed at a facility owned by the farmer.

4.  "Impacted farmer" means a producer or processor of agricultural commodities and includes subsidiaries and affiliates that have designated acres.

5.  "Impacted vegetable farmer" means an impacted farmer in the EAA who uses more than 30 percent of the land farmed by that farmer, whether owned or leased, for the production of vegetables.

6.  "Vegetable-area available land" means land within the EAA owned by the board of trustees which is covered by lease numbers 3422 and 1935/1935S.

(b) The Legislature declares that it is necessary for the public health and welfare that the Everglades water and water-related resources be conserved and protected. The Legislature further declares that certain lands may be needed for the treatment or storage of water prior to its release into the Everglades Protection Area. The acquisition of real property for this objective constitutes a public purpose for which public funds may be expended. In addition to other authority pursuant to this chapter to acquire real property, the governing board of the district is empowered and authorized to acquire fee title or easements by eminent domain for the limited purpose of implementing stormwater management systems, identified and described in the Everglades Construction Project or determined necessary to meet water quality requirements established by rule or permit.

(c) The Legislature determines it to be in the public interest to minimize the potential loss of land and related product supply to farmers and processors who are most affected by acquisition of land for Everglades restoration and hydroperiod purposes. Accordingly, subject to the priority established below for vegetable-area available land, impacted farmers shall have priority in the leasing of available land. An impacted farmer shall have the right to lease each parcel of available land, upon expiration of the existing lease, for a term of 20 years and at a rental rate determined by appraisal using established state procedures. For those parcels of land that have previously been competitively bid, the rental rate shall not be less than the rate the board of trustees currently receives. The board of trustees may also adjust the rental rate on an annual basis using an appropriate index, and update the appraisals at 5-year intervals. If more than one impacted farmer desires to lease a particular parcel of available land, the one that has the greatest number of designated acres shall have priority.

(d)  Impacted vegetable farmers shall have priority in leasing vegetable-area available land. An impacted vegetable farmer shall have the right to lease vegetable-area available land, upon expiration of the existing lease, for a term of 20 years or a term ending August 25, 2018, whichever term first expires, and at a rental rate determined by appraisal using established state procedures. If the lessee elects, such terms may consist of an initial 5-year term, with successive options to renew at the lessee's option for additional 5-year terms. For extensions of leases on those parcels of land that have previously been competitively bid, the rental rate shall not be less than the rate the board of trustees currently receives. The board of trustees may also adjust the rental rate on an annual basis using an appropriate index, and update the

appraisals at 5-year intervals. If more than one impacted vegetable farmer desires to lease vegetable-area available land, the one that has the greatest number of designated acres shall have priority.

(e)  Impacted vegetable farmers with farming operations in areas of Florida other than the EAA shall have priority in leasing suitable surplus land, where such lands are located in the St. Johns River Water Management District and in the vicinity of the other areas where such impacted vegetable farmers operate. The suitability of such use shall be determined solely by the St. Johns River Water Management District. The St. Johns River Water Management District shall make good faith efforts to provide these impacted vegetable farmers with the opportunity to lease such suitable lands to offset their designated acres. The rental rate shall be determined by appraisal using established procedures.

(f)  The corporation conducting correctional work programs under part II of chapter 946 shall be entitled to renew, for a period of 20 years, its lease with the Department of Corrections which expires June 30, 1998, which includes the utilization of land for the production of sugar cane, and which is identified as lease number 2671 with the board of trustees.

(g)  Except as specified in paragraph (f), once the leases or lease extensions specified in this subsection have been granted and become effective, the trustees shall retain the authority to terminate after 9 years any such lease or lease extension upon 2 years' notice to the lessee and a finding by the trustees that the lessee has ceased to be impacted as provided in this section. In that event, the outgoing lessee is entitled to be compensated for any documented, unamortized planting costs associated with the lease and any unamortized capital costs incurred prior to the notice. In addition, the trustees may terminate such lease or lease extension if the lessee fails to comply with, and after reasonable notice and opportunity to correct or fails to correct, any material provision of the lease or its obligation under this section.

**(6) EVERGLADES AGRICULTURAL PRIVILEGE TAX.—**

(a)  There is hereby imposed an annual Everglades agricultural privilege tax for the privilege of conducting an agricultural trade or business on:

1.  All real property located within the EAA that is classified as agricultural under the provisions of chapter 193; and

2.  Leasehold or other interests in real property located within the EAA owned by the United States, the state, or any agency thereof permitting the property to be used for agricultural purposes in a manner that would allow such property to be classified as agricultural under the provisions of chapter 193 if not governmentally owned, whether or not such property is actually classified as agricultural under the provisions of chapter 193.

It is hereby determined by the Legislature that the privilege of conducting an agricultural trade or business on such property constitutes a reasonable basis for imposition of the Everglades agricultural privilege tax and that logical differences exist between the agricultural use of such property and the use of other property within the EAA for residential or nonagricultural commercial use. The Everglades agricultural privilege tax shall constitute a lien against the property, or the leasehold or other interest in governmental property permitting such property to be used for agricultural purposes, described on the Everglades agricultural privilege tax roll. The lien shall be in effect from January 1 of the year the tax notice is mailed until discharged by payment and shall be equal in rank and dignity with the liens of all state, county, district, or municipal taxes and non-ad valorem assessments imposed pursuant to general law, special act, or local ordinance and shall be superior in dignity to all other liens, titles, and claims.

(b)  The Everglades agricultural privilege tax, other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, shall be collected in the manner provided for ad valorem taxes. By September 15 of each year, the governing board of the district shall certify by resolution an Everglades agricultural privilege tax roll on compatible electronic medium to the tax collector of each county in which a portion of the EAA is located. The district shall also produce one copy of the roll in printed form which shall be

11

available for inspection by the public. The district shall post the Everglades agricultural privilege tax for each parcel on the roll. The tax collector shall not accept any such roll that is not certified on compatible electronic medium and that does not contain the posting of the Everglades agricultural privilege tax for each parcel. It is the responsibility of the district that such rolls be free of errors and omissions. Alterations to such rolls may be made by the executive director of the district, or a designee, up to 10 days before certification. If the tax collector or any taxpayer discovers errors or omissions on such roll, such person may request the district to file a corrected roll or a correction of the amount of any Everglades agricultural privilege tax. Other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, Everglades agricultural privilege taxes collected pursuant to this section shall be included in the combined notice for ad valorem taxes and non-ad valorem assessments provided for in s. 197.3635. Such Everglades agricultural privilege taxes shall be listed in the portion of the combined notice utilized for non-ad valorem assessments. A separate mailing is authorized only as a solution to the most exigent factual circumstances. However, if a tax collector cannot merge an Everglades agricultural privilege tax roll to produce such a notice, the tax collector shall mail a separate notice of Everglades agricultural privilege taxes or shall direct the district to mail such a separate notice. In deciding whether a separate mailing is necessary, the tax collector shall consider all costs to the district and taxpayers of such a separate mailing and the adverse effects to the taxpayers of delayed and multiple notices. The district shall bear all costs associated with any separate notice. Everglades agricultural privilege taxes collected pursuant to this section shall be subject to all collection provisions of chapter 197, including provisions relating to discount for early payment, prepayment by installment method, deferred payment, penalty for delinquent payment, and issuance and sale of tax certificates and tax deeds for nonpayment. Everglades agricultural privilege taxes for leasehold or other interests in property owned by the United States, the state, or any agency thereof permitting such property to be used for agricultural purposes shall be included on the notice provided pursuant to s. 196.31, a copy of which shall be provided to lessees or other interestholders registering with the district, and shall be collected from the lessee or other appropriate interestholder and remitted to the district immediately upon collection. Everglades agricultural privilege taxes included on the statement provided pursuant to s. 196.31 shall be due and collected on or prior to the next April 1 following provision of the notice. Proceeds of the Everglades agricultural privilege taxes shall be distributed by the tax collector to the district. Each tax collector shall be paid a commission equal to the actual cost of collection, not to exceed 2 percent, on the amount of Everglades agricultural privilege taxes collected and remitted. Notwithstanding any general law or special act to the contrary, Everglades agricultural privilege taxes shall not be included on the notice of proposed property taxes provided for in s. 200.069.

(c) The initial Everglades agricultural privilege tax roll shall be certified for the tax notices mailed in November 1994. Incentive credits to the Everglades agricultural privilege taxes to be included on the initial Everglades agricultural privilege tax roll, if any, shall be based upon the total phosphorus load reduction for the year ending April 30, 1993. The Everglades agricultural privilege taxes for each year shall be computed in the following manner:

1. Annual Everglades agricultural privilege taxes shall be charged for the privilege of conducting an agricultural trade or business on each acre of real property or portion thereof. The annual Everglades agricultural privilege tax shall be $24.89 per acre for the tax notices mailed in November 1994 through November 1997; $27 per acre for the tax notices mailed in November 1998 through November 2001; $31 per acre for the tax notices mailed in November 2002 through November 2005; and $35 per acre for the tax notices mailed in November 2006 through November 2013.

2. It is the intent of the Legislature to encourage the performance of best management practices to maximize the reduction of phosphorus loads at points of discharge from the EAA by

providing an incentive credit against the Everglades agricultural privilege taxes set forth in subparagraph 1. The total phosphorus load reduction shall be measured for the entire EAA by comparing the actual measured total phosphorus load attributable to the EAA for each annual period ending on April 30 to the total estimated phosphorus load that would have occurred during the 1979-1988 base period using the model for total phosphorus load determinations provided in chapter 40E-63, Florida Administrative Code, utilizing the technical information and procedures contained in Section IV-EAA Period of Record Flow and Phosphorus Load Calculations; Section V-Monitoring Requirements; and Section VI-Phosphorus Load Allocations and Compliance Calculations of the Draft Technical Document in Support of chapter 40E-63, Florida Administrative Code - Works of the District within the Everglades, March 3, 1992, and the Standard Operating Procedures for Water Quality Collection in Support of the Everglades Water Condition Report, dated February 18, 1994. The model estimates the total phosphorus load that would have occurred during the 1979-1988 base period by substituting the rainfall conditions for such annual period ending April 30 for the conditions that were used to calibrate the model for the 1979-1988 base period. The data utilized to calculate the actual loads attributable to the EAA shall be adjusted to eliminate the effect of any load and flow that were not included in the 1979-1988 base period as defined in chapter 40E-63, Florida Administrative Code. The incorporation of the method of measuring the total phosphorus load reduction provided in this subparagraph is intended to provide a legislatively approved aid to the governing board of the district in making an annual ministerial determination of any incentive credit.

3. Phosphorus load reductions calculated in the manner described in subparagraph 2. and rounded to the nearest whole percentage point for each annual period beginning on May 1 and ending on April 30 shall be used to compute incentive credits to the Everglades agricultural privilege taxes to be included on the annual tax notices mailed in November of the next ensuing calendar year. Incentive credits, if any, will reduce the Everglades agricultural privilege taxes set forth in subparagraph 1. only to the extent that the phosphorus load reduction exceeds 25 percent. Subject to subparagraph 4., the reduction of phosphorus load by each percentage point in excess of 25 percent, computed for the 12-month period ended on April 30 of the calendar year immediately preceding certification of the Everglades agricultural privilege tax, shall result in the following incentive credits: $0.33 per acre for the tax notices mailed in November 1994 through November 1997; $0.54 per acre for the tax notices mailed in November 1998 through November 2001; $0.61 per acre for the tax notices mailed in November 2002 through November 2005, and $0.65 per acre for the tax notices mailed in November 2006 through November 2013. The determination of incentive credits, if any, shall be documented by resolution of the governing board of the district adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

4. Notwithstanding subparagraph 3., incentive credits for the performance of best management practices shall not reduce the minimum annual Everglades agricultural privilege tax to less than $24.89 per acre, which annual Everglades agricultural privilege tax as adjusted in the manner required by paragraph (e) shall be known as the "minimum tax." To the extent that the application of incentive credits for the performance of best management practices would reduce the annual Everglades agricultural privilege tax to an amount less than the minimum tax, then the unused or excess incentive credits for the performance of best management practices shall be carried forward, on a phosphorus load percentage basis, to be applied as incentive credits in subsequent years. Any unused or excess incentive credits remaining after certification of the Everglades agricultural privilege tax roll for the tax notices mailed in November 2013 shall be canceled.

5. Notwithstanding the schedule of Everglades agricultural privilege taxes set forth in subparagraph 1., the owner, lessee, or other appropriate interestholder of any property shall be entitled to have the Everglades agricultural privilege tax for any parcel of property reduced to

13

the minimum tax, commencing with the tax notices mailed in November 1996 for parcels of property participating in the early baseline option as defined in chapter 40E-63, Florida Administrative Code, and with the tax notices mailed in November 1997 for parcels of property not participating in the early baseline option, upon compliance with the requirements set forth in this subparagraph. The owner, lessee, or other appropriate interestholder shall file an application with the executive director of the district prior to July 1 for consideration of reduction to the minimum tax on the Everglades agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the reduction in phosphorus load attributable to such parcel of property. The phosphorus load reduction for each discharge structure serving the parcel shall be measured as provided in chapter 40E-63, Florida Administrative Code, and the permit issued for such property pursuant to chapter 40E-63, Florida Administrative Code. A parcel of property which has achieved the following annual phosphorus load reduction standards shall have the minimum tax included on the annual tax notice mailed in November of the next ensuing calendar year: 30 percent or more for the tax notices mailed in November 1994 through November 1997; 35 percent or more for the tax notices mailed in November 1998 through November 2001; 40 percent or more for the tax notices mailed in November 2002 through November 2005; and 45 percent or more for the tax notices mailed in November 2006 through November 2013. In addition, any parcel of property that achieves an annual flow weighted mean concentration of 50 parts per billion (ppb) of phosphorus at each discharge structure serving the property for any year ending April 30 shall have the minimum tax included on the annual tax notice mailed in November of the next ensuing calendar year. Any annual phosphorus reductions that exceed the amount necessary to have the minimum tax included on the annual tax notice for any parcel of property shall be carried forward to the subsequent years' phosphorus load reduction to determine if the minimum tax shall be included on the annual tax notice. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

6. The annual Everglades agricultural privilege tax for the tax notices mailed in November 2014 through November 2016 shall be $25 per acre and for tax notices mailed in November 2017 and thereafter shall be $10 per acre.

(d) For purposes of this paragraph, "vegetable acreage" means, for each tax year, any portion of a parcel of property used for a period of not less than 8 months for the production of vegetable crops, including sweet corn, during the 12 months ended September 30 of the year preceding the tax year. Land preparation, crop rotation, and fallow periods shall not disqualify property from classification as vegetable acreage if such property is actually used for the production of vegetable crops.

1. It is hereby determined by the Legislature that vegetable farming in the EAA is subject to volatile market conditions and is particularly subject to crop loss or damage due to freezes, flooding, and drought. It is further determined by the Legislature that, due to the foregoing factors, imposition of an Everglades agricultural privilege tax upon vegetable acreage in excess of the minimum tax could create a severe economic hardship and impair the production of vegetable crops. Notwithstanding the schedule of Everglades agricultural privilege taxes set forth in subparagraph (c)1., the Everglades agricultural privilege tax for vegetable acreage shall be the minimum tax, and vegetable acreage shall not be entitled to any incentive credits.

2. If either the Governor, the President of the United States, or the United States Department of Agriculture declares the existence of a state of emergency or disaster resulting from extreme natural conditions impairing the ability of vegetable acreage to produce crops, payment of the Everglades agricultural privilege taxes imposed for the privilege of conducting an agricultural trade or business on such property shall be deferred for a period of 1 year, and all subsequent annual payments shall be deferred for the same period.

14

a. If the declaration occurs between April 1 and October 31, the Everglades agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

b. If the declaration occurs between November 1 and March 31 and the Everglades agricultural privilege tax included on the most recent tax notice has not been paid, such Everglades agricultural privilege tax will be deferred to the next annual tax notice.

c. If the declaration occurs between November 1 and March 31 and the Everglades agricultural privilege tax included on the most recent tax notice has been paid, the Everglades agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

3. In the event payment of Everglades agricultural privilege taxes is deferred pursuant to this paragraph, the district must record a notice in the official records of each county in which vegetable acreage subject to such deferment is located. The recorded notice must describe each parcel of property as to which Everglades agricultural privilege taxes have been deferred and the amount deferred for such property. If all or any portion of the property as to which Everglades agricultural privilege taxes have been deferred ceases to be classified as agricultural under the provisions of chapter 193 or otherwise subject to the Everglades agricultural privilege tax, all deferred amounts must be included on the tax notice for such property mailed in November of the first tax year for which such property is not subject to the Everglades agricultural privilege tax. After a property owner has paid all outstanding Everglades agricultural privilege taxes, including any deferred amounts, the district shall provide the property owner with a recordable instrument evidencing the payment of all outstanding amounts.

4. The owner, lessee, or other appropriate interestholder must file an application with the executive director of the district prior to July 1 for classification of a portion of the property as vegetable acreage on the Everglades agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the number of acres used for the production of vegetable crops during the year in which incentive credits are determined and the period of such use. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

5. This paragraph does not relieve vegetable acreage from the performance of best management practices specified in chapter 40E-63, Florida Administrative Code.

(e) If, for any tax year, the number of acres subject to the Everglades agricultural privilege tax is less than the number of acres included on the Everglades agricultural privilege tax roll certified for the tax notices mailed in November 1994, the minimum tax shall be subject to increase in the manner provided in this paragraph. In determining the number of acres subject to the Everglades agricultural privilege tax for purposes of this paragraph, property acquired by a not-for-profit entity for purposes of conservation and preservation, the United States, or the state, or any agency thereof, and removed from the Everglades agricultural privilege tax roll after January 1, 1994, shall be treated as subject to the tax even though no tax is imposed or due: in its entirety, for tax notices mailed prior to November 2000; to the extent its area exceeds 4 percent of the total area of property subject to the Everglades agricultural tax, for tax notices mailed in November 2000 through November 2005; and to the extent its area exceeds 8 percent of the total area of property subject to the Everglades agricultural tax, for tax notices mailed in November 2006 and thereafter. For each tax year, the district shall determine the amount, if any, by which the sum of the following exceeds $12,367,000:

1. The product of the minimum tax multiplied by the number of acres subject to the Everglades agricultural privilege tax; and

2. The ad valorem tax increment, as defined in this subparagraph.

15

The aggregate of such annual amounts, less any portion previously applied to eliminate or reduce future increases in the minimum tax, as described in this paragraph, shall be known as the "excess tax amount." If for any tax year, the amount computed by multiplying the minimum tax by the number of acres then subject to the Everglades agricultural privilege tax is less than $12,367,000, the excess tax amount shall be applied in the following manner. If the excess tax amount exceeds such difference, an amount equal to the difference shall be deducted from the excess tax amount and applied to eliminate any increase in the minimum tax. If such difference exceeds the excess tax amount, the excess tax amount shall be applied to reduce any increase in the minimum tax. In such event, a new minimum tax shall be computed by subtracting the remaining excess tax amount from $12,367,000 and dividing the result by the number of acres subject to the Everglades agricultural privilege tax for such tax year. For purposes of this paragraph, the "ad valorem tax increment" means 50 percent of the difference between the amount of ad valorem taxes actually imposed by the district for the immediate prior tax year against property included on the Everglades agricultural privilege tax roll certified for the tax notices mailed in November 1994 that was not subject to the Everglades agricultural privilege tax during the immediate prior tax year and the amount of ad valorem taxes that would have been imposed against such property for the immediate prior tax year if the taxable value of each acre had been equal to the average taxable value of all other land classified as agricultural within the EAA for such year; however, the ad valorem tax increment for any year shall not exceed the amount that would have been derived from such property from imposition of the minimum tax during the immediate prior tax year.

(f)  Any owner, lessee, or other appropriate interestholder of property subject to the Everglades agricultural privilege tax may contest the Everglades agricultural privilege tax by filing an action in circuit court.

1.  No action may be brought to contest the Everglades agricultural privilege tax after 60 days from the date the tax notice that includes the Everglades agricultural privilege tax is mailed by the tax collector. Before an action to contest the Everglades agricultural privilege tax may be brought, the taxpayer shall pay to the tax collector the amount of the Everglades agricultural privilege tax which the taxpayer admits in good faith to be owing. The tax collector shall issue a receipt for the payment, and the receipt shall be filed with the complaint. Payment of an Everglades agricultural privilege tax shall not be deemed an admission that such tax was due and shall not prejudice the right to bring a timely action to challenge such tax and seek a refund. No action to contest the Everglades agricultural privilege tax may be maintained, and such action shall be dismissed, unless all Everglades agricultural privilege taxes imposed in years after the action is brought, which the taxpayer in good faith admits to be owing, are paid before they become delinquent. The requirements of this subparagraph are jurisdictional.

2.  In any action involving a challenge of the Everglades agricultural privilege tax, the court shall assess all costs. If the court finds that the amount of tax owed by the taxpayer is greater than the amount the taxpayer has in good faith admitted and paid, it shall enter judgment against the taxpayer for the deficiency and for interest on the deficiency at the rate of 12 percent per year from the date the tax became delinquent. If it finds that the amount of tax which the taxpayer has admitted to be owing is grossly disproportionate to the amount of tax found to be due and that the taxpayer's admission was not made in good faith, the court shall also assess a penalty at the rate of 25 percent of the deficiency per year from the date the tax became delinquent. The court may issue injunctions to restrain the sale of property for any Everglades agricultural privilege tax which appears to be contrary to law or equity.

(g)  Notwithstanding any contrary provisions in chapter 120, or any provision of any other law, an action in circuit court shall be the exclusive remedy to challenge the assessment of an Everglades agricultural privilege tax and owners of property subject to the Everglades agricultural privilege tax shall have no right or standing to initiate administrative proceedings under chapter 120 to challenge the assessment of an Everglades agricultural privilege tax,

including specifically, and without limitation, the annual certification by the district governing board of the Everglades agricultural privilege tax roll to the appropriate tax collector, the annual calculation of any incentive credit for phosphorus level reductions, the denial of an application for exclusion from the Everglades agricultural privilege tax, the calculation of the minimum tax adjustments provided in paragraph (e), the denial of an application for reduction to the minimum tax, and the denial of any application for classification as vegetable acreage, deferment of payment for vegetable acreage, or correction of any alleged error in the Everglades agricultural privilege tax roll.

(h) In recognition of the findings set forth in subsection (1), the Legislature finds that the assessment and use of the Everglades agricultural privilege tax is a matter of concern to all areas of Florida and the Legislature intends this act to be a general law authorization of the tax within the meaning of s. 9, Art. VII of the State Constitution and that payment of the tax complies with the obligations of owners and users of land under s. 7(b), Art. II of the State Constitution.

**(7) C-139 AGRICULTURAL PRIVILEGE TAX.—**

(a) There is hereby imposed an annual C-139 agricultural privilege tax for the privilege of conducting an agricultural trade or business on:

1. All real property located within the C-139 Basin that is classified as agricultural under the provisions of chapter 193; and

2. Leasehold or other interests in real property located within the C-139 Basin owned by the United States, the state, or any agency thereof permitting the property to be used for agricultural purposes in a manner that would result in such property being classified as agricultural under the provisions of chapter 193 if not governmentally owned, whether or not such property is actually classified as agricultural under the provisions of chapter 193.

It is hereby determined by the Legislature that the privilege of conducting an agricultural trade or business on such property constitutes a reasonable basis for imposing the C-139 agricultural privilege tax and that logical differences exist between the agricultural use of such property and the use of other property within the C-139 Basin for residential or nonagricultural commercial use. The C-139 agricultural privilege tax shall constitute a lien against the property, or the leasehold or other interest in governmental property permitting such property to be used for agricultural purposes, described on the C-139 agricultural privilege tax roll. The lien shall be in effect from January 1 of the year the tax notice is mailed until discharged by payment and shall be equal in rank and dignity with the liens of all state, county, district, or municipal taxes and non-ad valorem assessments imposed pursuant to general law, special act, or local ordinance and shall be superior in dignity to all other liens, titles, and claims.

(b) The C-139 agricultural privilege tax, other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, shall be collected in the manner provided for ad valorem taxes. By September 15 of each year, the governing board of the district shall certify by resolution a C-139 agricultural privilege tax roll on compatible electronic medium to the tax collector of each county in which a portion of the C-139 Basin is located. The district shall also produce one copy of the roll in printed form which shall be available for inspection by the public. The district shall post the C-139 agricultural privilege tax for each parcel on the roll. The tax collector shall not accept any such roll that is not certified on compatible electronic medium and that does not contain the posting of the C-139 agricultural privilege tax for each parcel. It is the responsibility of the district that such rolls be free of errors and omissions. Alterations to such rolls may be made by the executive director of the district, or a designee, up to 10 days before certification. If the tax collector or any taxpayer discovers errors or omissions on such roll, such person may request the district to file a corrected roll or a correction of the amount of any C-139 agricultural privilege tax. Other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, C-139 agricultural privilege taxes collected pursuant to this section shall be included in the combined notice for ad valorem taxes and non-ad valorem assessments provided for in s.

17

197.3635. Such C-139 agricultural privilege taxes shall be listed in the portion of the combined notice utilized for non-ad valorem assessments. A separate mailing is authorized only as a solution to the most exigent factual circumstances. However, if a tax collector cannot merge a C-139 agricultural privilege tax roll to produce such a notice, the tax collector shall mail a separate notice of C-139 agricultural privilege taxes or shall direct the district to mail such a separate notice. In deciding whether a separate mailing is necessary, the tax collector shall consider all costs to the district and taxpayers of such a separate mailing and the adverse effects to the taxpayers of delayed and multiple notices. The district shall bear all costs associated with any separate notice. C-139 agricultural privilege taxes collected pursuant to this section shall be subject to all collection provisions of chapter 197, including provisions relating to discount for early payment, prepayment by installment method, deferred payment, penalty for delinquent payment, and issuance and sale of tax certificates and tax deeds for nonpayment. C-139 agricultural privilege taxes for leasehold or other interests in property owned by the United States, the state, or any agency thereof permitting such property to be used for agricultural purposes shall be included on the notice provided pursuant to s. 196.31, a copy of which shall be provided to lessees or other interestholders registering with the district, and shall be collected from the lessee or other appropriate interestholder and remitted to the district immediately upon collection. C-139 agricultural privilege taxes included on the statement provided pursuant to s. 196.31 shall be due and collected on or prior to the next April 1 following provision of the notice. Proceeds of the C-139 agricultural privilege taxes shall be distributed by the tax collector to the district. Each tax collector shall be paid a commission equal to the actual cost of collection, not to exceed 2 percent, on the amount of C-139 agricultural privilege taxes collected and remitted. Notwithstanding any general law or special act to the contrary, C-139 agricultural privilege taxes shall not be included on the notice of proposed property taxes provided in s. 200.069.

(c)1.  The initial C-139 agricultural privilege tax roll shall be certified for the tax notices mailed in November 1994. The C-139 agricultural privilege taxes for the tax notices mailed in November 1994 through November 2002 shall be computed by dividing $654,656 by the number of acres included on the C-139 agricultural privilege tax roll for such year, excluding any property located within the C-139 Annex.

2.  The C-139 agricultural privilege taxes for the tax notices mailed in November 2003 through 2013 shall be computed by dividing $654,656 by the number of acres included on the C-139 agricultural privilege tax roll for November 2001, excluding any property located within the C-139 Annex.

3.  The C-139 agricultural privilege taxes for the tax notices mailed in November 2014 and thereafter shall be $1.80 per acre.

(d)  For purposes of this paragraph, "vegetable acreage" means, for each tax year, any portion of a parcel of property used for a period of not less than 8 months for the production of vegetable crops, including sweet corn, during the 12 months ended September 30 of the year preceding the tax year. Land preparation, crop rotation, and fallow periods shall not disqualify property from classification as vegetable acreage if such property is actually used for the production of vegetable crops.

1.  If either the Governor, the President of the United States, or the United States Department of Agriculture declares the existence of a state of emergency or disaster resulting from extreme natural conditions impairing the ability of vegetable acreage to produce crops, payment of the C-139 agricultural privilege taxes imposed for the privilege of conducting an agricultural trade or business on such property shall be deferred for a period of 1 year, and all subsequent annual payments shall be deferred for the same period.

a.  If the declaration occurs between April 1 and October 31, the C-139 agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

b. If the declaration occurs between November 1 and March 31 and the C-139 agricultural privilege tax included on the most recent tax notice has not been paid, such C-139 agricultural privilege tax will be deferred to the next annual tax notice.

c. If the declaration occurs between November 1 and March 31 and the C-139 agricultural privilege tax included on the most recent tax notice has been paid, the C-139 agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

2. In the event payment of C-139 agricultural privilege taxes is deferred pursuant to this paragraph, the district must record a notice in the official records of each county in which vegetable acreage subject to such deferment is located. The recorded notice must describe each parcel of property as to which C-139 agricultural privilege taxes have been deferred and the amount deferred for such property. If all or any portion of the property as to which C-139 agricultural privilege taxes have been deferred ceases to be classified as agricultural under the provisions of chapter 193 or otherwise subject to the C-139 agricultural privilege tax, all deferred amounts must be included on the tax notice for such property mailed in November of the first tax year for which such property is not subject to the C-139 agricultural privilege tax. After a property owner has paid all outstanding C-139 agricultural privilege taxes, including any deferred amounts, the district shall provide the property owner with a recordable instrument evidencing the payment of all outstanding amounts.

3. The owner, lessee, or other appropriate interestholder shall file an application with the executive director of the district prior to July 1 for classification of a portion of the property as vegetable acreage on the C-139 agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the number of acres used for the production of vegetable crops during the year in which incentive credits are determined and the period of such use. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual C-139 agricultural privilege tax roll to the appropriate tax collector.

4. This paragraph does not relieve vegetable acreage from the performance of best management practices specified in chapter 40E-63, Florida Administrative Code.

(e) Any owner, lessee, or other appropriate interestholder of property subject to the C-139 agricultural privilege tax may contest the C-139 agricultural privilege tax by filing an action in circuit court.

1. No action may be brought to contest the C-139 agricultural privilege tax after 60 days from the date the tax notice that includes the C-139 agricultural privilege tax is mailed by the tax collector. Before an action to contest the C-139 agricultural privilege tax may be brought, the taxpayer shall pay to the tax collector the amount of the C-139 agricultural privilege tax which the taxpayer admits in good faith to be owing. The tax collector shall issue a receipt for the payment and the receipt shall be filed with the complaint. Payment of an C-139 agricultural privilege tax shall not be deemed an admission that such tax was due and shall not prejudice the right to bring a timely action to challenge such tax and seek a refund. No action to contest the C-139 agricultural privilege tax may be maintained, and such action shall be dismissed, unless all C-139 agricultural privilege taxes imposed in years after the action is brought, which the taxpayer in good faith admits to be owing, are paid before they become delinquent. The requirements of this paragraph are jurisdictional.

2. In any action involving a challenge of the C-139 agricultural privilege tax, the court shall assess all costs. If the court finds that the amount of tax owed by the taxpayer is greater than the amount the taxpayer has in good faith admitted and paid, it shall enter judgment against the taxpayer for the deficiency and for interest on the deficiency at the rate of 12 percent per year from the date the tax became delinquent. If it finds that the amount of tax which the taxpayer has admitted to be owing is grossly disproportionate to the amount of tax found to be due and that the taxpayer's admission was not made in good faith, the court shall also assess a penalty

19

at the rate of 25 percent of the deficiency per year from the date the tax became delinquent. The court may issue injunctions to restrain the sale of property for any C-139 agricultural privilege tax which appears to be contrary to law or equity.

(f)  Notwithstanding any contrary provisions in chapter 120, or any provision of any other law, an action in circuit court shall be the exclusive remedy to challenge the assessment of an C-139 agricultural privilege tax and owners of property subject to the C-139 agricultural privilege tax shall have no right or standing to initiate administrative proceedings under chapter 120 to challenge the assessment of an C-139 agricultural privilege tax including specifically, and without limitation, the annual certification by the district governing board of the C-139 agricultural privilege tax roll to the appropriate tax collector, the denial of an application for exclusion from the C-139 agricultural privilege tax, and the denial of any application for classification as vegetable acreage, deferment of payment for vegetable acreage, or correction of any alleged error in the C-139 agricultural privilege tax roll.

(g)  In recognition of the findings set forth in subsection (1), the Legislature finds that the assessment and use of the C-139 agricultural privilege tax is a matter of concern to all areas of Florida and the Legislature intends this section to be a general law authorization of the tax within the meaning of s. 9, Art. VII of the State Constitution.

**(8)  SPECIAL ASSESSMENTS.—**

(a)  In addition to any other legally available funding mechanism, the district may create, alone or in cooperation with counties, municipalities, and special districts pursuant to s. 163.01, the Florida Interlocal Cooperation Act of 1969, one or more stormwater management system benefit areas including property located outside the EAA and the C-139 Basin, and property located within the EAA and the C-139 Basin that is not subject to the Everglades agricultural privilege tax or the C-139 agricultural privilege tax. The district may levy special assessments within said benefit areas to fund the planning, acquisition, construction, financing, operation, maintenance, and administration of stormwater management systems for the benefited areas. Any benefit area in which property owners receive substantially different levels of stormwater management system benefits shall include stormwater management system benefit subareas within which different per acreage assessments shall be levied from subarea to subarea based upon a reasonable relationship to benefits received. The assessments shall be calculated to generate sufficient funds to plan, acquire, construct, finance, operate, and maintain the stormwater management systems authorized pursuant to this section.

(b)  The district may use the non-ad valorem levy, collection, and enforcement method as provided in chapter 197 for assessments levied pursuant to paragraph (a).

(c)  The district shall publish notice of the certification of the non-ad valorem assessment roll pursuant to chapter 197 in a newspaper of general circulation in the counties wherein the assessment is being levied, within 1 week after the district certifies the non-ad valorem assessment roll to the tax collector pursuant to s. 197.3632(5). The assessments levied pursuant to paragraph (a) shall be final and conclusive as to each lot or parcel unless the owner thereof shall, within 90 days of certification of the non-ad valorem assessment roll pursuant to s. 197.3632(5), commence an action in circuit court. Absent such commencement of an action within such period of time by an owner of a lot or parcel, such owner shall thereafter be estopped to raise any question related to the special benefit afforded the property or the reasonableness of the amount of the assessment. Except with respect to an owner who has commenced such an action, the non-ad valorem assessment roll as finally adopted and certified by the South Florida Water Management District to the tax collector pursuant to s. 197.3632(5) shall be competent and sufficient evidence that the assessments were duly levied and that all other proceedings adequate to the adoption of the non-ad valorem assessment roll were duly held, taken, and performed as required by s. 197.3632. If any assessment is abated in whole or in part by the court, the amount by which the assessment is so reduced may, by resolution of the governing board of the district, be payable from funds of the district legally available for that

purpose, or at the discretion of the governing board of the district, assessments may be increased in the manner provided in s. 197.3632.

(d) In no event shall the amount of funds collected for stormwater management facilities pursuant to paragraph (a) exceed the cost of providing water management attributable to water quality treatment resulting from the operation of stormwater management systems of the landowners to be assessed. Such water quality treatment may be required by the plan or permits issued by the district. Prior to the imposition of assessments pursuant to paragraph (a) for construction of new stormwater management systems or the acquisition of necessary land, the district shall establish the general purpose, design, and function of the new system sufficient to make a fair and reasonable determination of the estimated costs of water management attributable to water quality treatment resulting from operation of stormwater management systems of the landowners to be assessed. This determination shall establish the proportion of the total anticipated costs attributable to the landowners. In determining the costs to be imposed by assessments, the district shall consider the extent to which nutrients originate from external sources beyond the control of the landowners to be assessed. Costs for hydroperiod restoration within the Everglades Protection Area shall be provided by funds other than those derived from the assessments. The proportion of total anticipated costs attributable to the landowners shall be apportioned to individual landowners considering the factors specified in paragraph (e). Any determination made pursuant to this paragraph or paragraph (e) may be included in the plan or permits issued by the district.

(e) In determining the amount of any assessment imposed on an individual landowner under paragraph (a), the district shall consider the quality and quantity of the stormwater discharged by the landowner, the amount of treatment provided to the landowner, and whether the landowner has provided equivalent treatment or retention prior to discharge to the district's system.

(f) No assessment shall be imposed under this section for the operation or maintenance of a stormwater management system or facility for which construction has been completed on or before July 1, 1991, except to the extent that the operation or maintenance, or any modification of such system or facility, is required to provide water quality treatment.

(g) The district shall suspend, terminate, or modify projects and funding for such projects, as appropriate, if the projects are not achieving applicable goals specified in the plan.

(h) The Legislature hereby determines that any property owner who contributes to the need for stormwater management systems and programs, as determined for each individual property owner either through the plan or through permits issued to the district or to the property owner, is deemed to benefit from such systems and programs, and such benefits are deemed to be directly proportional to the relative contribution of the property owner to such need. The Legislature also determines that the issuance of a master permit provides benefits, through the opportunity to achieve collective compliance, for all persons within the area of the master permit which may be considered by the district in the imposition of assessments under this section.

**(9) PERMITS.—**

(a) The Legislature finds that construction and operation of the Everglades Construction Project will benefit the water resources of the district and is consistent with the public interest. The district shall construct, maintain, and operate the Everglades Construction Project in accordance with this section.

(b) The Legislature finds that there is an immediate need to initiate cleanup and restoration of the Everglades Protection Area through the Everglades Construction Project. In recognition of this need, the district may begin construction of the Everglades Construction Project prior to final agency action, or notice of intended agency action, on any permit from the department under this section.

(c) The department may issue permits to the district to construct, operate, and maintain the Everglades Construction Project based on the criteria set forth in this section. The permits to be

issued by the department to the district under this section shall be in lieu of other permits under this part or part VIII of chapter 403, 1992 Supplement to the Florida Statutes 1991.

(d)  By June 1, 1994, the district shall apply to the department for a permit or permits for the construction, operation, and maintenance of the Everglades Construction Project. The district may comply with this paragraph by amending its pending Everglades permit application.

(e)  The department shall issue a permit for a term of 5 years for the construction, operation, and maintenance of the Everglades Construction Project upon the district's providing reasonable assurances that:

1.  The project will be constructed, operated, and maintained in accordance with the Everglades Construction Project;

2.  The BMP program set forth in paragraph (4)(f) has been implemented; and

3.  The final design of the Everglades Construction Project shall minimize wetland impacts, to the maximum extent practicable and consistent with the Everglades Construction Project.

(f)  At least 60 days prior to the expiration of any permit issued under this section, the district may apply for renewal for a period of 5 years.

(g)  Permits issued under this section may include any standard conditions provided by department rule which are appropriate and consistent with this section.

(h)  Discharges shall be allowed, provided the STAs are operated in accordance with this section, if, after a stabilization period:

1.  The STAs achieve the design objectives of the Everglades Construction Project for phosphorus;

2.  For water quality parameters other than phosphorus, the quality of water discharged from the STAs is of equal or better quality than inflows; and

3.  Discharges from STAs do not pose a serious danger to the public health, safety, or welfare.

(i)  The district may discharge from any STA into waters of the state upon issuance of final agency action authorizing such action or in accordance with s. 373.439.

(j)1.  Modifications to the Everglades Construction Project shall be submitted to the department for a determination as to whether permit modification is necessary. The department shall notify the district within 30 days after receiving the submittal as to whether permit modification is necessary.

2.  The Legislature recognizes that technological advances may occur during the construction of the Everglades Construction Project. If superior technology becomes available in the future which can be implemented to more effectively meet the intent and purposes of this section, the district is authorized to pursue that alternative through permit modification to the department. The department may issue or modify a permit provided that the alternative is demonstrated to be superior at achieving the restoration goals of the Everglades Construction Project considering:

a.  Levels of load reduction;

b.  Levels of discharge concentration reduction;

c.  Water quantity, distribution, and timing for the Everglades Protection Area;

d.  Compliance with water quality standards;

e.  Compatibility of treated water with the balance in natural populations of aquatic flora or fauna in the Everglades Protection Area;

f.  Cost-effectiveness; and

g.  The schedule for implementation.

Upon issuance of permit modifications by the department, the district is authorized to use available funds to finance the modification.

3.  The district shall modify projects of the Everglades Construction Project, as appropriate, if the projects are not achieving the design objectives. Modifications that are inconsistent with the permit shall require a permit modification from the department. Modifications which substitute the treatment technology must meet the requirements of subparagraph 2. Nothing in this section

shall prohibit the district from refining or modifying the final design of the project based upon the February 14, 1994, conceptual design document in accordance with standard engineering practices.

(k)  By October 1, 1994, the district shall apply for a permit under this section to operate and maintain discharge structures within the control of the district which discharge into, within, or from the Everglades Protection Area and are not included in the Everglades Construction Project. The district may comply with this subsection by amending its pending permit application regarding these structures. In addition to the requirements of ss. 373.413 and 373.416, the application shall include the following:

1.  Schedules and strategies for:

a.  Achieving and maintaining water quality standards;

b.  Evaluation of existing programs, permits, and water quality data;

c.  Acquisition of lands and construction and operation of water treatment facilities, if appropriate, together with development of funding mechanisms; and

d.  Development of a regulatory program to improve water quality, including identification of structures or systems requiring permits or modifications of existing permits.

2.  A monitoring program to ensure the accuracy of data and measure progress toward achieving compliance with water quality standards.

(l)  The department shall issue one or more permits for a term of 5 years for the operation and maintenance of structures identified by the district in paragraph (k) upon the district's demonstration of reasonable assurance that those elements identified in paragraph (k) will provide compliance with water quality standards to the maximum extent practicable and otherwise comply with the provisions of ss. 373.413 and 373.416. The department shall take agency action on the permit application by October 1, 1996. At least 60 days prior to the expiration of any permit, the district may apply for a renewal thereof for a period of 5 years.

(m)  The district may apply for modification of any permit issued pursuant to this subsection, including superior technology in accordance with the procedures set forth in this subsection.

(n)  The district also shall apply for a permit or modification of an existing permit, as provided in this subsection, for any new structure or for any modification of an existing structure.

(o)  Except as otherwise provided in this section, nothing in this subsection shall relieve any person from the need to obtain any permit required by the department or the district pursuant to any other provision of law.

(p)  The district shall publish notice of rulemaking pursuant to chapter 120 by October 1, 1991, allowing for a master permit or permits authorizing discharges from landowners within that area served by structures identified as S-5A, S-6, S-7, S-8, and S-150. For discharges within this area, the district shall not initiate any proceedings to require new permits or permit modifications for nutrient limitations prior to the adoption of the master permit rule by the governing board of the district or prior to April 1, 1992, whichever first occurs. The district's rules shall also establish conditions or requirements allowing for a single master permit for the Everglades Agricultural Area including those structures and water releases subject to chapter 40E-61, Florida Administrative Code. No later than the adoption of rules allowing for a single master permit, the department and the district shall provide appropriate procedures for incorporating into a master permit separate permits issued by the department under this chapter. The district's rules authorizing master permits for the Everglades Agricultural Area shall provide requirements consistent with this section and with interim or other permits issued by the department to the district. Such a master permit shall not preclude the requirement that individual permits be obtained for persons within the master permit area for activities not authorized by, or not in compliance with, the master permit. Nothing in this subsection shall limit the authority of the department or district to enforce existing permit requirements or existing rules, to require permits for new structures, or to develop rules for master permits for other areas. To the

greatest extent possible the department shall delegate to the district any authority necessary to implement this subsection which is not already delegated.

**(10)  LONG-TERM COMPLIANCE PERMITS.—**By December 31, 2006, the department and the district shall take such action as may be necessary ~~to implement the pre-2006 projects and strategies of the Long-Term Plan~~ so that water delivered to the Everglades Protection Area achieves ~~in all parts of the Everglades Protection Area~~ state water quality standards, including the phosphorus criterion ~~and moderating provisions.~~, in all parts of the Everglades Protection Area.

(a) ~~By December 31, 2003, the district shall submit to the department an application for permit modification to incorporate proposed changes to the Everglades Construction Project and other district works delivering water to the Everglades Protection Area as needed to implement the pre-2006 projects and strategies of the Long-Term Plan in all permits issued by the department, including the permits issued pursuant to subsection (9).  These changes shall be designed to achieve state water quality standards, including the phosphorus criterion and moderating provisions.  During the implementation of the initial phase of the Long-Term Plan, permits issued by the department shall be based on BAPRT, and shall include technology-based effluent limitations consistent with the Long-Term Plan, as provided in subparagraph (4)(e)3.~~

  (b)  If the Everglades Construction Project or other discharges to the Everglades Protection Area are in compliance with state water quality standards, including the phosphorus criterion, the permit application shall include:

1.  A plan for maintaining compliance with the phosphorus criterion in the Everglades Protection Area.

2.  A plan for maintaining compliance in the Everglades Protection Area with state water quality standards other than the phosphorus criterion.

**(11)  APPLICABILITY OF LAWS AND WATER QUALITY STANDARDS; AUTHORITY OF DISTRICT AND DEPARTMENT.—**

(a)  Except as otherwise provided in this section, nothing in this section shall be construed:

1.  As altering any applicable state water quality standards, laws, or district or department rules in areas impacted by this section; or

2.  To restrict the authority otherwise granted the department and the district pursuant to this chapter or chapter 403, and provisions of this section shall be deemed supplemental to the authority granted pursuant to this chapter and chapter 403.

(b)  Mixing zones, variances, and moderating provisions, or relief mechanisms for compliance with water quality standards as provided by department rules, shall not be permitted for discharges which are subject to paragraph (4)(f) and subject to this section, except that site specific alternative criteria may be allowed for nonphosphorus parameters if the applicant shows entitlement under applicable law. After December 31, 2006, all such relief mechanisms may be allowed for nonphosphorus parameters if otherwise provided for by applicable law.

(c)  Those landowners or permittees who are not in compliance as provided in paragraph (4)(f) must meet a discharge limit for phosphorus of 50 parts per billion (ppb) unless and until some other limit has been established by department rule or order or operation of paragraph (4)(e).

**(12)  RIGHTS OF SEMINOLE TRIBE OF FLORIDA.—**Nothing in this section is intended to diminish or alter the governmental authority and powers of the Seminole Tribe of Florida, or diminish or alter the rights of that tribe, including, but not limited to, rights under the Water Rights Compact among the Seminole Tribe of Florida, the state, and the South Florida Water Management District as enacted by Pub. L. No. 100-228, 101 Stat. 1556, and chapter 87-292, Laws of Florida, and codified in s. 285.165, and rights under any other agreement between the Seminole Tribe of Florida and the state or its agencies. No land of the Seminole Tribe of Florida shall be used for stormwater treatment without the consent of the tribe.

**(13) ANNUAL REPORTS.—**Beginning January 1, 1992, the district shall submit to the department, the Governor, the Speaker of the House of Representatives, the Minority Leader of the House of Representatives, the President of the Senate, and the Minority Leader of the Senate annual progress reports regarding implementation of the section. The annual report will include a summary of the water conditions in the Everglades Protection Area, the status of the impacted areas, the status of the construction of the STAs, the implementation of the BMPs, and actions taken to monitor and control exotic species. The district must prepare the report in coordination with federal and state agencies.

**(14) EVERGLADES FUND.—**The South Florida Water Management District is directed to separately account for all moneys used for the purpose of funding the Everglades Construction Project.

**(15) DEFINITION OF EVERGLADES AGRICULTURAL AREA.—**As used in this section, "Everglades Agricultural Area" or "EAA" means the following described property: BEGINNING at the intersection of the North line of Section 2, Township 41, Range 37 East, with the Easterly right-of-way line of U.S. Army Corps of Engineers' Levee D-9, in Palm Beach County, Florida; thence, easterly along said North line of said Section 2 to the Northeast corner of said Section 2; thence, northerly along the West line of Section 36, Township 40 South, Range 37 East, to the West one-quarter corner of said Section 36; thence, easterly along the East-West half section line of said Section 36 to the center of said Section 36; thence northerly along the North-South half section line of said Section 36 to the North one-quarter corner of said Section 36, said point being on the line between Palm Beach and Martin Counties; thence, easterly along said North line of said Section 36 and said line between Palm Beach and Martin Counties to the Westerly right-of-way line of the South Florida Water Management District's Levee 8 North Tieback; thence, southerly along said Westerly right-of-way line of said Levee 8 North Tieback to the Southerly right-of-way line of South Florida Water Management District's Levee 8 at a point near the Northeast corner of Section 12, Township 41 South, Range 37 East; thence, easterly along said Southerly right-of-way line of said Levee 8 to a point in Section 7, Township 41 South, Range 38 East, where said right-of-way line turns southeasterly; thence, southeasterly along the Southwesterly right-of-way line of said Levee 8 to a point near the South line of Section 8, Township 43 South, Range 40 East, where said right-of-way line turns southerly; thence, southerly along the Westerly right-of-way line of said Levee 8 to the Northerly right-of-way line of State Road 80, in Section 32, Township 43 South, Range 40 East; thence, westerly along the Northerly right-of-way line of said State Road 80 to the northeasterly extension of the Northwesterly right-of-way line of South Florida Water Management District's Levee 7; thence, southwesterly along said northeasterly extension, and along the northwesterly right-of-way line of said Levee 7 to a point near the Northwest corner of Section 3, Township 45 South, Range 39 East, where said right-of-way turns southerly; thence, southerly along the Westerly right-of-way line of said Levee 7 to the Northwesterly right-of-way line of South Florida Water Management District's Levee 6, on the East line of Section 4, Township 46 South, Range 39 East; thence, southwesterly along the Northwesterly right-of-way line of said Levee 6 to the Northerly right-of-way line of South Florida Water Management District's Levee 5, near the Southwest corner of Section 22, Township 47 South, Range 38 East; thence, westerly along said Northerly right-of-way lines of said Levee 5 and along the Northerly right-of-way line of South Florida Water Management District's Levee 4 to the Northeasterly right-of-way line of South Florida Water Management District's Levee 3 and the Northeast corner of Section 12, Township 48 South, Range 34 East; thence, northwesterly along said Northeasterly right-of-way line of said Levee 3 to a point near the Southwest corner of Section 9, Township 47 South, Range 34 East, where said right-of-way line turns northerly; thence, northerly along the Easterly right-of-way lines of said Levee 3 and South Florida Water Management District's Levee 2 to the southerly line of Section 4, Township 46 South, Range 34 East; thence, easterly along said southerly line of said Section 4 to the Southeast corner of said Section 4; thence, northerly

25

along the East lines of said Section 4 and Section 33, Township 45 South, Range 34 East, to the Northeast corner of said Section 33; thence, westerly along the North line of said Section 33 to said Easterly right-of-way line of said Levee 2; thence, northerly along said Easterly right-of-way lines of said Levee 2 and South Florida Water Management District's Levee 1, to the North line of Section 16, Township 44 South, Range 34 East; thence, easterly along the North lines of said Section 16 and Section 15, Township 44 South, Range 34 East, to the Northeast corner of said Section 15; thence, northerly along the West lines of Section 11 and Section 2, Township 44 South, Range 34 East, and the West lines of Section 35, Section 26 and Section 23, Township 43 South, Range 34 East to a point 25 feet north of the West quarter-corner (W1/4) of said Section 23; thence, easterly along a line that is 25 feet north and parallel to the East-West half section line of said Section 23 and Section 24 to a point that is 25 feet north of the center of said Section 24; thence, northerly along the North-South half section lines of said Section 24 and Section 13, Township 43 South, Range 34 East, to the intersection with the North right-of-way line of State Road 80A (old U.S. Highway 27); thence, westerly along said North right-of-way line of said State Road 80A (old U.S. Highway 27) to the intersection with the Southerly right-of-way line of State Road 80; thence, easterly along said Southerly right-of-way line of said State Road 80 to the intersection with the North line of Section 19, Township 43 South, Range 35 East; thence, easterly along said North line of said Section 19 to the intersection with Southerly right-of-way of U.S. Army Corps of Engineers Levee D-2; thence, easterly along said Southerly right-of-way of said Levee D-2 to the intersection with the north right-of-way line of State Road 80 (new U.S. Highway 27); thence, easterly along said North right-of-way line of said State Road 80 (new U.S. Highway 27) to the East right-of-way line of South Florida Water Management District's Levee 25 (Miami Canal); thence, North along said East right-of-way line of said Levee 25 to the said south right-of-way line of said Levee D-2; thence, easterly and northeasterly along said Southerly and Easterly right-of-way lines of said Levee D-2 and said Levee D-9 to the point of beginning.

[3]**(16)  DEFINITION OF C-139 BASIN.**—For purposes of this section:

(a) "C-139 Basin" or "Basin" means the following described property: beginning at the intersection of an easterly extension of the south bank of Deer Fence Canal with the center line of South Florida Water Management District's Levee 3 in Section 33, Township 46 South, Range 34 East, Hendry County, Florida; thence, westerly along said easterly extension and along the South bank of said Deer Fence Canal to where it intersects the center line of State Road 846 in Section 33, Township 46 South, Range 32 East; thence, departing from said top of bank to the center line of said State Road 846, westerly along said center line of said State Road 846 to the West line of Section 4, Township 47 South, Range 31 East; thence, northerly along the West line of said section 4, and along the west lines of Sections 33 and 28, Township 46 South, Range 31 East, to the northwest corner of said Section 28; thence, easterly along the North line of said Section 28 to the North one-quarter (N1/4) corner of said Section 28; thence, northerly along the West line of the Southeast one-quarter (SE1/4) of Section 21, Township 46 South, Range 31 East, to the northwest corner of said Southeast one-quarter (SE1/4) of Section 21; thence, easterly along the North line of said Southeast one-quarter (SE1/4) of Section 21 to the northeast corner of said Southeast one-quarter (SE1/4) of Section 21; thence, northerly along the East line of said Section 21 and the East line of Section 16, Township 46 South, Range 31, East, to the northeast corner thereof; thence, westerly along the North line of said Section 16, to the northwest corner thereof; thence, northerly along the West line of Sections 9 and 4, Township 46 South, Range 31, East, to the northwest corner of said Section 4; thence, westerly along the North lines of Section 5 and Section 6, Township 46 South, Range 31 East, to the South one-quarter (S1/4) corner of Section 31, Township 45 South, Range 31 East; thence, northerly to the South one-quarter (S1/4) corner of Section 30, Township 45 South, Range 31 East; thence, easterly along the South line of said Section 30 and the South lines of Sections 29 and 28, Township 45 South, Range 31 East, to the Southeast corner of said

Section 28; thence, northerly along the East line of said Section 28 and the East lines of Sections 21 and 16, Township 45 South, Range 31 East, to the Northwest corner of the Southwest one-quarter of the Southwest one-quarter (SW1/4 of the SW 1/4) of Section 15, Township 45 South, Range 31 East; thence, northeasterly to the east one-quarter (E1/4) corner of Section 15, Township 45 South, Range 31 East; thence, northerly along the East line of said Section 15, and the East line of Section 10, Township 45 South, Range 31 East, to the center line of a road in the Northeast one-quarter (NE1/4) of said Section 10; thence, generally easterly and northeasterly along the center line of said road to its intersection with the center line of State Road 832; thence, easterly along said center line of said State Road 832 to its intersection with the center line of State Road 833; thence, northerly along said center line of said State Road 833 to the north line of Section 9, Township 44 South, Range 32 East; thence, easterly along the North line of said Section 9 and the north lines of Sections 10, 11 and 12, Township 44 South, Range 32 East, to the northeast corner of Section 12, Township 44 South, Range 32 East; thence, easterly along the North line of Section 7, Township 44 South, Range 33 East, to the center line of Flaghole Drainage District Levee, as it runs to the east near the northwest corner of said Section 7, Township 44 South, Range 33 East; thence, easterly along said center line of the Flaghole Drainage District Levee to where it meets the center line of South Florida Water Management District's Levee 1 at Flag Hole Road; thence, continue easterly along said center line of said Levee 1 to where it turns south near the Northwest corner of Section 12, Township 44 South, Range 33 East; thence, Southerly along said center line of said Levee 1 to where the levee turns east near the Southwest corner of said Section 12; thence, easterly along said center line of said Levee 1 to where it turns south near the Northeast corner of Section 17, Township 44 South, Range 34 East; thence, southerly along said center line of said Levee 1 and the center line of South Florida Water Management District's Levee 2 to the intersection with the north line of Section 33, Township 45 South, Range 34 East; thence, easterly along the north line of said Section 33 to the northeast corner of said Section 33; thence, southerly along the east line of said Section 33 to the southeast corner of said Section 33; thence, southerly along the east line of Section 4, Township 46 South, Range 34 East to the southeast corner of said Section 4; thence, westerly along the south line of said Section 4 to the intersection with the centerline of South Florida Water Management District's Levee 2; thence, southerly along said Levee 2 centerline and South Florida Water Management District's Levee 3 centerline to the POINT OF BEGINNING.

(b)   Sections 21, 28, and 33, Township 46 South, Range 31 East, are not included within the boundary of the C-139 Basin.

(c)   If the district issues permits in accordance with all applicable rules allowing water from the "C-139 Annex" to flow into the drainage system for the C-139 Basin, the C-139 Annex shall be added to the C-139 Basin for all tax years thereafter, commencing with the next C-139 agricultural privilege tax roll certified after issuance of such permits. "C-139 Annex" means the following described property: that part of the S.E. 1/4 of Section 32, Township 46 South, Range 34 East and that portion of Sections 5 and 6, Township 47 South, Range 34 East lying west of the L-3 Canal and South of the Deer Fence Canal; all of Sections 7, 17, 18, 19, 20, 28, 29, 30, 31, 32, 33, and 34, and that portion of Sections 8, 9, 16, 21, 22, 26, 27, 35, and 36 lying south and west of the L-3 Canal, in Township 47 South, Range 34 East; and all of Sections 2, 3, 4, 5, 6, 8, 9, 10, and 11 and that portion of Section 1 lying south and west of the L-3 Canal all in Township 48 South, Range 34 East.

**(17)  SHORT TITLE.—**This section shall be known as the "Everglades Forever Act."

History.—s. 2, ch. 91-80; ss. 1, 2, ch. 94-115; s. 273, ch. 94-356; s. 171, ch. 99-13.

[1]Note.—Repealed by s. 38, ch. 99-247.

[2]Note.—Sections 403.91-403.938 comprised part VIII of ch. 403 in 1992. Except for s. 403.927 and ss. 403.93-403.958, these sections were repealed by ss. 45, 46, ch. 93-213, or s. 18, ch. 95-145. Sections 403.93-403.936 were repealed by s. 13, ch. 95-299. The two remaining

sections from former part VIII as it was constituted in 1992, ss. 403.927 and 403.938 (transferred to s. 403.9333 by s. 12, ch. 95-299), are located in part VII of ch. 403.

[3]Note.—Section 3, ch. 96-412, provides that "[n]otwithstanding s. 373.4592(16), to the contrary, Sections 21, 28, and 33, Township 46 South, Range 31 East shall not be included within the boundary of the C-139 Basin." Section 84, ch. 96-321, contains a substantially similar provision.

**Attachment 2 – Revisions to Phosphorus Rule**

**62-302.540 Water Quality Standards for Phosphorus Within the Everglades Protection Area.**

**(1) Purpose and Scope.**
(a) The purpose of this rule is to implement the requirements of the Everglades Forever Act by utilizing the powers and duties granted the Department under the Act and other applicable provisions of Chapter 373 and 403, F.S., to establish water quality standards for phosphorus, including a numeric phosphorus criterion, within the EPA.
(b) The water quality standards adopted by this rule include all of the following elements:

> 1. A numerical interpretation of the Class III narrative nutrient criterion for phosphorus; and
> 2. Establishment of moderating provisions for permits authorizing discharges into the EPA in compliance with water quality standards, including the numeric phosphorus criterion; and
> 3. A method for determining achievement of the numeric phosphorus criterion, which takes into consideration spatial and temporal variability, natural background conditions and confidence in laboratory results.

**(2) Findings.**
(a) The Legislature, in adopting the Everglades Forever Act, recognized that the EPA must be restored both in terms of water quantity and water quality.
(b) Best Management Practices (BMPs) have reduced phosphorus loads from the Everglades Agricultural Area to the EPA by more than twice the amount required by existing rules. Stormwater Treatment Areas (STAs) have reduced phosphorus concentrations to less than the goal of 50 ppb established in the Everglades Forever Act.
(c) While a significant percentage of the EPA currently meets the numeric phosphorus criterion, further efforts are required to achieve the criterion in the remaining impacted areas of the EPA.
(d) Even as water quality continues to improve, restoration will be a long-term process because of historic phosphorus accumulations found in sediments within impacted areas. This phosphorus can diffuse back into the water column, a phenomenon the Department recognizes as reflux.
(e) The Basin-Specific Feasibility Studies completed by the District considered environmental factors, implementation cost, scheduling, and technical factors in evaluating measures to reduce phosphorus levels entering the EPA. These studies and other information provided to the Commission show that:

> 1. At this time, chemical treatment technology is not cost-effective for treating discharges entering the EPA and poses the potential for adverse environmental effects.
> 2. Optimization of the existing STAs, in combination with BMPs, is currently the most cost-effective and environmentally preferable means to achieve further phosphorus reductions to the EPA, and to restore impacted areas. The effectiveness of such measures should be determined and maximized prior to requiring additional measures. Optimization shall take into consideration viable vegetative technologies, including Periphyton-based STAs that are found to be cost-effective and environmentally acceptable.

(f) The District and the Department recognize that STA and BMP optimization requires a sustained commitment to construct, implement, stabilize and measure phosphorus reduction benefits.

(g) The Comprehensive Everglades Restoration Plan (CERP) contains projects that will affect the flows and phosphorus levels entering the EPA. Achievement of water quality standards for water quality projects required under the Everglades Forever Act can be most effectively and efficiently attained when integrated with CERP projects.

(h) The Long-Term Plan constitutes a comprehensive program to optimize the STAs and BMPs to achieve further phosphorus reductions and thereby accomplish implementation of Best Available Phosphorus Reduction Technology (BAPRT).

(i) It is the intent of the Commission that implementation of this rule will fulfill commitments made by the State of Florida to restore and maintain water quality in the EPA, while, at the same time, fulfill the States obligations under the Settlement Agreement to achieve the long-term phosphorus concentration levels and discharge limits established in that Agreement for the Loxahatchee National Wildlife Refuge (Refuge) and the Everglades national Park (Park).

(j) Establishment of the numeric phosphorus criterion, based upon analyses conducted primarily in freshwater open water slough systems, assumed that preservation of the balance of the native flora and fauna in these open water slough systems would protect other communities of native vegetation in the EPA. Further research should be conducted in other habitat types to further evaluate the natural variability in those habitat types.

(k) The Commission has received substantial testimony regarding mercury and its impact on the EPA. The Commission encourages all interested parties to continue research efforts on the effects of mercury.

(l) The Commission finds that this rule must incorporate a flexible approach towards the application of the numeric phosphorus criterion for phosphorus in order to guide the implementation of phosphorus reductions in the Everglades Protection Area. Chapter 403, F.S., the Everglades Forever Act and U.S. Environmental Protection Agency regulations set forth at 40 CFR Part 131 include general policies that authorize such flexibility under appropriate circumstances, including those described in subparagraphs (c) through (h) and (k) above. The Commission has exercised this authority by including in this rule both a numeric interpretation of the phosphorus criterion and the various other standard setting provisions of this rule, including the permitting and moderating provisions.

**(3) Definitions.**

(a) "Best Available Phosphorus Reduction Technology" (BAPRT) shall be as defined by s. 373.4592(2)(a), F.S. BMPs shall maintain and, where practicable, improve upon the performance of urban and agricultural source controls in reducing overall phosphorus levels. Agricultural BMPs within the Everglades Agricultural Area and the C-139 Basin shall be in accordance with Rules 40E-61 and 40E-63, F.A.C. STA phosphorus reductions shall be improved through implementation of optimization measures as defined by s. 373.4592(2)(l), F.S. BAPRT may include measures intended to reduce phosphorus levels in discharges from a single basin or sub-basin, or a program designed to address discharges from multiple basins.

(b) "Long-Term Plan" shall be as defined by Section 373.4592(2)(j), F.S.

(c) The "Everglades Protection Area" or "EPA" shall mean Water Conservation Areas 1 (Refuge), 2A, 2B, 3A and 3B, and the Everglades National Park.

(d) "Impacted Areas" shall mean areas of the EPA where total phosphorus concentrations in the upper 10 centimeters of the soils are greater than 500 mg/kg.

(e) "District" shall mean the South Florida Water Management District.

(f) "Optimization" shall be as defined by Section 373.4592(2)(l), F.S.

(g)"Settlement Agreement" shall mean the Settlement Agreement entered in
Case No. 88-1886-Civ-Hoeveler, United States District Court for the Southern District of
Florida, as modified by the Omnibus Order entered in the case on April 27, 2001.
(h) "Technology-based effluent limitation" or "TBEL" shall be defined in
Section 373.4592(2)(p), F.S.
(i) "Unimpacted Areas" shall mean those areas which are not "Impacted
Areas".

**(4) Phosphorus Criterion.**
(a) The numeric phosphorus criterion for Class III waters in the EPA shall be
a long-term geometric mean of 10 ppb, but shall not be lower than the natural conditions
of the EPA, and shall take into account spatial and temporal variability. Achievement of
the criterion shall be determined by the methods in this subsection. Exceedences of the
provisions of the subsection shall not be considered deviations from the criterion if they
are attributable to the full range of natural spatial and temporal variability, statistical
variability inherent in sampling and testing procedures or higher natural background
conditions.
(b) Water Bodies.
Achievement of the phosphorus criterion for waters in the EPA shall be
determined separately in impacted and unimpacted areas in each of the following
waterbodies: Water Conservation Areas 1, 2 and 3, and the Everglades National Park.
(c) Achievement of Criterion in Everglades National Park.
Achievement of the phosphorus criterion in the Park shall be based on the methods as
set forth in Appendix A of the Settlement Agreement unless the Settlement Agreement is
rescinded or terminated. If the Settlement Agreement is no longer in force, achievement
of the criterion shall be determined based on the method provided for the remaining
EPA.
For the Park, the Department shall review data from inflows into the park at locations
established pursuant to Appendix A of the Settlement Agreement and shall determine
that compliance is achieved if the Department concludes that phosphorus concentration
limits for inflows into the Park do not result in a violation of the limits established in
Appendix A.
(d) Achievement of the Criterion in WCA-1, WCA-2 and WCA-3.
    1. Achievement of the criterion in unimpacted areas in each WCA shall be
    determined based upon data from stations that are evenly distributed and located
    in freshwater open water sloughs similar to the areas from which data were
    obtained to derive the phosphorus criterion. Achievement of the criterion shall be
    determined based on data collected monthly from the network of monitoring
    stations in the unimpacted area. The water body will have achieved the criterion
    if the five year geometric mean averaged across all stations is less than or equal
    to 10 ppb. In order to provide protection against imbalances of aquatic flora or
    fauna, the following provisions must also be met:
        a. The annual geometric mean average across all stations is less than or
        equal to 10 ppb for three of five years; and
        b. The annual geometric mean averaged across all stations is less than or
        equal to 11 ppb; and
        c. The annual geometric mean at all individual stations is less than or
        equal to 15 ppb. Individual station analyses are representative of only that
        station.
    2. Achievement of the criterion shall be determined based on data collected
    monthly from the network of monitoring stations in the impacted area. Impacted

Areas of the water body will have achieved the criterion if the five year geometric mean averaged across all stations is less than or equal to 10 ppb. In order to provide protection against imbalances of aquatic flora or fauna, the following provisions must also be met:

> a. The annual geometric mean averaged across all stations is less than or equal to 10 ppb for three of five years; and

> b. The annual geometric mean averaged across all stations is less than or equal to 11 ppb; and

> c. The annual geometric mean at all individual stations is less than or equal to 15 ppb. Individual station analyses are representative of only that station.

~~If these limits are not met, no action shall be required, provided that the net improvement or hydropattern restoration provisions of subsection (6) below are met.~~ Notwithstanding the definition of Impacted Area in subsection (3), individual stations in the network shall be deemed to be unimpacted for purposes of this rule if the five-year geometric mean is less than or equal to 10 ppb and the annual geometric mean is less than or equal to 15 ppb.

(e) Adjustment of Achievement Methods.

The Department shall complete a technical review of the achievement methods set forth in this subsection at a minimum of five year intervals and will report to the ERC on changes as needed. Data will be collected as necessary at stations that are evenly distributed and representative of major natural habitat types to further define the natural spatial and temporal variability and natural background of phosphorus concentrations in the EPA. As a part of the review, the Department may propose amendments to the achievement method provisions of this rule to include: (1) a hydrologic variability algorithm in a manner similar to the Settlement Agreement; and (2) implementing adjustment factors that take into account water body specific variability, including the effect of habitat types. The hydrologic variability evaluation shall be based on data from at least one climatic drought cycle and data reflecting the average interior stage of the water body on the dates of sample collection.

(f) Data Screening. Data from each monitoring station shall be evaluated prior to being used for the purposes of determining achievement of the criterion. Data shall be excluded from calculations for the purpose of determining achievement of the criterion if such data:

> 1. Do not comply with the requirements of Chapter 62-160, F.A.C.; or

> 2. Are excluded through the screening protocol set forth in the *Data QualityScreening Protocol*; or

> 3. Were collected from sites affected by extreme events such as fire, flood, drought or hurricanes, until normal conditions are restored; or

> 4. Where affected by localized activities caused by temporary human or natural disturbances such as airboat traffic, authorized (permitted or exempt) restoration activities, alligator holes, or bird rookeries.

> 5. Were sampled in years where hydrologic conditions (e.g. rainfall amount, water levels and water deliveries) were outside the range that occurred during the period (calendar years 1978-2001) used to set the phosphorus criterion.

**(5) Long-Term Compliance Permit Requirements for Phosphorus Discharges into the EPA.**

~~(a) In addition to meeting all other applicable permitting criteria, an applicant must provide reasonable assurance that the discharge will comply with state water quality standards as set forth in this section.~~

(b) Discharges into the EPA shall be deemed in compliance with state water quality standards upon a demonstration that:

    1. Phosphorus levels in the discharges will be at or below the phosphorus criterion set forth in this rule; or

    ~~2. Discharges will not cause or contribute to exceedences of the phosphorus criterion in the receiving waters, the determination of which will take into account the phosphorus in the water column that is due to reflux; or~~

    ~~3. Discharges will comply with moderating provisions as provided in this rule.~~

(c) Discharges into the Park must not result in a violation of the concentration limits established for the Park in Appendix A of the Settlement Agreement as determined through the methodology set forth in paragraph (4).

~~(d) Discharge limits for permits allowing discharges into the EPA shall be based upon TBELs established through BAPRT and shall not require water quality based effluent limitations through 2016. Such TBELs shall be applied as effluent limitations as defined in Rule 62-302.200(10), F.A.C.~~

**(6) Moderating Provisions.** ~~The following moderating provisions are established for discharges into or within the EPA as a part of state water quality standards applicable to the phosphorus criterion set forth in this rule:~~

~~(a) Net Improvement in Impacted Areas.~~

    ~~1. Until December 31, 2016, discharges into or within the EPA shall be permitted using net improvement as a moderating provision upon a demonstration by the applicant that:~~

        ~~a. The permittee will implement, or cause to be implemented, BAPRT, as defined by s. 373.4592(2)(a), F.S., and further provided in this section, which shall include a continued research and monitoring program designed to reduce outflow concentrations of phosphorus; and~~

        ~~b. The discharge is into or within an impacted area.~~

    ~~2. BAPRT shall use an adaptive management approach based on the best available information and data to develop and implement incremental phosphorus reduction measures with the goal of achieving the phosphorus criterion. BAPRT shall also include projects and strategies to accelerate restoration of natural conditions with regard to populations of native flora or fauna.~~

    ~~3. For purposes of this rule, the Long-Term Plan shall constitute BAPRT. The planning goal of the Long-Term Plan is to achieve compliance with the criterion set forth in subsection (4) of this rule. Implementation of BAPRT will result in net improvement in impacted areas of the EPA. The Initial Phase of the Long-Term Plan shall be implemented through 2016. Revisions to the Long-Term Plan shall be incorporated through an adaptive management approach including a Process Development and Engineering component to identify and implement incremental optimization measures for further phosphorus reductions.~~

    ~~4. The Department and the District shall propose amendments to the Long-Term Plan as science and environmental conditions warrant. The Department shall approve all amendments to the Long-Term Plan.~~

    ~~5. As part of the review of permit applications, the Department shall review proposed changes to the Long-Term Plan identified through the Process Development and Engineering component of the Long-Term Plan to evaluate changes necessary to comply with this rule, including the numeric phosphorus criterion. Those changes which the department deems necessary to comply with~~

~~this rule, including the numeric phosphorus criterion, shall be included as conditions of the respective permit or permits for the structures associated with the particular basin or basins involved. Until December 31, 2016, such permits shall include technology-based effluent limitations consistent with the Long-Term Plan.~~
~~(b) Hydropattern Restoration. Discharges into or within unimpacted areas of the EPA shall be permitted for hydropattern restoration purposes upon a demonstration by the applicant that:~~
~~1. The discharge will be able to achieve compliance with the requirements of paragraph (6)(a)1.a. above;~~
~~2. The environmental benefits of establishing the discharge clearly outweigh the potential adverse impacts that may result in the event that phosphorus levels in the discharge exceed the criterion; and~~
~~3. The discharge complies with antidegradation requirements.~~
~~(c) Existing Moderating Provisions. Nothing in this rule shall eliminate the availability of moderating provisions that may otherwise exist as a matter of law, rule or regulation.~~

**(7) Document Incorporated By Reference.** The following document is referenced elsewhere in this Section and is hereby incorporated by reference: Data Quality Screening Protocol, dated July 15, 2004.

**(8) Contingencies.** In the event any provision of this rule is challenged in any proceeding, the Commission shall immediately by notified. In the event any provision of this rule: (a) is determined to be invalid under applicable law; or (b) is disapproved by the U.S. Environmental Protection Agency under the Clean Water Act, the Department shall bring the matter back before the Commission at the earliest practicable date for reconsideration.

Specific Authority 373.043, 373.4592, 403.061 FS. Law Implemented 373.016, 373.026, 373.4592, 403.021(11), 403.061, 403.201 FS. History – New 7-15-04, Amended 5-25-05.